1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

        vs.                    :   Criminal Action No. 85-33

GEORGE A. NADER,               :

           Defendant.         :

- - - - - - - - - - - - - - x

FILED

JUN 19 1986

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

                  Courtroom No. 17
                  Washington, D.C.

                  Friday, February 7, 1986

       The above-entitled matter came on for hearing on

Motions in open court before The Honorable JOHN GARRETT PENN,

United States District Judge, commencing at 10:28 o'clock a.m.


    APPEARANCES:

        For the Plaintiff:

           RONALD DIXON, ESQUIRE


        For the Defendant:

           DAVID POVICH, ESQUIRE
           RICHARD S. HOFFMAN, ESQUIRE


COURTRAN

HARRY DEUTSCH
Official Court Reporter
4800-G, U.S. COURTHOUSE
Washington, D.C.  20001
   (202) 898-0780

| Government's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GWYNNETH MOOLENAAR | 5 | 53 | | |
| | | 69 | 91 | 110 |
| By the Court | | | | Page 114 |
| ROBERT NORTHROP | 127 | 157 | 188 | |
| By the Court | | | | Page 190 |
| Recross Examination | | | | Page 202 |
| Further Redirect Examination | | | | Page 205 |

**Defendant's Witnesses:**

| JACK GAUNTT | 60 | 67 |
|---|---|---|

| Government's Exhibits: | for identification |
|---|---|
| 1 | 37 |
| 2 | 94 |

| Defendant's Exhibits: | |
|---|---|
| 1 | 15 |
| 2 | 65 |
| 3 | 70 |
| 4 | 73 |
| 5 | 87 |
| 6 | 160 |
| 7 | 174 |

1                    P R O C E E D I N G S

2          MR. POVICH:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. DIXON:  Good morning, Your Honor.

5          THE DEPUTY CLERK:  Criminal Case 85-33, United States

6    vs. George A. Nader.  Mr. Dixon for the Government; Mr. Povich

7    and Mr. Hoffman for the defendant.

8          THE COURT:  All right, counsel, are there any

9    preliminary matters?

10         MR. DIXON:  No, sir, Your Honor, not from the

11   Government.

12         THE COURT:  Mr. Povich?

13         MR. POVICH:  No, sir.

14         THE COURT:  You're ready to proceed?

15         MR. POVICH:  Yes, sir.  We would like to call several

16   witnesses, if we could, relevant to the motion.  Generally,

17   Your Honor, this concerns our motion to suppress statements

18   made, which we believe resulted from being confronted with

19   material illegally seized from the defendant's home.

20         THE COURT:  All right.

21         MR. DIXON:  Your Honor, if the Court is ready to

22   proceed, we would call as our first witness --

23         MR. POVICH:  Is there some understanding, Your Honor,

24   as to who has the burden in this matter?

25         MR. DIXON:  The Government.

1          MR. POVICH:  I think we should have a rule on

2     witnesses, Your Honor.

3          THE COURT:  All right.  The Court will impose a rule

4     on witnesses.  I understand this is the first witness for the

5     Government.

6          MR. HOFFMAN:  This gentleman is going to be our first

7     witness.

8          MR. POVICH:  He's going to be our first witness.

9     That's Mr. Gauntt, who was there when the agents came into the

10    home.

11         THE COURT:  Oh, yes.

12         MR. POVICH:  Ms. Moolenaar was, I guess, in a sense,

13    Your Honor --

14         MR. DIXON:  Your Honor, Ms. Moolenaar can describe

15    what happened.

16         MR. POVICH:  I'm just saying, she is the attorney who

17    represented --

18         THE COURT:  I recall.

19         MR. POVICH:  -- the defendant initially.

20         THE COURT:  All right, then, the Court will impose a

21    rule on witnesses.  This witness will withdraw from the

22    courtroom.

23         Just so you are informed, prior to ruling on the

24    motion, that is, the motion to suppress, I did have the

25    Government deliver to me the cartons of material that had been

1    picked up.

2          MR. POVICH:  Yes, sir.

3          THE COURT:  And I am not sure whether it is clear --

4    I think it's clear in the memorandum, perhaps it isn't, but I

5    did go through the items.  I didn't look at every item in

6    there, but I did go through the items that were seized.  That

7    material has now been returned to the Government.

8          MR. POVICH:  Thank you, Your Honor.  I think you had

9    indicated that the Court did wish to do that.

10                    GWYNNETH MOOLENAAR,

11   a witness called on behalf of the Government, having been

12   first duly sworn, was examined and testified as follows:

13          MR. DIXON:  May I proceed, please, Your Honor?

14          THE COURT:  You may.

15                    DIRECT EXAMINATION

16          BY MR. DIXON:

17   Q.   Good morning, Miss.

18   A.   Good morning.

19   Q.   My name is Ronald Dixon.  I'm an assistant U.S.

20   attorney.  I'm going to ask you a few questions about some

21   meetings you had with some postal inspectors and a customs

22   agent.

23          Would you give us your full name, and spell your

24   first and last name, please.

25   A.   My name is Gwynneth Moolenaar.  The first name is

1    spelled G-W-Y-N-N-E-T-H.

2        Q.    And your last name, please?

3        A.    M-O-O-L-E-N-A-A-R.

4        Q.    Now, Ms. Moolenaar, what type of job do you hold,

5    ma'am?

6        A.    I am an attorney.

7        Q.    And how long have you been an attorney?

8        A.    Since 1971.

9        Q.    Where are you admitted to practice law?

10       A.    Several locations:  the District of Columbia, the

11   Virgin Islands, Virginia.  I'm admitted at several federal and

12   Supreme Court bars.  Is that what you're asking?

13       Q.    Yes, ma'am.  Have you ever been an assistant United

14   States attorney?

15       A.    No, I have not.

16       Q.    Never served as an assistant United States attorney?

17       A.    I've served as a special assistant.

18       Q.    And where and when was that, please?

19       A.    That was in Las Vegas and in Reno, Nevada, and that

20   was the years 1978 to '79.

21       Q.    While you were a special assistant United States

22   attorney, did you serve -- well, I'll withdraw that question,

23   it's leading.  What was your capacity?  Do you understand my

24   question?

25       A.    No, I do not.

1      Q.   Okay, I'll withdraw that and ask you this.  What type

2   of law did you practice?

3      A.   Criminal law.

4      Q.   And was it exclusively criminal during the time that

5   you were with the United States -- the Department of Justice

6   as a special assistant United States attorney?

7      A.   Practically, yes.

8      Q.   Now, did you serve --

9          THE COURT:  I gather that it was not exclusively

10  criminal?

11         THE WITNESS:  Not exclusively.  I did an immigration

12  case.  You said exclusively.  I have to be accurate.

13         BY MR. DIXON:

14     Q.   Did you work anywhere else within the Department of

15  Justice or for the United States Government during the time

16  that you were a special assistant United States attorney in

17  '78 and '79?

18     A.   Your question is kind of confusing.  I was a trial

19  attorney for the Department of Justice for seven years.

20     Q.   For seven years?

21     A.   Yes.

22     Q.   As a special assistant United States attorney?

23     A.   No, as a trial attorney.

24     Q.   Okay, that's what I was getting at.  Before you were

25  a special, what was your duty station?  Where was your duty

1   station?

2       A.   I was at main Justice.

3       Q.   Here in Washington, D.C.?

4       A.   Yes.

5       Q.   And what types of matters were you responsible for as

6   a trial attorney at main Justice?

7       A.   Civil rights matters.

8       Q.   Now, Ms. Moolenaar, I'd like to leave that for a

9   moment.  We'll come back to it and progress ahead just a

10  little bit.

11          Did there come a time in April -- indulgence, please,

12  Your Honor.  Did there come a time in April of 1984 that you

13  had an occasion to represent anyone that you see in court

14  today, ma'am?

15      A.   Yes, I represented the defendant, George Nader.

16      Q.   Would you identify him by where he's seated, and

17  further identify him by an article of clothing he might be

18  wearing?

19      A.   He's seated at the defendant's table at the Court's

20  right, and he's wearing a gray suit.  I believe that's gray.

21          MR. DIXON:  Your Honor, may the record reflect an

22  identification of the accused?

23          THE COURT:  It may.

24          MR. POVICH:  Yes, there's no question that she was

25  the attorney representing the defendant early in this case.

1          BY MR. DIXON:

2      Q.   Now, Ms. Moolenaar, when did you first take up that

3  representation?

4      A.   On April 12, 1984.

5      Q.   And how long did that representation last?

6      A.   It hasn't ended.

7      Q.   You're still representing Mr. Nader right at this

8  moment?

9      A.   I have not withdrawn from the case.

10      Q.   My question is, are you representing Mr. Nader at

11  this moment?

12      A.   The client has -- I have answered you.

13          MR. POVICH:  Your Honor, I had planned on taking this

14  matter up, because I thought we were going to call her, but I

15  think the record should be clear that Ms. Moolenaar was the

16  original counsel in this case, and then our firm certified our

17  appearance, and she has not withdrawn her appearance.

18          The reason, principal reason why we entered this case

19  was because we believed that she would be a witness,

20  potentially would be a witness in this case, and therefore,

21  the defendant, we felt under the circumstances, it would be

22  preferable if other counsel were also representing the

23  defendant.

24          Whether she still is or is not still representing the

25  defendant I think may be a close question.  She has not

1    withdrawn.  We have taken over the active responsibility of

2    representing him, principally because we anticipated that a

3    hearing such as this would take place.

4           MR. DIXON:  Your Honor, if I could interrupt Mr.

5    Povich at this point.  My question elicited an answer -- the

6    witness has explained it -- and I would ask to move forward at

7    this time, unless there comes a time when the Court has a

8    question as to Ms. Moolenaar's status vis Mr. Nader.

9           At this point, Your Honor, I think we have

10    established that she did represent him, and what I'd like to

11    do is just lay a foundation at this point that will allow me

12    to do something else later on, but it would not necessarily

13    affect an area that Mr. Povich is concerned about, Your Honor.

14           MR. POVICH:  I just don't want her representation, if

15    that is what she still is, to in any way be disabling insofar

16    as permitting her to testify in this case, except for the fact

17    that I understand she wishes to assert a privilege insofar as

18    communications between her and her client are concerned.

19           THE COURT:  You mean, Mr. Nader wants to assert a

20    privilege.

21           MR. POVICH:  Yes, but Ms. Moolenaar was sensitive to

22    the issue, and asked us, and we said yes, Mr. Nader does wish

23    to assert a privilege.

24           THE COURT:  I think the first time this matter came

25    before the Court, Ms. Moolenaar was counsel or appeared before

1    the Court.

2           THE WITNESS:  That's correct, Your Honor.

3           THE COURT:  Mr. Dixon.

4           MR. DIXON:  Thank you, Your Honor.

5           BY MR. DIXON:

6      Q.   Now, Ms. Moolenaar, during the month of -- well, I'll

7    withdraw that question.  Had you received from the U.S.

8    Attorney's Office, here in Washington, D.C., in January of

9    1985, any communication about the Nader case?

10     A.   You stated January of 1985?

11     Q.   I'm sorry.  January of 1986.  My mistake.

12     A.   There came through the mail a subpoena.

13     Q.   And did you receive anything else with the subpoena?

14     A.   A notice of -- a request to appear for a meeting.

15     Q.   And do you recall the language on the request asking

16   you to appear for a meeting?  What was the meeting about?

17     A.   To discuss the hearing scheduled right now.

18     Q.   And who was the assistant U.S. attorney who asked you

19   to appear at that meeting?

20     A.   The name stated on the bottom.  I think the last name

21   was Dixon.

22     Q.   Was his first name Ronald?

23     A.   I believe so.

24     Q.   And on the subpoena that you received from the United

25   States, was there a name of an assistant U.S. attorney?

1          THE COURT:  Was there a name of what?

2          MR. DIXON:  Of an assistant United States attorney?

3    A.   On the subpoena?  I didn't pay attention to that.

4  I'm sorry.

5    Q.   Now, Ms. Moolenaar, what was the date of the

6  conference that you were asked to attend?

7    A.   Wednesday -- this past Wednesday; that would have

8  been the 5th.

9    Q.   Yes, ma'am.  Did you attend that meeting?

10    A.   I did not.

11    Q.   Did you telephone at any time prior to not attending

12  the meeting the assistant U.S. attorney whose name appeared on

13  the witness conference notice to inform him that you would not

14  attend?

15    A.   No, I did not.

16    Q.   At that time, when you received the notice to appear

17  to testify and the subpoena to testify for the United States,

18  was your relationship vis Mr. Nader professionally the same as

19  it is today?

20    A.   Yes, it is.  I am still counsel.

21    Q.   Now, Ms. Moolenaar, have you had an occasion to meet

22  with Mr. Povich and Mr. Hoffman about today's motion?

23    A.   At what point in time?

24    Q.   In January of 1986?

25    A.   I have.

1      Q.    How many times would you say you've met with them?

2      A.    Twice.

3      Q.    In January of 1986?

4      A.    Twice.

5      Q.    I'm sorry?

6      A.    Twice.

7      Q.    And prior to January of 1986, did you have an

8   occasion to meet with Mr. Hoffman or Mr. Povich reference to a

9   motion today, on the motion to suppress statements?

10     A.    No, I did not.

11     Q.    Now, were you served with a subpoena by Mr. Hoffman

12  or Mr. Povich on behalf of Mr. Nader to appear here today?

13     A.    Yes, I was.

14     Q.    And when did you receive that subpoena, ma'am?

15     A.    I believe it was the prior Wednesday.  The dates I'm

16  not --

17     Q.    I understand.  You can approximate.

18     A.    The prior Wednesday.

19     Q.    And I'd like to take you up to today, February 7th,

20  1986, and I'd like you to recall back about fifteen or twenty

21  minutes ago, and I'd like to ask you if I, Ronald Dixon, had

22  an occasion to speak with you?

23     A.    You saw me a few minutes ago and said your name was

24  Ronald Dixon.  You asked if I would speak with you.  You

25  identified who you were, and asked if I would speak with you.

1      Q.   I'm sorry.  I didn't hear what you said.

2      A.   You identified who you were, and asked whether or not

3  I would speak with you.

4      Q.   When I identified who I was, would you state

5  specifically, as best as your recollection will allow, what I

6  said to you about my identification?

7      A.   You said your name was Ronald Dixon.  You're an

8  assistant United States attorney.  You'd like to talk with me

9  a few moments.  Would I like to talk with you.

10     Q.   About what?

11     A.   About this motion.

12     Q.   And what was your response?

13     A.   No.

14        MR. DIXON:  Your Honor, at this time, I would ask

15 that the witness be excused, and I would ask that the Court

16 hear the Government on a request, based upon the testimony

17 we've already heard.

18        MR. HOFFMAN:  I'm sorry.  What was that last part?

19        MR. DIXON:  Based upon the testimony we have already

20 heard from Ms. Moolenaar.

21        THE COURT:  All right.  If you would step down, Ms.

22 Moolenaar, and step out of the courtroom.

23        MR. POVICH:  Your Honor, before she does, could we

24 have a copy, since it's been referred to, of the subpoena

25 which she received?  Do you have that with you, Ms. Moolenaar?

1            THE WITNESS:  Yes, I do.

2            MR. POVICH:  Could I mark that as an exhibit, since,

3     apparently, it's become an issue.

4            THE COURT:  All right.

5            MR. POVICH:  Thank you.

6            MR. HOFFMAN:  I have a copy, Your Honor.

7            THE COURT:  All right.

8            MR. POVICH:  Could we just ask her briefly if this is

9     the copy?

10            MR. POVICH:  This appears to be the copy.  Thank you,

11     Your Honor.

12            THE COURT:  That's a copy of the Government subpoena?

13            MR. POVICH:  Yes, sir.

14            THE COURT:  All right.

15            THE DEPUTY CLERK:  You want this marked?

16            MR. POVICH:  As Defendant's Exhibit 1, please.

17            THE DEPUTY CLERK:  Defendant's Exhibit No. 1, marked

18     for identification.

19                         (Defendant's Exhibit No. 1

20                          was marked for identification.)

21            MR. DIXON:  Your Honor, if the Court, please, based

22     upon the --

23            THE COURT:  Just for the record --

24            MR. DIXON:  Yes, sir.  I'm sorry.

25            THE COURT:  -- can we agree that Defendant's Exhibit

1    No. 1 is a copy of the Government's subpoena?

2           MR. DIXON:  If I can look at it, Your Honor, I don't

3    think we will have any problem with that.

4           THE COURT:  Sure.

5           MR. DIXON:  Yes, Your Honor, the United States can

6    enter that stipulation factually.

7           THE COURT:  All right, fine.

8           Mr. Dixon.

9           MR. DIXON:  Your Honor, based upon the testimony

10   we've just heard from Ms. Moolenaar, the Government would ask,

11   even though we're calling her as our witness, and we will --

12   would like to resume with her testimony in that posture, we're

13   asking permission from the Court to be able to lead Ms.

14   Moolenaar, based upon her association with Mr. Nader

15   professionally, and based upon what appears to the United

16   States, and we suggest should appear to the Court at this

17   time, based upon her testimony, her unwillingness to cooperate

18   with the United States, and it appears to us that she's a

19   hostile witness, actually representing an adverse party in

20   this, that being Mr. Nader, and, Your Honor, we would ask the

21   Court to consider rule 611 of the Federal Rules of Evidence,

22   subpart (c), and we'll defer to Mr. Povich and Mr. Hoffman.

23          MR. POVICH:  Your Honor, I must confess that this

24   issue with respect to an attorney is a matter I have not had

25   occasion to address previously.  I believe, without

1    characterizing her as a hostile witness or not, I don't have

2    any objection to a cross-examination being conducted of her in

3    such manner as the United States attorney deems appropriate,

4    and I think that the issue should only arise if I object.   I

5    think we may be premature.   I don't expect that I'm going to

6    object, except insofar as it may get to matters of privilege,

7    which has nothing to do with whether she is a hostile witness

8    or not.   As a member of the bar of this Court, I would prefer

9    to, since she is, I would prefer to proceed on that basis, and

10   let Mr. Dixon examine and see if the issue arises.

11           THE COURT:   All right, Mr. Dixon.   Based upon that

12   representation, why you may examine the witness as an adverse

13   witness.   You can lead the witness.

14           MR. DIXON:   Thank you, Your Honor.

15           THE COURT:   Or ask leading questions.   I doubt if

16   you'd lead the witness.

17           MR. DIXON:   May I proceed, Your Honor?

18           THE COURT:   You may.

19           BY MR. DIXON:

20      Q.   Ms. Moolenaar, and I hope this isn't confusing, us

21   jumping back and forth, but I would like us to go back and

22   talk about certain events that occurred in April of 1984.

23   Now, you've indicated earlier that you represented Mr. George

24   Nader in April of 1984, and I'd like to ask you what that

25   representation involved?

1          MR. POVICH:  Objection, Your Honor.  That's far too

2    broad a question about representing a client.  It could

3    possibly get into matters of privilege.  I'd like the question

4    a little more narrowly posed.

5          MR. DIXON:  Very well, Your Honor.

6          BY MR. DIXON:

7    Q.   Were you representing Mr. Nader in a criminal matter?

8    A.   When?

9    Q.   In April of 1984?

10   A.   There was no criminal matter in April of 1984.

11   Q.   Had Mr. Nader been arrested in April of 1984?

12   A.   No, he was not.

13   Q.   And did your representation of Mr. Nader relate to

14   certain items that had been removed from his apartment or his

15   room on Connecticut Avenue?  You can answer yes or no, Ms.

16   Moolenaar.

17   A.   Yes, I represented him at the time.

18         THE COURT:  What was the answer?

19         THE WITNESS:  Yes.

20         BY MR. DIXON:

21   Q.   Now, when did you first have an occasion to meet Mr.

22   Nader and agree to represent him?

23   A.   April 12th, 1984.

24   Q.   Did Mr. Nader come to you?

25   A.   Yes, he did.

1          Q.    And I'm not asking you to explain what he talked

2    about, but did Mr. Nader, after speaking with you, did you

3    take certain actions --

4              MR. POVICH:  Objection.

5              MR. DIXON:  Well, I hadn't finished the question yet.

6              MR. POVICH:  All right.

7              BY MR. DIXON:

8          Q.    Did you take certain actions, one of them being to

9    get in touch with members of the United States Postal Service?

10         A.    That's a compound question.

11         Q.    Okay, I'll make it simpler.  After you met with Mr.

12   Nader on April 12th, 1984, did there come a time shortly

13   thereafter that you had an occasion to call a member of the

14   United States Postal Service about Mr. Nader?

15         A.    Yes.

16         Q.    And do you recall when that was?

17         A.    When it was?

18         Q.    Yes, ma'am.

19         A.    April 12th, 1984.  You're talking about the time?

20         Q.    Yes, ma'am.  No, I'm talking about the day.  After

21   April 12th, 1984, when was it, if you recall, that you called?

22         A.    It was the same day.

23         Q.    Okay.  And what did you talk with that postal

24   inspector about?

25         A.    I left a message, and he returned my call.

1      Q.    When he returned your call, what did you talk to him

2  about?

3      A.    What he talked about.

4      Q.    Well, let me withdraw that question and ask this.

5  What was the nature of the conversation?  What was the

6  conversation about between you and the postal inspector?

7      A.    All right, the postal inspector who returned my call

8  identified himself on the phone as being Mr. Northrop.

9      Q.    Okay.

10     A.    And he indicated he was returning my call.  I

11  explained to him that I was representing Mr. Nader, and he had

12  been attempting to contact Mr. Nader before.  He indicated

13  that he just wanted to talk with my client, and to -- is that

14  what you're asking me now?

15     Q.    You've given me more than I asked for, but we'll come

16  back to that.  Why don't we just stop right there.  Now, the

17  postal inspector --

18          MR. POVICH:  Your Honor, excuse me.  I believe the

19  question was what was said in this conversation.

20          THE COURT:  Yes.  What did you talk about, I think

21  was the question.

22          THE WITNESS:  You said what did we talk about?

23          BY MR. DIXON:

24     Q.    Yes.

25     A.    And this is the initial conversation.

1    Q.   Okay.

2    A.   He indicated he wanted to talk with my client; he

3  wanted to go over the inventory of the items that were taken

4  from his room, and to get some background information on the

5  client; that he was not going to arrest the client, and

6  advised me about -- him about the rules, about the postal

7  rules for the purpose of -- he wanted to have a meeting so he

8  could return these items, and that was the purpose of the

9  phone call.

10   Q.   When you say you advised him about the postal rules,

11  what are you talking about?

12   A.   What did Mr. Northrop mean when he said that?

13   Q.   I thought you said you advised him about the rules.

14   A.   No, the conversation came from Mr. Northrop to me.

15   Q.   Okay.

16        Now, you indicated Mr. Northrop said that he had

17  tried to reach Mr. Nader prior to April 12, 1984?

18   A.   I don't know if it was another date, but it was prior

19  to returning my call.

20   Q.   Isn't it a fact, Ms. Moolenaar, that the postal

21  inspector, Mr. Northrop, and Mr. Bloodworth, who was an agent

22  with the United States Customs Service, left their cards at

23  Mr. Nader's apartment or room after the search?

24   A.   I don't know that.

25   Q.   You do not know that?

1      MR. POVICH:  I'm sorry.  Did you say card?

2      MR. DIXON:  Card, yes.

3      MR. POVICH:  I'm sorry.

4      THE WITNESS:  I don't know that.

5      BY MR. DIXON:

6      Q.   Okay.  Let me ask you this.  You didn't know who the

7      postal inspector was that came to Mr. Nader's apartment and

8      executed the warrant, did you, on April 12th?  Did you?  Yes

9      or no.

10     THE COURT:  On April the 12th, did she know?

11     MR. DIXON:  Yes, sir.

12     THE WITNESS:  You're talking about this phone

13     conversation?  No, I didn't.

14     BY MR. DIXON:

15     Q.   No, no.  Just listen to my question.  After you

16     talked with Mr. Nader on April the 12th, 1984, you said that

17     you had had an occasion to call the postal inspection service,

18     a particular postal inspector.  My question is -- I withdraw

19     the last question and ask you a new one.  How did you know

20     that the postal inspector you wanted to talk to was Northrop?

21     A.   That's privileged.  That was a communication --

22     THE COURT:  I didn't hear anyone assert a privilege

23     at this point.  Is there?

24     MR. POVICH:  Your Honor, the problem is, I don't know

25     what her answer to that -- I don't know that the answer is

1    privileged, so I have to rely on her.  She has been advised by

2    us that we have no objection to her appearing as a witness.

3    The question of privilege came up, and we said we wish to

4    assert the privilege.  Any other questions you may answer.  So

5    I must say, Your Honor, I don't know -- I have to -- she's

6    relying upon our request that she assert the privilege, and if

7    she believes that is a privileged matter, we would like to

8    assert the privilege.

9           THE COURT:  At this point, then, as I understand it,

10   she knew that she was to call or to speak with a Mr. Northrop,

11   however she knew.

12          MR. DIXON:  Okay, Your Honor.

13          BY MR. DIXON:

14   Q.    Now, Ms. Moolenaar, before you were able to reach

15   Postal Inspector Northrop, that is, when you had called and he

16   wasn't there and you left a message, what were you going to

17   talk with Mr. Northrop about, when you called, before he got

18   back to you?

19   A.    I was not going to talk with him about anything.  I

20   wanted to know what it was that he was going to talk with my

21   client about.

22   Q.    Now, after you were able to get through to Inspector

23   Northrop on April the 12th, 1984, there came a time that you

24   agreed to bring your client, Mr. Nader, to the main post

25   office next to Union Station for an interview; did you not?

1    You can answer yes or no.

2       A.    Not exactly.  They requested that he come down, so I

3    agreed to accompany him.

4       Q.    And when you went with Mr. Nader to meet with the

5    postal inspector and the customs officer, you weren't going as

6    a social friend, were you?  Yes or no.

7       A.    No.

8       Q.    You were going as his attorney, weren't you?

9       A.    Yes.

10      Q.    And you were going to advise him about criminal

11   matters, weren't you?

12      A.    Not to advise him, no.

13      Q.    You weren't going to advise Mr. Nader of anything?

14      A.    As need be, yes.

15      Q.    And the nature of the legal matter was a criminal

16   matter, wasn't it?

17      A.    Not to my knowledge.

18      Q.    Well, let me ask you this.  You knew that a search

19   warrant had been executed at Mr. Nader's residence prior to

20   your going down to the postal inspectors, didn't you?

21      A.    That --

22      Q.    Would you just answer yes or no.

23      A.    Let me see.  I knew that items had been taken from

24   his apartment, from his room.

25      Q.    And you also knew that a search warrant had been

1    executed, didn't you?

2         A.   No, I did not, not at that phone conversation.

3         Q.   Before you went for the meeting on April 16th, 1984,

4    you knew that a search warrant had been executed at Mr.

5    Nader's room on Connecticut Avenue, didn't you, Ms. Moolenaar?

6              MR. POVICH:   I believe she's answered the question.

7         A.   I knew that items had been taken --

8              THE COURT:   I'm not sure she has, Mr. Povich, or at

9    least, if she has, I'm not sure I understand the answer.

10             THE WITNESS:   All I knew is that items had been taken

11   from his room.

12             BY MR. DIXON:

13        Q.   Let me ask you this.   Since you were going down for

14   this meeting and you were going as Mr. Nader's attorney, and

15   you knew that items had been taken from Mr. Nader's room

16   previous to the meeting by postal inspectors, and you were

17   going to advise Mr. Nader about certain matters once you got

18   to the meeting, did it occur to you that the postal inspectors

19   might have had a search warrant?

20        A.   No, not at the time.   There was no mention of a

21   search warrant.

22        Q.   Let me ask you this, Ms. Moolenaar.   In your

23   experience as a trial attorney with Justice and as a special

24   assistant United States attorney at the -- I believe it was

25   Reno and Las Vegas U.S. attorney's office in Nevada?

1      A.    Yes.

2      Q.    Were you ever aware of a situation where postal

3  inspectors went into people's private homes and took matters

4  out without a warrant?  Yes or no.

5      A.    No.

6      Q.    That would be unusual, wouldn't it?  Wouldn't that be

7  unusual?

8           MR. POVICH:  Your Honor, I object to the relevance of

9  this.  The question was did she know or didn't she.

10          MR. DIXON:  I withdraw the question, Your Honor.

11          MR. POVICH:  She said she did not know there had been

12  a search warrant.

13          MR. DIXON:  I withdraw the question, Your Honor.  We

14  can move on.

15          MR. POVICH:  Thank you.

16          THE COURT:  All right.

17          BY MR. DIXON:

18      Q.    Now, Ms. Moolenaar, when you and Mr. Nader arrived at

19  the post office, you had an occasion to meet Mr. Robert

20  Northrop and Special Agent Don Bloodworth with the United

21  States Customs Service, didn't you?

22      A.    Yes.

23      Q.    And Special Agent Northrop informed you that he was a

24  postal inspector, didn't he?

25      A.    Yes.

1      Q.   And he also informed you that they had executed a

2   search warrant at Mr. Nader's room?

3      A.   Not at the outset.

4           THE COURT:  Well, I don't think he asked that

5   question.  He said did he inform you.

6           THE WITNESS:  Yes, he did inform me.

7           BY MR. DIXON:

8      Q.   And he also told you that they seized certain items

9   from Mr. Nader's room, didn't he?

10     A.   Yes.

11     Q.   And he also talked to you about an item that was

12  delivered under controlled circumstances to Mr. Nader's

13  residence?

14     A.   Yes.

15     Q.   Now, when Mr. Nader walked into the post office and

16  sat down to speak with the postal inspectors, he was not under

17  arrest, was he?

18     A.   That's correct.

19     Q.   And when Mr. Nader walked in to speak with the postal

20  inspector and Customs Agent Bloodworth, he was not formally

21  charged with anything as far as you knew, was he?

22     A.   That's correct.  In fact, they said they didn't even

23  anticipate --

24     Q.   Well, you've answered my question, Ms. Moolenaar.

25  We'll get to the conversation.

1          Now, you and Special Agent Northrop and Agent

2     Bloodworth began to talk about what was going to happen at

3     this meeting, didn't you?

4          A.    Not exactly.

5          Q.    Isn't it a fact, Ms. Moolenaar, that Special Agent

6     Northrop informed you that he wanted to identify some of the

7     children that were depicted in the photographs that Mr. Nader

8     had in his apartment?

9          A.    Not -- no.

10          Q.    He didn't tell you that?

11          A.    No, he never said such a thing.

12          Q.    Isn't it a fact that Special Agent -- I'm sorry,

13     Postal Inspector Northrop told you that he wanted to gather

14     some background information on Mr. Nader?

15          A.    That's correct.  That's absolutely correct.  In fact,

16     that was the first thing he said.

17          Q.    And they proceeded to do that?

18          A.    Yes.

19          Q.    And didn't Mr. Northrop tell you that the matter

20     would have to be referred, either -- well, did Mr. Northrop

21     tell you that the matter would have to be referred, the matter

22     being the items that were delivered to Mr. Nader's home and

23     the items that were discovered in Mr. Nader's home, would have

24     to be referred to an assistant United States attorney for

25     review?  Yes or no.

1      A.   No, he did not state it as such.  No, he did not.

2      Q.   Well, what did he tell you about possible

3   prosecution, if anything?

4      A.   He said nothing about possible prosecution.  In fact,

5   he said that they weren't going to arrest him; there were no

6   charges or nothing.  You talking about this meeting when we

7   went down there?

8      Q.   Yes, ma'am.

9      A.   Even on the telephone, he indicated that the whole

10  purpose of that was to go through the items that were taken

11  from his apartment, and advise him about the postal service.

12      THE COURT:  I think the question relates to the

13  meeting, what was discussed at the meeting.

14      THE WITNESS:  Right.  In other words, it was to

15  return the items that were taken, and to explain to him the

16  postal rules regarding mailing of contraband material.

17      BY MR. DIXON:

18      Q.   And Mr. -- according to you, now, Mr. Nader needed

19  you to go with him down to the post office to have those two

20  things explained to him, what the rules were and to return

21  these items?  He needed you to go down with him for that?

22      A.   What is your question?

23      Q.   My question is, is it your testimony today that,

24  based upon what you've just said as to the reasons why the

25  postal inspectors wanted Mr. Nader to come down, to, one,

7

1    explain the rules to him about the delivery or receipt of

2    contraband materials, and to return the items to him, that you

3    had to go down to represent about that?

4        A.   My clients come to me with various reasons for

5    representation, and that was Mr. Nader's reason.

6        Q.   Now, how old did Mr. Nader say he was, do you recall,

7    when he was asked his age by Mr. Northrop?

8        A.   This matter is so old.  I think Mr. Nader was 25,

9    something like that.

10            THE COURT:  He said he was 25?

11            THE WITNESS:  I believe.  Twenty-four or twenty-five.

12            BY MR. DIXON:

13       Q.   Isn't it a fact that Mr. Nader told Mr. Northrop that

14   he was a high school graduate?

15       A.   Oh, no.

16       Q.   Didn't tell him that?

17       A.   What do you mean?  When we went down to the meeting,

18   that he just graduated from high school?

19       Q.   No, no, no, no, no.

20       A.   Oh.

21       Q.   As part of the background questions, didn't Mr.

22   Nader --

23       A.   Oh, you didn't state that.

24       Q.   He did say that, didn't he?

25       A.   He stated he graduated from high school, yes.

1      Q.   Mr. Nader has also gone to college, told Mr. Northrop

2   he had also gone to college, hadn't he?

3      A.   That is correct.

4      Q.   And Mr. Nader also told Mr. Northrop that he had

5   traveled rather extensively through the Middle East and other

6   parts of the world?

7      A.   That's correct.

8      Q.   And Mr. Nader also told Mr. Northrop that he had met

9   with various heads of state, didn't he, in foreign countries?

10     A.   That's correct.

11     Q.   And Mr. Nader also told Mr. Northrop that he

12  published a newspaper or a newsletter about Middle Eastern

13  affairs, didn't he?

14     A.   It's not a newspaper, it's a magazine.

15     Q.   Magazine, I'm sorry, about Middle Eastern affairs,

16  didn't he?

17     A.   That's correct, his company did.

18     Q.   Now, after the background information was obtained,

19  Mr. Nader was at some point shown what was taken from his

20  apartment, wasn't he, from his room?

21     A.   Yes.

22     Q.   And you were sitting right there when this took

23  place, weren't you?

24     A.   Yes.

25     Q.   Mr. Nader was asked questions about what was taken

1      from his room, wasn't he?

2          A.   During the -- during the revealing -- unveiling,

3      whatever you want to call it, of the contents, he would be

4      questioned about the contents, yes.

5          Q.   Now, Mr. Nader admitted that the items found from his

6      room belonged to him, did he?

7          A.   He identified them.

8          Q.   He knew what they were, he was able to identify them?

9          A.   I've answered your question.

10              THE COURT:  Which question is it?  He was able to

11     identify them?

12              BY MR. DIXON:

13         Q.   He was able to identify them, wasn't he?

14         A.   He identified the items.

15         Q.   And you were there the whole time, weren't you?

16         A.   Yes, I was.

17         Q.   Now, let me ask you this.  Did Mr. Northrop and Mr.

18     Bloodworth ever prevent you from leaving the room or having a

19     private conversation with Mr. Nader?  Yes or no.

20         A.   No.

21         Q.   If you had wanted to do that at any time during the

22     course of the interview, the time that you spent in the

23     company of Northrop and Bloodworth, you would have been able

24     to do that, wouldn't you?

25         A.   Yes.

1      Q.   Did Mr. Nader ever turn to you and say that he wanted

2  to talk to you privately about anything?

3      A.   We had private conversations.

4      Q.   Mr. Nader wasn't nervous at all, was he?

5      A.   What do you mean by that?

6      Q.   Well, was he perspiring during the course of the

7  interview?  If you noticed.

8      A.   I didn't notice.

9      Q.   Was he fidgeting around in his chair in a nervous

10  fashion?

11      A.   Not to my recollection.

12      Q.   Did he appear to understand all of the questions that

13  were put to him?

14      A.   Are you asking for my speculation?

15      Q.   No.  I'm asking you to recall back and tell us what

16  you observed.

17      A.   If he appeared to understand the questions?

18      Q.   Yes, ma'am.

19      A.   He appeared to understand the questions.

20      Q.   And Mr. Nader speaks English rather well, doesn't he?

21      A.   He speaks English.

22      Q.   His English is his native tongue?

23      A.   No, it's not.

24      Q.   Do you know what his native language is?

25      A.   In Lebanon, what is his native tongue?  No, I don't.

1      Q.   Now, let me ask you this, Ms. Moolenaar, and I would

2  like you to confine your answer to an area that is not

3  privileged.  Well, all right, let me be more specific.  How

4  long had Mr. Nader -- well, how long did Mr. Nader -- what did

5  Mr. Nader say to Inspector Northrop about how long he had been

6  in the United States; do you recall?

7           I will withdraw that question and ask this.  Isn't it

8  a fact that Mr. Nader told Mr. Northrop that he entered the

9  United States in July of 1975?

10     A.   I don't recall.

11     Q.   Isn't it a fact that Mr. Nader has lived continually

12 in the United States since he entered the United States?

13     A.   I don't know.

14     Q.   As a resident of the United States?

15     A.   I don't know that.

16     Q.   Isn't it a fact that Mr. Nader at that time was

17 seeking to be a naturalized citizen of the United States, and

18 since that time has become a naturalized American citizen?

19           THE COURT:  At which time, April 12 or April 16?

20           MR. DIXON:  I'm sorry.

21           BY MR. DIXON:

22     Q.   Isn't it a fact that, in April of 1984, Mr. Nader was

23 seeking to become a naturalized American citizen?

24     A.   Yes, to my recollection.

25     Q.   And isn't it a fact that, as of today, February 7th,

1   1986, Mr. Nader is a naturalized American citizen?

2      A.   That is correct.

3      Q.   Did you assist him with any of that?

4      A.   If I did, it would be privileged, wouldn't it?

5      Q.   Well, I didn't ask you specifically what you did.   I

6   just asked if you assisted him.   Yes or no.

7           MR. POVICH:   We waive the privilege with respect to

8   that matter, Your Honor.

9           THE COURT:   You may answer.

10          THE WITNESS:   No, I did not.

11          BY MR. DIXON:

12     Q.   Now, Ms. Moolenaar, excuse me for jumping around.

13  I'm not trying to confuse you.   Let's get back to the meeting

14  again, and let me ask you about this.   Have you ever heard

15  before the phrase, "I am going to warn you of your rights,"

16  before April 16th, 1984?

17     A.   The phrase, "I am going to warn you of your rights"?

18     Q.   Yes.   In your professional capacity as an assistant

19  United States attorney?

20     A.   As a special assistant.

21     Q.   Special assistant United States attorney?

22     A.   As a citizen, yes.   As any person.

23     Q.   Let's talk about your time as a special assistant

24  United States attorney.

25     A.   All right.

1      Q.    Have you ever dealt with a case in which a statement

2  was taken from a defendant?

3      A.    Yes.

4      Q.    And in those cases in which you've dealt with

5  statements being taken from defendants, were they Mirandized?

6      A.    Yes, they were.

7      Q.    And you know what Miranda is, don't you?

8      A.    Yes.

9      Q.    And you knew what Miranda was on April 16th, 1984,

10 didn't you?

11     A.    April 16th, 1984?

12     Q.    Yes, ma'am.  And you knew the implications of Miranda

13 as an attorney?

14     A.    Excuse me.  Is the date of the meeting April 16th?

15     Q.    Yes, ma'am, April 16th, 1984.

16     A.    I'm -- I'm just wondering.  If I stated that I met

17 the client on April -- did I state April 12th?  I hope I

18 said --

19     Q.    Why don't you answer my question first, and then if I

20 have a question about when you met him, I'll ask you.

21     A.    It was the same date, April 16th.

22     Q.    On April 16th, 1984, did you understand the

23 implications of Miranda?

24     A.    Sure.

25     Q.    Now, Ms. Moolenaar, there did come a time when Mr.

1      Nader was warned of his rights, didn't there?

2          A.   Yes.

3          Q.   And you were present and witnessed that, didn't you?

4          A.   Yes, I did.

5               THE DEPUTY CLERK:  Government's Exhibit No. 1, marked

6      for identification.

7                              (Government's Exhibit No. 1

8                              was marked for identification.)

9               BY MR. DIXON:

10         Q.   And you heard Mr. Nader being warned by Special

11     Agent -- Postal Inspector Northrop about his rights, didn't

12     you?

13         A.   Yes.

14         Q.   And Mr. Northrop went through very specifically what

15     Mr. Nader's rights were, didn't he?

16         A.   Yes.

17         Q.   And do you remember, in particular, this particular

18     clause in the rights:

19              "If you decide to answer questions now without having

20          an attorney present, you will still have the right to stop

21          answering at any time.  You also have the right to stop

22          answering at any time until you talk to a lawyer."

23              Remember that?

24         A.   In particular, that statement?

25         Q.   Yes.

1        A.   No, I recall all of them as one item, but that did

2   not stick out as any particular item.

3        Q.   Now, let me ask you this.  You indicated something

4   earlier, and you've been alluding to this area, and let's talk

5   about it.  Did an assistant United States attorney promise not

6   to prosecute to you on April 16th, 1984, promise to you not to

7   prosecute George Nader for any offense that resulted from

8   anything that was seized from his room?

9        A.   I didn't speak with any assistant U.S. attorney.

10       Q.   Will you just answer my question yes or no.

11       A.   The answer is no.

12       Q.   Now, for a moment, let's step away from that and go

13  back to your experience as a special assistant United States

14  attorney in the U.S. Attorney's Office in Nevada.  Did you

15  ever come across a situation in a criminal matter, Ms.

16  Moolenaar, when a law enforcement officer at the investigative

17  level, most notably a postal inspector, made decisions about

18  prosecution, criminal prosecution?  Yes or no.

19       A.   No.

20       Q.   That would be unusual for something like that to

21  happen, wouldn't it?

22       A.   It's not the course.

23       Q.   I'm sorry?

24       A.   It's not the course.

25       Q.   They just don't do that, do they?

1       A.    That's correct.

2       Q.    They don't have the authority to do that, do they?

3       A.    That's correct.

4       Q.    And you knew that on April 16th, 1984, didn't you?

5  Yes or no.

6       A.    Yes.

7       Q.    Now, did an assistant United States attorney on April

8  16th, 1984 threaten Mr. Nader in any way to get him to talk

9  about what was taken out of his room?

10      A.    No.

11      Q.    Did Mr. Northrop at any time while you were present

12 threaten Mr. Nader to answer questions about what was taken

13 out of his room?

14      A.    No.

15      Q.    Was Mr. Nader in handcuffs at any time?

16      A.    No.

17      Q.    Did you ever leave Mr. Nader alone to face those two

18 law enforcement officers at any point while you were there?

19      A.    No.

20      Q.    Were they courteous to you and Mr. Nader?

21      A.    Yes.

22      Q.    I'd like to show you --

23           MR. DIXON:   Request permission to approach, Your

24 Honor, for future occasions.

25           THE COURT:   Yes.

1           BY MR. DIXON:

2      Q.    I'd like to show you Government's No. 1 for

3    identification, Ms. Moolenaar.  I'd like you to look at that,

4    and tell me if it looks familiar to you.

5      A.    I do recognize it.  This is the warning and waiver of

6    rights form, and it's witnessed by myself as counsel for Mr.

7    Nader.

8      Q.    And Government's No. 1 was executed on April 16th,

9    1984 at approximately 4:05 p.m?

10     A.    It was executed at 4:07.

11     Q.    4:07, I'm sorry.

12           Is Mr. Nader's signature on Government's No. 1, as

13   you recognize it, if you recognize it?

14     A.    I don't recognize it.

15     Q.    You don't recognize Mr. Nader's signature?

16     A.    No, I do not.

17     Q.    Did you observe Mr. Nader sign Government's No. 1?

18     A.    Yes.

19     Q.    And did Mr. Nader sign in the area where a potential

20   defendant or defendant would sign Government's No. 1?

21           MR. POVICH:  Objection.

22           MR. DIXON:  I'll withdraw that question and ask this.

23           BY MR. DIXON:

24     Q.    Did Mr. Nader sign as the person who's being

25   interviewed?

1        A.    He signed the waiver.

2        Q.    And when Mr. Nader signed this waiver, as a person

3   who practices as a special assistant U.S. attorney in criminal

4   matters and a person who is going down to represent Mr. Nader

5   on a criminal matter, what did that mean when he signed,

6   waiving --

7            MR. POVICH:  Objection.  I think the document speaks

8   for itself.

9            BY MR. DIXON:

10       Q.    What did you understand it to mean?

11           MR. POVICH:  Objection, it's irrelevant.

12           MR. DIXON:  It is very relevant, Your Honor.

13           THE COURT:  Objection is overruled.  You may answer.

14           THE WITNESS:  You stated that on a criminal matter.

15   We had not been informed we were coming down on a criminal

16   matter, and you stated that as part of your question, so you

17   have to delete that as part of your question.  But in terms of

18   signing the warning and waiver of rights, that is the full

19   gamut of the rights that a suspect or whatever should be --

20   should be informed about.

21           BY MR. DIXON:

22       Q.    Now, Ms. Moolenaar, after the rights warning had been

23   executed at 4:07 p.m. on April 16th, 1984, signed by Mr.

24   Nader, signed by yourself as witness, did you and Mr. Nader

25   get up and walk out of the office?  Yes or no.

1      A.   Yes, it was not long after that that we left.

2      Q.   My question was, as soon as the waiver was executed

3   at 4:07 p.m., did you and Mr. Nader get up and leave?  Yes or

4   no.

5      A.   We were already standing up.

6      Q.   Did you leave?

7      A.   We left shortly after.

8      Q.   After the rights warning was executed that Mr. Nader

9   signed and that you signed as a witness, he was asked

10   questions, wasn't he?

11      A.   No.

12      Q.   He was asked no questions at all?

13      A.   He was asked questions, but he -- yes, I'm sorry.

14   But --

15      Q.   There's no question pending.  You've already answered

16   my question, Ms. Moolenaar.

17           MR. DIXON:  Indulgence, please, Your Honor.

18           THE COURT:  Yes.

19           BY MR. DIXON:

20      Q.   Now, Ms. Moolenaar, isn't it a fact that you were

21   reluctant to have Mr. Nader initial and date any of the

22   materials that were taken from his room?

23      A.   I instructed him not to.

24           THE COURT:  You instructed him --

25           THE WITNESS:  Not to.

1        THE COURT:  Not to?

2        THE WITNESS:  Initial and date.

3        BY MR. DIXON:

4    Q.   And that was as an attorney?

5    A.   Yes.

6    Q.   Did Mr. Nader give a written signed statement?

7    A.   He did not.

8    Q.   Was he asked to?

9    A.   I can't recall.

10   Q.   If he had been, would you have let him?

11   A.   No, I would not.

12   Q.   And you would have been acting as an attorney in so

13   advising him?

14   A.   Yes.

15   Q.   Now, isn't it a fact that after Mr. Nader declined to

16   initial and date the items that were being shown to him during

17   the course of the interview, that is when Special Agent

18   Northrop advised Mr. Nader of his rights?  Yes or no.

19   A.   That is --

20   Q.   If you can recall.

21   A.   No, I don't recall specifically.

22   Q.   Now, isn't it a fact, Ms. Moolenaar, that the

23   interview was terminated shortly after 5:00 p.m. on April

24   16th, 1984?

25   A.   Yes.

1        Q.   How shortly after 4:07 p.m., then, did you leave?

2        A.   With Mr. Nader?  Well, what I said is that we made --

3     he made --

10

4        Q.   My question was, how shortly after 4:07 p.m. did you

5     and Mr. Nader leave the office where the interview was being

6     conducted; do you recall?

7        A.   No, I don't.

8        Q.   Could it have been -- it could have been ten minutes,

9     couldn't it?

10       A.   No.

11       Q.   Well, it could have been almost 45 minutes, couldn't

12    it?

13       A.   It could have been.

14       Q.   You do remember leaving at 5:00, don't you?  You've

15    already told us that.

16       A.   Approximately 5:00, yes.

17       Q.   Now, was Mr. Nader questioned between 4:07 p.m. and

18    5:00 p.m. by Postal Inspector Northrop?

19       A.   He was asked questions.

20       Q.   And that was after he was warned of his rights,

21    right?

22       A.   That's correct.

23       Q.   And you didn't leave him during that entire time, did

24    you?

25       A.   That's correct, but --

1       Q.   No question is pending.

2       A.   You asked me to recall.

3       Q.   My question was, you didn't leave him, and you said

4  no.

5       A.   Right, I did not leave him.

6       Q.   Now, isn't it a fact, Ms. Moolenaar, that Mr. Nader

7  was shown the contents of the controlled delivery, shown the

8  matters that were mailed to him from Europe after he signed a

9  waiver?

10       MR. POVICH:  Objection, unless the question means the

11  contents of the package was the subject of the controlled

12  delivery.  Is that the question?

13       MR. DIXON:  Yes.

14       MR. POVICH:  Okay.

15       THE WITNESS:  My answer is no.

16       BY MR. DIXON:

17       Q.   He was not?

18       A.   That's correct, he was not.

19       Q.   When was he shown the contents of the controlled

20  delivery?

21       A.   He never was.

22       Q.   He never was?

23       A.   No.

24       MR. DIXON:  Indulgence, please, Your Honor.

25       THE COURT:  Yes.

1          BY MR. DIXON:

2      Q.   Was he ever shown the package itself?

3      A.   No, it remained on the top of the desk.

4      Q.   It remained on the top of the desk?

5      A.   Yes.

6      Q.   You could see it?

7      A.   It was visible.

8      Q.   How did you know what it was?

9      A.   They had said it was that, and it was there at their

10   desk, they meaning the postal inspector and the customs agent.

11     Q.   When did that happen, at what point?

12     A.   It remained on top of the desk throughout the entire

13   time.

14     Q.   My question was -- and let me ask it very

15   specifically -- when was there first conversation about the

16   item, the controlled delivery?

17     A.   I don't recall that.

18     Q.   Well, could it have happened at the beginning of the

19   interview, during the biographical session?

20     A.   What conversation are you talking about?

21     Q.   The conversation you have just told us about, that

22   this -- let me ask you this.  When did you first notice this

23   package that was identified as a controlled delivery sitting

24   on the desk?

25     A.   The agents must have pointed it out as being the

1     subject of that controlled delivery.  It remained on the desk

2     of the agents at all times.

3          Q.   And you could see it, couldn't you?

4          A.   We were sitting facing it.

5          Q.   And Mr. Nader could see it, couldn't he?

6          A.   I said we were sitting facing it.

7          Q.   Specifically, Mr. Nader could see it, couldn't he?

8          A.   Yes.

9          Q.   In fact, you talked to Mr. Nader about it, didn't

10    you?

11         A.   No, I did not.

12         Q.   Never talked to him about it?

13         A.   No.

14         Q.   Is it your testimony today that you went with Mr.

15    Nader to the postal inspector's office about a search warrant

16    that had been executed and a controlled delivery, and you

17    never at all talked about the substance of the controlled

18    delivery?

19         A.   To whom is this?

20         Q.   The postal inspectors.

21         A.   I talked with them.  I questioned them about it, and

22    about the affidavit and so forth, the probable cause and so

23    forth, but not to Mr. Nader.  That took a lot of -- that was

24    after the Miranda rights were read.

25         Q.   I am sorry?

1       A.    That's when -- I believe that's when I asked those

2    questions.

3       Q.    After the Miranda rights?

4       A.    I believe so.

5       Q.    Why did you ask after the Miranda rights about the

6    probable cause?

7       A.    It was near -- it was near the end of the interview.

8    It was near the end of the meeting that the discussion

9    emanated from me, because I asked a lot of questions.  We had

10   been there awhile, and it was my impression we were there to

11   return the items that were taken from his room, and it seemed

12   to be getting deeper and deeper involved, and I asked more

13   about the control, the nature of the package.  They explained

14   that it was intercepted, where it was, and all like that.

15          I asked questions about who was the AUSA involved.

16   They identified the assistant United States attorney involved.

17   They gave me his name, and his name is Doug Behr, and I asked

18   how can I reach him.  They said he was on vacation.  I asked

19   all those questions.  He was not due back until Monday or

20   Tuesday of that week.

21          That's -- you know, I could -- that's what took

22   place.  I asked a lot of questions about it.  I never -- no

23   one ever touched the package or anything.  It remained there

24   on the desk.

25       Q.    Ms. Moolenaar, did Mr. Nader, when he was shown the

package containing the controlled delivery matter, acknowledge
that he placed the order, and that the package was probably
addressed to him at his personal residence?

A.    No, he did not.

Q.    And did Mr. Nader, when asked, state that he
recognized the return address bearing the name of Ralph
Zonatz, Z-O-N-A-T-Z, in Holland?  Yes or no.

A.    No, he did not.

Q.    And, when asked, did Mr. Nader state that Mr. Zonatz
was connected with a company that mail-ordered child
pornography?  Yes or no.

A.    No, he did not.

Q.    When asked, did Mr. Nader state that his first
experience with child pornography was in Holland, while he was
on a plane trip enroute to Israel?  Yes or no.

A.    What is the question?

Q.    Did Mr. Nader state, in response to a question, that
his first experience with child pornography was in Holland,
while he was on a plane trip enroute to Israel?

A.    I don't have any recollection of that.

Q.    When asked a question, did Mr. Nader state that he
stopped in Holland for one evening, and at the hotel he bought
a magazine depicting young boys engaged in sexual activity?

A.    Not to my knowledge.

Q.    When asked a question, did Mr. Nader state that he

1      jotted down the name and address of a company known as COQ

2      Company in Copenhagen and kept that name and address with him,

3      so that he may respond with them -- I'm sorry, may correspond

4      with them and make future purchases of similar material

5      depicting young boys in sexual activity?  Yes or no.

6          A.   Not to my knowledge.  I have to state, because I

7      don't know whether or not that was -- I have a problem with

8      recalling that.

9          Q.   See if you recall this.

10          MR. DIXON:  Indulgence, please, Your Honor.

11          THE COURT:  Yes.

12          BY MR. DIXON:

13          Q.   Did Mr. Nader state, when shown the controlled

14      delivery package, which was still in a sealed condition --

15          A.   That's true, it never was opened.

16          Q.   Just listen to me, please.  Did he state that he

17      expected it to contain various magazines depicting young boys

18      in various sexual activities?  Yes or no.

19          A.   Absolutely not.

20          Q.   And did you refuse to allow him to initial and date

21      the mailing, indicating that he had placed that order for the

22      controlled delivery?

23          A.   Yes.

24          Q.   You did that?

25          A.   Yes.

1      Q.   You remember that specifically?

2      A.   Yes, I wouldn't allow him to do any of those things.

3      Q.   And that related to the controlled delivery?

4      A.   That's correct.

5      Q.   And that's the original conversation, other than what

6  you've just told us from the witness stand, is the only

7  conversation, that and the questions you asked about probable

8  cause and other things, was the only conversation, excluding

9  the questions I just asked you about what Mr. Nader said?

10     A.   No, not only.

11     Q.   Ms. Moolenaar, I'm going to ask you a question.  I

12  have to ask you this series of questions, and I'm not trying

13  to embarrass you, but I must ask you these questions.

14          Isn't it a fact, Ms. Moolenaar, that you were

15  attempting, by taking Mr. Nader to visit with the postal

16  inspectors, you were attempting to prevent the matter from

17  going beyond that stage, prevent the matter from going to the

18  grand jury, from being reviewed and from being indicted?

19  Isn't that the reason you took your client to the postal

20  inspection office?

21     A.   No.

22          THE COURT:  No?

23          THE WITNESS:  No.

24          BY MR. DIXON:

25     Q.   And isn't it a fact, Ms. Moolenaar, that during the

1  course of the interview, you realized that bringing your

2  client to this interview probably was not a result of the best

3  professional judgment that you had at that time; isn't that a

4  fact?

5      A.   No, that's not a fact.

6      Q.   And isn't it a fact, Ms. Moolenaar, that after the

7  interview was over, after 5:00 p.m., that and Mr. Nader left

8  the postal inspection office, you realized that Mr. Nader had

9  legally, pursuant to the Miranda warnings and pursuant to your

10  presence there, implicated himself in a criminal offense?

11      A.   No, we didn't realize that.

12      Q.   And isn't it a fact, Ms. Moolenaar, as a result of

13  that realization, that you had then and even today a very

14  strong interest in the outcome of this case against Mr. Nader?

15  Yes or no.

16      A.   I have an interest in the outcome of any case that

17  I'm involved in.

18      Q.   My question is, isn't it a fact, as a result of what

19  happened at the postal inspection office and as a result of

20  what happens today, that you have a very strong interest in

21  the outcome?

22      A.   Yes, I have a strong interest.

23      Q.   In the outcome of Mr. Nader's case?

24      A.   My answer is yes, I have an interest.

25          MR. DIXON:  Indulgence, please, Your Honor.

1          THE COURT:  Yes.

2          MR. DIXON:  I have nothing further, Your Honor,

3     subject to direct examination.

4          THE COURT:  Mr. Povich, before we have your

5     examination of the witness, we'll take a brief recess in this

6     matter, so I can take another matter that's before me.  You

7     may step down, Ms. Moolenaar.

8          (Recess.)

9               THE COURT:  All right, Mr. Povich.

10         MR. POVICH:  Thank you, Your Honor.

11                   CROSS-EXAMINATION

12         BY MR. POVICH:

13    Q.   Ms. Moolenaar, I would like to, perhaps, give you an

14    opportunity to clear up a date that you indicated you had some

15    concern with.

16    A.   Yes.  Is that the date that I first met the client?

17    Q.   Yes.

18    A.   It's the same date of the meeting.  If the date of

19    the meeting is the 16th, that's the same date.  It was just a

20    few minutes before.

21         MR. POVICH:  Your Honor, I think the earlier

22    testimony was that she first met the client on April 12.

23         MR. DIXON:  Your Honor, I'll have to object to Mr.

24    Povich addressing the Court in this fashion.  A question

25    should be put to the witness.  He doesn't need to explain for

1    the Court what the problem is.  I think the Court can perceive

2    that.  I believe we should get on with cross-examination.

3               THE COURT:  Is there any dispute as to the date?

4               MR. DIXON:  No, Your Honor, no dispute.

5               THE COURT:  You may proceed.

6               BY MR. POVICH:

7        Q.   You first met the defendant, Mr. Nader, when?

8        A.   On April 16th, 1984.  Excuse me.  April 16th, 1984.

9        Q.   And was that the first date that you had a

10   conversation with Mr. Northrop?

11       A.   Yes, it is.

12       Q.   And was that also -- was that a telephone

13   conversation?

14       A.   Yes, it was.

15       Q.   And you described that previously?

16       A.   Briefly, yes.

17       Q.   And that was the same date that you then met with Mr.

18   Northrop and Mr. Bloodworth?

19       A.   Yes, it was.

20       Q.   So you met your client, had the telephone call, and

21   had the meeting all the same day?

22       A.   Yes.

23       Q.   Would you tell His Honor the reason that you called

24   or how you happened to speak with Mr. Northrop that day on the

25   telephone?

1          A.    How that phone call came about?

2          Q.    Yes.

3          A.    To the best of my knowledge, there was a phone

4     message left for the client by a postal inspector named Kelly,

5     I believe, and that was the name that the client brought to me

6     as the person who had been trying to contact him.

7               I returned that call, placed that call to Postal

8     Inspector Kelly, and left my office number, and then I

9     received a return call from Inspector Northrop, who said he

10    had been returning the call that I had placed to Inspector

11    Kelly.

12         Q.    At that time, had you been given, shown, exhibited in

13    any way any inventory of a search warrant or the warrant

14    itself or an affidavit of a search warrant?

15         A.    No.

16         Q.    Would you advise His Honor as to the nature -- what

17    was said in the conversation that you had with Mr. Northrop

18    the first occasion that you had to discuss this matter?

19         A.    Yes, that conversation, he returned, he said, "I'm

20    returning your call," and he identified who he was, Inspector

21    Northrop.  He indicated that he just wanted to -- I told

22    him -- he wanted to know who I was, and I explained that I was

23    representing Mr. Nader, and he said, "I just wanted to talk

24    with your client, to advise him about the" -- he wanted to

25    explain to him about the items that were taken from his room,

1    and that he wanted to go over the inventory with him and get

2    some background on the client, and to return these items to

3    him; that they just wanted to talk with him; he had not

4    anticipated arresting him, he was not under arrest, no charges

5    were being brought, and that was the whole purpose of the

6    call.

7         Q.    When you -- did you agree to meet with Mr. Northrop?

8         A.    Yes.

9         Q.    And when you agreed to meet with him, what was the

10   purpose of the meeting, according to what Mr. Northrop had

11   told you?

12        A.    The purpose of the meeting was to return the items

13   that were taken from the the apartment, and to go over the

14   inventory of the items taken.

15        Q.    Did he indicate what, if anything, was to be

16   returned?

17        A.    Miscellaneous papers.

18        Q.    But he said he wanted to go over that inventory with

19   you?

20        A.    Yes, and get some background on him.  I don't know if

21   I answered that.

22        Q.    Yes.  Did he indicate whether or not -- I believe you

23   said that he wanted to talk to or advise your client about the

24   rules?

25        A.    The rules, yes, the postal rules.

1      Q.    The postal rules concerning?

2      A.    Concerning contraband material.

3      Q.    At the time that you went down there, did you as an

4  attorney see this in the context of a criminal matter?

5      A.    No, I did not.

6      Q.    Or criminal prosecution of your client?

7      A.    No, I did not.

8      Q.    And why did you not view it that way?

9      A.    He wasn't -- if it was, he should have been advised

10 from the onset that you are a suspect of a criminal

11 investigation, and he should have been advised of his rights

12 right away.  He was not.  There was no indication of any such

13 thing at all.  We were sitting in a very informal setting, and

14 we were there to get the items that were taken from his

15 apartment; from his room, excuse me.

16     Q.    That's what the agent told you?

17     A.    Yes.

18     Q.    Did you make a note of this conversation?

19     A.    Yes.

20     Q.    Do you have that note?

21     A.    Yes.

22     Q.    May I have it?

23     A.    Oh, I have it in the juryroom.  In the juryroom.

24     Q.    The witness room?

25     A.    The witness room, I'm sorry.

1       MR. POVICH:  Can we pass it for a moment, Your Honor?

2       THE COURT:  Yes, all right.

3       THE WITNESS:  As he was speaking, I was --

4       THE COURT:  No question pending at this point.

5       THE WITNESS:  I'm sorry.

6       BY MR. POVICH:

7   Q.    When I get -- at some point we'll break for lunch,

8   and we might have an opportunity at that time --

9       THE COURT:  How long do you think you will be

10  examining this witness?

11      MR. DIXON:  A half hour at least, Your Honor.

12      THE COURT:  Would you like to break for lunch at this

13  point?

14      MR. POVICH:  Yes,

15      MR. DIXON:  It's up to the Court, the witness and Mr.

16  Povich, Your Honor.  I'm amenable.

17      MR. POVICH:  I think it would help, Your Honor, if we

18  could get the notes.  Then we could move a little faster.

19      THE COURT:  Just to get an idea of the rest of our

20  day, Mr. Povich and Mr. Dixon --

21      MR. DIXON:  Yes, sir?

22      THE COURT:  What does our time look like?

23      MR. DIXON:  Your Honor, I intend to call Agent

24  Northrop and possibly Agent Bloodworth.  I don't know if it'll

25  be necessary for Agent Bloodworth.  I suspect that Mr. Povich

1  may want to take some time with Mr. Northrop, as I did with

2  Ms. Moolenaar.

3          MR. POVICH:  Yes.  And we have a brief witness, Mr.

4  Gauntt.

5          THE COURT:  In addition to?

6          MR. POVICH:  Yes, but very brief.

7          THE COURT:  Let's recess at this time for lunch.

8  We'll stand in recess until 1:45.

9          MR. DIXON:  Very well, Your Honor.

10          THE COURT:  Ms. Moolenaar, you should not discuss

11  your testimony with any of the witnesses in this case.

12          THE WITNESS:  Yes, Your Honor.

13          (At 12:25 p.m., a luncheon recess was taken.)

14

15                       AFTERNOON SESSION

16                         (1:45 p.m.)

17          MR. POVICH:  Your Honor, may it please the Court, we

18  have a very, very short witness, who has been here since this

19  morning.  His name is Mr. Gauntt.  He lives at the defendant's

20  residence.  If possible, we'd like to put him on just for a

21  few minutes.

22          THE COURT:  I have no problem with that.  Mr. Dixon?

23          MR. DIXON:  I've been informed, Your Honor.  I have

24  no problem as well.

25          MR. HOFFMAN:  Mr. Gauntt.

1                           JACK GAUNTT,

2    a witness produced on call of the Defendant, having been first

3    duly sworn, was examined and testified as follows:

4                        DIRECT EXAMINATION

5            BY MR. HOFFMAN:

6        Q.   First, let me know if you have any difficulty hearing

7    me at any time; okay, Mr. Gauntt?

8        A.   Thank you.

9        Q.   Would you state your name for the record, and spell

10   your last name, please.

11       A.   My name is Jack Gauntt, spelled G-A-U-N-T-T.

12       Q.   How old are you, Mr. Gauntt?

13       A.   I'll soon be 80.

14       Q.   Pardon me?

15       A.   I will soon be 80.

16       Q.   And what is your address?

17       A.   2019 Connecticut Avenue, Northwest, in the city.

18       Q.   Are you married, Mr. Gauntt?

19       A.   Yes.

20       Q.   Do you live at that address with your wife?

21       A.   Yes.

22       Q.   Do you know the defendant, George Nader?

23       A.   I do, yes.

24       Q.   How do you know Mr. Nader?

25       A.   He has a room in our home.

1       Q.   He's a tenant of yours?

2       A.   Yes.

3       Q.   How long has Mr. Nader lived with you in your home?

4       A.   About four and a half years.

5       Q.   Now, Mr. Gauntt, I want to call your attention to

6 April of 1984.  Do you have a recollection of someone from the

7 post office coming to deliver a package to Mr. Nader?

8       A.   Yes, I do.

9       Q.   Did they come once or did they come more than once to

10 deliver this package?

11      A.   Three times.

12      Q.   The first time that they came, was Mr. Nader home?

13      A.   Mr. Nader was not at home.

14      Q.   Did they ask you to accept this package?

15      A.   They did, and I said just wait till he comes.  I did

16 not sign the package.

17      Q.   They asked you to sign for it and keep the package,

18 and you told them to come back?

19      A.   Yes, that's right.

20      Q.   Was Mr. Nader home at that time?

21      A.   He was not at home.

22      Q.   Do you know if he was out of town?

23      A.   I don't know, but I think he was.

24      Q.   You think he was out of town?

25      A.   Yes, I do.

1      Q.    They came back and delivered the package a second

2   time?

3      A.    Yes, they did.

4      Q.    Was Mr. Nader home that second time?

5      A.    Mr. Nader was not at home, and he was out of town at

6   that time.

7      Q.    Did you inform the agent who came to deliver it that

8   he was not at home?

9      A.    That I don't recall.

10      Q.    But you refused to accept the package?

11      A.    I refused to accept it.

12      Q.    Did they come again a third time to deliver the

13   package?

14      A.    Yes, they came a third time.

15      Q.    Was Mr. Nader home at that time?

16      A.    Mr. Nader was not at home.

17      Q.    Did they again ask you to sign for the package?

18      A.    Yes.

19      Q.    And did you do so?

20      A.    The third time I did.

21      Q.    You did sign it?

22      A.    Yes, sir.

23      Q.    They dropped the package off in your house?

24      A.    Yes.

25      Q.    Do you remember where the package was placed when

1   they left it there?

2       A.   Yes, we have a table just inside the front door, and

3   it was placed on the table.

4       Q.   Is that in a hallway?

5       A.   Yes.

6       Q.   After the package was delivered, did anyone from the

7   government return to your house?

8       A.   Yes, three people came.

9       Q.   How long after the package was delivered did that

10  occur?

11      A.   It wasn't but a few minutes.

12      Q.   A few minutes after the package was delivered?

13      A.   That's right.

14      Q.   Did they come into your house?

15      A.   They did.

16      Q.   What did they do when they came into your house, if

17  you remember?

18      A.   They just told me, asked me first if Mr. Nader was

19  there, and I said no, he is not here.

20      Q.   Did they then enter the hosue?

21      A.   Yes, they entered the house.

22      Q.   Did they at any time take the package that had been

23  left on the table?

24      A.   Yes, they did.

25      Q.   Did they do anything else other than take that

1        package?

2            A.    Yes, they went upstairs.   They asked where was his

3        room, and I told them it was on the third floor, the front

4        room.

5            Q.    Did they enter his room?

6            A.    Yes, they just went on upstairs.

7            Q.    When they were in his room, was the door open or

8        closed?

9            A.    It was closed.

10           Q.    You were not in the room with them?

11           A.    I was not in the room with them.   As a matter of

12       fact, I didn't know where they were going.   I just said his

13       room is on the third floor, the front, and up they went.

14           Q.    Approximately how long were the agents in your house?

15           A.    About thirty minutes.

16           Q.    And did they leave with some material?   Did they take

17       some things with them?

18           A.    They took things with them, yes.   I don't know what

19       they took.

20           Q.    But you saw them come out of Mr. Nader's room with

21       things?

22           A.    Oh, yes, they came downstairs with things, out of his

23       room.

24           Q.    Did they also take the package that was in the

25       hallway with them?

1          A.    Yes, they did.

2          Q.    Was Mr. Nader home or present at all during this

3     search?

4          A.    Mr. Nader was not at home during this time.

5          Q.    Just so I'm clear, from the time they delivered the

6     package to the time they came in and searched the house and

7     then left with the package, Mr. Nader was never home?

8          A.    Never home, that's right.

9          MR. HOFFMAN:   You can mark this as defendant's next

10    in order.

11          THE DEPUTY CLERK:   Defendant's Exhibit No. 2, marked

12    for identification.

13                              (Defendant's Exhibit No. 2

14                               was marked for identification.)

15          MR. HOFFMAN:   Your Honor, this is a copy of a search

16    warrant inventory, and Mr. Dixon has said he would stipulate

17    it's an accurate copy of the original document.

18          THE COURT:   All right.

19          BY MR. HOFFMAN:

20          Q.    Mr. Gauntt, I'm handing you something entitled

21    "Search Warrant Inventory" on the top.   Can you identify for

22    the Court whether that is your signature there?

23          A.    That is my signature, yes.

24          Q.    And what is the date next to your signature?

25          A.    4/12/84.

1      Q.   Do you recall signing this document?

2      A.   I did sign it, yes.

3      Q.   Do you remember, Mr. Gauntt, whether a copy of this

4  document was left with you when the agents left?

5      A.   They did not leave a copy with me.

6      Q.   They took this with them when they --

7      A.   But I signed it.

8      Q.   You signed it, but then they took the inventory with

9  them?

10      A.   Yes, and then they left.

11      Q.   Did they leave any list of what was taken from Mr.

12  Nader's room?

13      A.   They did not leave anything.   I asked no questions.

14          THE COURT:   They did not leave anything?

15          THE WITNESS:   They left nothing with me.

16          BY MR. HOFFMAN:

17      Q.   Do you know whether they left -- they took this list

18  that you signed?  Did you sign only one copy?

19      A.   I signed that.

20      Q.   And they took this with them?

21      A.   Yes.

22      Q.   So, as far as you're aware, there was no list of what

23  was taken left in your house?

24      A.   That's correct.

25      Q.   Did they ever make a list of what was in that

1    envelope that you left at the --

2        A.    No.

3        Q.    Did they open the envelope?

4        A.    That I don't know.

5        Q.    Did you see them open the envelope while in your

6    house?

7        A.    No, they took the envelope upstairs with them, and I

8    suppose they took it with them.  I don't know.

9        Q.    Are you aware of any list of the contents of the

10   envelope being left in your house?

11       A.    There was no contents there.

12             MR. HOFFMAN:  I have no further questions of the

13   witness, Your Honor.

14             THE COURT:  Cross.

15             MR. DIXON:  Yes, Your Honor, just briefly.

16                       CROSS-EXAMINATION

17             BY MR. DIXON:

18       Q.    Mr. Gauntt, my name is Ronald Dixon.  I am going to

19   ask you a few questions, okay?

20       A.    Sure.  Thank you.

21       Q.    Mr. Gauntt, you were not present when the government

22   agents were searching Mr. Nader's room, were you, sir?

23       A.    I was in the house, but not on the floor.

24       Q.    So you don't know what they were doing up there, do

25   you?

1          A.    I don't know what they were doing.

2          Q.    And you don't know what they left, do you?

3          A.    I don't know what they took nor left.

4          Q.    Now, do you know what they took out?

5          A.    I don't know that, no.

6          Q.    You, as a good citizen, just stayed downstairs and

7    let them do whatever they had to do, right?

8          A.    That's right, that's correct.

9          Q.    And when they came into your home, you were satisfied

10   that they had a right to be there, because they had a search

11   warrant, didn't they?

12         A.    Yes, there was three people, a lady and two men.

13               MR. DIXON:  Indulgence, please, Your Honor.

14               THE COURT:  Yes.

15               BY MR. DIXON:

16         Q.    Why did you sign the return, Mr. Gauntt?

17         A.    Because they said for me to.

18         Q.    They told you that you had to?

19         A.    Yes, they said, "Here, sign the paper," and I signed

20   the paper when they came downstairs.

21         Q.    Did you know what you were signing?

22         A.    Not really.

23         Q.    You just signed it 'cause they asked you to?

24         A.    Yes, they said they were government people, so I

25   trusted them.

1        MR. DIXON:  Okay.  I have nothing further, Your

2   Honor.

3        MR. HOFFMAN:  No redirect, Your Honor.

4        THE COURT:  All right.  Thank you, Mr. Gauntt.  You

5   may step down.  Do not discuss your testimony with the other

6   witnesses.

7        MR. POVICH:  I'd like to recall Ms. Moolenaar.

8                    GWYNNETH MOOLENAAR,

9   a witness called on behalf of the Government, having been

10  previously duly sworn, resumed the stand and testified further

11  as follows:

12                  CROSS-EXAMINATION (Resumed)

13       BY MR. POVICH:

14   Q.   Ms. Moolenaar, during the break, have you had an

15   opportunity to obtain your notes with respect to the telephone

16   conversation which you had with Agent Northrop on April 16th?

17   A.   Yes, I have.

18   Q.   Would you give me those, please.

19       MR. POVICH:  Excuse me.

20       (Discussion off the record.)

21       MR. POVICH:  I am leaving a copy of that with Mr.

22   Dixon.

23       Could we have this marked as -- Exhibit 3?

24       THE DEPUTY CLERK:  Yes, sir.

25       MR. POVICH:  Defendant's Exhibit 3.

1          THE DEPUTY CLERK:  Defendant's Exhibit 3, marked for

2     identification.

3                              (Defendant's Exhibit No. 3

4                              was marked for identification.)

5          BY MR. POVICH:

6     Q.    I show you what's been marked as Defendant's Exhibit

7     3 for identification, and ask you if you can identify those,

8     and I note that there are, after you've done so, that there's

9     two different colors of ink on that paper.  Would you explain

10    to His Honor what that document is and how those different

11    colored inks came on there?

12         MR. DIXON:  Your Honor, I'm going to object to this

13    line of questioning.  First of all, if this is being offered

14    to in some way rehabilitate anything that Ms. Moolenaar said

15    on what started off as direct but what turned into cross, then

16    we should get to that.  No foundation has been laid for that.

17         If it's not being entered for that purpose, it just

18    can't come in to bolster her testimony, and we would ask for a

19    proffer on that.  If it's coming in as a prior consistent

20    statement, there's been no attack and no foundation laid to

21    show what this statement is doing to rehabilitate, and we'd

22    just like to know what the purpose of the statement is.

23         MR. POVICH:  Your Honor, I haven't offered it yet.

24    I've only asked her to identify it.

25         MR. DIXON:  She's going to testify from it, Your

1     Honor.  The Court is going to hear it.  It's going to be in

2     evidence when she talks about what's on there, and I'm trying

3     to prevent that until we get a proffer.

4            THE COURT:  Well, I'll hear the question first.

5            BY MR. POVICH:

6     Q.    Can you identify what that document is?

7     A.    Yes, I can.

8     Q.    What is it?

9     A.    They're notes of a conversation I had.

10    Q.    And the date of the conversation was?

11           MR. DIXON:  Objection, Your Honor.  Objection.

12    Objection.

13           THE COURT:  Grounds?

14           MR. DIXON:  The grounds are that she will testify,

15    she's going to refresh her recollection about the date of the

16    conversation, she's going to testify about it, it's coming

17    from the notes, and it's going to be in evidence, and the

18    Court hasn't made a ruling as to whether it's admissible or

19    not.

20           MR. POVICH:  Your Honor, there's an issue as to when

21    the conversation took place.

22           THE COURT:  I think it's been resolved now, but I'm

23    not positive.  If it refreshes her recollection as to the

24    exact date.  Mr. Dixon elicited it was on the 12th.

25           MR. DIXON:  Your Honor, we stipulated it was the

1      16th.

2              THE COURT:  I think the parties have agreed it was

3      the 16th now.

4              THE WITNESS:  It is the 16th, April 16th, 1984.

5              THE COURT:  That's been stipulated.

6              MR. POVICH:  Right.

7              BY MR. POVICH:

8      Q.    And there is two different types of ink on that page;

9      is that correct?

10     A.    Yes.

11     Q.    And could you explain why that is?

12     A.    At the time the conversation was being taken place, I

13     wrote down a blue color in -- I wrote with a pen with blue

14     color ink, and taking down the main words, leaving out

15     adjectives and things of that nature.  On the completion of

16     that, then I filled in the contents, the other material that

17     was left out.

18     Q.    With what color ink?

19     A.    There's black ink.

20     Q.    And when did you do that?

21     A.    That same day.

22     Q.    Did there come a time when you obtained an inventory

23     of the property which was taken from your client's home?

24     A.    Yes.

25     Q.    Do you have a copy of the inventory?

1          A.   Yes.

2          Q.   Or do you have the inventory that you obtained?

3          A.   I have what was considered to be the original

4     inventory.

5               MR. POVICH:  Can we have this marked as Exhibit 4, I

6     believe.

7               THE DEPUTY CLERK:  Defendant's Exhibit 4, marked for

8     identification.

9                              (Defendant's Exhibit No. 4

10                              was marked for identification.)

11              BY MR. POVICH:

12         Q.   Can you tell me, Ms. Moolenaar, where you obtained

13    Defendant's Exhibit 4?

14         A.   I obtained that from the Clerk's Office, the

15    magistrate's intake office.

16         Q.   At a particular magistrate?

17         A.   Excuse me, the U.S. Courthouse.

18         Q.   In the U.S. Courthouse?

19         A.   Yes.

20         Q.   This building?

21         A.   This building.

22         Q.   A particular magistrate?

23         A.   Not from the magistrate himself, but it was filed

24    back in the file room, and you receive those from the intake

25    person, who would be Mr. Hughes, Greg Hughes.

Q.   And the pink copy is designated a copy for whom?

A.   On the form itself, it states, "Pink copy, recipient."

Q.   "Recipient"?

A.   Yes.

Q.   Would that be the copy which, in normal course, would be left with the person who acknowledged acceptance of that document?

A.   In the normal course of a search, of execution of a search, yes, this should have been left with the place where the search took place.

Q.   And you obtained it from the Clerk's Office?

A.   Yes, I did.

Q.   I would like to direct your attention to the meeting subsequently on April 16, 1984, which you described that you had with Agent Northrop?

A.   Yes.

Q.   Can you tell me where that meeting was?

A.   It was held at the main post office on North Capitol and Massachusetts Avenue, Northwest, Washington, D.C.

Q.   Did you know where that office was located at the time of the telephone call?

A.   No, I did not.

Q.   How did you ascertain where it was?

A.   In that phone conversation that Mr. Northrop returned

1   of my call, he explained to me where to meet, what room

2   number, how to get there, how to get a visitor's pass, all

3   those things, explained to me how to get to that building.

4       Q.   And what time would you say was it that you arrived

5   at the meeting?

6       A.   It was after 2:30.

7       Q.   And who was present at the meeting?

8       A.   Mr. Northrop identified himself, and there was Mr.

9   Bloodworth.  Yes?

10      Q.   You and Mr. Nader?

11      A.   Yes, and Mr. Nader and myself.

12      Q.   Anyone else?

13      A.   No.

14      Q.   And why were you holding -- why were you attending

15  that meeting?

16      A.   I was present to represent my client.  The meeting

17  was called to meet with the client.  I was there to represent

18  the client.

19      Q.   And what was the purpose, as you understood it, for

20  the meeting with the client?

21      A.   To return the items that they had taken from his

22  room, and to go to some background information, and to explain

23  to him the rules about contraband materials seized.

24      Q.   Can you describe the room where this meeting took

25  place?

1          A.    It was a rather small room, similar to the witness

2     room outside this courthouse, this courtroom.

3          Q.    And could you -- how was it furnished?

4          A.    With a metal desk -- that's where the two agents sat,

5     behind a metal desk; one sat behind the desk, the other one

6     sat to the side, to the left, and we sat in front in some

7     folding chairs, I believe.

8          Q.    The distance of the room, was it longer than from you

9     to me?

10         A.    Not much longer.

11         Q.    And how wide was it?

12         A.    Well, I -- it's a small room.  I don't -- on the

13    record, you can't tell the distance from you to me, but it's a

14    small room.

15         Q.    When you went in, did you see any items or material

16    in the room?

17         A.    Yes, there were several bags and boxes in a small

18    little traveling case.

19         Q.    And did you have any understanding as to what that

20    material was?

21         A.    Well, on walking into the room, when we sat down, I

22    looked around the room.  No, at first I didn't have any

23    understanding.  I did not know whether or not that was a

24    particular room designated just for evidence, or all the

25    matters coming before the postal office, or could it just have

1      been this particular matter.  I had no ideas.  But the items

2      were there.

3          Q.    How many items were there?  How much material was

4      there?

5          A.    There were several bags, bags and boxes.

6          Q.    And during the course -- after an introduction -- did

7      you introduce yourself to the --

8          A.    Yes, I did.

9          Q.    Can you tell me the type of information which was

10     disclosed during the course of this meeting in the beginning,

11     and then what it led to?  Tell His Honor how the meeting

12     transpired.

13         A.    The agents introduced themselves to me.  One was from

14     the postal service, one was from the customs service.  I did

15     not understand the distinction at that time, as to why both of

16     them had to be there or what was it all about.

17             They explained that there were lots of house items

18     taken from Mr. Nader's apartment -- excuse me, his room.  They

19     explained that this was a controlled delivery case.  I did not

20     know what that -- controlled delivery case, they had said.

21             They also explained that they wanted to go through

22     some background information on the client.  That was the

23     main -- they wanted to get into his background, who he was,

24     where he worked, his company, that sort of thing, and that's

25     what transpired.

1        Q.    Can you tell me the type of information they obtained

2    from him insofar as his background was concerned?

3        A.    Basic information, like date of birth; had he gone to

4    high school, had he completed college; his parents, his

5    relatives in the United States; his immigration status,

6    matters of that nature.

7        Q.    How much time would you say it took to obtain this

8    background information?

9        A.    Specific recollection I don't have.

10        Q.    And after -- did there come a time when the interview

11    ceased with respect to the background information and changed

12    to a different subject?

13        A.    Yes, it did.

14        Q.    Could you tell His Honor how that occurred and what

15    happened?

16        A.    Yes, they started going into the items taken from the

17    room, and they just randomly picked up a bag and opened it up

18    and started going through the contents, and asked whether or

19    not he could identify that these things came from his room.

20        Q.    And did you -- when that occurred, what, if any,

21    conversation -- did they represent that this was material

22    taken from his room?

23        A.    Yes, they did.

24        Q.    This is not the material in terms of this package?

25        A.    No, there was nothing said about the package.

1      Q.   So that the information that they started to question

2   your client about concerned the material which was taken from

3   his room that was in bags and boxes, was it?

4      A.   Right.   The first bag that was taken up for

5   discussion was actually Bag No. 6.

6      Q.   Six?

7      A.   And they opened up Bag No. 6.   There was some sort of

8   label on there that said "Bag No. 6," and they opened that up,

9   and went through the contents of that.   In fact, there was a

10  picture frame, there was some -- miscellaneous papers; oh,

11  undeveloped film, matters of that nature.

12     Q.   And were there questions about the contents of that

13  bag?

14     A.   Yes.

15     Q.   And were those questions answered?

16     A.   Yes, they were.

17     Q.   Was there anything in particular that you remember

18  that gave you some cause or concern?

19     A.   Well, the agent indicated that the film -- the

20  undeveloped film was still -- was not developed.   The agent

21  said, "Well, we'll develop this," and that caused me some

22  concern, because I thought that we came down there to return

23  the items.

24     Q.   Did you think in terms of the volume of the material

25  which was there?

1      A.   Right.  I looked around, and then I said, "Well, if

2  you're going to go through all these items, let's do this in

3  sequence."  And so we started in with -- I said, "Why don't we

4  start with Bag No. 1."  Obviously, if you had Bag No. 6, you

5  had to have had 1 through 5, so then they said, "Okay, we'll

6  go ahead and go through this in sequence," and then they

7  proceeded to go through Bag No. 1 up until we reached the 6

8  again, and then 7, 8, until the completion of whatever it was

9  they had.  I did not have this inventory then, this written

10  inventory.

11      Q.   When did you obtain that inventory?

12      A.   My recollection of that was after I returned back to

13  the office, finished with my client, I then decided several

14  things that I needed to do, and one of them was to get a copy

15  of the search warrant, and that's when I came back to the

16  courthouse to get that.

17      Q.   That was following your meeting with Agents Northrop

18  and Bloodworth?

19      A.   Right.

20      Q.   As -- you said, I think, in response to a question

21  from Mr. Dixon, that they asked questions about the contents

22  of each of these bags as they unveiled them or exhibited them;

23  is that correct?

24      A.   Yes, they opened them up and took out the contents.

25  They didn't go through each and every item.  For example, if

1  there were magazines, they would say, "Well, there are about

2  twenty magazines here," and we could see that there were

3  approximately twenty magazines; we'd agree, "Yes, there are

4  twenty magazines:

5      Q.   Now, did they -- was -- -- did they continue to go

6  through the sequence of bags?

7      A.   Yes, from one through -- up until six, like they

8  started with six, they went through one through six, then

9  after six -- not after six, after five, 'cause they did six

10  first, one through six -- excuse me.  Six first.  Then one

11  through five, then seven through the end, whatever the end

12  number was.

13      Q.   And they did all of this before they got to this

14  packet?

15      A.   That's correct.

16      Q.   Before?

17      A.   Well, they absolutely didn't open the package, the

18  package that was subject to the controlled delivery.  That

19  remained on top of the desk of the agents rights there.  We

20  never once opened the contents of that package.

21      Q.   The material which was taken from each of the bags or

22  boxes as they were opened, when Mr. Nader was asked questions

23  about that, did he answer?

24      A.   Yes, he did.

25      Q.   And did there come a time when you -- and you

1    permitted him to answer?

2         A.   Yes, I did.

3         Q.   And what was the reason for that?

4         A.   He was not under any -- under any criminal charges,

5    or he was not subject -- he was not told he was being the

6    subject of any invetigation or anything, any particular

7    charges.  There was no -- there was no concern at that point.

8         Q.   Did there come a time when you questioned whether or

9    not they were going to return this material to you?

10        A.   I asked whether they going to return it.

11        Q.   And what did they say?

12        A.   They couldn't say.  That's what they said:  they

13   could not say.  They couldn't say.

14        Q.   Was there a discussion because of the nature of the

15   conversation which you had had on the phone about returning?

16        A.   I think it was because of my presence there, and I

17   asked quite a lot of questions, and I became quite concerned

18   as to the length of time we were there.  We went through the

19   items.  The fact that they -- they were reluctant to return it

20   after we had gotten into it.  It seemed like that to me.

21        Q.   Were you asked at any point or was your client asked

22   at any point to initial any --

23        A.   Yes, he was.

24        Q.   -- any packages?

25        A.   Right, he was asked to do that, and I declined.

1      Q.    The packages -- material which had been taken from

2    his room?

3      A.    The word "packages," "packages" isn't correct.

4      Q.    Bags?

5      A.    He was asked to initial, for example, labels on

6    magazines and things.  I declined to let him do that.

7      Q.    I see.

8      A.    He was also asked to initial and I think date, and I

9    said no, I would not permit him to do that, and this happened

10   over and over again, and they considered me to be a stickler,

11   and they said "Well, if you're going to be such a hard nose"

12   or something like that -- I don't know what the words were,

13   I'm sorry.

14     Q.    As a result of that, did anything happen when they

15   said "If you're going to be such a hard nose"?

16     A.    Whatever the words were, because I was being so

17   technical and sticklish, they said, "We might as well do this

18   the right way.  We might as well give you the Miranda

19   warnings."  And so they went through -- they got the form.  I

20   don't know, I think he left the room to get the form.  I'm

21   not -- I can't recall, but I think he got the form, and read

22   him his rights, and he said, "We should have done this at the

23   beginning," so that's how it happened.

24     Q.    You said that it was a period of time after he signed

25   the Miranda warnings in which you remained there?

1      A.    Yes.   Well, see, we had become at odds at that point.

2    I was getting into the purpose of this whole thing, what was

3    it all about, who was the assistant U.S. attorney involved.   I

4    asked a lot of questions.

5            They then told me of the assistant's name.   They

6    explained to me that he was not there at the time, he was on

7    vacation.   I wanted to know when would he be back.

8            I also asked about the probable cause for the

9    issuance of a search warrant, how did that come about.   I

10   asked a lot of questions.

11           They explained to me what they had felt, what they

12   had been told.   I asked for a copy of the affidavit and they

13   refused to give me that.

14     Q.    Did you ask them for a copy of the inventory?

15     A.    No, I did not.

16     Q.    Did they have an inventory?

17     A.    They had it -- I didn't know that's what it was they

18   had.   No, I didn't ask for a copy of the inventory.   I knew

19   right there they had the affidavit, and I wanted to see that.

20     Q.    Were there discussions then about -- when was there a

21   discussion, if any, about the package itself?   Was it after

22   these discussions on the package -- the package, I mean the

23   controlled delivery package.   Was it after they had gone

24   through this information that had been -- or the material

25   which had been taken to the --

1      A.   Yes, it was.   They explained that it had been

2    intercepted in the mail, and all this thing, and I was

3    concerned about the right of the postal office to do that on

4    site.  Mr. Northrop was the principal one who was asking most

5    of the questions, and we got into like a legal discussion in

6    terms of United States v. Ferber, and it was a thrashing out

7    of views on paedophilia and matters of that nature.   There

8    were conversations -- it was a conversation between Mr.

9    Northrop and myself practically.  Mr. Bloodworth spoke

10   occasionally, not that much.  He was not much knowledgeable

11   about the subject matter.

12      Q.   Did there ever come a time when there was any

13   discussion about the contents of the package?

14      A.   No, we --

15      Q.   By "the package," I mean the controlled delivery

16   package, the one that was not open?

17      A.   They asked a question of my client, what was inside

18   that package.  He made no statements regarding it.  He had no

19   knowledge of what it was.

20      Q.   Do you have notes of this meeting?

21      A.   Yes, I do.

22      Q.   May I have those?

23      A.   You may have them to the extent that other

24   information that does not pertain to me would be deleted.

25      Q.   Would you tell me where there is information on the

1    note that does not pertain to the meeting, what page it might

2    be on?

3        A.   Page 5.

4        Q.   Thank you.

5        A.   I numbered my pages one through seven.

6        Q.   Did you fold page 5 over to cover the material which

7    did not relate to the meeting?

8        A.   Yes.

9        Q.   Now, again, those notes have the blue ink and they

10   have the black ink?

11       A.   That's correct.

12       Q.   Can you tell His Honor how that happened?

13       A.   With the two pens.  I have a blue pen and a black

14   pen.  I write down with the blue pen, and then I fill in.

15       Q.   Subsequently?

16       A.   Subsequent information.

17       Q.   When was the subsequent information?

18       A.   The same day, at the same time, on the day of the --

19   at the same time.

20           MR. POVICH:  Your Honor, I'd like to have these

21   identified.  With respect to the page 5 -- I am sorry, page 5

22   of 7, which she has folded over, which does not really -- if

23   Your Honor does not mind, I would simply take a piece of tape

24   and tape that over, and I think that, rather than tear things

25   off, which I...

1          THE COURT:  That's?

2          MR. POVICH:  I'm only identifying it.  I'm not

3     introducing in it evidence.

4          THE COURT:  Why don't you staple it.  That might be a

5     little better, in case you want to preserve it.

6          MR. POVICH:  Yes, Your Honor.

7          THE DEPUTY CLERK:  Defendant's Exhibit 5, marked for

8     identification.

9                              (Defendant's Exhibit No. 5

10                             was marked for identification.)

11         BY MR. POVICH:

12    Q.   I show you Defendant's Exhibit 5, and ask you to

13    identify what Exhibit 5 is?

14    A.   Exhibit 5 consists of my original notes.

15         MR. DIXON:  Your Honor, may I see the exhibit?

16         THE WITNESS:  My original notes taken down during the

17    meeting between the agents of the postal service and the

18    customs service and my client and myself.

19         BY MR. POVICH:

20    Q.   Did there come a time, and can you describe the

21    circumstances, when you came to the conclusion that the

22    material was not going to be returned to you, as represented

23    at the conversation which you had had?

24    A.   Yes.

25    Q.   When was that, and would you explain it to His Honor?

1      A.    We had been there for quite a while.  We had gone

2   through a lot of his -- the bags and the boxes of stuff, and

3   they'd asked quite a lot of questions about all that stuff.

4   So I became concerned, and I asked when were they going to

5   return these items.  Is that what you asked me?

6      Q.    Yes.  And what did they say?

7      A.    They couldn't make that decision.  That's what they

8   said.  They didn't know.  They couldn't make that decision.

9      Q.    Did you indicate to them --

10     A.    But --

11     Q.    -- that was contrary to what --

12     A.    Right, because we had -- is that what you asked me?

13     Q.    Yes.

14     A.    Right, that's what we came down there for.  It seemed

15  like it was ridiculous.  We had come down there for -- plus I

16  had been looking around the room seeing the things, wondering

17  when we would leave, and how we would fit it in George's

18  car -- it seemed like quite a lot of stuff -- and then, all of

19  a sudden, it came about that they weren't going to return the

20  items.

21     Q.    Did Mr. Nader at any time acknowledge that he placed

22  an order for the delivery of the package which was the

23  controlled delivery package?

24     A.    No, he did not.

25          MR. POVICH:  Your Honor indulge, me for a moment.

1          THE COURT:  Yes.

2          BY MR. POVICH:

3     Q.   Before I close, the material which started to be

4  exhibited to your client and to you by the agents as having

5  been taken from the room was material which related, which

6  depicted child pornography; was it not?

7     A.   Yes, that's when I -- I don't know how much I can

8  elaborate on the question, because I'm limited to the answer.

9  Yes, that was child pornography, yes.

10    Q.   And this was the material which was repeatedly

11  exhibited to your client and to you or shown to you?

12    A.   Yes, right.  Pictures of -- I think some of the

13  magazines were "Hound Dog" or something like that.

14    Q.   But it was?

15    A.   "Piccolos," something like that.

16    Q.   It was in one form or another all the material which

17  had been taken from his home?

18    A.   Yes.

19    Q.   Along with pictures of people, family, friends, and

20  other things; is that correct?

21    A.   Yes.

22    Q.   Was there anything -- for instance -- and this was

23  time and time again; is that correct?

24    A.   Yes.

25    Q.   This is what they did?

1      A.    Yes.

2      Q.    And they questioned him about it?

3      A.    Yes.

4      Q.    Material that had his name on it or his address or

5  some connection with him, right?

6      A.    That were taken from his room, yes.

7      Q.    And it was obvious it was taken from his room?

8      A.    Yes.

9            MR. DIXON:  Objection to the leading nature of the

10  questions.

11           THE COURT:  Sustained.

12           BY MR. POVICH:

13     Q.    Was there anything that they said wasn't there?

14     A.    Yes, there was a -- a picture of the ship called the

15  Constitution, they said was -- somehow or other they didn't

16  have it in that room at the time, and there was a toy, I

17  think, called -- a stuffed toy, a penquin toy was not there.

18  It was at some other location.  They apologized for not having

19  it there or something.

20     Q.    But everything else was the material which they

21  represented had been taken from his home?

22     A.    Right.

23     Q.    And it included --

24     A.    His albums, his photo albums, things like that.

25  There were things that were taken from his home that were

1    obviously not illegal.

2        Q.    Obviously not what?

3        A.    Illegal.

4        Q.    Along with other matter?

5        A.    Right.

6            MR. POVICH:  I think I'm finished, Your Honor, if

7    you'll give me one moment.

8            THE COURT:  Yes.

9            MR. POVICH:  I have no further questions.

10            THE COURT:  Mr. Dixon.

11            MR. DIXON:  Yes, sir?

12            THE COURT:  Any other questions?

13                    REDIRECT-EXAMINATION

14            BY MR. DIXON:

15        Q.    Ms. Moolenaar, in response to Mr. Povich's questions

16    about what was shown to Mr. Nader during the course of the

17    interview, you went through a few things as to the nature of

18    the items that were shown, and I think you alluded to what

19    they depicted?

20        A.    Yes.

21        Q.    Now, you said during cross-examination when I

22    initially questioned you, and you also repeated when Mr.

23    Povich questioned you, that nothing in the controlled delivery

24    was shown to your client?

25        A.    That's correct.

1      Q.    You're sure about that?

2      A.    I'm positive about that.  It was never opened.  It

3  remained constantly sealed.  We never touched it or handled

4  it.  We never came close to it.

5      Q.    Was there any discussion about it?

6      A.    They made comments about it, the agents did.

7      Q.    Now, in explaining to the Court through Mr. Povich's

8  question about -- in describing to the Court through Mr.

9  Povich's question and describing what was shown to your

10  client, you mentioned one particular advertisement called

11  Piccolo, didn't you?

12      A.    I believe so.  Now, see, the problem I have with this

13  case --

14      Q.    You answered my question.  You did mention Piccolo,

15  didn't you?

16      A.    I said I believe Piccolo, whatever you call it.

17      Q.    Piccolo?

18      A.    I said I believe that, and that's because --

19      Q.    I didn't ask you to explain.  I just asked you if you

20  remembered.

21          And Piccolo was part of the items that the customs

22  officer showed you that was obscene or depicted children in

23  sexual --

24      A.    No, no.  I never handled any -- neither one of us --

25      Q.    I didn't ask you if you handled it.

1    A.    We had to go by what they said it was.

2    Q.    Just listen to me.  You told us that the officers

3    showed you items that they had taken out of Mr. Nader's room

4    that were obscene, that depicted children in sexual activity?

5    A.    Magazines.

6    Q.    And you, in mentioning and trying to remember, you

7    said one of the magazines or one of the pieces was Piccolo?

8    A.    I believe.  That's not -- that is not a positive at

9    all, because I don't recall at what point I recall that name.

10   Q.    Ms. Moolenaar, all I asked you was a question that

11   required a yes or no answer.

12   A.    I said Hound Dog.

13   Q.    And you said Piccolo, didn't you?

14   A.    And I said -- I believe I said Piccolo.

15   Q.    Ms. Moolenaar, you also testified that you went down

16   to the Clerk's Office to obtain a copy of the inventory?

17   A.    I went down there primarily to get the search warrant

18   and the affidavit to get this probable cause business, to find

19   out what initiated all of this.

20   Q.    You didn't go -- I'm sorry, go ahead.

21   A.    Yes, while I was there, I obtained a copy of this.

22   This is what I got.

23   Q.    Did you get a copy --

24   A.    "This," meaning Exhibit 4.

25   Q.    Did you get a copy of the affidavit as well?

1    A.   Yes, I did.

2    Q.   And you got a copy of the search warrant, right?

3    A.   Yes, I did.

4         MR. DIXON:  Indulgence please, Your Honor.

5         THE COURT:  Yes.

6                        (Government's Exhibit No. 2

7                         was marked for identification.)

8         MR. DIXON:  Government's No. 2, I'm showing to Mr.

9    Povich and Mr. Hoffman.

10        BY MR. DIXON:

11   Q.   Ms. Moolenaar, I'm going to show you what's been

12   marked as Government's No. 2, and I want you to look at it and

13   tell me if it looks familiar to you, please, ma'am?

14   A.   Yes, this is a copy of the search warrant.  Excuse

15   me, this is the affidavit on top.

16        THE COURT:  This is what?

17        BY MR. DIXON:

18   Q.   That's the search application for the warrant, isn't

19   it?

20   A.   The application for the warrant, right.

21   Q.   And the affidavit is immediately behind it, is it

22   not, on the second page?

23   A.   Yes.

24   Q.   And then it goes on to include the inventory; does it

25   not?

1      A.   No, there's some kind of drawing here, and then

2   there's a copy of the inventory.

3      Q.   Now, I'd like to direct your attention to -- well,

4   let me ask you this.  After you obtained the search warrant

5   and the affidavit --

6      A.   From the Clerk's Office.

7      Q.   Yes.  You had an occasion to read it, didn't you?

8      A.   Yes.

9      Q.   And in reading it, you were able to determine what

10   was contained in the controlled delivery, weren't you?

11      A.   Yes.

12      Q.   And I'd like you to look at the first page of

13   Government's No. 2, and I'd like you to direct your attention

14   to the mid-section, where it reads, "The following property or

15   person is concealed," and I'd like you to read what is listed

16   there to yourself, and when you're finished, would you please

17   look up.

18            THE COURT:  We are at that point, Mr. Dixon.

19            MR. DIXON:  Oh.

20            BY MR. DIXON:

21      Q.   Have you had a chance to read that over?

22      A.   Yes.

23      Q.   Now, can you tell us what was in the controlled

24   delivery, what types of magazines?

25      A.   Child pornography.

1          MR. POVICH:  Your Honor, it's irrelevant to --

2          MR. DIXON:  It's very relevant, Your Honor.

3          MR. POVICH:  Your Honor, I say it's irrelevant.  What

4     is in the controlled delivery package is irrelevant.  The

5     question is not what was in that package.  The question is

6     what was exhibited to the defendant at the time he was making

7     his statement.

8          MR. DIXON:  Your Honor, may we approach the bench

9     outside of the witness's earshot?

10          THE COURT:  I think I know where you're going.

11     Objection is overruled.

12          MR. DIXON:  Okay.

13          BY MR. DIXON:

14     Q.    Now, Ms. Moolenaar, do you recall now what was in --

15     well, first of all, let me ask you this.  What is written here

16     in the section I asked you to read to yourself?

17     A.    Yes.

18     Q.    Right here in the middle, where it says, "The

19     following property or persons concealed," is that what was in

20     the controlled delivery?

21     A.    I never saw any items.

22     Q.    Let me ask you this.  You never saw the items?

23     A.    No, I did not.

24     Q.    Let me ask you this.  When you read over the

25     affidavit --

1      A.    When I came to the Clerk's Office.

2      Q.    Yes.  When you read over the affidavit, and when you

3  read over the search warrant, did you read as to what the

4  officers stated was in the controlled delivery, the items

5  listed in the controlled delivery?

6      A.    What did you say?  Did I read --

7      Q.    I will withdraw my question and read this --

8      A.    I didn't follow you.

9      Q.    When you went and got the search warrant and the

10  affidavit for the search warrant --

11     A.    Yes.

12     Q.    All right.  Did you read it?

13     A.    Yes.

14     Q.    And that, as you understood it, was a statement by

15  the person, the affiant who obtained the search warrant, as to

16  what the affiant was looking for; did you understand that?

17     A.    Right, yes.

18     Q.    And in this particular instance, the affiant was

19  Donald Bloodworth; is that correct?

20     A.    Yes.

21     Q.    And Bloodworth, in his affidavit, indicated --

22     A.    That is not his affidavit.  The affidavit is by some

23  other agent in New Jersey.

24     Q.    Let me turn over to page 4, and I'd like you to look

25  at page 4.

1          A.    Oh, okay.

2          Q.    And look at that.

3          A.    All right.  That's right.  Okay, I see it.

4          Q.    Now, let me ask you again.  The affidavit was the

5     affidavit of Agent Bloodworth?

6          A.    Okay, yes.

7          Q.    And in averring as to what he wanted to search for,

8     he listed in his affidavit what was in the controlled

9     delivery, didn't he?

10         A.    Yes.

11         Q.    And you read that, didn't you?

12               MR. POVICH:  Your Honor --

13         A.    Now, what do you mean?  When did I read that?

14         Q.    You read that when you obtained the warrant, didn't

15    you?

16               MR. POVICH:  Objection.

17               THE COURT:  Just a moment.  Just a moment.

18               Mr. Povich.

19               MR. POVICH:  We will stipulate, Your Honor, that the

20    magazine Piccolo was in the controlled delivery package.  That

21    doesn't mean --

22               MR. DIXON:  Your Honor, can we --

23               MR. POVICH:  Can we come to the bench for a moment?

24               THE COURT:  You may approach the bench.  If you'd

25    have a seat in the jury box, Ms. Moolenaar.

1          (Counsel approached the bench, and the following

2     ensued:)

3          MR. POVICH:  Your Honor, because there's one magazine

4     named Piccolo in the controlled delivery is not probative.

5     If, as in their case, there are probably six of them, other

6     magazines named Piccolo by the same publisher that were taken

7     from this man's room.  If the Government is prepared to

8     represent that the only Piccolo magazine was the one in the

9     controlled delivery package, and that there was no other

10    Piccolo magazine exhibited to the defendant, then the inquiry

11    is appropriate, but that's not the case.

12         THE COURT:  Mr. Dixon.

13         MR. DIXON:  No, sir, Your Honor.  They opened the

14    door.  They asked this witness to explain to them what was

15    shown to them by the postal inspectors.

16         This witness on their -- well, this witness through

17    their question listed and specifically said Hound Dog and

18    specifically said Piccolo.

19         Your Honor, inside the controlled delivery was a

20    magazine called Piccolo.  This is coming in to impeach this

21    witness's testimony.  This witness said earlier that nothing

22    was said to her or her client about what was inside of the

23    controlled delivery.  If that's the case, how did she -- why

24    did that pop into her head, Piccolo?  She can explain it if

25    she wants to.

1          MR. HOFFMAN:  Your Honor --

2          THE COURT:  Wait a minute.  Hold it.  I may have

3    missed one point.  Tell me again what the point is on Piccolo.

4          MR. DIXON:  On the Piccolo, Your Honor, the

5    question --

6          THE COURT:  What do you think she said with respect

7    to Piccolo?

8          MR. DIXON:  She said that the items that were shown

9    to her included a magazine called Piccolo.  All right, now,

10   Piccolo, as we understand it, was in the controlled delivery,

11   all right?

12         In addition, Your Honor, she claims that the

13   controlled delivery was not discussed with her, it wasn't

14   opened, and it wasn't discussed with them at all, and they --

15   now the defense is trying to say that we have to show, that we

16   have to show that Piccolo, the only Piccolo magazine was the

17   one in the controlled delivery.

18         I say no, this is coming in to impeach this witness's

19   credibility, to impeach her earlier testimony.  She has

20   already said under oath that nothing was shown to her on at

21   least two or three occasions in the controlled delivery.

22         Your Honor, this witness has an interest in these

23   proceedings, she's already said that; a very vital interest, I

24   might say.  We have brought that out when we initially had her

25   on the stand, and this is coming out specifically to impeach

1    her earlier testimony.

2           If they want to go back and ask her specifically if

3    there was another -- where this Piccolo came from or where the

4    name came from, or why she thought of it, they can do that.

5           THE COURT:  Let me say this.  As counsel know, I

6    looked through all of the items, and I know for a fact in

7    looking through that box, that there was a Piccolo or Piccolo,

8    however it's pronounced, in the controlled delivery, but there

9    were many, many other Piccolos in the box, because I think, if

10   you read my memorandum on it, I even said that perhaps one way

11   the agents could have approached it --

12          MR. POVICH:  Exactly.

13          THE COURT:  -- I felt, is to suggest that other items

14   than Piccolo magazine -- because, in looking at the magazines

15   in the controlled delivery, some of them -- one of them was

16   Piccolo, which I thought fell, as I said in the opinion, as

17   obscenity, but there were some others that were a different

18   category all together, so there were other Piccolos there --

19          MR. DIXON:  Well, Your Honor --

20          THE COURT:  I'm not sure of the point you are getting

21   at.

22          MR. DIXON:  Whether this witness can testify about

23.  that or not is the question, and we don't know what she's

24   going to say.  Okay, if she can say -- the Court has had the

25   benefit of -- she can say affirmatively under oath, "No, the

1   Piccolo that I saw was not from the controlled delivery, it

2   was from something else," then the question is, "How do you

3   know that, if you didn't know what was in the controlled

4   delivery?"  Your Honor, I think it is fair game, and I think

5   it's a fair question.  I think the witness should be asked

6   that question.

7          THE COURT:  All right.  Now.

8          MR. HOFFMAN:  I have only one thing, Your Honor:

9   that Mr. Dixon is questioning her and impeaching her on the

10  basis of what is in this affidavit, and she has testified she

11  didn't have it until after these statements were made.  This

12  hearing is on admissibility of statements made at this

13  meeting.  She didn't have the affidavit until after the

14  meeting.  It's completely irrelevant what is in the affidavit.

15         MR. POVICH:  That's not the point.  He's making a

16  very basic point.  His point is he wants to examine her in

17  order to establish that Piccolo was in the controlled delivery

18  package; therefore, it had to have been opened, whereas, in

19  fact, as the Court has pointed out, as I had suggested, that

20  Piccolo magazine was not limited to the controlled delivery

21  package, that it was in other places; and I think, under the

22  circumstances, I think it's unfair on cross-examination to

23  suggest that the only way she could have known that Piccolo

24  was there was to have had the package opened, which she claims

25  was not done.

1          MR. DIXON:  Your Honor, we can't predict the witness.

2      We all know that.  The witness has to tell us that.  We can't

3      speculate about what the witness is going to say.  We don't

4      know what the witness is going to say.

5          We know what the situation is, and this is not

6      something to lay a trap for this witness.  This is an

7      experienced attorney, Your Honor.  She has made some very

8      damning admissions on the witness stand, and also has taken a

9      very firm position on some other things, and a lot hinges on

10     her testimony and on her credibility and on her abilities to

11     recall and recite now what happened at a time before today's

12     hearing, and I think the Government has a right to probe that

13     area with her.

14          THE COURT:  Anything else?

15          MR. POVICH:  No, sir.

16          MR. HOFFMAN:  No, sir.

17          THE COURT:  All right, objection is overruled.

18          (Counsel returned to the trial tables, and the

19     following ensued:)

20          THE COURT:  All right, Ms. Moolenaar.

21          BY MR. DIXON:

22     Q.   Ms. Moolenaar, I think when I last was asking you

23     questions, it was about the Piccolo issue, and I will agree to

24     the stipulation by counsel that Piccolo was amongst the

25     controlled delivery items.  Now, my question to you is, you

1    stated earlier that you didn't see anything in the controlled

2    delivery at all?

3        A.    That's correct, I didn't.

4        Q.    We have a stipulation that Piccolo was in the

5    controlled delivery.  Do you recall, where you say Piccolo,

6    where Piccolo comes up?

7        A.    The word "Piccolo" -- I never -- this is the problem

8    with a case like this, that information comes to me through

9    attorney-client information, through being involved in the

10   case, at which point in time I do learn this information.

11   That's my problem, and you're calling me as a witness.  It's

12   very hard to distinguish where you get the information, but to

13   my recollection, that Piccolo thing was part of the controlled

14   delivery.  The bag was never opened.  The package was never

15   opened.  I never saw the Piccolo, I thought it was called.

16           THE COURT:  You never saw the Piccolo magazine?

17           THE WITNESS:  No.  No.

18           THE COURT:  You never saw a Piccolo magazine that

19   day?

20           THE WITNESS:  I never handled any of the magazines.

21           THE COURT:  I'm not asking you what you handled,

22   touched, whatever else.  I'm asking you what you saw.

23           THE WITNESS:  To my knowledge, no.  See, when I said

24   I believe, because I am not so sure when this information came

25   into my mind, to my knowledge.

1          MR. DIXON:  Very well, Ms. Moolenaar.

2          BY MR. DIXON:

3      Q.   Ms. Moolenaar, just a couple of questions.

4          With reference to Defendant's Exhibit No. 4, you

5   indicate this was a return on the search warrant that you

6   obtained after the search was executed and after your meeting

7   with Agents Bloodworth and Northrop; is that correct?

8      A.   Yes, that's correct.

9      Q.   I'd like to invite your attention to page 1 of

10  Defense No. 4, to the middle section, which reads, "I hereby

11  acknowledge receipt of a copy of," and read that to yourself,

12  please.

13          Okay?  Now, have you had a chance to read that

14  section?

15     A.   Yes.

16     Q.   And did you have a chance to read or to view the

17  signature of the recipient?

18     A.   Yes.

19     Q.   Now, let me ask you this.  Do you know the person who

20  signed as the recipient on the search warrant?

21     A.   No, I do not.

22     Q.   Do you know who that person is?

23     A.   As of today, yes.

24     Q.   And who is that person?

25     A.   Mr. Gauntt.

1      Q.   Now, on the date that you obtained that return, and

2   you realized and read that the recipient was not George Nader,

3   did you have an occasion to try to find out who the recipient

4   was?

5      A.   Yes, that's correct.

6      Q.   And what efforts did you take to find out who the

7   recipient was?

8      A.   I believe it is part of the attorney-client

9   privilege.

10     Q.   Okay, let me ask you this.  Did you talk to Mr. Nader

11  about it?  Yes or no.  I am not asking you what you talked

12  about.  Did you talk to him about it?

13     A.   Yes, I did.

14     Q.   And after you talked to Mr. Nader, did you conduct an

15  investigation to determine who the recipient was or try to

16  interview the recipient?  Yes or no.

17     A.   Something else, but not that.

18     Q.   Okay.  Let me ask you this.  Have you talked to the

19  person listed as the recipient about --

20     A.   At any point in time?

21     Q.   No, just listen.  About what that person allegedly

22  received?

23     A.   No, I did not.

24     Q.   Let me ask you another question, Ms. Moolenaar.  You

25  said that when you went to talk to Bloodworth and Northrop

1   with Mr. Nader, the reasons you were going was to review the

2   material, to get some background information, and to have Mr.

3   Nader counseled about the rules regarding pornography; I mean

4   the rules -- the postal rules regarding matters of

5   pornography.  Is that an accurate recital of the three things

6   you went to talk about?

7        A.   And to return the items.

8        Q.   And to return them; okay, four.

9             Now, at the time you talked to Mr. Northrop on the

10  telephone on April 16th, 1984, did Mr. Northrop tell you that

11  he had contraband that was taken from Mr. Nader's house in his

12  possession?

13       A.   Yes.

14       Q.   He did, okay.

15            Now, that was before you got to the meeting, right?

16       A.   Yes.

17       Q.   Now, what does the term "contraband" mean in a legal

18  sense, in the sense, being more specific, or in the scenario

19  that surrounded Mr. Nader at the time you spoke with Mr.

20  Northrop?  Do you understand my question?

21       A.   That's very broad.

22       Q.   It's convoluted.  Let me try again.  You say that

23  Northrop mentioned contraband, that he had contraband that was

24  taken from Mr. Nader's room?

25       A.   I think he said that kind of mail is contraband.

1      Q.    Okay, "that kind of mail is contraband"?

2      A.    Yes.

3      Q.    And according to you, he made that statement to you

4   when you talked to him on April 16th, 1984 over the telephone?

5      A.    Yes.

6      Q.    Now, what did that mean to you, when he said

7   "contraband"?

8      A.    It meant illegal matters, illegal mailings.

9      Q.    Now, did that, when he told you he had contraband,

10   did that cause you to change in any way the way that you were

11   going to conduct this interview with Mr. Northrop or Mr.

12   Bloodworth, based upon the fact that he told you they had

13   contraband taken from your client's room?  Yes or no.

14      A.    Well, first of all you said it would change anything?

15      Q.    Yes.

16      A.    The way I would conduct the meeting?  Change what

17   from what?  And I'm not conducting the meeting, they were.

18   And, in fact, there are several ways that, to my knowledge,

19   materials could be returned.  An in rem proceeding could

20   return the items -- excuse me, would destroy the contraband

21   material, and he would be given back anything that was not,

22   that was not illegal; so it could have been an in rem.  I had

23   no idea.

24      Q.    You also said, Ms. Moolenaar, that you received a

25   call on the 16th, and you had just talked with Mr. Nader for

1    the first time on the 16th?

2        A.   Yes.

3        Q.   And you went immediately to meet with the postal

4    inspectors on the 16th?

5        A.   Yes.

6        Q.   Was there anything that prevented you from calling

7    the postal inspectors and telling them, "Look, I don't want to

8    come down today.  I have just met my client.  He has just

9    advised me of the situation.  I just talked with you, and I

10   want to get some more information.  I want to talk to my

11   client a little more."  Was there anything pressing you to go

12   down on the 16th?

13       A.   No.

14       Q.   They didn't put any pressure on you, did they?  They

15   didn't say, "We're going to arrest your client, if you don't

16   get him down here today," did they?

17       A.   No.

18       Q.   They didn't say, "We're going to go to the grand jury

19   with this material, if you don't come down here today," did

20   they?

21       A.   No.

22       Q.   You made a tactical decision to go down and speak

23   with them on the 16th, didn't you?

24       A.   My client requested that I accompany him.

25            MR. DIXON:  Indulgence please, Your Honor.

1          THE COURT:  Yes.

2          MR. DIXON:  I have nothing further, Your Honor.

3          MR. POVICH:  Just a couple of questions.

4                    RECROSS-EXAMINATION

5          BY MR. POVICH:

6     Q.   When you saw magazines that day in the meeting,

7     during the course of the meeting, where did those magazines

8     come from?

9     A.   They were all foreign material.

10    Q.   And --

11         THE COURT:  When you say that, you're referring to

12    material from outside of this country?

13         THE WITNESS:  Yes, overseas.

14         THE COURT:  All right.

15         THE WITNESS:  And they were also inflammatory.

16         THE COURT:  It has another meaning at times.

17         BY MR. POVICH:

18    Q.   And when the magazines were exhibited to you, where

19    were they taken from?

20    A.   Around the -- the desk where the agents were sitting.

21    They were all there in that same room.  Is that what you mean?

22    Q.   Yes.

23    A.   Yes, they were taken from the bags that had been

24    placed there, and apparently from the seizure from his room.

25    Q.   During the course of this meeting, were you shown

1   lots of magazines -- I don't mean "shown" in the sense of

2   opening each one, but were you shown covers and backs?

3       A.   I didn't particularly want to see them.  They were --

4   he would have -- like, he would say that this would have -- it

5   would be a stack of them; he said, "This contains

6   approximately twenty, twenty or thirty."

7       Q.   Did those have different names on them?

8       A.   I was not close to them to read the names.  I had to

9   rely on what he was saying.  So I can't answer exactly yes,

10  this is so.  To my knowledge, he would say this is -- whatever

11  the names of these things were.

12      Q.   These magazines?

13      A.   These magazines, yes.

14      Q.   And they would discuss, they would say the name or

15  you could read the name or you heard the name?

16      A.   He would tell me -- he would say, "This is Hound

17  Dog," or "This is" -- to my -- you have to understand, I never

18  handled -- I would have -- I wouldn't have scrutinized the

19  title or the notes.  I didn't do any of that.

20      Q.   I'm not suggesting that at all.  During the course of

21  this afternoon, the names of the magazines were spoken; is

22  that correct?

23      A.   Yes.

24      Q.   You said one of them was Hound Dog; is that correct?

25      A.   Right.

1    Q.   Do you recall whether or not you heard the name

2    Piccolo during the course of that afternoon as a magazine

3    which came from one of the six bags, six or more bags that had

4    been --

5            MR. DIXON:  Objection, Your Honor.  Mr. Povich's

6    question is terribly leading.

7            THE COURT:  What's that?

8            MR. DIXON:  Mr. Povich's question is leading, Your

9    Honor.

10           THE COURT:  Mr. Povich?

11           THE WITNESS:  The name --

12           MR. POVICH:  It is a leading question, Your Honor.

13           THE COURT:  Sustained, then.

14           THE WITNESS:  If you wanted to know the name of the

15   magazine --

16           THE COURT:  No question pending, ma'am.

17           BY MR. POVICH:

18    Q.   I don't want to suggest for a moment that you were

19    interested in the magazines.

20    A.   I was not.

21    Q.   And you certainly were not looking at them to the

22    extent that you could avoid looking at them, some of them?

23    A.   Right.

24    Q.   But to say that, nevertheless, during the course of

25    the afternoon, their names may have been read or Mr. Nader may

1    have been questioned about these magazines which were taken

2    from his room --

3         A.    Right, by referring to them by names, yes, that's

4    correct.

5         Q.    And was there any other occasion when you would have

6    heard the name of any of these magazines, other than then?

7         A.    From my client.

8         Q.    I see.  Other than from your client and from the

9    agents -- you mean -- other than from your client and from the

10   discussions which took place during the course of this

11   meeting, was there any other time when there was any mention

12   of any of the names, particularly, of the magazines?

13        A.    Other than this meeting?

14        Q.    Yes.

15        A.    Certainly.  I've had a year of transactions between

16   the U.S. Attorney's Office and myself, and certainly, during

17   that course of time, we talked about all kinds of things.

18        Q.    Are you absolutely certain that the controlled

19   delivery package was not opened?

20        A.    I am positive.

21        Q.    And that you did not learn the name of the magazine

22   Piccolo from the controlled delivery package, from being

23   inside the controlled deliver --

24        A.    That's correct.  No, I did not learn that from inside

25   the package.  It was never opened.

1        MR. POVICH:  I have no further questions.

2        THE COURT:  Ms. Moolenaar, did you -- you may have

3    answered this, but just so I'm clear on it.  Did you ever look

4    inside the controlled delivery package?

5        THE WITNESS:  No, I did not.

6        THE COURT:  Even after you had the concern about who

7    the assistant U.S. attorney was?

8        THE WITNESS:  I never went down to look at it.

9        THE COURT:  You say "went down to look at it."  It

10   was right there in front of you.

11       THE WITNESS:  No, I've had other meetings --

12       THE COURT:  No, I'm not speaking about any other

13   meetings except that one.  At the time you became concerned

14   and you wanted to know who the assistant U.S. attorney was and

15   so forth, did you look into the controlled delivery package at

16   that point?

17       THE WITNESS:  No, I did not.  Never once did I.

18       THE COURT:  This was a time after your client had

19   been warned under Miranda; is that correct?

20       THE WITNESS:  When?  As to what?

21       THE COURT:  Well, there came a time when he was given

22   a Miranda warning; is that correct?

23       THE WITNESS:  Yes, that's correct.

24       THE COURT:  And that package was still sitting on the

25   desk?

1          THE WITNESS:  Yes.

2          THE COURT:  And you knew that that was the controlled

3    delivery package?

4          THE WITNESS:  Yes.

5          THE COURT:  But you had not looked inside?

6          THE WITNESS:  It was never opened.

7          THE COURT:  At that point, did you look inside?

8          THE WITNESS:  No, I did not.

9          THE COURT:  Why not?

10         THE WITNESS:  I didn't want -- why not?  I didn't

11   look at any of the magazines.  I did not look at any of the

12   names or anything.

13         THE COURT:  I'm asking you why you didn't look at the

14   package, what was the content of the package?

15         THE WITNESS:  I never asked for it to be opened.

16         THE COURT:  I understand that.  I'm just curious as

17   to why not.  Why didn't you look at?

18         Well, let me start from the beginning.  You -- at the

19   time you made this telephone call on April 16, 1984, you knew

20   that there had been a search of your client's room; is that

21   correct?

22         THE WITNESS:  I knew that items had been taken, yes.

23         THE COURT:  Well, did you think they had been taken

24   by some undescribed burglars?

25         THE WITNESS:  No, no.

1        THE COURT:  Did you think they had been taken by

2  government agents?

3        THE WITNESS:  Yes, I knew that, yes.

4        THE COURT:  So you knew there had been a search of

5  the room?

6        THE WITNESS:  Yes.

7        THE COURT:  All right.  If you can't answer the

8  question just say so, but at that point in time or during the

9  course of your conversation with Mr. Northrop, did you learn

10  or ascertain that these items were considered to be obscene?

11        THE WITNESS:  Yes.

12        THE COURT:  Or concerning child pornography?

13        THE WITNESS:  Yes.

14        THE COURT:  Now, when they were opening the bags on

15  the floor --

16        THE WITNESS:  Yes?

17        THE COURT:  -- did you look at any of the items?  I

18  will stop there.

19        THE WITNESS:  As they held them up, I saw them.  I

20  did not hold one item.

21        THE COURT:  You did not hold one item?

22        THE WITNESS:  No.

23        THE COURT:  Did they hold up magazines?

24        THE WITNESS:  Yes, they held up magazines.

25        THE COURT:  And what else did you see?  Just

1    describing what you saw.  I'm not asking you to describe any

2    pictures, but the types of items they showed you.

3              THE WITNESS:  They were magazines -- you mean,

4    categories of things?

5              THE COURT:  Yes.

6              THE WITNESS:  There were magazines, there were photo

7    albums.

8              THE COURT:  Did you look at the photo albums?

9              THE WITNESS:  They flipped the pages open.

10             THE COURT:  Did you look at them?

11             THE WITNESS:  I didn't examine them, no.  They

12    flipped the pages -- this was not a meeting of sitting down to

13    discuss item by item.  This was a meeting to give the things

14    back.

15             THE COURT:  Well, why -- but they were showing these

16    things --

17             THE WITNESS:  Yes, they were showing them as part --

18             THE COURT:  And at the time they were showing them to

19    you, what were they saying?

20             THE WITNESS:  They wanted to know whether or not

21    these were his items, to identify whether or not these were

22    his.

23             THE COURT:  Now, did Mr. Nader look at these things?

24             THE WITNESS:  He sat in the same seat as I did, did

25    not examine the contents, no.

1    THE COURT:  He just said, "Yes, these are mine"?

2    THE WITNESS:  Yes.

3    THE COURT:  Without looking at them?

4    THE COURT:  He never physically examined the

5    contents.

6    THE COURT:  Were you aware that there was a possible

7    criminal charge?

8    THE WITNESS:  No, I was not at all.

9    THE COURT:  You were not aware that it might be

10   against the law to bring these materials into the country?

11   THE WITNESS:   Importing?

12   THE COURT:  Yes.

13   THE WITNESS:  Under 1462, no.  I had not had any

14   cases under 1462.

15   THE COURT:  Did you feel that what was depicted in

16   these magazines or these books or photo albums was really of

17   no concern to you?

18   THE WITNESS:  No, I never felt that.

19   THE COURT:  Then why didn't you look at them?

20   THE WITNESS:  They were personally offensive.

21   THE COURT:  Well, I know, but you were there as his

22   counsel; were you not?

23   THE WITNESS:  Yes, I was.  This is what I planned to

24   have done.  After the session had prolonged, and I realized

25   that the agents were not returning them, and there was an

1    assistant involved, I then made a mental decision that this

2    has to be dealt lawyer to lawyer, and that I would contact the

3    assistant U.S. attorney and from there proceed.

4             THE COURT:  Did you ever ask Mr. -- well, when you

5    ascertained that there had been a search --

6             THE WITNESS:  Yes?

7             THE COURT:  When did you ascertain there had been a

8    search of Mr. Nader's room?

9             THE WITNESS:  At that meeting.

10            THE COURT:  You didn't know it before that?

11            THE WITNESS:  No, I did not.

12            THE COURT:  And you say you did see the inventory at

13   that time?

14            THE WITNESS:  No, I did not.

15            THE COURT:  Or you did not?

16            THE WITNESS:  No.

17            THE COURT:  And you asked for it?

18            THE WITNESS:  No, I didn't ask for the inventory.  I

19   asked for the affidavit -- I wanted to know the affidavit of

20   probable cause to support the search warrant.

21            THE COURT:  Why were you interested -- well, when did

22   you want to know that?

23            THE WITNESS:  To find out --

24            THE COURT:  No, when.  Was this before Miranda or

25   after Miranda?

1          THE WITNESS:  After, because they started asking

2     questions about the package.

3          THE COURT:  As I understand it, then, Ms. Moolenaar,

4     when you went to meet with these people, you thought that they

5     were just there to return these items to you and to Mr. Nader

6     and for no other reason?

7          THE WITNESS:  I didn't have that much background

8     information prior to going down.  Neither did the phone call

9     give that much.  It only indicated that it was a -- a session

10    where they -- he needed to identify -- since, apparently, he

11    wasn't the one from whom they took it, he had to come down and

12    identify that they were his, and for him to be the recipient

13    of them transferring it back to him.  It was not under my

14    impression that any of the so-called contraband materials

15    would be returned to him; I knew they would keep those, and

16    neither did the client want those, but anything else would be

17    returned to him.

18         THE COURT:  But you were aware that you were dealing

19    with some property that was allegedly obscene?

20         THE WITNESS:  At which point in time?  When I got

21    there, I saw them.

22         THE COURT:  Now, I notice that, during the course of

23    your responses to questions from counsel, on a number of

24    occasions you used the word "concern."  You were concerned

25    about this and concerned about that and so forth.  I think I

1   counted at least four times that you used the word "concern"

2   about different things.  And from your testimony, I gather

3   that some of these concerns were prior to the Miranda warning.

4   At this point, you were not aware or concerned that this might

5   be some type of a criminal investigation?

6        THE WITNESS:  This is why I became concerned.  That's

7   the point I'm making.  The -- in other words, we were told one

8   thing, we got there and they proceeded into another direction.

9   This caused concern.  This caused me to act as more

10  aggressively, rather than as a witness to this transfer of

11  materi -- of property.  I then asked the questions that should

12  elicit more information at a subsequent time.  I asked

13  questions such as who is the assistant involved; I asked --

14  those were my concerns.

15       THE COURT:  This was after the Miranda warning?

16       THE WITNESS:  I also asked which magistrate could

17  have signed the search warrant.  They indicated Magistrate

18  Attridge, and I knew he was one of the younger magistrates.

19       I asked -- I asked a lot of questions in terms of how

20  this came about, the controlled delivery, the nature of this.

21  That's what I meant by concerned, and I saw that this thing

22  took on a different twist than what was originally --

23       THE COURT:  But were you concerned, prior to the time

24  of the Miranda warning, that if you're dealing with material

25  which is allegedly obscene or involves children, as you

1    testified you knew at that point, that that could lead to some

2    type of a criminal charge?

3         THE WITNESS:  I had not read anything about that.

4    No, I did not know that.

5         THE COURT:  When you say you "had not read anything

6    about that," I'm not sure what you mean.

7         THE WITNESS:  I don't know if you're being technical,

8    Your Honor.

9         THE COURT:  Are you talking about --

10        THE WITNESS:  The mere receipt of that?

11        THE COURT:  What's that?

12        THE WITNESS:  The mere receipt of that?

13        THE COURT:  I'm just asking if you knew that you were

14   down there about materials that were allegedly obscene.

15   Weren't you concerned at all that there might be some criminal

16   charge involved, that a crime may have been committed?

17        THE WITNESS:  Yes.

18        THE COURT:  And you knew that prior to the Miranda

19   warning; isn't that correct?

20        THE WITNESS:  Well, you mean as a lawyer?

21        THE COURT:  As a lawyer, yes.  You were there as a

22   lawyer, weren't you?

23        THE WITNESS:  Yes.

24        THE COURT:  As a lawyer.

25        THE WITNESS:  I'm always conscious of whatever other

12

1       implications there might be, certainly.

2               THE COURT:  Well, being conscious of that, I gather

3       the client still discussed where these items came from; is

4       that correct?  He made statements as to where these items

5       were, and made admissions concerning these items being from

6       his room; is that it?

7               THE WITNESS:  In terms of identifying them?

8               THE COURT:  Yes.

9               THE WITNESS:  Yes.

10              THE COURT:  And he made statements --

11              THE WITNESS:  No, not statements concerning -- he

12      identified them, yes.  "That's mine.  Yes, that's mine."  Is

13      that what you mean?

14              THE COURT:  You say when you spoke with the agent, he

15      said he wanted to go over the inventory or go over these

16      items?

17              THE WITNESS:  On the telephone, yes.

18              THE COURT:  Yes.

19              THE WITNESS:  And get some background.

20              THE COURT:  And did he say why he wanted this

21      background?

22              THE WITNESS:  No, he did not.

23              THE COURT:  Did you ask?

24              THE WITNESS:  No, I did not.

25              THE COURT:  After your meeting and after you had

1        requested a copy of the inventory and you did not receive

2        that --

3                    THE WITNESS:  I requested a copy of the affidavit.

4                    THE COURT:  You did not request a copy of the

5        inventory?

6                    THE WITNESS:  I did not know -- I didn't know that

7        what they had in front of them was the inventory.  I'm sorry,

8        I thought I explained that before.  On going down to the

9        Clerk's Office, that's where I got a copy of the inventory

10       that was attached to the other papers as well, the search

11       warrant and the affidavit.

12                   THE COURT:  You were not aware that there was an

13       inventory in that office at that time?

14                   THE WITNESS:  In the office?

15                   THE COURT:  Yes, where you were meeting with the

16       agents?

17                   THE WITNESS:  What they were using, what they had in

18       front of them, no, I did not see -- I did not know that's what

19       it was.  Your Honor, they picked up bags at random and went

20       through the contents.  They did not match the bags at random

21       with what was written on a printed form, if that's what you

22       mean.

23                   THE COURT:  When you say the "printed form," you

24       mean --

25                   THE WITNESS:  The inventory, which I have come later

1    to find out.

2            THE COURT:  Did they have a copy of the inventory

3    there, as far as you know?

4            THE WITNESS:  Yes, this is what I know now.

5            THE COURT:  But you did not see the inventory?

6            THE WITNESS:  No, I did not.

7            THE COURT:  I have no other questions.  Any other

8    questions of the witness?

9            MR. DIXON:  No, sir, not from the Government.

10           THE COURT:  Mr. Povich?

11           MR. POVICH:  No, sir.

12           THE COURT:  All right.  Thank you very much, ma'am.

13   You may step down.  Do not discuss your testimony with the

14   other witnesses.

15           THE WITNESS:  Okay.

16                   ROBERT NORTHROP,

17   a witness called on behalf of the Government, having been

18   first duly sworn, was examined and testified as follows:

19           MR. POVICH:  How late would Your Honor like to go?

20           THE COURT:  No later than 5:00 o'clock, Mr. Povich.

21           MR. DIXON:  Your Honor, I think that Mr. Northrop may

22   be on the witness stand for quite some period of time.  Mr.

23   Bloodworth is available.  In light of the weather conditions

24   today, I would ask the Court to entertain allowing the

25   Government to release Mr. Bloodworth and have him come back on

1    Monday, because I don't think we're going to get to Mr.

2    Bloodworth today.  I mean, we may, but I think we may spend a

3    lot of time with this witness.

4         MR. POVICH:  Whatever you want, Your Honor.  I have

5    no objection.

6         MR. DIXON:  On the other hand, I would like, as the

7    Court would like to, I'm sure Mr. Povich, use every minute we

8    can to move this case along, but I just -- and I would not

9    make this request, other than the fact that the weather is so

10   bad today, and he has to go a ways to get home.

11        MR. POVICH:  I'm advised that Mr. Northrop will be on

12   for a long time.  The reason I'm advised, I think maybe we're

13   getting very far afield of what is essentially a limited issue

14   here.  It is not a question so much of what was said, but when

15   it was said, and following what sequence.  If we keep just

16   going back through this whole meeting, I don't think that's

17   really at issue in this case.  We're not challenging whether

18   somebody said something or didn't say something at this time.

19   We're only challenging what, if anything, prompted them.

20        THE COURT:  Well, let me ask you this, Mr. Dixon.  Is

21   there a particular time when -- I don't know where Agent

22   Bloodworth lives or how far he has to go, but I'm wondering if

23   we could hold him for, say, a half hour to see exactly where

24   we are at that point, and then make a judgment.

25        MR. DIXON:  That makes sense, Your Honor.

1        THE COURT:  But I'm certainly willing to go over, if

2  necessary.

3        MR. DIXON:  I would only ask if one of the Marshals

4  would be allowed to inform Agent Bloodworth that we're going

5  to employ that procedure.

6        THE COURT:  We'll let him know in about a half hour

7  or so.

8        MR. DIXON:  Proceed please, Your Honor?

9        THE COURT:  Yes.

10                    DIRECT-EXAMINATION

11        BY MR. DIXON:

12   Q.   Sir, in a loud, clear voice, would you state your

13  name and spell your last name.

14   A.   My name is Robert Northrop, N-O-R-T-H-R-O-P.

15   Q.   Are you employed, Mr. Northrop?

16   A.   Yes, I am.

17   Q.   Where?

18   A.   I'm employed by the U.S. Postal Service as a postal

19  inspector in Washington, D.C.

20   Q.   And how long have you been so employed?

21   A.   Approximately eleven years.

22   Q.   And in 1984, could you tell us what your primary

23  responsibility was as a postal inspector?

24   A.   It was a prohibited mailings assignment, which covers

25  items that are non-mailable, such as narcotics, bombs and

1    child pornography.

2        Q.   Now, I'd like to -- I would like you to focus on

3    April of 1984, and I'd like to ask you if you then had an

4    occasion to assist with the execution of a search warrant?

5        A.   Yes, I did.

6        Q.   And would you tell us what premises were searched,

7    please, and in what city?

8        A.   The search warrant was conducted in Washington, D.C.,

9    and the premise for it was the delivery of various magazines

10   and a role of film depicting child pornography that was in the

11   United States mail and seized by the U.S. Customs Service, and

12   eventually became the subject of a controlled delivery.  The

13   search warrant was based on the delivery of the contraband.

14       Q.   Now, can you give the Court the address of the

15   premises that you searched, if you recall?

16       A.   It's in my notes.  It was Connecticut Avenue.

17            MR. DIXON:  Would the defense stipulate to 2019

18   Connecticut Avenue, Northwest?

19            MR. POVICH:  Stipulated.

20            MR. DIXON:  We'd ask that the record reflect the

21   stipulation.

22            THE COURT:  All right.

23            BY MR. DIXON:

24       Q.   Now, once the search warrant was executed, were any

25   items seized?

1      A.   Yes.

2      Q.   What about the controlled delivery, was that seized?

3      A.   Yes, it was.

4      Q.   After the items were seized, and the controlled

5 delivery was seized, did you and others leave 2019 Connecticut

6 Avenue, Northwest?

7      A.   Yes, we did.

8      Q.   Now, did there come a time after the search that you

9 had an occasion to be contacted by an attorney?

10     A.   Yes.

11     Q.   All right, would you explain to the Court when that

12 was, first of of all?

13     A.   It was sometime after the search.  Not the same day

14 as the search, possibly a day or two.

15     Q.   And do you recall the name of that attorney?

16     A.   It was a Ms. Moolenaar.

17     Q.   Have you seen Ms. Moolenaar down here today?

18     A.   Yes.

19     Q.   And do you know if she was just in the courtroom

20 testifying before you came in?

21     A.   Yes.

22     Q.   Now, did Ms. Moolenaar represent anyone?

23     A.   Ms. Moolenaar was representing Mr. Nader.

24     Q.   Do you see Mr. Nader in court today?

25     A.   Yes, I do.

1          Q.   Would you identify him by where he's seated and

2     further identify him by an article of clothing he might be

3     wearing.

4          A.   Yes, Mr. Nader is seated at the table to my right, at

5     the head of the table, wearing a gray suit.

6          MR. DIXON:   Your Honor, may the record reflect an

7     identification of the defendant?

8          THE COURT:   It may.

9          BY MR. DIXON:

10         Q.   Now, as specifically as you can, will you explain to

11     the Court the substance of your conversation with Ms.

12     Moolenaar prior to -- the substance of your conversation with

13     Ms. Moolenaar immediately after or shortly after the search

14     warrant was executed at 2019 Connecticut Avenue?

15         A.   Basically, she was calling to advise me that she was

16     representing Mr. Nader in the matter that was before us, the

17     subject of this controlled delivery, and that she would like

18     to make an appointment, make a mutually convenient time to

19     come down and talk about the case and take a look at the

20     things that were seized.

21         Q.   Now, as specifically as you can, what did you tell

22     her about that proposal?  What did you say to her?

23         A.   I told her that yes, it was possible, and we'd be

24     more than happy to talk to her about it, and Mr. Nader as

25     well, and that I could get ahold of Agent Bloodworth, and if

1    the four of us could find a date and time, then we could meet

2    at the offices -- at the city post office, where the material

3    was being held.

4        Q.   Now, did there come a time that you talked with Ms.

5    Moolenaar again before that meeting, if a meeting was actually

6    held?

7        A.   I don't remember.

8        Q.   Now, Inspector Northrop, were you conducting a

9    criminal investigation at that time?

10       A.   Yes.

11       Q.   And what, if anything, did you say to Ms. -- well,

12   let me ask you this.  Was that investigation related to

13   anything that you had seized from 2019 Connecticut Avenue,

14   Northwest?

15       A.   Yes.

16       Q.   Now, what, if anything -- and be specific, sir -- did

17   you say to Ms. Moolenaar prior to any meeting that you may

18   have had vis that criminal investigation?

19           MR. POVICH:  Objection.  I think that was asked and

20   answered.  He only had one conversation with her prior to the

21   meeting, and he has already disclosed it.

22           MR. DIXON:  I'll withdraw the question, Your Honor.

23           THE COURT:  All right.

24           BY MR. DIXON:

25       Q.   Did there come a time that you discussed with Ms.

1    Moolenaar in what direction you were taking this

2    investigation?

3         A.    Yes.

4         Q.    When was that?

5         A.    It was before our actual meeting.

6         Q.    Okay.

7         A.    And -- the direction was probably more than one

8    direction.  Aside from the federal direction, if you want to

9    call it that, with respect to the elements of the controlled

10   delivery, probably the more pressing direction that I was

11   looking for was the identity of the personal photographs, the

12   identity of the children, the young boys depicted in the

13   personal photographs that were taken during the search, the

14   purpose of which was to determine whether or not there was any

15   sexual molestation with these children.  That is always the

16   prime concern in my office with respect to child pornography

17   investigations.  The pornography is second to the actual sex

18   offenses.

19        Q.    Now, did there come a time that there was a meeting?

20        A.    Yes.

21        Q.    And do you recall the date of the meeting?

22        A.    April 16th, 17th.

23        Q.    Is there anything that would refresh your -- well,

24   I'll withdraw that question.

25             MR. DIXON:  Would the defense stipulate that the

1    meeting was on April 16th, '84?

2         MR. HOFFMAN:   (Nodding in the affirmative.)

3         MR. DIXON:   Your Honor, may the record so reflect?

4         THE COURT:   It may.

5         BY MR. DIXON:

6    Q.   Now, about what time of day was the meeting?

7    A.   It started approximately 3:25.

8    Q.   And where was the meeting to take place?

9    A.   It took place in the inspector's office, third floor,

10   of the city post office here in Washington, D.C.

11   Q.   And who did you expect to attend?

12   A.   Three persons:  Ms. Moolenaar, Mr. Nader, Mr.

13   Bloodworth.

14   Q.   Now, how did Mr. Nader -- did Mr. Nader ultimately

15   appear at the meeting?

16   A.   Yes, he did.

17   Q.   How did he get there?

18   A.   I don't know how he got there.  He came with his

19   attorney.

20   Q.   Was Mr. Nader under arrest at any time?

21   A.   No.

22   Q.   When they arrived, how was the meeting initiated and

23   what, if anything, did you tell them you wanted to discuss?

24   A.   Okay.  I believe that Ms. Moolenaar initiated the

25   meeting, and one of the concerns that she expressed was

1  whether or not her defendant or client was going to be under

2  arrest or was going to be charged at the time, which we said

3  no.  It was clearly understood in my mind, and I tried to

4  communicate that as best I could to her, that he was not going

5  to be arrested; this was free and voluntary.  She wanted to

6  take a look at the case.  We wanted to take talk to the

7  defendant; we wanted to find out who the children were and

8  proceed from there.  And at no time would he be placed under

9  arrest.

10     Q.   Now, you said something about being charged.  What do

11  you mean by being charged?

12     A.   Well, at the time, there were no charges placed

13  against him for the importation of child pornography.  There

14  were none.

15     Q.   But what did you mean when you said that there would

16  be no charge?

17     A.   What I -- what I meant -- what I conveyed to her was

18  that her client was not under arrest, hadn't been presented

19  for any grand jury action; that he was free to come and go as

20  she deems necessary or whatever.

21     Q.   Now, let me ask you this.  Was an assistant United

22  States attorney assigned to this case at that time?

23     A.   Yes.

24     Q.   And do you recall the name of the assistant?

25     A.   Yes, his name was Behr, B-E-H-R, I think, Douglas

1    Behr.

2        Q.    Would that be Douglas Behr?

3        A.    Yes.

4        Q.    And let me ask you this, Mr. Northrop.  Do you make

5    decisions about charges being brought against persons --

6        A.    No.

7        Q.    -- by the grand jury, at the grand jury level?

8        A.    No.  She understood that.  Also --

9        Q.    Hold it now.

10            THE COURT:  Just a moment.

11            BY MR. DIXON:

12       Q.    There's no question pending.  I haven't asked you a

13   question.

14            Now, let me ask you this.  Had you explained that to

15   Ms. Moolenaar?

16            THE COURT:  Explained what to Ms. Moolenaar?

17            MR. DIXON:  About the no arrest and the charge.

18            BY MR. DIXON:

19       Q.    When you explained those two things to Ms. Moolenaar,

20   did she and her client leave at that point, get up and leave

21   the room and go away?

22       A.    No, that understanding -- we had that understanding

23   before the meeting, and it was -- it was a known fact at the

24   outset of this meeting.  It was clearly understood at the time

25   of this meeting that this particular client of hers was not

1    under arrest, would not be placed under arrest, and that no

2    charges were presented for the grand jury against him.  That

3    was both before the actual meeting took place and at the very

4    outset of this meeting.

5            THE COURT:  When you say "before the meeting took

6    place" --

7            THE WITNESS:  I believe in our conversation, when we

8    were talking about looking at the case and talking to this

9    client, that she may have expressed that.  I feel pretty

10   certain that she asked me that in the telephone conversation.

11           THE COURT:  She asked you what?

12           THE WITNESS:  Whether or not he was going to be

13   arrested; if she brought him down to the post office, would he

14   be free to go home.  My answer was yes, he's free to do

15   whatever he wants to do.

16           BY MR. DIXON:

17       Q.   So then, when you said earlier, when you related

18   earlier the items or issues that you talked with Ms. Moolenaar

19   about over the phone before the meeting, you were mistaken,

20   because you did not include what you have just told us about?

21       A.   Yes.

22       Q.   Is there anything else?

23       A.   Not that I can remember.  That seems to cover it all.

24       Q.   Now, once that occurred at the meeting in your

25   office, what is the next thing that you started to talk about

1   with Ms. Moolenaar and Mr. Nader, if anything?

2        A.   From the very outset of the meeting, after

3   introductions were made, we wanted to get some personal

4   information from Mr. Nader.   They wanted to look at the

5   evidence.

6        Q.   Who is "they"?  Who are you talking about?

7        A.   Ms. Moolenaar and Mr. Nader.

8        Q.   What evidence are you talking about?

9        A.   Items that were taken during the search.

10       Q.   And be specific, now.   I'm going to ask you, for

11  future reference, when you're on direct with me or redirect,

12  if necessary.   We are going to talk about two pieces of

13  evidence --

14            MR. POVICH:   Objection.   I think the admonition of

15  being specific is sufficient, Your Honor.

16            BY MR. DIXON:

17       Q.   When you speak about evidence that was found in Mr.

18  Nader's room, I would like you to make it clear.

19       A.   Okay.

20       Q.   And when you speak about other evidence, I'd like you

21  to make it clear.

22       A.   Okay.

23       Q.   Now, which evidence -- after you got the background

24  information from Mr. Nader --

25       A.   Mm-hmm?

1    Q.   -- did there come a time that you started discussing

2    evidence?

3    A.   Yes.

4    Q.   And what evidence did you start to discuss first?

5    A.   Okay.  We talked about the controlled delivery, the

6    evidence that is the subject of the controlled delivery, the

7    package that was seized by Customs.

8         Mr. Nader gave us some background information as to

9    his employment, that he was the editor and affiliated with

10   International Insight and its publications.  Well, that also

11   was part of the address on the controlled delivery, and so

12   that more or less led into the discussion of that particular

13   piece of evidence.  It had his name on it.  It had his

14   company's name on it.  It had his home address on it.

15        The controlled delivery was never opened.  At that

16   time, it was in a sealed condition.  Technically, it was in a

17   resealed condition.  It was originally opened by Customs.

18        We showed him the piece, and that's what was on the

19   table.  On the floor, in a hamper, was all of the evidence

20   that was taken from his residence, everything that is not the

21   controlled delivery, and as itemized in the search warrant

22   inventory.

23   Q.   Did you have a copy of the inventory?

24   A.   Yes, a copy was available to everybody.

25   Q.   Okay, when you say that, what do you mean?

1          A.    A copy was available to myself, Agent Bloodworth, and

2     Ms. Moolenaar representing Mr. Nader.

3          Q.    Well, let's just stay on that for just one moment.

4     How was a copy made available to Mr. Nader and Ms. Moolenaar?

5          A.    I have a copy of the inventory, and whether I Xeroxed

6     it or made my tissue copy available there, it was on a cleared

7     off table, approximately the size of those tables there.

8     There was nothing on that table, other than a note pad and

9     whatever items they brought with them.  The idea was to keep

10    the table clean, go through the material, the evidence in an

11    orderly fashion.  The first thing we started with was the

12    envelope containing the contraband, the controlled delivery.

13          So having talked about his employment with the

14    International Insight, and that leading into the controlled

15    delivery, that's what was on the table.  That was the focus of

16    our attention.

17         Q.    Now, what did you say to Ms. Moolenaar about the

18    controlled delivery at that point, if anything?

19         A.    It was explained to her that this is the controlled

20    delivery, that it was severed from the other evidence taken in

21    the house; that this was the crux of the whole thing that

22    brought us all together, this was the point at issue.

23         Q.    And did you say anything to Ms. Moolenaar about the

24    legality of the material in the controlled delivery?

25         A.    No.

1    Q.   Why?

2    A.   It was still in a sealed condition, and it wasn't

3    visible, and all I wanted to do at that particular point in

4    time was to present it to the defendant and his attorney,

5    which she was representing him -- we were all given to

6    understand she was representing him; she was his retained

7    counsel -- and we wanted to see what he had to say about it.

8         THE COURT:  See what?

9         THE WITNESS:  We wanted to hear what he had to say

10   about it.  He had been talking about his company,

11   International Insight was part of the address, so that's what

12   led right into that: so if that's your company, and this is

13   your name, and this is your home address, not your company

14   address, do you recognize this mailing?

15        BY MR. DIXON:

16   Q.   Okay, let me ask you this now.  Before you started to

17   talk about that, was there any discussion after -- either

18   before or after you got the biographical information, about

19   pornography, as you can recall?

20   A.   Well, I can't recall specifically what was said, but

21   it would suffice to say that we all knew what we were there

22   for.  We all knew that it was a pornography case.  We all knew

23   that it was dealing with child pornography, and that we were

24   concerned about minors, male minors, and that our primary

25   concern at that time was the identity of these local children.

16

1      Q.   Okay, now --

2      A.   So she surely knew that that's what we were talking

3   about.

4      Q.   Okay, now, you're saying she surely knew, and you're

5   assuming and drawing conclusions.  Tell the Court specifically

6   what either you said or what the circumstances were, if there

7   were any obvious circumstances, that led you to that

8   conclusion, that Mr. Nader and Ms. Moolenaar knew that you

9   were there about child pornography?                    .

10      A.   Let me seem if I understand your question.

11      Q.   Okay, I'll withdraw that question and ask you this.

12   Either during or before you got the personal history

13   information, you indicated that through conversations that you

14   had with Ms. Moolenaar prior to that, she was aware that you

15   were coming down to discuss contraband?

16      A.   That's right.

17      Q.   And I'm asking you to recall back upon those

18   conversations and what words you used to explain to her

19   exactly what you were interested in when she was coming down,

20   when she was sitting in your office, before you got to the

21   controlled delivery on the telephone or during the time you

22   were asking about biographical information?

23           MR. POVICH:  Objection, Your Honor.  It's leading,

24   and it's a multiple question, and I don't think it should be

25   prefaced by editorial comment about what has been said so far.

1    The question has been asked and answered about four times now.

2              THE COURT:  Mr. Dixon.

3              MR. DIXON:  Your Honor, the question that I'm putting

4    to the witness is a question specifically related to how he

5    informed Ms. Moolenaar and Mr. Nader about the substance of

6    their meeting.  The witness has said --

7              THE COURT:  Well, why don't you stop right there, and

8    we'll take the answer to that question.

9              THE WITNESS:  Would you ask the question.

10             BY MR. DIXON:

11   Q.    Okay, how did you inform Mr. Nader and Ms. Moolenaar

12   of the substance of your meeting?  How did you prepare them

13   for what you were going to talk about?

14   A.    Okay.  What I wanted them to discuss that was of

15   primary interest to me was the identity of some personal

16   photographs depicting young boys.  The reason why the identity

17   of these boys was important to me, as I explained to Ms.

18   Moolenaar, was to determine whether or not these children were

19   sexually molested by her client.

20             The sex offenses, the molestation of the minor

21   children, would have been the primary direction that this case

22   would have been going, since we view the identity and the

23   subsequent sex offenses generally litigated in state courts

24   more important than the pornography cases.

25   Q.    All right.

1          A.   That was clearly one of the things that I intended to

2     get out of this meeting, was his cooperation in that respect.

3               MR. POVICH:   Your Honor --

4               THE COURT:   Mr. Povich.

5               MR. POVICH:   That's not responsive to the question.

6     The question was what did he say to them, not what he wanted

7     to get.   Obviously, what he wanted to get and what he told

8     them are two different things.

9               MR. DIXON:   Your Honor, he has stated what he told

10    them.

11              THE COURT:   No, he put it in terms of what he wanted,

12    and I'm not sure it's actually clear that that's what he said.

13    If he did, he can tell us.

14              THE WITNESS:   That's what I would have --

15              THE COURT:   What did you say?

16              THE WITNESS:   I said what I wanted to get from him

17    was his cooperation with respect to the identity of these

18    children depicted in these photographs, to determine whether

19    or not there was any sexual contact between them, any child

20    molesting here, and that that was the primary direction that I

21    was concerned with at the time, and that that would be

22    discussed at our meeting.

23              BY MR. DIXON:

24         Q.   All right, now, once you got the biographical

25    information, you told us you started talking about the

1   evidence in the controlled delivery.  Tell the Court what

2   questions you put to Mr. Nader about the controlled delivery.

3       A.   Okay.  Mr. Nader was asked -- he was presented the

4   controlled delivery on this table, asked if that was his.  He

5   acknowledged that that was his name.

6           He also acknowledged -- I asked and he acknowledged

7   in the affirmative that he had ordered that material, that he

8   recognized it.  The only way that I can assume that he

9   recognized it would have been the return address, but he

10  acknowledged that yes, that was his.

11          Without looking at the material inside, I asked him,

12  "What do you think is in this?"

13      Q.   What did he tell you?

14      A.   He said that it would probably contain some pictures

15  of boys, and I believe he said something to the effect that

16  there would be sexually explicit material containing boys.

17      Q.   Now, when you asked Mr. Nader the first question,

18  showed him the controlled delivery and asked if he knew

19  anything about it, did Ms. Moolenaar say anything?

20      A.   No.

21      Q.   Did Ms. Moolenaar attempt at all, as you can see, to

22  stop Mr. Nader from saying anything?

23      A.   No.

24      Q.   Did she appear alarmed to you at that point?

25      A.   No.

1     Q.    Before Mr. Nader answered you, did he look in the

2     direction of Ms. Moolenaar?  As you can remember.

3     A.    No.

4     Q.    Now, let's go to the second question you asked Mr.

5     Nader about, the controlled delivery, and that was whether --

6     what did he think was inside of the controlled delivery.  When

7     you asked him that question, did Ms. Moolenaar try to stop him

8     from answering?

9     A.    No.

10    Q.    Now, did you know at that point what was inside the

11    controlled delivery?

12    A.    Yes.

13    Q.    And was Mr. Nader's description accurate or

14    inaccurate?

15    A.    It was accurate.

16    Q.    After Mr. Nader made that -- answered that question,

17    what is the next thing you asked him about?

18    A.    I believe we opened it up.  He gave us a description

19    that it would contain pornographic materials depicting boys or

20    something along those lines.  It was an accurate description.

21    The package was opened up.

22         What I wanted him to do was initial and date the

23    package, and then initial and date its contents.  At that

24    point, Ms. Moolenaar said no, and she instructed her client

25    not to do that.

1    Q.    Did there come a time that you asked Mr. Nader

2    questions about how he came to get the -- order the items in

3    the controlled delivery ?

4    A.    Yes.

5    Q.    Could you explain?

6    A.    Well, we -- the conversation was -- I would describe

7    it as casual.  It was a free-flowing, casual conversation.  It

8    was not adversarial.  She did not want her client to initial

9    and date the materials, but to talk about them was not a

10    problem.  So we went on talking about them.

11    Q.    Okay, now, when you say she did not want her client

12    to initial and date them but talking about them wasn't a

13    problem, what did she do or say that led you to the conclusion

14    that she was comfortable that Mr. Nader talk about the items

15    in the controlled delivery?  What did Ms. -- if you're

16    speaking of Ms. Moolenaar now?

17    A.    Yes.  She said that no, she didn't want her client to

18    initial and date the controlled delivery; she just didn't want

19    him to do that.  As for terminating this conversation, no, it

20    was fine to talk.  As for talking about this subject matter,

21    as opposed to going off on some other course, that was not a

22    problem with her.  We were free to talk about the controlled

23    delivery, but there would be no initialing and dating of the

24    controlled delivery.

25    Q.    Now, let me ask you this.  Do you know what a warning

1    and waiver of rights form is?

2        A.    Yes.

3        Q.    And did there come a time that that became a subject

4    to be talked about?

5        A.    Yes.

6        Q.    Would you explain how that happened?

7        A.    Okay.  We focused our attention back to this

8    controlled delivery, and Mr. Nader explained to us how he came

9    to do business with the person whose name appeared on the

10   return address portion of this shipment, and having gotten a

11   statement from him as to where he first met him, where he

12   first came into contact with this kind of material and how he

13   ordered it, which he acknowledged ordering, we began to get

14   into the other evidence.

15        So the controlled delivery was reassembled, put back

16   in the envelope, and set aside.  Then we'd get into the other

17   evidence.

18        Now, as I recall, some of the first things we looked

19   at were other pornographic magazines, similar types of child

20   pornography.  Mr. Nader would acknowledge having ordered these

21   from this source, and I would ask him to initial and date

22   that.  Ms. Moolenaar stated that he can talk about it, but I

23   don't want him to give any written statements, and I don't

24   want any initialing and dating done.

25        Ms. Moolenaar, acting in the capacity of his attorney

1    and not allowing certain things to be done, I stated to her

2    that this is an active investigation, and I'm a postal

3    inspector, and Agent Bloodworth is a customs agent, and we

4    obviously have a vested interest in going over this material

5    and having this discussion continue, and if we had things our

6    way, of course, we would prefer that we could reduce all this

7    to writing and have a clean statement, preferably in her

8    client's handwriting, as to exactly what he did with respect

9    to his business dealings with this exporter, and since we

10   weren't going to get that, obviously, and since no initialing

11   and dating was even going to be permitted, and because this

12   was an open investigation, that although no charges had been

13   filed, and I'm not the person that makes that decision,

14   anyway, and I also remember her having told us at the outset

15   that she was a former assistant United States attorney

16   practicing, I believe, in Las Vegas, Nevada, I told her that

17   it wasn't necessary for me to explain my job to her, that we

18   both understand from your experience what it is that we want,

19   and at this juncture, because she is actively representing

20   him, I thought it was necessary to be more formal, that the

21   conversation would hopefully remain cordial, but not quite as

22   casual, that we're going to discuss business now, and at that

23   point I told her I'd feel more comfortable at the very minimum

24   of formally advising your client, and I produced a standard

25   warning and waiver form, and gave the client a warning and

1    waiver.

2         Q.    And did he sign it?

3         A.    Yes, he did.

4         Q.    And did Ms. Moolenaar sign it?

5         A.    Yes, she did.  I read it aloud to him, and if I

6    remember correctly, I circled the first line in our version,

7    the inspection service version of the warning and waiver, and

8    made him read it aloud, and it took a couple of minutes.

9    Whatever questions he had, he had retained counsel there.  So

10   the warning and waiver was executed.

11        Q.    I show you Government's No. 1, and I'll ask you to

12   identify that, please, if you can?

13        A.    Okay.  Government Exhibit No. 1 is the United States

14   Postal Inspection Service warning and waiver of rights, and

15   it's a two-part form, the first part being a warning, and the

16   second part being a waiver.  I have the warning portion

17   circled.

18        Q.    Let me just ask you this.  Do you recognize that as

19   similar to anything, any document that you've executed,

20   pursuant to your testimony?

21        A.    Yes.

22        Q.    And what is that?

23        A.    This is the warning and waiver form that we executed.

24        Q.    And do you see any familiar signatures?

25        A.    Yes.

Q.   Do you see anything else that you recognize about
that warning and waiver?

A.   Yes.

Q.   What is that?

A.   Okay, the warning portion is underlined.  I
underlined that as I read that to him.

Q.   Mm-hmm.

A.   The first sentence says -- well, it says, "Before you
are asked any questions, you must understand your rights," and
the first point in that regard is:  "You have a right to
remain silent."  I circled that, asked him to read that aloud.
He read it aloud.  I continued with the rest of the points in
the warning portion, and two minutes later, he signed it; he
signed both parts.

Q.   Now, after the warning and rights was executed,
signed by Mr. Nader and his attorney, did you continue to talk
to Mr. Nader?

A.   Yes, we did.

Q.   And what did you talk about?

A.   We talked about all the rest of the evidence, and we
talked about all the previous evidence in a very brief kind of
way.  I mean, we had already established in the conversational
flow that he recognized the controlled delivery, that he
ordered the materials.  He recognized the return address.  He
told us of how he came to know this company.  He acknowledged

1      doing previous business with them.

2              There was one piece of evidence that had a different

3      name.  He acknowledged that that was a name that he used, an

4      alias, as it were, and I went back all over that verbally.

5          Q.   Okay, when you say --

6          A.   Having -- immediately after executing this warning

7      and waiver, I went back over all that to have him repeat that.

8          Q.   Okay, now, when you say you "went back over all of

9      that," did you go back over the controlled delivery?

10         A.   Yes, that being the controlled delivery and the

11     evidence that we had gotten to that point, which, as I recall,

12     was a lot of evidence that I would have preferred to have him

13     initial and date.

14             To be certain, there was a lot of evidence there that

15     was neither here nor there to me -- I really wasn't that

16     concerned about it -- but with respect to previous mailings

17     and similar types of magazines, I would have preferred to have

18     him initial and date those, but we couldn't get that done.

19     She did not want her client doing that.

20             A warning and waiver was executed, and having gotten

21     that out of the way and more or less formalized our positions

22     here, I went back over his statements of the controlled

23     delivery and his continuing statements as to his acknowledging

24     the previous business dealings, this alias that he used, and

25     how he got ahold of it, and then the rest of the conversation

1    or meeting went forward from that point.

2        Q.    Now, after you used the warning and rights, and you

3    went back again over the controlled delivery, asking specific

4    questions about that, during that questioning period did Ms.

5    Moolenaar attempt to stop Mr. Nader from answering any

6    questions the second time around?

7        A.    No, she never did that.  I'd like to add, there are

8    three --

9        Q.    Well, no, you've answered the question.

10            MR. DIXON:  Indulgence please, Your Honor.

11            BY MR. DIXON:

12       Q.    About how long did this interview last, Agent

13   Northrop, would you say?

14       A.    It started at about 3:25, and ended approximately

15   5:00.

16       Q.    Now, with reference to Mr. Nader, during the course

17   of the interview -- and let's focus on after you warned him of

18   his rights -- did Mr. Nader have any problems at all in

19   communicating with you?

20       A.    No.

21       Q.    Did it appear to you that Mr. Nader understood the

22   questions you were asking him?

23       A.    Yes.

24       Q.    About the controlled delivery?

25       A.    Yes.

1     Q.    Did Mr. Nader appear to be afraid to you?

2     A.    No.

3     Q.    Did there come a time, dealing with the period after

4  you Mirandized Mr. Nader, that he, when you were asking him

5  questions, did he ever turn to Ms. Moolenaar for assistance,

6  to ask her a question after you had asked him one?

7     A.    No.

8     Q.    How was Mr. Nader's English?

9     A.    His English is very good.

10          MR. DIXON:  Indulgence please, Your Honor.

11          BY MR. DIXON:

12    Q.    How was the meeting ended, Mr. Northrop?  What was to

13 happen after April 16th, 1984, with reference to this case and

14 Mr. Nader?

15    A.    Okay.  Mr. Nader was free to go, and was not placed

16 under arrest.  I told them and/or Agent Bloodworth, it was

17 communicated on our part to them that, to be perfectly honest

18 with them, we didn't know what was going to happen with the

19 case -- that wasn't our judgment call, anyway -- that whether

20 or not his prosecution would be authorized was something the

21 U.S. Attorney's Office would decide.  She obviously understood

22 all of that.

23    Q.    Don't reach any conclusions.

24    A.    Okay.

25    Q.    What else did you say?

1    A.    I had several names and addresses of children.  I

2    told her that what I intended to do was to begin contacting

3    these people.  I wanted to talk to the parents and/or the

4    children and find out if there was anything of substance

5    there, and they expressed an interest in helping the

6    government with the case.

7    Q.    Now, when you informed Ms. Moolenaar, as you have

8    just said, that you could not make a decision on the

9    prosecution, you didn't know what was going to happen, you'd

10   have to go someplace else, to the U.S. Attorney's Office, what

11   was her reaction, if any?

12   A.    Her reaction was one of intimate knowledge of that

13   process.  She had told us that she had been in that

14   occupation, and she was -- she understood that.

15   Q.    Well, let me ask you this.  After you made that

16   statement to her, did you note anger coming from her?

17   A.    No.

18   Q.    Did she express --

19        MR. POVICH:  Objection, Your Honor.  Your Honor,

20   these are all leading.  He says yes or no, yes or no.

21        THE COURT:  Sustained.

22        BY MR. DIXON:

23   Q.    Let me ask you this.  Did she appear to be surprised?

24        MR. POVICH:  Objection.

25        MR. DIXON:  That's something that he can view

1    himself, Your Honor, facial expression.  It doesn't call for

2    hearsay, a hearsay response.  He can just tell us what her

3    expression was.

4          MR. POVICH:  Just ask her what she did after he told

5    her this.

6          THE COURT:  Sustained.

7          BY MR. DIXON:

8    Q.   What did she do after you told her that, after you

9    explained to her what was going to happen next?

10   A.   She seemed -- she acknowledged that she understood

11   what our position was, and what had to happen next.  It was a

12   very matter of fact type ending.

13   Q.   Did you return any materials to Mr. Nader or Ms.

14   Moolenaar?

15   A.   I don't recall.  I believe that he was inquiring

16   aoubt a passport, and I do believe he got it.

17   Q.   You gave him his passport?

18   A.   There was some kind of papers like that.  It was a

19   passport or something.  I am not that familiar with those, and

20   Customs seemed to know more about the stamping, comings and

21   goings.

22   Q.   Did Ms. Moolenaar ask for any of the documents --

23   I'll withdraw that question.  Did Ms. Moolenaar ask for

24   anything from you, anything at all that you can remember,

25   dealing with your conversation and the documents that you

1    handled?

2         A.   Not that I can think of.

3         Q.   Did there come a time after that, that you had any

4    contact with Ms. Moolenaar, either by phone or in person?

5         A.   I don't believe I did.

6         Q.   Did you have any contact with Mr. Nader after that,

7    either by phone or in person?

8         A.   I believe Mr. Nader contacted Customs.  I don't

9    recall having any contact with him after that.

10        Q.   I'm just talking about you.

11        A.   No.

12             MR. DIXON:  Nothing further, Your Honor, subject to

13   cross-examination.

14             THE COURT:  Before we have cross, I note the time is

15   after 4:00 o'clock, and I suspect we're not going to reach Mr.

16   Bloodworth.  I'm not sure how long the cross will take.  Is it

17   Bloodworth?

18             MR. DIXON:  Yes, Your Honor.

19             THE COURT:  So I think we can excuse Mr. Bloodworth.

20             MR. DIXON:  Okay.  I would ask if the Marshals could

21   advise Mr. Bloodworth.

22             THE COURT:  And are you available on Monday, Mr.

23   Povich?

24             MR. POVICH:  What is the date of that, Your Honor?

25             THE COURT:  The 10th.

1      MR. POVICH:  I believe so, Your Honor.  I believe I

2   am.

3      THE COURT:  It will have to be in the afternoon.

4      MR. DIXON:  That's agreeable, Your Honor.

5      MR. POVICH:  I think that's all right, Your Honor.

6      THE COURT:  All right, so it will be 1:30 Monday

7   afternoon.

8      THE COURT:  All right, Mr. Povich.

9                      CROSS-EXAMINATION

10      BY MR. POVICH:

11      Q.   Mr. Northrop, what would initialing and dating of a

12   package mean, if done at your request?

13      A.   What I wanted him to do was --

14      Q.   No.  What would initialing and dating of a package

15   mean, if done at your request?

16      A.   Well, to me, it would have been -- it would have

17   provided his acknowledgement of the specific items that we

18   were talking about, with respect to ordering them and

19   acknowledging that they were his.

20      Q.   In other words, if you ask someone whether or not you

21   ordered this package and were the contents yours, and the

22   person said yes, you would expect that he would then initial

23   and date the package?

24      A.   I would ask him to.

25      Q.   And if he declined to do so?

1  A. Then he would decline to do so.

2  Q. When you asked -- did you tell Mr. Nader and Ms.

3 Moolenaar what initialing and dating the controlled delivery

4 package would mean?

5  A. I asked him to initial and date it, and told her that

6 I would prefer that he would initial and date it, so that we

7 could establish that that is one of the items that we talked

8 about with respect to his admissions.

9  Q. Oh.

10  A. It wasn't simply yes, that is my property.

11  Q. So you mean, when you told her that you wanted him --

12 and you told him to initial and date it, that it was simply a

13 package that you talked about with respect to admissions?

14  A. Yes.

15  Q. And was the admission, that he ordered that package

16 and the contents were his?

17  A. Yes.

18  Q. Well -- but you didn't tell her that?

19  A. No, I did tell her that.  That's what we under --

20 that's what -- I wanted him to initial and date the items that

21 we had shown him that were the substance of the charge, the

22 controlled delivery evidence, and the other evidence taken in

23 the search, that he acknowledged having purchased and ordered

24 and directed into this country.

25  Q. Now, on that occasion he declined to do so on the

1    advice of counsel; was it not true?

2        A.    That's correct.

3        Q.    And she would not let him or advised him against

4    that, right?

5        A.    That's correct.

6        Q.    But that was not based upon anything that he told

7    you?  That was not because he denied ordering or would not

8    answer any questions concerning whether he ordered that

9    package?

10       A.    No.

11       Q.    And knew its contents?

12       A.    No.   That was based upon her decision to advise him

13   not to do that.

14       Q.    Had nothing to do with what he said?

15       A.    No.   Him?  He admitted ordering it.  He would have

16   initialled and dated it, and she advised him not to do it.

17       Q.    Even though the initialing and dating would have

18   meant that he acknowledged that he ordered that package?

19       A.    That's correct.

20       Q.    Do you have a memorandum of your interview?

21       A.    Yes.

22       Q.    Could I see it, please?

23       A.    I don't have it.

24            MR. POVICH:  Do you have it, counsel?

25            (Handed to counsel.)

1          THE DEPUTY CLERK:  Defendant's Exhibit No. 6, marked

2     for identification.

3                              (Defendant's Exhibit No. 6

4                               was marked for identification.)

5          BY MR. POVICH:

6          Q.   I show you what's been marked as Defendant's Exhibit

7     6.  Can you tell us what it is?

8          A.   It's an investigative memorandum.  It is a memorandum

9     of this interview.

10         Q.   Does this memorandum contain information relating to

11    what transpired during the course of that meeting?

12         A.   Yes.

13         Q.   Was it important during the course of that meeting

14    that the package be opened and the defendant be given an

15    opportunity to examine it, the controlled delivery package?

16    When I say "package," that is what I'm talking about.  Was it

17    important that that happen?

18         A.   I thought it important that he acknowledge its

19    contents before it was opened.

20         Q.   Yes or no.  Yes or no.  Was it important that the

21    package be opened, and he examine the contents and acknowledge

22    that that is what he ordered?

23         A.   Yes.

24         Q.   Is there anything in that entire memorandum that

25    indicates that that package was anything other than sealed?

1       A.    It indicates on page 3 that it was sealed, in a

2    sealed condition.

3       Q.    Does it indicate that it was ever opened?  I said

4    anything other than sealed.

5       A.    No.

6       Q.    You stated that your primary concern was whether

7    there had been child molestation?

8       A.    Right.

9       Q.    Did you tell Ms. Moolenaar that at any time, either

10   before the meeting or during the course of the meeting or

11   subsequent to the meeting?

12      A.    I probably told her that at all those stages.

13      Q.    You told her that you would like to speak with her

14   client to find out whether or not there had been any child

15   molestation?

16      A.    That's correct.

17      Q.    And that that was the reason why you wanted him to

18   come down to identify what was taken from his room?

19      A.    That wasn't the sole reason.  I think she wanted to

20   see what was taken from his room.

21      Q.    What made you -- why do you say that you feel that

22   she wanted to see what was taken from his room?

23      A.    I think she wanted to get a feel for the case, the

24   materials involved.

25      Q.    Isn't there some way, an attorney looking to see what

1    was seized in the course of a seizure pursuant to a search

2    warrant, without coming down with her client and examining

3    them?

4         A.   I assume there is.  That's --

5         Q.   She could have called you up and said she wanted to

6    come see it, couldn't she?

7         A.   Yes.

8         Q.   She could have gotten an inventory, couldn't she?

9         A.   Yes.

10        Q.   By the way, the inventory, did you lead -- did you

11   participate in the execution of the search warrant?

12        A.   Yes.

13        Q.   Is this the inventory which was made out or a copy of

14   the inventory?

15        A.   Yes.

16        Q.   What did you do with that inventory?

17        A.   That pink copy --

18             THE COURT:  That is Exhibit --

19             MR. POVICH:  I am sorry, Your Honor, you're right.

20             BY MR. POVICH:

21        Q.   I show you what has been marked as Exhibit 4, Your

22   Honor --

23             THE COURT:  Defense four.

24        Q.   -- the pink copy of the report and return, executed

25   by Mr. Gauntt.  What did you do with that inventory?

1        A.    The materials or the inventory sheet?

2        Q.    The inventory sheet.

3        A.    Okay.  A copy was given to Mr. Gauntt, a copy would

4    have been returned to the Court, and another copy would have

5    been kept by me.

6        Q.    A copy was returned -- was given to Mr. Gauntt?

7        A.    Yes.

8        Q.    You're certain of that?

9        A.    J. Gauntt.

10       Q.    You're saying a copy was given to Mr. Gauntt because

11   his signature appears on the line, "recipient;" is that right?

12       A.    That's right.

13       Q.    That's why you're saying it?

14       A.    Right.

15       Q.    Do you have an independent recollection as well that

16   a copy was left with him?

17       A.    It seems like it was.

18       Q.    It seems like it was?  Do you recall it?

19       A.    I gave it to Mr. Gauntt or Mrs. Gauntt.  I don't

20   remember if it was to the Mrs. or the Mister.

21       Q.    Well, did you give it to the person -- well, would

22   you have given it to Mrs. Gauntt and had Mr. Gauntt sign it?

23       A.    It says "J. Gauntt."  Whoever I gave it to, that's

24   the signature they gave, they put on it.

25       Q.    And it's your testimony that that Exhibit 4, pink

1     copy, was left with Mr. Gauntt?

2       A.   Right.

3       Q.   And you have an independent recollection of that?

4       A.   Of the Gauntts?

5       Q.   Of giving it to the Gauntts?

6       A.   Right, Mr. and Mrs. -- I don't remember at the time.

7     I think they were both home.

8       Q.   No, no. Do you have an independent recollection of

9     giving it to either Mr. or Mrs. Gauntt?

10       A.   No.

11       Q.   You don't?

12       A.   No, I don't know who -- I don't know which one.

13     Whoever signed that is the person that it was given to.

14       Q.   If Mr. Gauntt signed this, and Mr. Gauntt said he

15     signed it, then you have an independent recollection that you

16     gave it to him?

17       A.   That doesn't sound so independent. I gave it to

18     whoever signed that. I don't remember if it was Mister or

19     Mrs.

20       Q.   And is this a document which was available to the

21     defendant and his counsel at the time?

22       A.   Yes. At the time of our meeting?

23       Q.   Did you see defendant and counsel or counsel look at

24     this at the time you were going through the items which were

25     seized?

1      A.   Yes.

2      Q.   You did?

3      A.   Yes.  Not the pink sheet.  I don't remember if it was

4  the pink sheet.  I had my copy.  Copies were available to her.

5      Q.   Copies -- well, you've said that.  You mean you would

6  have copied one for her?

7      A.   Yes, she would have had -- she would have had that,

8  mine or their own copy.  I don't remember which one she was

9  following along with.

10      Q.   She was following along with a document such as this?

11      A.   Yes.

12      Q.   You have a specific recollection of that?

13      A.   Yes.

14      Q.   And you believe that she wanted to have the meeting

15  because she was curious as to what was seized?

16      A.   I believe she wanted to see the material that was

17  seized, and express some cooperation with the government on

18  behalf of her client, yes.  That's why I think she wanted to

19  have the meeting.

20      Q.   Well, what did she tell you?  Forget what you

21  believe.  What did she tell you?

22      A.   She said that she wanted to see the evidence that was

23  seized.  She told me that.  I told her that it would be

24  available, she could look at it.  We would schedule a time.

25  Myself and the client and Bloodworth would be there.  That we

1    would try to answer any questions that they may have about

2    whether or not he'll be arrested or how the case will go from

3    there.  I told her that I would be interested in the identity

4    of these other children.  She agreed to that.  That,

5    basically, anything she wanted would be put on the table, and

6    she is free to ask all the questions she wants.

7        Q.   Who initiated the request that this meeting take

8    place, you or her?

9        A.   She.

10       Q.   She did?

11       A.   (Nodding in the affirmative.)

12       Q.   Were you surprised to hear from her?

13       A.   I don't remember if I was surprised.  I probably

14   wasn't.

15       Q.   You didn't indicate to her that you would like her

16   client to come down and discuss these matters with you?

17       A.   I think it was a mutual interest.

18       Q.   No?

19       A.   I think I wanted to discuss things with her client as

20   much as she wanted to see the case.

21       Q.   Well, she -- most lawyers don't show up to inquire

22   about a case with their clients, do they?

23       A.   No, they don't.

24       Q.   And you are saying that that she went down there with

25   her client to discuss the case with you?

1      A.    That's correct.

2      Q.    At her request or at yours?

3      A.    I would say at theirs.

4      Q.    At theirs?

5      A.    At their request, Nader's and Moolenaar's.

6      Q.    They were anxious to come down to discuss this?

7      A.    They didn't have any reservations that I could see.

8      Q.    I didn't ask you if they had any reservations.

9      A.    Then I would say they were anxious.

10      Q.    And it was at their initiation that this meeting took

11 place at the post office?

12      A.    Business cards were left at his residence, and they

13 contacted us.

14      Q.    What was the business card left at the residence for?

15      A.    Well, we thought maybe Mr. Nader would like to know

16 who was in his room at the very minimum, so we left him our

17 names and business cards.

18      Q.    Well, did you leave --

19      A.    And they contacted us, and a meeting evolved.

20      Q.    Well, doesn't this search warrant inventory indicate

21 who took what from his room?  Did you leave --

22      A.    Yes.

23      Q.    Yes?

24      A.    Yes.

25      Q.    Did you leave the business cards because you didn't

1     leave the warrant?

2          A.    We left both.

3          Q.    Well, you left both?

4          A.    That's correct.

5          Q.    You left -- where did you leave the business cards?

6          A.    Left them with whoever I left a copy of the inventory

7     with.

8          Q.    Mr. Gauntt?

9          A.    J. Gauntt.

10         Q.    J. Gauntt?

11         A.    (Nodding in the affirmative.)

12         Q.    And you specifically recall discussing with Ms.

13    Moolenaar your desire for her to bring her client down there

14    so that you could discuss whether or not he had participated

15    in sexual activities with young boys?

16         MR. DIXON:  Objection, Your Honor, objection.  Mr.

17    Povich is limiting his question to one area that Mr. Northrop

18    stated he wanted to discuss from a broad area that Mr.

19    Northrop has expanded upon, and I'm going to object to the

20    form of the question.

21         THE COURT:  Mr. Povich.

22         MR. POVICH:  Your Honor, I asked him whether or not

23    he specifically told her that that's why he wanted her and her

24    client to come down there, to discuss sexual activities with

25    young boys.

1          THE COURT:  Objection is overruled.

2          THE WITNESS:  That is one of the reasons I wanted to

3    talk to her client, yes.

4          BY MR. POVICH:

5     Q.   No, no.  Not one of the reasons.  It is clear that

6    it's one of the reasons.

7     A.   Okay.

8     Q.   The question is did you tell her that?

9     A.   Yes.

10    Q.   To induce her to come down?

11    A.   I don't know if it's an inducement.  That's what I

12   told her.

13    Q.   With a client, to discuss sexual activities with

14   young boys is an inducement?

15    A.   Well, I wouldn't -- if you want to characterize it

16   otherwise, you can.  I don't know that it's an inducement or

17   not.  That is simply what I told her I wanted to do.  Now, if

18   that induced her, I don't know.  I would think it wouldn't.

19    Q.   But there's no question in your mind that that's what

20   you told her?

21    A.   Yes.  She clearly understood all the avenues or

22   directions, if you want to call them, that this investigation

23   was going to take.

24    Q.   That's not what you -- did you mean to include that

25   as part of the background that you wanted to obtain on her

1    client?

2        A.    Yes.

3        Q.    Oh, background, I see.  When you said -- did you say

4    sexual activity, or did you say you wanted to get background?

5        A.    That's an either/or thing.  It was all of those.

6        Q.    Well, did you say you wanted to get some background

7    on her client?

8        A.    Yes.

9        Q.    Did you say you wanted to find out if he was sexually

10    involved with young boys?

11        A.    Boys in general; more, boys in specific, but in that

12    vein, yes.

13        Q.    The boys that you had pictures of?

14        A.    Right.

15        Q.    Did you tell her that that's what you wanted to do?

16        A.    Right.

17        Q.    To question her about whether he had sexual

18    activities with the boys that you had pictures of?

19        A.    I wanted the identity of these boys, so that I could

20    talk to the boys themselves or their parents, to see if they

21    would indicate there was sexual -- he didn't -- he didn't have

22    to say, nor would anything be directed necessarily to him.  My

23    concern was to identify the children and get it from them as

24    to what happened.

25        Q.    Mr. Northrop, I know what you've said your concern

1    is.  I'm still trying to find out what was said on the phone

2    before Ms. Moolenaar and her client showed up at your door.

3         A.    That's what was said then.

4         Q.    That's what was said then?

5         A.    Yes, on the phone:  the whole context of what this

6    meeting would cover, and there were several things, aside from

7    meeting Mr. Nader and getting some personal history and

8    discussing the identity of the children that we wanted to

9    identify, and to --

10        Q.    And why?

11        A.    And to review the case.

12        Q.    And why you wanted to identify the children?

13        A.    Yes.

14        Q.    And that you would be contacting their parents to

15   find out if there had been any improper activity with them?

16        A.    I told her I thought that was very important, and

17   also, that we would go over all of the material seized from

18   his apartment, and review the controlled delivery itself, the

19   substance of the case, and that if she had any questions, she

20   was free to ask, that it would be an open forum.

21        Q.    Did you tell her that you wanted to explain the

22   obscenity laws?

23        A.    No.

24        Q.    You didn't?  Or the laws with respect to the mailing

25   or ordering of obscenity?  Did you tell her you wanted to

1    explain those to her and her client?

2        A.    Specifically, no.  It was probably implied.  I told

3    her that I wanted to talk about the controlled delivery.  Now,

4    that, in my opinion, covers all of those items, and she's

5    representing him as counsel.  That's what we're talking about.

6        Q.    That was made known to her.  Now, how long was this

7    telephone conversation?

8        A.    I don't know.  I don't -- it wasn't long.

9        Q.    Five minutes, ten minutes?

10       A.    I'd say probably -- maybe five.  Somewhere in between

11   that.

12       Q.    Between five and ten minutes?

13       A.    Yes.

14       Q.    And then, following that, they came down that same

15   day?

16       A.    Yes -- no, no.  I don't remember when the

17   conversation was.  It wasn't -- I don't believe it was the

18   same day as the interview.  That was something that was said

19   in advance, and we all tried to get our schedules for whatever

20   day that was.

21       Q.    April 16th.  Did you have more than one conversation

22   with her on the telephone before the meeting?

23       A.    I don't recall.

24       Q.    At the moment, you're just recalling one?

25       A.    It seems that I had -- I know I had -- I had some

1    discussions with her, and it was not in person, it was on the

2    phone.

3        Q.    Before the meeting?

4        A.    Yes, before the meeting, and the purpose of that was

5    to tell her where we were, where we were going, all the items

6    and directions that I've just gone over, and to set a time to

7    do that, so that we can get into all the other questions that

8    might be raised at that time.

9        Q.    Now, they showed up on April 16th for a meeting; is

10   that correct?

11       A.    That's correct.

12       Q.    You say 3:25?

13       A.    Right.

14       Q.    Can you tell me what you went through right after

15   they showed up?

16       A.    Yes.   We introduced ourselves.   We sat down at the

17   table, approximately that size, 3:25, thereabouts.   We told

18   them that we would like to get some personal history

19   information:   his name, date of birth, address, employment,

20   military service, general personal-type information.

21       Q.    How long did that take?

22       A.    It probably took about ten minutes.

23       Q.    What was the next subject that you went into?

24       A.    We discussed his employment, a little bit of

25   background on what is the Middle East Insight, where is the

1    offices, some of his -- well, come to think of it, it had to

2    have been more than ten minutes -- his high school education,

3    how he came into the United States.  That was what happened

4    next.

5        Q.   And at that point, after you finished discussing his

6    business, his high school education, how he came into the

7    United States, how long had the meeting taken place?

8        A.   I'd say it was probably on the order of maybe fifteen

9    minutes.

10       Q.   Total at this point?

11       A.   Yeah, that's a guess.

12       Q.   So you're fifteen minutes into the --

13       A.   Right.

14       Q.   -- into the interview?

15       A.   Right.

16       Q.   And when did you -- what did you discuss then?

17       A.   Well, we ended the personal-type information on the

18   note of his business and its location and its offices, and

19   from there, we moved to the controlled delivery, the package,

20   and to the address that was on it and the company name that

21   was on it, his home address that was on it, and we focused our

22   attention, basically, on those addresses, the addressee, the

23   return addressee, those two addresses of the controlled

24   delivery.

25

1          THE DEPUTY CLERK:  Defendant's Exhibit No. 7, marked

2     for identification.

3                              (Defendant's Exhibit No. 7

4                              was marked for identification.)

5          BY MR. POVICH:

6     Q.   And you asked him -- so you're saying that the first

7     thing that you did was go into the controlled delivery?

8     A.   Right.

9     Q.   Were the other -- was the other material which you

10    had taken from his room present with you?

11    A.   Yes.

12    Q.   Was it in boxes and all around the room?

13    A.   No, it was all in a hamper, small wheeled cart,

14    approximately three feet by two feet, a small hamper.

15    Q.   And where was that put?

16    A.   That was at the end of the table.  We were sitting on

17    opposite lengths.  The hamper was at the head of the table.

18    Q.   Was it -- how was the material packaged in the

19    hamper, in bags?

20    A.   Boxes and bags.

21    Q.   Was it open?

22    A.   Yes.

23    Q.   You could see what was there generally, what was on

24    top?

25    A.   Well, there wasn't any seal or lid on it.  It was an

1    open hamper.

2         Q.    I mean, he could see, he could recognize things that

3    had been -- of his that had been taken from his home?

4         A.    Probably could have.

5         Q.    And he could see that it was -- volume-wise, how

6    large was it?

7         A.    Not that much.

8         Q.    Not that much?

9         A.    A hamper, I would say, three feet by two feet by less

10   than three feet deep.

11        Q.    Three feet by two feet by less than three feet.  And

12   was it filled?

13        A.    Filled?  Yes.

14        Q.    When you -- what was the first, which you considered

15   to be obscene or pornographic material, which you exhibited to

16   the defendant and his counsel?

17        A.    I think it was the contents of the controlled

18   delivery.

19        Q.    The contents of the controlled delivery --

20        A.    Right.

21        Q.    -- was the first material you opened?

22        A.    Yeah, because we went from the personal history to

23   his company, I believe to the controlled delivery, and after

24   he admitted to ordering the material and that that was his,

25   and recognized the return address, it still being sealed, I

1   knew what was inside, so we opened it up.

2       Q.   What was the next contraband that you exhibited?

3       A.   I think it was -- would have been in numerical order,

4   respect to the inventory list, so it would have been item No.

5   1 on the inventory list.

6       Q.   Well, let me -- in between that -- in between item --

7   the controlled delivery package, which you say you opened --

8   although your notes don't indicate that, do they?

9       A.   No, but it was opened.  Those are my notes.

10      Q.   Have you had an opportunity to review your

11  handwritten notes?

12      A.   Yes.

13      Q.   Do they indicate that it was opened?

14      A.   I know it was opened.

15      Q.   Mr. Northrop, do your --

16      A.   My notes do not indicate it was opened.  I know it

17  was opened.

18      Q.   I see.  What was the next thing that was exhibited to

19  the defendant, after the opening, you say, of the controlled

20  delivery?

21      A.   Item 1 on the inventory list.

22      Q.   Item 1.  You're certain of that?

23      A.   Yes.

24      Q.   And you went in numerical order?

25      A.   Yes.

1      Q.   Was any of the other bags, other than bag 1,

2  exhibited first to the defendant from item 1, before bag 1 --

3  we're talking about bags now essentially, right?

4      A.   Yes.   I don't think it was.   I think we went in

5  chronological numerical order:   one, two, three, four.

6      Q.   What was the most important document or material

7  which you had seized for the purposes of your investigation

8  from the defendant's room, according to your prior statement

9  as to what your investigation was focusing on?

10     A.   The most important item seized from his room, is that

11  what you're asking me?   What I think was the most important

12  item seized from his room?

13     Q.   Let's just say -- let's put it this way.   You said

14  the most important thing for you was the evidence about the

15  identity of children, to ascertain whether there had been any

16  sexual molestation?

17     A.   Right.

18     Q.   What was the most important item seized from his room

19  or anywhere else, that you wanted to question the defendant

20  about?

21     A.   I don't know that there was a most important thing.

22  I wanted to -- if I had to say one, I would say we already got

23  it out of the way.   That was the controlled delivery.

24     Q.   But that wasn't the most important thing, was it?

25     A.   It wasn't the most important thing seized from his

1    room.

2         Q.   Wouldn't bag 6 be the most important thing?

3         A.   What's bag 6?

4         Q.   It contains pictures of young people.

5         A.   We took them in numerical order, and I don't know

6    that there'd be any one most important thing.  The most

7    important direction to go is -- then it's bag 6, yes, to find

8    out who these people are in bag 6, and resolve that.

9         Q.   So you would have opened or shown him material taken

10   from his room, which showed pictures of young boys that you

11   wanted identified, according to you?

12        A.   That's right.

13        Q.   And if Ms. Moolenaar said that the first package

14   which was shown was package not 1, but 6, would she be

15   mistaken?

16        A.   I don't know if she would be mistaken.

17        Q.   Let me show you Exhibit 7.  Can you identify what

18   those are?

19        A.   Yes.  Exhibit 7 are notes of mine, dated 4/16/84.

20        Q.   Do those notes contain a listing of the sequence of

21   bags that were exhibited to the defendant and counsel?

22        A.   It lists the numbers of the items seized, and they

23   appear to be in sequential order.

24        Q.   Is there any missing?

25        A.   Yes.

1      Q.   Which number?

2      A.   Number 6.

3      Q.   Would that have been exhibited early on?

4      A.   I'd have to see what No. 6 is.  It must have been.

5      Q.   Where on your list there, on your notes, does it

6   indicate that the controlled delivery package was opened and

7   exhibited to the defendant?

8      A.   On my notes?

9      Q.   Yes.  Where does it say that the package was opened

10   and delivered?  I'm sorry, opened and exhibited.

11      A.   These handwritten notes I don't believe address that.

12   I don't see it on there.

13      Q.   Is that another way of saying they don't say that?

14      A.   Right, it doesn't say that.

15      Q.   These handwritten notes indicate, do they not, a

16   sequence of bags containing material which was exhibited to

17   the defendant and counsel; is that correct?

18      A.   Yes.

19      Q.   They go one, two, three, four, five, seven, eight,

20   ten and eleven.

21           THE REPORTER:  Is nine not there?

22           BY MR. POVICH:

23      Q.   Nine is not there; is that right?

24      A.   That's right.

25      Q.   Do you know what is in Bag No. 9?

1        A.    No.

2        Q.    Do you know when Bag No. 9 was shown the defendant or

3    portions of it?

4        A.    No.

5        Q.    When in the sequence of events did you obtain the

6    waiver of rights form?

7        A.    The rights form was obtained after the controlled

8    delivery was discussed and shown to him, put out of the way,

9    and after several of the other items taken that also show

10   previous business dealings were shown to the defendant.

11       Q.    So you were into, then, material relating to ordering

12   of pornographic information?

13       A.    Right.

14       Q.    And that material may in and of itself have been

15   pornographic or contraband, correct?

16       A.    Yes.

17       Q.    And you said that the first fifteen minutes took

18   background information; is that correct, approximately?

19       A.    Yeah, I'd say probably the first fifteen minutes -- I

20   don't know, ten, fifteen minutes was background information,

21   schooling, coming into the U.S., and his occupation with

22   International Insight.

23       Q.    And then you got into the things that you were --

24       A.    Then we went to controlled delivery.

25       Q.    Controlled delivery.  And then into?

1        A.   And then to the rest of the material taken, seized,

2    items seized.

3        Q.   Your notes, though, don't indicate when the

4    controlled delivery came up; is that correct?

5        A.   No, I know that.

6        Q.   So if the meeting started at 3:25 --

7        A.   Mm-hmm.

8        Q.   Right?

9        A.   Yes.

10       Q.   By 3:40, you were through the preliminaries, and you

11   were into what you would consider to be the meat of this

12   investigation; is that right?

13       A.   Yes.

14       Q.   And from 3:40 until 4:07, you were discussing the

15   material which was retrieved from this defendant's room; were

16   you not?

17       A.   Yes.

18       Q.   And then at 4:07, you asked that he sign the waiver?

19       A.   Yes.

20       Q.   Because his counsel and he refused to acknowledge in

21   writing --

22       A.   Right.

23       Q.   -- information that you wanted him to acknowledge?

24       A.   That's correct.

25       Q.   In your opinion memorandum on page -- I am sorry,

1    typed memorandum -- page 4, it says:

2         "When we first asked the initial question about his

3      ordering these materials, and he told us about his trip to

4      Israel and Holland," you said "His attorney was reluctant

5      to have her client make such statements."

6         MR. DIXON:  Objection, Your Honor, that's not the

7    total length of the sentence.  It goes on beyond that.

8    There's something else as well.  If he's going to try to

9    impeach the witness, he should use the proper form, repeat the

10   whole sentence to the witness.  There's more to it than that.

11        THE COURT:  For the record, what is the exhibit we

12   are referring to?

13        BY MR. POVICH:

14   Q.   This is Exhibit No. 6, I believe, Agent Northrop?

15   A.   Exhibit 6.  From page 4.

16   Q.   Would you read for me the -- isn't there an

17   indication in that first paragraph at the bottom of page 4

18   that his attorney was reluctant to have her client make such

19   statements?

20   A.   Yes.

21   Q.   Haven't you suggested to this Court that there was no

22   reluctance on her part for him to discuss any of this

23   material, that the only reluctance was initially?

24   A.   Well, it may have been a temporary reluctance.  Maybe

25   I'm not making myself clear.  I still say that when we first

1    started to get into this controlled delivery aspect, there was

2    not an adversarial atmosphere there.  There may have been some

3    initial reluctance, but whatever, whatever hedging she may

4    have done, she reached a very favorable conclusion, and

5    nothing impeded our way.  I mean, maybe she hesitated, there

6    was some reluctance.  I mean, it was not -- it was not a

7    barrier for the conversation to continue or for him to allow

8    us to question him about his business dealings, or for her to

9    allow him to continue answering in the affirmative.

10       Q.   Agent Northrop, you had in front of this man, had you

11   not, and you had gone through, because you said in the

12   beginning of that, when we first asked the initial questions

13   about ordering these materials, I mean, you had gone through

14   at some length from at least 3:40 to 4:07, right, before you

15   got him to initial this material, the waiver?

16       A.   Right.

17       Q.   I mean you had exhibited to him item after item with

18   his name on it, right, with his address on it?

19       A.   That's right.

20       Q.   With his business address on it?

21       A.   That's right.

22       Q.   You had exhibited all those things, magazines,

23   correct?

24       A.   That's correct.

25       Q.   All those items which had been taken from the room

1    other than the controlled delivery package, right; generally,

2    a lot of them?

3        A.    No, I didn't think we got to all of them.

4        Q.    But quite a few?

5        A.    We were hitting on a lot of the magazines and

6    envelopes and the types of things that you're talking about

7    there, yes, and those were the things that I wanted him to

8    initial and date, not extraneous things that I didn't believe

9    had any bearing at all on importation of postal matters.

10        Q.    And you knew that there was no question that had come

11    from his room, didn't it?

12        A.    Yes, there was no question.

13        Q.    Did you think that the presence of all this material

14    with his name all over it, which had come from his room, with

15    all his other personal effects which were not of an

16    inincriminatory nature, lent itself at all to his willingness,

17    as you say, to discuss freely this matter with him?

18        A.    I don't know how it would have -- I don't know how he

19    would have viewed it or how that would have lent anything to

20    him to discuss it.  All I know is that she was reluctant to

21    have him initial and date it.

22        Q.    No, not she, he.  I'm talking about him, presenting

23    it all to him and, indeed, to counsel.

24        A.    Right.

25        Q.    Don't you think that the presentation of this hamper,

1    as you say, two by three by three of material, a large portion

2    of which is contraband, a large portion of which is

3    identifiable and clearly his, don't you think that the show-up

4    with all of this material lent itself to convince him that he

5    should discuss this freely, that there was nothing to

6    withhold, because you had the goods on him?

7        A.   I didn't show up.  He showed up.

8        Q.   But weren't you trying to present him with the idea

9    that "We've got the goods on you, for cripe's sake, Mr. Man,

10   Mr. Defendant.  Tell us about it"?  Wasn't that the whole

11   purpose, really, of exhibiting a lot of this, so that you

12   could get some statement from him, something that was

13   forthcoming?

14       A.   I would say that that's not a yes or no type

15   question.

16       Q.   Well, answer it the best you can.

17       A.   Okay.  I would say yes, in my mind, it would have --

18   it would have been nice for Ms. Moolenaar and the defendant,

19   client, to give us a statement, a written statement.

20       Q.   No, I am not talking about a statement, I'm talking

21   about discussions.

22            MR. DIXON:  Objection, Your Honor.  He asked the

23   witnesse for an opinion.

24            THE WITNESS:  To come clean, as it were.

25            MR. DIXON:  He's giving his opinion.

1    BY MR. POVICH:

2        Q.   Come clean in the form of a written statement?

3        A.   Exactly.  But what I would say no, in that it wasn't

4    all dumped on him.  They wanted to see it.  They requested it

5    one piece of evidence at a time, and had she perceived it that

6    way, or if she felt that that's what it was, that, "Hey, all

7    this is being dumped on us, and it's all his story, and we

8    might as well give it up," she had every opportunity at every

9    one of those junctures to say, "That's enough.  We don't need

10   to see any more."

11       It was displayed.  They looked at at it.  It was put

12   back and set aside.  It was an orderly -- next piece of

13   evidence, done, next piece of evidence.  It was a very orderly

14   procedure that she could have stopped at any point and walked

15   out of there.

16       Q.   But the purpose of exhibiting all of this to them

17   essentially on your part was to say, "Look, we have it all.

18   Be responsible enough to talk about it."  Wasn't that what you

19   were saying?

20           MR. DIXON:  Objection, Your Honor.

21           BY MR. POVICH:

22       Q.   "We're concerned about children here.  I want you to

23   tell us about it."  Isn't that your attitude?

24           MR. DIXON:  Objection, Your Honor, asked and

25   answered.

1        THE COURT:  No.  Objection is overruled.  You may

2    answer.

3        THE WITNESS:  My purpose in showing all that was to

4    obtain a statement in the affirmative or negative, but a

5    statement from this person as to the evidence that we had.

6        MR. POVICH:  I have no further questions.

7        THE COURT:  Mr. Dixon.

8        MR. DIXON:  Indulgence for one moment, please, Your

9    Honor.

10                    REDIRECT-EXAMINATION

11        BY MR. DIXON:

12    Q.   Following up on Mr. Povich's question about why

13    you -- in your opinion, why you thought Mr. Nader was giving

14    you all this information, did you think, as a follow-up to

15    that question, that Ms. Moolenaar was after anything by coming

16    down there and having her client talk to you?

17        MR. POVICH:  I'm sorry, I didn't hear that.

18        BY MR. DIXON:

19    Q.   Did you think Ms. Moolenaar was after anything by

20    coming down and having her client talk to you, based upon --

21        MR. POVICH:  After anything?

22        MR. DIXON:  Yes.

23    A.   I think I said before, in my mind, I think Ms.

24    Moolenaar was interested in seeing exactly what this material

25    was, and perhaps the scope of it.  I think she wanted to get

1    an overall view of the child pornography, the child

2    pornography in the controlled delivery, and to get this issue

3    of sex offenses straightened out with the authorities.

4            I think Ms. Moolenaar came down and was interested in

5    seeing that, if her client gave cooperation, as to whether or

6    not maybe the U.S. Attorney's Office would decline to

7    prosecute.

8            I think she wanted to give up a little information to

9    the agents, in return for seeing what the agents had, so that

10   she could advise her client as to the probability of the

11   government even going forward with it, or if maybe he could

12   provide us with some kind of information or something that

13   maybe even would negate his ever being indicted.

14           I can only guess that Mr. Nader expressed a lot of

15   concern about being arrested and seeing his name in the press.

16   He was very concerned about that, and I think Ms. Moolenaar

17   wanted to know what kind of information the government had on

18   this client, to see if there was maybe some way that that

19   could be avoided, and therefore giving up this kind of

20   information for the government was fine, as long as it was

21   verbal.

22           The instant that we asked for it in writing, she said

23   no.  She would draw the line with defending or protecting her

24   client at that point, but I do believe she was under some

25   obligation to come down.  We weren't going to stare at one

1    another across this table.

2            So yes, I made everything available to her, and all I

3    wanted was something in the positive from them, and what I got

4    was a verbal statement that he ordered all of this, he

5    recognized it.  He gave me a verbal yes on all of these

6    matters, and they walked out knowing that he wasn't under

7    arrest, and perhaps there was something that they could do,

8    maybe even cut a deal at the U.S. Attorney's Office to avoid

9    prosecution, and save him the damage that the press report

10   would make on a person arrested for child pornography here in

11   the United -- in D.C.  That is what I think she was trying to

12   do.

13       Q.   Now, let me ask you this.  Did you -- I won't ask

14   anything else, Your Honor.

15            THE COURT:  Just a few questions, Agent Northrop.

16   Why didn't you formalize, as you used the term, formalize this

17   matter at the beginning of the meeting?

18            THE WITNESS:  I didn't want to do that, because I

19   preferred for the tone of this meeting to be informal, and I

20   wanted to gauge their responsiveness, their willingness to

21   talk about it, and I didn't want to -- I didn't want it to

22   become an adversarial meeting right from the outset.

23            THE COURT:  But your intent with respect to the

24   meeting was no different in the beginning than it was in the

25   end, was it?

1          THE WITNESS:  No.

2          THE COURT:  And you state that you were concerned,

3     primarily concerned with the children; is that right?

4          THE WITNESS:  That's correct.

5          THE COURT:  And you expressed that to both Mr. Nader

6     and his counsel?

7          THE WITNESS:  Yes.

8          THE COURT:  At the meeting?

9          THE WITNESS:  Yes.

10         THE COURT:  And you testified that you told her prior

11    to the meeting, that is, Ms. Moolenaar, that there would be no

12    arrest?

13         THE WITNESS:  That's correct.  That he was not under

14    arrest, and that he would be free to go; that he would not be

15    arrested when he came down.

16         THE COURT:  And did you tell her why he would not be

17    under arrest?

18         THE WITNESS:  No.

19         THE COURT:  Did she ask?

20         THE WITNESS:  I don't think so.  She was just

21    concerned that he wouldn't be.  They wanted -- they wanted to

22    really put that off or avoid it all together.

23         THE COURT:  Well, did you get the impression they

24    were trying to avoid it all together?

25         THE WITNESS:  I would think that, as counsel, that's

1    what she'd be paid to do.  I mean, that would be, in my mind,

2    if I were an attorney, the best course for my client, not to

3    be arrested at all.  I think she understood that that's out of

4    my control, anyway.  It's --

5         THE COURT:  But you focused on your concern about

6    getting the names of these children?

7         THE WITNESS:  That's correct.

8         THE COURT:  But that wasn't the total focus of your

9    investigation, was it?

10        THE WITNESS:  No, it was not the total focus.

11        THE COURT:  Now, did you tell her what the total

12   focus of your investigation was prior to the meeting?

13        THE WITNESS:  Yes.  Let's put it this way.  We

14   discussed our mutual interest with this case.

15        Now, representing the postal service, the customs

16   service, we had a vested interest in looking into those

17   matters with respect to the mailing and other mailings, if

18   any, but as a responsibility to possible victims of this kind

19   of activity, we have a responsibility to those citizens and

20   the state authorities as well, and it covered a lot of states.

21        Now, if, in fact, that's the way it went, I assure

22   you a lot more time would have been spent on this

23   investigation or any investigation with the follow-up on those

24   children than it would on the simple controlled delivery.

25        THE COURT:  If you were concerned about the potential

1    victims of this situation, that is the children, why did you

2    ask about the controlled package first?

3              THE WITNESS:  The controlled package was the real

4    reason -- well, it was the reason that brought us all

5    together.

6              THE COURT:  The real reason you were there?

7              THE WITNESS:  Well, it was the reason that brought us

8    all together.

9              Your Honor, I am not trying to say that I work

10   pornography cases so that I can work state cases on child

11   abuse.  I work pornography cases.

12             Our primary concern, when we find evidence of child

13   molestation -- not simple distribution -- when we find people

14   who are manufacturing child pornography, i.e., molesting

15   children, or when we find customers who are receiving child

16   pornography who are molesting children, we immediately move to

17   the molestations and try to resolve those.  Those are victims.

18   That's where our --

19             THE COURT:  And you found no evidence here; isn't

20   that correct?

21             THE WITNESS:  No, we did not.

22             THE COURT:  What you had was a suspicion, an

23   intuition?

24             THE WITNESS:  That's exactly right.  But if someone

25   were to ask me -- and that's what I believe I'm being asked

1    here -- what is my primary concern in that investigation at

2    this time, it would have been, and still would be today in any

3    other case, are there any victims?  Are any children being

4    molested here?  Are these pictures evidence of this person's

5    molestation or what?  Let's go to the child victim first.

6            Now, that does not mean that that's the only place

7    that I focus my attention, and that the shipping, the

8    interstate or foreign commerce of child pornography, is not

9    ever looked at.

10           Ms. Moolenaar clearly understood that she had two

11   problems on her hands.  She had this problem with the

12   importation, use of the mails, the distribution of

13   pornography.  She had a potential problem of whether or not

14   her client was an active paedophile.  And we did not know

15   that.

16           We knew he had imported the pornography, had

17   reasonable -- obviously, reasonable grounds to suspect that,

18   but what we did not know anything about was what, if anything,

19   happened with these children that he had come in contact with,

20   and who were these children.

21           THE COURT:  But you're testifying that you know

22   both -- you made both of your objectives known to Ms.

23   Moolenaar?

24           THE WITNESS:  Yes.

25           THE COURT:  In clear language?

1          THE WITNESS:  Yes, she knew that.

2          THE COURT:  That you were interested in the possible

3    prosecution for the importation of this material, and you were

4    interested in possible child molesting?

5          THE WITNESS:  Yes.

6          THE COURT:  Just how did you explain to her that you

7    were interested in the possible prosecution for the

8    importation of this material?

9          THE WITNESS:  Well, I think that spoke for itself.  I

10   explained to her --

11         THE COURT:  Well, did you explain that to her?  Let

12   me take that back for a moment.  You did tell her that you

13   were concerned about child molesting; is that right?

14         THE WITNESS:  Yes.

15         THE COURT:  Did you tell her that you were also

16   concerned about possible prosecution for the importation of

17   this material?

18         THE WITNESS:  She wanted to know if her client --

19         THE COURT:  I don't want to know what she wanted to

20   know.  I asked what you said.

21         THE WITNESS:  Right.  I made it known to her.  I told

22   her that the prosecution, this mailing business, was one of

23   the things we were to talk about.

24         THE COURT:  Well, I know you were going to talk about

25   the mailing, because, obviously, you had a package that had

1    been mailed, but what about with the idea of the prosecution

2    for that mailing?

3              THE WITNESS:  I am sure --

4              THE COURT:  I'm not asking what you are sure of.  I'm

5    asking what you said.

6              THE WITNESS:  Are you asking me if I told her we

7    would prosecute?

8              THE COURT:  I'm asking what you said.

9              THE WITNESS:  Let the record reflect that we're going

10   over this again, Your Honor.  I told her that we were

11   interested in the molestation.  We were also interested in

12   this investigation with customs and postal, with respect to

13   this importation of child pornography.

14              Now, we did not get into whether or not he was going

15   or when he was going to be indicted or when he was going to be

16   arrested or anything that would transpire in the future.  That

17   was an unknown to me, and it is an unknown to me, until the

18   U.S. Attorney's Office tells me we're going to do it, so --

19              THE COURT:  Then let me go back to my original

20   question, and ask why you waited so long to bring up, to

21   formalize this discussion, as you said, that is, to advise him

22   of his rights?

23              THE WITNESS:  Okay.  What we did was, we talked about

24   the controlled delivery, and the reason why -- and I think

25   I've stated this, that I did not formalize it was because we

1    had a congenial --

2            THE COURT:  What is the word you're looking for?

3            THE WITNESS:  I think I said casual conversation

4    here, and I wanted it to remain that way.  I did not want to

5    immediately go into a formal mode of an adversarial

6    confrontational type meeting.

7            THE COURT:  Was that because you did not want to put

8    them on notice that this was --

9            THE WITNESS:  I did put them on notice.

10           THE COURT:  -- going into -- what's that?

11           THE WITNESS:  I believe when we started, not talking

12   about the phone or anything that was said prior, when we got

13   into that meeting, I wanted it to remain cordial, and it was

14   clearly understood by the nature of the questioning and her

15   background and the fact that she was privately retained

16   counsel for him, that what we are talking about here is

17   obviously a potential violation.

18           THE COURT:  Why did you feel it would be any less

19   cordial if you advised him what the nature of your

20   conversation was, your investigation, and advised him of his

21   rights under Miranda?  Why did you think that would make it

22   any less cordial?

23           THE WITNESS:  Well, because Miranda wasn't required,

24   and I didn't want to just go into it automatically.  It wasn't

25   required.  It was coming -- I wanted to know how cooperative

they were going to be.  The Miranda really is meaningless in
this case, and it was the only kind of formal thing that I
could do only after we started to stumble over these
successive "No, don't sign that.  Don't initial and date
that."

THE COURT:  I don't understand that.  How did that
change anything?

THE WITNESS:  I don't know that it really in
actuality changed anything, but when we finally got to the
last "No, I don't want that," I stopped what we were doing,
and I addressed Ms. Moolenaar more as an inspector to the
attorney, and I said, "Look, I would like to get these things
in writing, obviously get these in writing, get him to initial
and date these.  Inasmuch as you are now acting as counsel,
saying 'No, don't do this and don't do that,' I think, for the
sake of the client," more so than for either her or myself,
that it should be formalized and made visual to him what was
the significance of her saying no to him, and why I kept
asking for it.  She'd said no.  I'd ask.  I'd ask again.
She'd said say no.  So he was given his rights at that time.
In actuality, I don't know whether he was ever advised of his
rights would ever amount to anything.  It was a non-custodial
meeting.

THE COURT:  Why did you advise him of his rights at
the end then?

1      THE WITNESS:  He wasn't advised of his rights at the

2  end.  He was advised of his rights --

3      THE COURT:  He was advised of his rights at some

4  time; isn't that correct?

5      THE WITNESS:  Right.

6      THE COURT:  Why?

7      THE WITNESS:  Because I would say, "Here's this

8  item," and yes, I'd get an affirmative.  "Well, would you

9  initial and date that?  "No."  Ms. Moolenaar, "No."  Go to the

10  next item.  Same thing, "No."

11      I don't know that Mr. Nader -- well, just so that all

12  four of us at the table would know exactly where we really in

13  reality stand, so that he wasn't maybe misconstruing this

14  thing as something other than what it was.  Many people don't

15  know what a postal inspector is.  Maybe he didn't appreciate

16  the seriousness of the questions that were being asked.  I

17  don't know.  I don't know what, if anything, he perceived

18  this.  I don't know what kind of conversations he had with

19  her.

20      So to put everything up on the table, and let's try

21  to put it back into the perspective of, in reality, this is

22  the government versus the citizen, he was Mirandized.  It was

23  nothing more than what I call formalizing the discussions, and

24  really started to put us in the perspective so that she, even

25  she, whatever ideas she may have had, was getting the message:

1    "These people want to talk to you about the controlled

2    delivery and the importation of child pornography, and they

3    are serious about it."

4              So at that point Ms. Moolenaar could have said,

5    "Forget it, I'm leaving.  I see where you're coming from,

6    Inspector.  I understand that this has a potential for an

7    adversarial confrontation at some point."  She could have left

8    at that point, and I think if she wasn't put on notice or had

9    some kind of I don't know what idea of what this was, she

10   certainly at that point understood that I am not Robert

11   Northrop, Citizen, I am the Postal Inspector doing my job at

12   that point, and then I felt that it was important to, after

13   having Mirandized this individual, and the attorney signed on

14   it, we went back over all that material, so that if they

15   wanted to retract anything or get up and leave, that was the

16   time to do it.

17             They did not, and, in fact, I don't believe that it

18   really changed the atmosphere.  I don't really think it

19   changed all that much, because we went back over the

20   controlled delivery, went back over the material she had

21   previously objected to, and that interview continued for a

22   good hour after that.  That was at 4:07, and I believe the

23   interview terminated at 5:00 o'clock, so for the next

24   approximately 33 minutes, we kept talking, and he kept on

25   admitting all the -- he never changed his position as to who

1    Mr. Bronsky was, which is an alias name.  We went back over

2    that, and the names of these children were forthcoming, and

3    the information flowed from them.  They just did not want it

4    in writing.

5            What more could I do?  It's not my job to act as his

6    counsel.

7            THE COURT:  I'd suggest you could have advised him of

8    his rights when you first spoke with him.  All right.

9            MR. POVICH:  Could I --

10           THE COURT:  Let me ask you this, Agent.  Did Ms.

11   Moolenaar, at the time you were going through the controlled

12   package and then item No. 6 and then 1, 2, 3, 4 and so forth,

13   did she look at the evidence?

14           THE WITNESS:  Yes.

15           THE COURT:  Did she look at it?  Did she just glance

16   at it, or did she look through it?

17           THE WITNESS:  She looked through it.

18           THE COURT:  Now, there are a number of things that

19   were seized, right, some of which are photo albums?

20           THE WITNESS:  Yes.

21           THE COURT:  What type of items were shown to Ms.

22   Moolenaar and Mr. Nader?

23           THE WITNESS:  Ms. Moolenaar and Mr. Nader saw

24   everything that was seized.

25           THE COURT:  Everything?

1          THE WITNESS:  Yes.

2          THE COURT:  And did she look at all of them?

3          THE WITNESS:  To her satisfaction, she did, and to

4    mine, yes.

5          THE COURT:  Well, I mean there were some books,

6    magazines there; is that correct?

7          THE WITNESS:  That's correct.

8          THE COURT:  Did she page through the magazines?

9          THE WITNESS:  Yes, some of them she did.  I'm not

10   trying to say that she propped her feet up and read them all,

11   but she knew what they were, and she looked at them, and I

12   think she probably leafed through some of them faster, and

13   after a while, her pace may have quickened a bit, but there

14   were no time constraints.

15         THE COURT:  All right.  Thank you.

16         Any other questions of this witness?

17         MR. DIXON:  No, sir, Your Honor.

18         MR. POVICH:  I just have this one question.

19         THE COURT:  All right.

20                   RECROSS-EXAMINATION

21         BY MR. POVICH:

22   Q.   So much has been said about what your purpose was and

23   what you told him the purpose was.  This is the defendant.

24   Did you tell him that you wanted him to have a more

25   knowledgeable idea of what exactly it is that was seized and

1     why it was seized?

2          A.    Did I tell him that?

3          Q.    Yes.

4          A.    No, I don't believe I did.

5          Q.   I question, sometimes, with all due respect, the bona

6     fides of what it is that you tell me or that you would have

7     told him at the time for the purpose.  I don't understand.

8     Would you read that memorandum, please.  It's the top of page

9     2.  It talks about the beginning of this interview with the

10    defendant:

11              "He was advised that we would like to go through

12         items seized, and that he would have a proper and more

13         knowledgeable idea of exactly what was seized and why."

14              Isn't that what you told him and isn't that what you

15    told Ms. Moolenaar in the conversation before they even showed

16    up?

17         A.    As with respect to the phone conversation, I don't

18    know that that's exactly what I said.  That's what was said at

19    the outset of the person to person meeting.

20         Q.    Well, if Ms. Moolenaar said that she, in her

21    conversation with you, that she was given the impression that

22    you wanted to advise them, so that they would have -- go

23    through the inventory, so that they would know what was seized

24    and why it was seized, almost like instructive of mail and the

25    obscenity laws -- you know, like you can't have this or you

1    can't, or this is against the law and this isn't?

2        A.    No.

3        Q.    No?  Nothing like that?

4        A.    Nothing like that.  If that is the impression she

5    got, that's her impression.  I was not holding a class on the

6    technicalities of the law.  It was -- it was what Mr. Nader is

7    missing from his room, what we took.  It's what was listed on

8    the search inventory.  I got the yes, she wanted to see what

9    it was exactly we did take, and what the scope of this

10   investigation might ultimately end up being.

11       Q.    But the question is, in your memorandum, you say:

12             "He was advised that we would like to go through the

13       items seized, that he would have a proper and more

14       knowledgeable idea of exactly what was seized and why."

15       A.    Yes.

16       Q.    Was that part of the sort of the informality of this

17   proceeding?

18       A.    That would be indicative of the informalities, and

19   that he, Mr. Nader, would know why.  Mr. Nader at that time

20   was a Lebanese citizen.  I'm not so sure that he would have

21   understood maybe why.  Maybe he thinks this isn't even

22   illegal.  Maybe he thinks that child pornography isn't a crime

23   in this culture.  I don't know.  It was those kinds of things.

24             This man, in my mind, was from a foreign country,

25   and, in fact, I think he told us in the conversation that

1    hugging and kissing and that kind of thing of men to boys is

2    commonplace there.  I don't know.  I have never been to

3    Lebanon.  That's only what he tells me.  So, in that respect,

4    yes.  As for Ms. Moolenaar, I would think she graduated from

5    law school and was a prosecutor.  She knew.

6            THE COURT:  Any other questions of this witness?

7            MR. POVICH:  No, sir.  I have -- no, sir.

8            THE COURT:  No other questions?  Is that what you

9    said, Mr. Povich?

10            MR. POVICH:  No, I have no further questions, Your

11    Honor.

12            MR. DIXON:  Your Honor, I have just one, just one

13    very brief question.

14            THE COURT:  All right.

15                    FURTHER REDIRECT-EXAMINATION

16            BY MR. DIXON:

17    Q.    In response to Mr. Povich was just asking you about

18    if Ms. Moolenaar would have been mistaken if you said that you

19    were going to advise Mr. Nader as to what was taken and why.

20    If Ms. Moolenaar said that it wasn't explained to her that the

21    discussion was to center around the importation of child

22    pornography and violation of 18 U.S.C. 1462 or thereabouts,

23    would she be mistaken about that?

24    A.    If she said it was not going to discuss that, would

25    she be mistaken?

1        Q.    Yes.

2        A.    If she thought we were not going to discuss that, I

3   think she would be mistaken.  We were going to discuss -- we

4   weren't going to pull out our law books and have a discussion

5   on the dry reading of a certain statute, but we were certainly

6   going to discuss the real evidence that her client had -- that

7   we obtained from her client with respect to that statute, and

8   if she didn't get that, she was very much mistaken.

9        Q.    Let me refer you to Defendant's No. 6 Mr. Povich was

10  just using, and I'd like you to direct your attention to the

11  last sentence on the first page.  Did you, in fact, explain to

12  Ms. Moolenaar and Mr. Nader that it was explained by

13  yourself -- it was explained to Mr. Nader by Bloodworth and

14  yourself that our discussion was to center around the

15  importation of child pornography in violation of 18 U.S.C.

16  1462?

17       A.    Yes.

18       Q.    Which prohibits the importation of obscene materials

19  into the United States?

20       A.    Yes.  That was part of the introduction.  I did not

21  introduce myself as Joe Citizen.  I was a Postal Inspector.

22       Q.    Okay.

23       A.    He was the customs agent, and that is what -- that is

24  why we were there, as opposed to, say, the FBI or somebody

25  else.

1          MR. DIXON:  Your Honor, shall I ask the Court to

2    entertain an admission of exhibits at this time or Monday?

3          THE COURT:  I think we can do that on Monday.  You

4    have one other witness; is that right, Agent Bloodworth?

5          MR. DIXON:  At this point, it looks that way.

6          THE COURT:  All right.  All right, then.  There are

7    no other questions of this witness?

8          Thank you.  You may step down.  And I do not wish to

9    suggest by our questions that we do not agree with your

10   concern about children being molested.  I think I've already

11   mentioned that in my memorandum.

12         We stand in recess.

13         (At 5:18 p.m., the hearing in the matter was

14   recessed.)

15

16                          -oOo-

17

18                  CERTIFICATE OF REPORTER

19         I hereby certify that the foregoing is the official
     transcript of proceedings in the hereinbefore-captioned
20   matter, and that it is complete and accurate to the best of my
     knowledge and ability.

21

22

23

24                                   HARRY DEUTSCH
25                                   Official Court Reporter