1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

       vs.      :   Criminal Action No. 85-33

GEORGE A. NADER,      :

      Defendant.      :

- - - - - - - - - - - - - - x

FILED

JUN 19 1986

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Courtroom No. 17
Washington, D.C.

Monday, February 10, 1986

The hearing on Motions in the above-entitled matter
resumed in open court before The Honorable JOHN GARRETT PENN,
United States District Judge, commencing at 1:45 o'clock a.m.


APPEARANCES:

    For the Plaintiff:

        RONALD DIXON, ESQUIRE


    For the Defendant:

        DAVID POVICH, ESQUIRE
        RICHARD S. HOFFMAN, ESQUIRE


HARRY DEUTSCH
Official Court Reporter
4800-G, U.S. COURTHOUSE
Washington, D.C.  20001
   (202) 898-0780

# T A B L E   O F   C O N T E N T S

Government's Exhibits:                    in evidence

         1                                   212
         2                                   214
         3                                   --


Defendant's Exhibits:                     in evidence

         1                                   215
         2                                   215
         3                                   --
         4                                   223
         5                                   229
         6                                   --
         7                                   229


Closing Argument by Mr. Dixon                     Page 241

Closing Argument by Mr. Hoffman                   Page 251

Rebuttal Argument by Mr. Dixon                    Page 275

Rebuttal Argument by Mr. Hoffman                  Page 280

1                    P R O C E E D I N G S

2          THE COURT:  Good afternoon counsel.

3          MR. DIXON:  Good afternoon, Your Honor.

4          THE COURT:  Mr. Dixon.

5          MR. DIXON:  Your Honor, after speaking with the

6   witnesses, one witness that I have presented, and reviewing

7   the case a little further, I'm not going to call any other

8   witnesses, and we would rest with the testimony of Mr.

9   Northrop and Ms. Moolenaar, and at this time, we would ask the

10  Court to accept into evidence our two exhibits -- I believe

11  it's Government's 1 and 2 -- and we would defer to the Court

12  and to Mr. Povich for any evidence that they may want to

13  submit at this time.

14         THE COURT:  All right.  With respect to Government's

15  Exhibits 1 and 2, any objection?

16         MR. POVICH:  Your Honor, can I make sure I know which

17  ones they are?  1 is the warning and waiver of rights?

18         MR. DIXON:  Yes.

19         And 2, Your Honor, is the affidavit, search warrant,

20  and the inventory, and a diagram of the premises that were

21  searched.

22         The Court will recall that that came in or that was

23  used by the United States in an attempt to impeach Ms.

24  Moolenaar.  The Court will recall that Ms. Moolenaar indicated

25  during direct examination in response to a question from Mr.

1    Povich that she was shown several magazines.  She had viewed

2    nothing from the controlled delivery, but she was shown

3    several magazines, and she was asked to enumerate by name if

4    she recalled.

5         She indicated Hound Dog and Piccadillo, and the

6    Government seized upon that opportunity, after hearing that,

7    to impeach Ms. Moolenaar, because, as the Government recalled,

8    Piccadillo was only among those magazines inside of a

9    controlled delivery.

10        After a bench conference, all parties agreed that the

11   magazine Piccadillo was among those items that were taken from

12   the apartment.  However, to test this witness's credibility

13   and to test this witness's ability to recall, the Court

14   allowed the Government to pose a question to the witness, and

15   the witness's answer initially was that she had seen

16   Piccadillo in the controlled delivery, which was, of course,

17   in direct contrast to her earlier testimony, but I think an

18   attempt at rehabilitation was made, and she sort of, in the

19   Government's view, meandered around here and there, and I

20   don't -- her other testimony dealing with that issue is very

21   fuzzy, and that's how it came out, but that is the genesis of

22   Government's No. 2.

23        THE COURT:  All right.

24        MR. POVICH:  In the event this case at some point in

25   time goes to the Court of Appeals, and they're looking for

1      Piccadillo, I think the name of the magazine is Piccolo.

2              MR. DIXON:  Piccolo, I'm sorry; not Piccadillo,

3      Piccolo.  I'm not well versed, Your Honor.

4              MR. POVICH:  Or Piccolo, as we called it up to this.

5              THE COURT:  Whatever.

6              MR. POVICH:  Your Honor, I have no objection to

7      Exhibit No. 1, which is the waiver.  I think it was discussed

8      at length, and I think the Court should have the benefit of

9      precisely the form, and the indication that it was executed,

10     and that it was done, and particularly the time which appears

11     on it.

12                          (Government's Exhibit No. 1

13                          was received in evidence.)

14             MR. POVICH:  With respect to Government's Exhibit No.

15     2, I would accept the Government's exhibit and not object to

16     it, with one exception.  I do so, Your Honor, because it is

17     offered -- because there is a credibility contest, and I

18     believe there is a credibility contest between Ms. Moolenaar

19     and the agent, and I think that the Court, if it reaches that

20     point, should have the benefit of whatever documentation is

21     available to assess it.

22             But there is an attachment to Exhibit 2, Your Honor.

23     It is an affidavit for a search warrant, and then it goes on,

24     Your Honor.  In addition, it has a diagram of the room, which

25     I don't believe was part of the affidavit for the search

1    warrant, since the officers had not entered the room at that

2    point, and I don't think they really had it.

3             And the third part of it is the report on the return

4    of the search warrant inventory.  I have no objection to that.

5    In addition, I think it's been identified as one of the

6    defendant's exhibits.  The only question I have is the

7    inclusion of this diagram of the room and why that was part of

8    it.  Ron, do you know?

9             MR. DIXON:  Could I have the Court's indulgence one

10   moment?

11            MR. POVICH:  The record should reflect I've never

12   seen the diagram before, and we appear to have had copies of

13   both the affidavit and of the inventory, and it has not been

14   up to this point a part of it, and it seems to be signed by

15   Agent Bloodworth, and he's not testified, so I really question

16   whether or not that should be included.

17            THE COURT:  I'm not sure I recall seeing the diagram

18   before.

19            MR. POVICH:  Nor do I think it's particularly

20   relevant, certainly not to these proceedings.

21            MR. DIXON:  Your Honor, if the Court please, I would

22   have no objection to that part of Government's Exhibit No. 2

23   being sanitized, if you will, and --

24            THE COURT:  The diagram?

25            MR. DIXON:  Yes, sir.

1                              (Government's Exhibit No. 2, as

2                              amended, was received in

3                              evidence.)

4              MR. POVICH:  Do I understand, Mr. Dixon, you're

5     resting now?

6              MR. DIXON:  Yes.

7              MR. POVICH:  May I address the Court?

8              THE COURT:  Yes.

9              MR. POVICH:  With respect to -- we don't wish to

10    introduce any further testimony, Your Honor, but we would like

11    to introduce our exhibits.

12             I will pass for a moment, Defendant's Exhibit 1,

13    which is the request for the appearance and the subpoena for

14    Ms. Moolenaar to appear at this hearing today, which was

15    issued by the United States, and take that up at the end.

16             Exhibit No. 2, Your Honor, is the -- Defendant's

17    Exhibit 2 is a search warrant, inventory and return, report

18    and return.  It was identified by Mr. Gauntt.  If Your Honor

19    may recall, he said he signed it because it was -- the

20    Government told him to sign it, and he -- he believed they

21    were from the Government, so he did so.  It's important, I

22    think, Your Honor, and I would like to introduce it as the

23    document shown to Mr. Gauntt, which he said he signed but did

24    not receive a copy of, specifically, the pink copy.

25             MR. DIXON:  Your Honor, I don't have any problem with

1     that.  It's a part of the Court's record already, the Court

2     can take judicial notice of its own records.

3          THE COURT:  All right, Government's Exhibits 1 and 2

4     are received.  I'm sorry, Defense Exhibits.

5                              (Defendant's Exhibits Nos. 1 and 2

6                              were received in evidence.)

7          MR. POVICH:  Your Honor, the next number is

8     Defendant's Exhibit 3, and this, Your Honor, is Ms.

9     Moolenaar's -- are Ms. Moolenaar's notes.  It is a one-page

10    exhibit of the telephone conversation.

11         Now, as Mr. Dixon says, her credibility has been

12    attacked.  These are contemporaneous notes of what she said

13    transpired.  She was questioned closely, I think, by both

14    parties and the Court on those conversations, and I would urge

15    that it's admissible, and that the Court should have the

16    benefit of her contemporaneous notes.

17         THE COURT:  Mr. Dixon.

18         MR. DIXON:  Your Honor, in general, Ms. Moolenaar, as

19    all witnesses who take the witness stand, her credibility was

20    attacked by the United States as well as Agent Northrop.  The

21    notes that are comprised in Defense No. 3 were not used

22    specifically, either to impeach or to rehabilitate Ms.

23    Moolenaar.  They are just general notes about the

24    conversation.

25         We would submit that all they would do is serve to

1    bolster her testimony.  They really don't tell the Court any

2    more than it already knows about Ms. Moolenaar's testimony,

3    and there was no attempt by the Government, nor by the

4    defense, to rehabilitate her.

5          The Court recalled that the notes were referred to

6    and identified by Ms. Moolenaar, but the defense, after an

7    objection, abandoned whatever tactic they were using to try

8    to -- whatever purpose they were going to put the notes to.

9          There was no direct impeachment by the Government or

10    rehabilitation by the defense that would serve to bring these

11    notes into evidence at this point, and they would merely be

12    coming in as a prior consistent or inconsistent statement,

13    whichever part of the notes you wanted to seize upon that may

14    have been used but weren't used, and we would object on those

15    grounds, Your Honor.

16          THE COURT:  Mr. Povich.

17          MR. POVICH:  Your Honor, these notes were first

18    identified on my cross-examination or my examination of Ms.

19    Moolenaar.  She really at the conclusion of that testimony had

20    been attacked quite forcefully as to her credibility insofar

21    as what transpired in that first telephone conversation -- for

22    instance, what was said -- and the subsequent witness, more

23    importantly, Mr. Northrop, testified, essentially, that what

24    Ms. Moolenaar had said when I examined did not take place, and

25    he said his interest was, for instance, in such matters as

1   sexual conduct with young boys, and that that was specifically

2   discussed.

3        These notes, which she identified on the stand as

4   being her notes, are totally absent -- do not contain one

5   reference at all to that type of a conversation in their

6   telephone conversation -- not one -- and they are introduced,

7   Your Honor -- when I examined her and had her identify this, I

8   sought to introduce this at that point in her testimony.

9        It was objected to, and I waited, and the Court did

10  not rule on it, because it was just passed, and I did not

11  because I expected that, after Mr. Northrop testified and the

12  contents of that conversation really became clearly at issue,

13  that at that point it would be clearly admissible, and that's

14  why we waited till this point, at the conclusion of this

15  hearing, where the contents of that conversation are clearly

16  relevant, to introduce it to rehabilitate now, as a statement

17  of -- a contemporaneous note of Ms. Moolenaar as to what had

18  transpired.

19       It is no different, Your Honor, than what we have in

20  every situation where a police officer takes the stand,

21  testifies what's happened.  On cross-examination, he is

22  challenged, and his contemporaneous notes are introduced or

23  allowed to be introduced, in order to show that what he said

24  happened was supported by contemporaneous writing.

25       I think Ms. Moolenaar is entitled to the same

3

1    consideration, and indeed, these notes not only corroborate

2    what she said, but I think would assist the Court in a

3    difficult matter of credibility.

4              THE COURT:  All right.

5              MR. DIXON:  I have nothing further, Your Honor, on

6    that issue.

7              THE COURT:  What's that?

8              MR. DIXON:  I have nothing further on the notes.

9    I'll stand on the argument I made earlier.

10             THE COURT:  Well, what is the rule that you would

11    bring it under, Mr. Povich?

12             MR. POVICH:  If Your Honor will indulge me for a

13    moment.

14             THE COURT:  Sure.

15             MR. POVICH:  Give me a moment, Your Honor.  I'm

16    sorry, I should have...

17             Mr. Hoffman is looking up the specific rule, Your

18    Honor.  It would be the rule which relates to the exception to

19    the hearsay rule, which allows a witness who has made a prior

20    consistent statement to have that statement introduced, and I

21    will get it for you in a moment.

22             MR. POVICH:  It's interesting, Your Honor.  There are

23    two bases in rule 803.  This is what I'm going to check.

24             THE COURT:  803?

25             MR. POVICH:  Yes, sir.

1          MR. POVICH:  I'd like to start out, first, by saying

2     I don't know whether Ms. Moolenaar is adverse, who she's the

3     adverse party to, but anyway, Your Honor, 803, paragraph 1, a

4     statement describing or explaining an event or condition made

5     while the declarant was perceiving the events or conditions or

6     immediately thereafter, and therefore, it is an exception to

7     the hearsay rule, Your Honor.  This statement, I believe, is

8     clearly not excluded.

9          And, also, the general provisions under 24, Your

10    Honor, with the other exception, as a statement not

11    specifically covered by any of the foregoing exceptions but

12    having equivalent circumstantial guarantees of

13    trustworthiness, if the Court determines that, a, the

14    statement is offered as evidence of a material fact, the

15    statement is more probative on the point for which it is

16    offered than any other evidence which the proponent can

17    procure through reasonable efforts, and the general purpose of

18    these rules, that the interests of justice will best be served

19    by the admission of the statement into evidence.  Most

20    principally that one, Your Honor.

21         I think Your Honor has to sit back and ascertain --

22    we have two people trying to describe what happened in a

23    telephone conversation.  One of the individuals, an attorney,

24    has made contemporaneous notes of what was said, and I think

25    in the interests of justice, those notes, especially if her

1 credibility has been attacked, should be admitted in the

2 interests of justice.

3   THE COURT:  Anything else, Mr. Dixon?

4   MR. DIXON:  No, Your Honor.  I'd stand on the

5 arguments I made earlier.  We think that the only way that

6 these statements -- well, it's not -- first of all, we don't

7 think it's a statement.

8   The only way that Ms. Moolenaar's notes can come in

9 is if Ms. Moolenaar was specifically impeached by the

10 Government.  The Court allowed the United States to

11 cross-examine Ms. Moolenaar, because -- well, before the Court

12 even got to that ruling, the defense conceded, so the Court

13 didn't have to make that ruling.  The defense conceded that

14 the Government should be allowed to cross-examine Ms.

15 Moolenaar, and we did.

16   After we cross-examined Ms. Moolenaar, Mr. Povich, as

17 I recall, attempted to use -- identified Ms. Moolenaar's

18 notes, had her identify them, and had her talk about what she

19 wrote down.  I objected to her reciting anything on the notes,

20 all right?  So there was no attempt to rehabilitate at that

21 point.

22   Then we get to Mr. Northrop testifying, and now the

23 defense is reaching way back, trying to use Ms. Moolenaar's

24 notes to impeach Mr. Northrop.  But we don't know, we don't

25 know what Ms. Moolenaar wrote, and what she left out.  These

1    are very cryptic notes.  They can't -- they don't rise to the

2    dignity of a statement, because everything is not there.

3    There are things that aren't there, and that means that these

4    notes are incomplete.

5           We don't know how they can try to use Ms. Moolenaar's

6    notes to impeach Mr. Northrop, because he didn't write them.

7    She wrote them.

8           They didn't ask her any questions about what she had

9    on her notes, because there was no grounds to.  The things I

10   asked her did not fall within the four corners of that

11   document, or they would have tried to rehabilitate her, but

12   they didn't, and now they're trying to get to the Court's

13   attention her notes to bolster her testimony, on the general

14   theory that her credibility is in issue.

15          Of course her credibility is in issue.  So is

16   Inspector Northrop's.  But I daresay I don't think the defense

17   will argue that his notes should be submitted to the Court in

18   toto, and, Your Honor, we think there's just no grounds for

19   them to try to get the notes in.  Had they specifically come

20   back and tried to rehabilitate Ms. Moolenaar on a specific

21   point, then we would say, arguably, that the notes could come

22   in, but that didn't happen, so our position has not been

23   changed, and we would ask the Court to exclude them.

24          THE COURT:  May I see the notes before I hear further

25   argument?

1          MR. POVICH:  Yes, sir.

2          THE COURT:  All right, last word, Mr. Povich.

3          MR. POVICH:  Yes, sir.  I spent some time, I

4    believe -- using the Government's argument, I spent some time

5    trying to "rehabilitate," if that is the correct word,

6    statements which Ms. Moolenaar or points which Mr. Dixon tried

7    to obtain from Ms. Moolenaar, particularly -- a perfect

8    example is the Piccolo or Piccolo situation, in which I

9    examined her at some length to try to have some understanding

10   of the circumstances under which she received information

11   concerning that, and that will be apparent -- that's not

12   apparent from that one, Your Honor; that was my reexamination

13   of her with respect to the telephone conversation of the day

14   of the meeting -- but the telephone conversation prior to the

15   meeting, and it was very important as to what was said as to

16   why it was going down, at whose request she was coming down,

17   and I went back over that at some length with her, and she

18   testified to those matters consistent with her notes, and I

19   would think, Your Honor, if rehabilitation is the key, and I

20   don't think it is, that that's what happened, and that they're

21   admissible.

22          THE COURT:  Defendant Exhibit No. 3 will not be

23   received.

24          MR. POVICH:  Your Honor, Exhibit 4 is a defendant's

25   exhibit, which is the search warrant and report inventory,

1      which Ms. Moolenaar said she obtained from the Magistrate's

2      office.

3               THE COURT:  Any objection?

4               MR. DIXON:  No, sir, Your Honor.  That's a part of

5      the Court's record.

6               THE COURT:  Received.

7                          (Defendant's Exhibit No. 4

8                           was received in evidence.)

9               MR. POVICH:  Your Honor, Exhibit No. 5 is defendant

10     Moolenaar's notes as to the -- which were written during the

11     course of the meeting that she had with Agent Northrop and

12     Bloodworth.  It sets forth in some detail the sequence of

13     events.

14               It corroborates what she testified to both on my

15     examination of her after she was cross-examined as an adverse

16     witness, and it addresses such important matters as which

17     boxes were opened and which ones were not, because it

18     indicates the contents -- references those that were opened

19     and looked at, and those that were not, and, Your Honor, it is

20     sequential, so that it shows that matters were taken not

21     numerically in order, as Mr. Northrop said, but only after

22     they had gone into other matters first and then started going

23     numerically in order.

24               It generally corroborates the material, Your Honor,

25     which she was viciously attacked on in some instances by the

1    United States attorney, and it indicates that her testimony

2    with respect to the matters covered here was truthful,

3    particularly, Your Honor, the absence of any note whatsoever

4    about the contents of the controlled delivery package.  Not

5    one word about that in these notes.

6         We think it is important for her credibility, since

7    the Government went to some lengths to show that Agent

8    Northrop was testifying correctly when he said it was opened,

9    and that she was not being truthful when she said that it was

10   not.  I would offer her contemporaneous notes, Exhibit 5.

11        MR. DIXON:  Your Honor, our problem with Defendant's

12   No. 5 is even more basic than with Defendant's 3.  It's our

13   recollection that -- and again, the Court's recollection

14   controls -- is that Ms. Moolenaar -- we don't even recall her

15   identifying Defendant's No. 5 as notes that she took at the

16   time when she was being interviewed.

17        Moving aside from that, even if they did, even if

18   they did have her identify Defendant's No. 5, again, we would

19   ask the Court, if the Court is going to allow this, allow

20   specifically not the whole notes -- well, I'll withdraw that.

21   If the Court is going to allow one page, the doctrine of

22   completeness would apply that the page before and the page

23   after and whatever is relevant to explain that particular

24   entry.

25        But, again, our position, going beyond whether or not

1    it was properly identified, is that let's stick with straight

2    impeachment.  You just can't -- we don't think you can just

3    give us a self-serving statement or some document to bolster a

4    witness's testimony, and that's basically what we have.

5         Corroboration is one thing, but again, that's

6    independent corroboration.  Here we have something that a

7    witness wrote down.  She may have included, she may have

8    excluded things for any one of a number of reasons.  She may

9    have forgotten, and to this day does not recall that she

10   looked at the controlled delivery.

11        THE COURT:  I would just note for the record that Ms.

12   Moolenaar did identify, according to my notes, Defendant

13   Exhibit No. 5 as her original notes taken at the time of the

14   meeting with the agent.

15        MR. DIXON:  Very well, Your Honor.

16        But, Your Honor, moving away from that, the same

17   objections that we had to the earlier notes would apply to

18   this.  If there's some specific passage that rehabilitates Ms.

19   Moolenaar on a particular point that she was impeached on, we

20   would have no problem with that, because that's fair, that

21   should come in, that's a prior consistent statement after she

22   was impeached on cross-examination, but we don't think that's

23   the case here, and what is happening is the Court is going to

24   get carte blanche one -- and I'm reluctant to say party -- one

25   witness's version of what happened, and it's memorialized by

1        being in writing, and so far all the Court has is the

2        testimony that it has to make some judgment calls on, but we

3        think -- and we'll save this for argument at the appropriate

4        time -- there's more to it than that.

5              But our objections to Defendant's No. 5 would remain

6        the same as they would to Defendant's 3, Your Honor, unless

7        there's some specific passage or some specific phrase in the

8        notes that serves to rehabilitate Ms. Moolenaar on a point

9        that she was cross-examined on by the United States.

10             MR. HOFFMAN:  Your Honor, may I?

11             THE COURT:  Yes.

12             MR. HOFFMAN:  Two points.  One, there is, given that

13       concession, there are several points on which she was very

14       vehemently cross-examined, which those notes specifically

15       corroborate.  One is what was reviewed at the meeting, and

16       most importantly, as will become clear when we argue the case,

17       the sequence of review of the material at the meeting, in

18       which she was impeached, and her testimony is in conflict with

19       that of Agent Northrop, who testified that the controlled

20       delivery was the first thing examined at the meeting.  She was

21       impeached when she testified it was the last thing discussed

22       at the meeting, and then not examined at all.

23             I've rarely heard someone be impeached so severely.

24       Mr. Dixon suggested to her in questions and at the bench that

25       she was, for want of a better phrase, lying, because she had

1   an interest in this case, and he questioned her professional

2   conduct.

3          It is, I think, a very well known and standard rule

4   that where there exists a contemporaneous utterance when

5   someone is accused of a recent fabrication, that

6   contemporaneous utterance is admissible.  This is a

7   contemporaneous note of that very meeting in which she has

8   been accused of a recent fabrication in her testimony, and as

9   such those notes in whole are admissible.

10         MR. POVICH:  I think that would apply -- Your Honor,

11  that was my point with respect to No. 3 as well.

12         THE COURT:  Well, I have a feeling that there's a

13  difference between No. 3 and No. 5, for the reason that it's

14  my recollection that both Ms. Moolenaar and Agent -- not

15  Bloodworth but --

16         MR. POVICH:  Northrop.

17         MR. DIXON:  Northrop.

18         THE COURT:  -- Northrop made notes, I believe,

19  concerning the order in which they looked at the exhibits in

20  question, and I think that order is significant for both of

21  them, because they were both questioned about the order that

22  they looked at the exhibits.

23         Now, of course, the agent's notes have not been

24  offered --

25         MR. POVICH:  They will be, Your Honor, the raw notes.

1      THE COURT:  -- but they testified, as I recall, that

2  they did make notes as to the order in which they were offered

3  and reviewed, and having that in mind, and since that is a

4  matter the Court wishes to consider, and the fact that there

5  was testimony, as I recall, that these notes were made at or

6  about the time of this meeting, it seems to me that it is

7  significant and relevant, but, further, it is admissible.

8      Now, I find myself, looking at rule 803, trying to

9  find which pigeonhole it goes in, and I'm afraid I must advise

10  you that I'm reminded of a case I tried in the United States

11  District Court in Ohio once, where the judge ruled against me,

12  and I tried to get him to advise me of the basis of his

13  ruling, and finally, he said, "Well, all I can tell you, Mr.

14  Penn, is, I only have an old lawyer's hunch that I'm right."

15      MR. DIXON:  The plenary power of the Court, Your

16  Honor (Laughter).

17      MR. POVICH:  I could only suggest, Your Honor, it's

18  either subsection 1 or 24.

19      THE COURT:  I will not admit to being an old lawyer,

20  but I think it is admissible, at least under 803-24, perhaps

21  under 803-1, and I'd have to look at it further; and I think

22  because, and the only reason is because, that note and the

23  other note as well set out the order in which they actually

24  looked at the diagram or the evidence.

25      MR. POVICH:  Yes, sir.

1          THE COURT:  Now, it can be argued, of course, that

2   they had an opportunity to refresh their recollection as to

3   that order by looking at their notes, and I think they

4   testified after looking at their notes concerning the order as

5   well, but I'm going to hold that Defendant Exhibit 5 is

6   admissible, and I'll receive it.

7                              (Defendant's Exhibit No. 5

8                               was received in evidence.)

9          MR. POVICH:  I would offer Defendant's Exhibit 7,

10   then, Your Honor, which is Agent Northrop's handwritten notes.

11          MR. DIXON:  No objection, Your Honor.

12          THE COURT:  I'll receive 7.

13                              (Defendant's Exhibit No. 7

14                               was received in evidence.)

15          MR. POVICH:  My last comment, Your Honor -- it's only

16   a comment.  It's perhaps not necessary to the proceedings.

17   It's in evidence.  It's perhaps not necessary to the

18   proceedings, but the United States attorney's office, there is

19   a practice which has grown up in the United States attorney's

20   office, and I can't put my finger on it, but I think it has

21   been condemned, of sending out what appears to be a subpoena

22   for a hearing which, in fact, is nothing more than a subpoena

23   to appear in my office so that I can question you about it.

24          I ask that Exhibit 1 be introduced, because that's

25   what this subpoena represents.  It says that they are to

1    report to room so and so and such and such of the United

2    States attorney's office, and it has all the indicia -- in

3    fact, it's been typed on top of a subpoena of this Court, and

4    I -- every time I see this, I want to object to it, because I

5    think it's improper.  A person can be subpoenaed to come to

6    court and asked if they would come to the person's office, but

7    they can't be subpoenaed to what appears to be coming to

8    someone's office first, and I just want to make that comment.

9         THE COURT:  That's Defendant Exhibit 1; is that

10   right?

11        MR. POVICH:  Yes.

12        THE COURT:  That's already in evidence.

13        MR. POVICH:  Yes.

14        THE COURT:  All right, defendant have anything else?

15        MR. POVICH:  No, sir.

16        THE COURT:  All right, argument.

17        MR. DIXON:  Your Honor, before we get to argument, it

18   appears that there's one other exhibit that should come in,

19   and I think the defense was about to proffer it, but they did

20   not, and that's, I think, Defendant's -- the Court will --

21        MR. POVICH:  Six?

22        MR. DIXON:  Defendant 6, and Your Honor, that is an

23   exhibit that the Court should have.  We have already rested

24   our case.

25        THE COURT:  Which one is that?

1          MR. DIXON:  That's the memorandum of Postal Inspector

2     Northrop, laying out what happened at the April 16th, 1984

3     hearing, a memorandum that was used to, indeed, impeach Agent

4     Northrop.  On page, I believe it was, 4, Agent Northrop made a

5     statement on the witness stand, and he was impeached with

6     something that he said in the written memorandum, that he

7     identified and agreed was accurate, and the Court may recall

8     that I stood and asked under the doctrine of completeness that

9     the entire sentence be read, so that the matter would be

10    clear.

11         Your Honor, procedurally, I have rested.  I would ask

12    the Court to allow the Government to reopen just for purposes

13    of admitting that particular exhibit.  It has been identified.

14    In fact, it was used by the defense, and if we need to put a

15    Government sticker on it, I would ask the Court to allow the

16    Government -- first of all, I would ask the Court to allow the

17    Government to reopen to consider that.

18         THE COURT:  First, what is Defense Exhibit 7?

19         MR. DIXON:  That is -- 7 are the notes taken by

20    Northrop, and -- handwritten notes; and 6 is the memorandum

21    that he wrote as a result of consulting those notes, and I

22    think the Government would be out of the water if Defendant's

23    No. 6 had not been used, but it was used to impeach Inspector

24    Northrop.

25         THE COURT:  But 7 are his original notes?

1          MR. DIXON:  Yes, sir.

2          THE COURT:  And 6 is a memorandum he prepared based

3   on those notes?

4          MR. DIXON:  Yes, sir, that is more expansive than 7.

5          THE COURT:  All right.  Any objection?

6          MR. POVICH:  Yes.

7          THE COURT:  Well, first, for the record, I will allow

8   the Government to reopen its case for the purpose of -- well,

9   I don't know whether you wish to argue that point or not, Mr.

10  Povich.

11         MR. POVICH:  No.

12         THE COURT:  I will allow the Government to reopen its

13  case for the purpose of marking the exhibit in question as a

14  Government exhibit and offering it, and assuming that that's

15  been done, I'll hear your argument, Mr. Povich.

16         MR. POVICH:  Yes, sir.  This is a typewritten

17  memorandum, Your Honor, of the interview conducted by Agent

18  Northrop and Agent Bloodworth.  It appears to be written by

19  Agent Northrop, and that's why I questioned him about it.  It

20  doesn't indicate when it was written, the date, the time, at

21  what point it was written.  Sometime subsequently to the

22  hearing.  There is no date on it.

23         I questioned him about it principally because of the

24  absence of anything in the memorandum which he wrote as to

25  opening of the package, if you'll recall, was the principal

1    issue, and nowhere in this memorandum did he say -- was there

2    any reference to the fact that the package was opened at all.

3           I don't know with whom -- there was no testimony as

4    to the source of this information, whether he consulted with

5    Agent Bloodworth, whether he consulted with other agents.   It

6    was simply an interview -- it was simply a memorandum written

7    by him, and I examined on it.

8           Now, as the Court knows, not every document used to

9    cross-examine a witness makes it admissible, and I don't think

10   that they're entitled to have an entire memorandum -- it's

11   called an investigative memorandum, memorandum of interview,

12   undated.   Sources are not indicated.   I don't think that that

13   entire memorandum or any portion of it is admissible.

14          I think, for the Court's purposes, the Court has

15   identified the issue with respect to contemporaneous notes of

16   what transpired at that hearing and not an investigative

17   memorandum of the interview written at some other point in

18   time that could draw upon other information and is not

19   necessarily limited to Agent Bloodworth's data -- I'm sorry,

20   Agent Northrop's data -- which is what Agent Northrop's

21   handwritten memorandum would have been, and under those

22   circumstances, Your Honor, I think it's -- I would object

23   strongly to it being introduced.

24          THE COURT:   Mr. Dixon, are you offering the entire

25   document?

1          MR. DIXON:  Yes, sir, I am, Your Honor.

2          THE COURT:  May I see the document?

3          (Handed to the Court.)

4          MR. POVICH:  I'm sorry, Your Honor, I may have

5     underlined something.  Is that my copy or is it a clean copy?

6          THE COURT:  I'm not sure whose copy it is.

7          MR. POVICH:  If it's not marked -- good.

8          THE COURT:  I don't see anything on it.  Do you want

9     to take it?

10          MR. POVICH:  That's fine.  My marks are readily

11     apparent.  Thank you.

12          THE COURT:  Yes, Mr. Dixon?

13          MR. DIXON:  Your Honor, with reference to -- I would

14     use the arguments made so eloquently by opposing counsel.

15     Matters of credibility are at issue, and I think the Court

16     will find that there are certain matters that Ms. -- recall

17     certain matters that Ms. Moolenaar testified about, that Agent

18     Northrop testified about, that were memorialized in this

19     particular item.  For instance, the first line on the first

20     page:

21          "The discussion began with introductions, with all

22       four parties present, and a brief explanation of the

23       purpose of our meeting.  The next order of business was to

24       obtain some personal information from the subject, Mr.

25       George Nader, i.e., personal history, after which some

1          background as to his line of business in connection with a

2          firm called International Insight and a magazine which he

3          publishes known as the Middle East Insight, and other

4          relevant materials to that company."

5              He then says:  "It was explained to Mr. Nader by

6          Agent Bloodworth and myself that our discussion was to

7          center around the importation of child pornography in

8          violation of 18 U.S.C. 1462."

9              Ms. Moolenaar denied that on the witness stand.  She

10     said something like that never happened.  The Court will

11     recall that I asked her a specific question, and it came from

12     this memorandum.

13             The Court will recall that I asked Ms. Moolenaar

14     several other questions that came from this memorandum.  Okay.

15     I invite the Court's attention to page 2, and the Court will

16     recall that my line of questioning on Ms. Moolenaar was as

17     follows:

18             "Ms. Moolenaar, is it a fact that Mr. Nader was asked

19         this question and he gave this response?  He stated that

20         he jotted down the name and address of a company known as

21         COQ Company in Copenhagen, and kept that name and address

22         with him so that he may correspond with them and make

23         future purchases of similar material depicting young boys

24         in sexual activity?"

25             She said no, and the Court may recall that I asked

1      Ms. Moolenaar a question in this fashion:

2              "Ms. Moolenaar, was your client asked this question,

3          and did he give this answer?  He had stopped there in

4          Holland for one evening, and at the hotel he bought" --

5          this is on page 2, the bottom of the page -- "he had

6          stopped there in Holland for one evening, and at the

7          hotel he bought a magazine depicting young boys engaged in

8          sexual activity?"

9              Her response was "No, my client didn't say anything

10     like that at all."

11             Your Honor, we think that this memorandum -- well, we

12     think that it is significant by virtue of its conspicuous

13     absence from those that the defense wanted to move in.

14             We, also, Your Honor, think that it lays out in great

15     detail what happened, just as Ms. Moolenaar's contemporaneous

16     notes -- I think that's Defendant's No. --

17             MR. POVICH:  Five, Your Honor.

18             MR. DIXON:  -- Defendant's No. 5, and we think that

19     Mr. Northrop was cross-examined on the witness stand about

20     what happened at the meeting; he was impeached on at least one

21     occasion that I can recall that Mr. Povich has pointed out for

22     us -- that was on page -- I'm sorry, I'm sorry.  He was asked

23     to read through the entire memorandum, the Court will recall,

24     and he was asked:  "Did you put anything in your memorandum at

25     all about showing or opening the controlled delivery?"  And he

8

1    said, "No, it's not there," and he said on the witness stand

2    that he showed it to her.

3         Your Honor, this memorandum was used ad nauseam by

4    the defense to impeach Mr. Northrop's credibility.  There are

5    statements here that rehabilitate him, if you will, and there

6    are statements that go along the lines of what the defense was

7    after, and we think that the Court is entitled to it as the

8    finder of fact and as the concluder of law to have this

9    memorandum before it.

10        Now, the issue that Mr. Povich raised about when this

11   memorandum was written, we think is not a real issue, because

12   Agent Northrop identified it on the witness stand and said,

13   "Yes, I wrote it," and "Yes, that's mine."  We think that

14   identifies it and that brings it into the ballpark.  That

15   makes it material, that makes it relevant, and we think that

16   the Court should receive it to assist it in making a very

17   difficult decision on this case.

18        THE COURT:  But you're asking me to -- well, if I

19   receive -- as I understand, you're offering this for for my

20   consideration of the entire document?

21        MR. DIXON:  Yes, sir, I am, Your Honor, because the

22   Court cannot -- under the doctrine of completeness, if we were

23   to cut out -- if we were to expurgate or excise certain parts

24   of this document, what comes after that would not make any

25   sense if the Court didn't have the opportunity to read what

1    came before it; in other words, directing the Court's

2    attention to the first page, the first -- the last sentence on

3    the first page, "It was explained to Mr. Nader," and so on,

4    would make no sense without, we submit, without the preceding

5    sentence and without the next sentence, because it would give

6    a reader a false impression that that was the first thing that

7    happened at the meeting, that they sat down and they said to

8    Mr. Nader, "Okay, Mr. Nader, according to the Government's

9    view, we're going to explain to you that what you did was in

10   violation of the law.  You imported child pornography," and

11   that just didn't happen.  There was testimony from Moolenaar

12   and Northrop that that was not the course, the first thing

13   that happened.  That was not the first thing that happened.

14         The first thing that happened was introductions and

15   biographical information, and then they got into other areas.

16   What I'm saying is if the Court were just to take that, based

17   on the impeachment of Ms. Moolenaar, just take that sentence,

18   it would be misleading because of what is the agreed testimony

19   from the other witnesses.  They don't agree on that particular

20   sentence, but they agree on what happened before that and what

21   led up to that, and the demarcation comes when the

22   Government's witness says, "Hey, I advised them that they

23   should have been on notice that this has the trappings of a

24   criminal investigation."  They say no, that never happened,

25   and, Your Honor, that's why we would ask that the entire

1    document be received by the Court.

2         MR. HOFFMAN:  Your Honor, may I?

3         THE COURT:  Yes.

4         MR. HOFFMAN:  Just a couple of statements.  There's a

5    difference between this memorandum and Defendant's Exhibit 5.

6    A couple that are most important is that this is not a

7    contemporaneous memorandum.

8         The doctrine that we're talking about, when someone's

9    recollection of an event has been impeached, and they have

10   been accused of misrecollecting or misstating, if there's a

11   contemporaneous note that's one thing.  This is something done

12   afterwards.  This is what the agent produces as perhaps a

13   summary of what's happened.  We have his contemporaneous

14   notes.  You've already got them.  They've been admitted.

15        That leads to the second problem of this.  This has

16   double hearsay all over it.  This has statements -- it appears

17   to have statements that he talked to others at the meeting to

18   get these statements, probably, most particularly, Agent

19   Bloodworth, because there is material in this document that is

20   nowhere to be found in his original notes.  So the likelihood

21   that he spoke with someone else is great and included those

22   statements in here, and those other statements which cannot be

23   identified and separated are clearly inadmissible.

24        The third difference is that the United States did

25   not use this memorandum in reexamining after cross-examination

1    the agent.  Defendant's Exhibit 5 was identified and used by

2    Mr. Povich in examining Ms. Moolenaar, because of the way she

3    was impeached by the United States.

4        After Mr. Povich finished cross-examining, and did,

5    in fact, use portions of this, the United States chose for

6    whatever reason not to use any portion of this as a method of

7    rehabilitation, so the fact that it conceivably could be

8    rehabilitation isn't really relevant, because I assume by some

9    choice it was determined not to use this memorandum.  It was

10   not referred to in any way by the Government in redirect in

11   rehabilitation of the agent.

12       For all of those reasons, this exhibit is materially

13   different from the exhibit that Your Honor has admitted as

14   introduced by the defense.

15       I believe Mr. Povich said it the first time, but we

16   do not know when this exhibit was created.  We don't know how

17   long after this meeting, especially with relation to the

18   motions and what has been filed in this case, that this

19   memorandum was dictated by the agent.

20       MR. POVICH:  Or typed.

21       MR. HOFFMAN:  Or, as Mr. Povich --

22       THE COURT:  Government's Exhibit No. 3 is not

23   received.  Counsel have anything else?

24       MR. DIXON:  No, sir, we do not, Your Honor.

25       THE COURT:  All right, you ready for argument?

1          MR. DIXON:  Yes, sir.

2          Your Honor, at the outset, the United States would

3     make the observation that this has been a most difficult case

4     for the Government and, most assuredly, we think that it's

5     been a most difficult case for the Court and the defense.

6          Your Honor, going right to the issue at hand, we

7     would submit that the statements made by Mr. Nader should not

8     be suppressed, the reason being, a, Mr. Nader was not in

9     custody at the time the statements were made; b, I think the

10    defense, by virtue of the Court's ruling, has to abandon its

11    earlier Wong Sun argument.

12         The Court will recall, in the defense's motion

13    papers, they attacked the statements as the basis of the

14    poisonous tree.  Since the Court has ruled on evidence that

15    was seized, the Court has found that the evidence seized from

16    Mr. Nader's room should be suppressed, because of the

17    overbreadth of the search warrant; therefore, anything that

18    comes as a result of that should be suppressed as well.

19         Now, in dealing with the controlled delivery, the

20    Court has not suppressed the evidence that was seized during

21    the search, that being the controlled delivery.

22         Your Honor, that is what the -- the controlled

23    delivery, we submit, even knocking out the other evidence

24    taken from Mr. Nader's room, is what brought Mr. Nader and Ms.

25    Moolenaar to the office of the postal inspector.

1          Now, Your Honor, we see this in a very strong clear

2     light.  Miranda really doesn't apply, because Mr. Nader was

3     not under arrest, and Mr. Nader came voluntarily to, if we

4     will, the police station or the office of the postal

5     inspector, and indeed, Your Honor, Mr. Nader was in a much

6     better position than other defendants this Court has seen

7     before it in statements cases.

8          Your Honor, I would submit that the case law is -- it

9     is rare when you have a statement situation involving an

10    attorney who was sitting right beside her client.  That is

11    rare.

12         Normally, the cases that we deal with, and the cases

13    that come before this Court, are cases that deal with a single

14    defendant confronted with the power and majesty, if you will,

15    of the Government, that realized through a police officer, an

16    FBI agent or some other law enforcement official, and that

17    person is alone in an unknown environment, in a foreign

18    environment, and is under a criminal charge by virtue of the

19    fact that he's either arrested or he or she cannot leave, and

20    that is the genesis of the whole Miranda protection that is

21    offered to defendants.

22         Your Honor, in this case, Mr. Nader's apartment was

23    searched.  We submit the evidence shows that Mr. Nader's

24    attorney contacted Mr. Northrop.  Now, the reason we think

25    that that fact should be accepted by the Court is as follows:

1    How did the postal inspectors know, if the Court will, who Mr.

2    Nader's attorney was, after they executed the search warrant?

3         The Court will recall that Ms. Moolenaar said that

4    someone from the Government, either Postal or Customs, called

5    her, and asked her to come down.  That was Ms. Moolenaar's

6    testimony.

7         The Court will recall that the testimony from the

8    Government was that Ms. Moolenaar contacted Northrop or Kelly,

9    and that was a result of leaving a copy of their business

10   cards as well as a copy of the search warrant affidavit, the

11   inventory and the search warrant.

12        Now, there's some dispute about whether or not Mr.

13   Gauntt actually received a copy of it, but, Your Honor, Mr.

14   Gauntt signed it, and that is in writing, and it reflects that

15   he stated that he received a copy of the affidavit.

16        But putting that aside for a moment, we would ask the

17   Court to credit our witness's testimony of the fact that Ms.

18   Moolenaar did contact our witness, because there was no way

19   for the witness to know that Ms. Moolenaar was the attorney.

20   So how would they know who to call?  How would they know what

21   Mr. Nader was going to do?

22        The call was made, and Your Honor, this is, not where

23   the trouble sets in, but this is where the whole situation

24   starts.  Ms. Gwynneth Moolenaar, Your Honor, is an experienced

25   special assistant, as she calls it, United States attorney.

1    She worked for the Department of Justice.  She is admitted to

2    several bars.

3         We submit, Your Honor, Ms. Moolenaar saw a client who

4    was in fear of being arrested, in fear of allegations being

5    made as to his sexual preferences, as they related to small

6    children, and Ms. Moolenaar wanted to handle this as

7    efficiently, as quickly and as non-media-wise as possible.

8    And the reason she took the course she did, and it's not

9    unusual, was to locate this situation, to get in and speak to

10   the postal inspectors, try to find out what this case was

11   about, find out where it was going, and find out about their

12   evidence.

13        Your Honor, another thing we ask the Court to

14   consider when it makes this determination about the

15   motivations of Ms. Moolenaar -- and we think her motivations

16   are important -- Ms. Moolenaar was getting free discovery, and

17   Ms. Moolenaar made a tactical decision, we would submit, a

18   tactical decision to take her client into the postal

19   inspection office to allow them to question her client, and

20   she was going to get something out of the deal as well.  It

21   was a give and take, Your Honor, and that is what Ms.

22   Moolenaar bargained for, and that is exactly what she got.

23        When she arrived at the office of the postal

24   inspector, she was under no misapprehension.  No one pulled

25   the wool over her eyes.  If Mr. Nader had walked into that

1    office by himself, we would not be standing before this Court

2    today, because that clearly would have been foul play.  If Mr.

3    Nader had walked in by himself, being a Lebanese citizen,

4    possibly -- possibly -- but we say as to the contrary as a

5    result of his education, his background, his business

6    interest -- possibly there would have been a question of

7    overreaching.  But he walked in protected, the prophylactic of

8    an attorney, and we can only assume that they had a chance to

9    talk about this before.

10           We seriously dispute Ms. Moolenaar's contention that

11   she went down there the same date Mr. Nader went to see her.

12   We would take issue with that, Your Honor, but of course the

13   Court is the final arbiter of the facts.

14           Once they walked in, they sat down and they started

15   to talk about the matter at hand, which was the contraband,

16   the obscene pictures, the child pornography, and as time wore

17   on, Ms. Moolenaar assumed more of an advocate -- became more

18   of an advocate.  She had the presence of mind to tell her

19   client not to sign anything, not to write or not to initial or

20   to date anything.

21           But she tells this Court in the same breath that this

22   wasn't a criminal situation.  What was she thinking about when

23   she told her client not to do that?  Does something suddenly

24   spring forth in her head that "Hey, maybe I shouldn't have my

25   client do this"?  And at that point, Your Honor, at that

1    point, Mr. Nader had the protection of Ms. Moolenaar, and

2    legally, as far as the case law stands, as I understand it,

3    the Government didn't have to offer him anything, because he

4    had his lawyer right there.  We didn't even have to advise

5    him.  He had his lawyer right there with him, a criminal

6    lawyer, an assistant United States attorney.

7          Now, there came a time when we did advise Mr. Nader

8    of his rights.  We would submit to the Court that that was

9    even unnecessary, but Northrop did it anyway, and at that

10   point, approximately an hour, an hour and a half, maybe two

11   hours had elapsed during the course of the interview.  Mr.

12   Nader had made very damaging statements establishing a nexus

13   between himself and the evidence that is remaining, that being

14   the controlled delivery, admitting he ordered it, telling us

15   how he ordered it, with his lawyer sitting right there.

16         He was Mirandized, he was read his rights; they were

17   explained to him.  His lawyer was right there.  She even

18   signed as a witness.  And the questioning started anew about

19   the same area, over the same subject matter, and again Mr.

20   Nader made the same damaging admissions against his interest.

21         After the interview was over, at 5:00 o'clock or

22   shortly thereafter, Mr. Nader got up out of the office and

23   walked away, and he remained free, up to the time he was

24   called before the Court by way of indictment.  And he still

25   remains free today.  He's out on bond.

1        Your Honor, at no time, at no time -- we would submit

2    that defense could not stand before this Court and make a

3    Miranda custodial argument because it just didn't exist.

4        Now, what I suspect the defense will try to do is

5    create a situation by which Mr. Nader was misled.  What I mean

6    by that is this.  That promises were made to Mr. Nader through

7    his attorney that no charge would be brought, that no

8    prosecution would follow, if they would come down and talk to

9    us, and, Your Honor, we think that the facts and circumstances

10   bear out that that did not happen, and the hard, hard fact is

11   that Ms. Moolenaar should have known better, and she -- and

12   the Court recalled that she said on the witness stand herself

13   under cross-examination, I asked her:

14       "Ms. Moolenaar, you were a special assistant U.S.

15    attorney, and you worked criminal cases?

16       "Yes, I did.

17       "Did you ever have an occasion in which a law

18    enforcement officer made a decision on prosecution?

19       "No.

20       "That would be unusual, wouldn't it?

21       "Yes, highly unusual."

22       And that was the colloquy, Your Honor.

23       "Ms. Moolenaar, did you know and appreciate that when

24    you walked into that interview on April 16th, 1984?

25       "Yes."

1        Your Honor, we think it's plain and simple.  No one

2    pulled the wool over Ms. Moolenaar's eyes.  No one lied to

3    her.  No one coerced her.  No one threatened her or Mr. Nader.

4        They made a tactical decision, and we submit that the

5    Court should not enter its judgment for that judgment of an

6    attorney who's on the line, Your Honor.  Twenty-twenty is

7    always hindsight.  This is what Ms. Moolenaar thought was the

8    best thing to do for her client.

9        In reality, maybe Ms. Moolenaar should have gone in

10   and the first words out of her mouth is:  "Everything that we

11   talk about from this point forward is off the record.  You and

12   I are going to have a discussion about what you have, and we

13   will make a decision as to if we want to cooperate with you or

14   whatever the situation may be."  Being an experienced special

15   assistant U.S. attorney, that should have popped into her mind

16   almost immediately, but she chose not to follow that course.

17       And I don't know, even if the Court were to say to

18   the Government, "Well, Mr. Dixon, I understand what you're

19   saying, all of that is true, but the Court on a public policy

20   theory has to step in; where it appears an attorney is acting

21   in an ineffective manner, we have to step in and protect the

22   unassuming public."

23       But, Your Honor, we would ask the Court to view this

24   situation as Strickland vs. Washington points out.  We would

25   submit that Ms. Moolenaar may be guilty of making a poor

1    judgment call, but she was not incompetent, she was not

2    ineffective, because Strickland, the newest case from the

3    Supreme Court on ineffective assistance of counsel, says you

4    look at the standard for the particular community of lawyers

5    that you're talking about, and here in Washington, D.C., I

6    think the Court can readily state and even agree with the

7    United States, that criminal attorneys in this jurisdiction

8    always meet with prosecutors; not always, but more often than

9    not they meet with prosecutors when they have defendants, to

10   try to work cases out.  Pre-indictment pleas have sprung from

11   those, cooperation agreements where the defendant is going to

12   cooperate to assist the Government in investigating another

13   wrongdoer, and those situations are a matter of record.

14        What I mean by that, Your Honor, is we did not see

15   any piece of paper coming from the defense or from the

16   Government to the effect that the United States and Mr. Nader

17   have a deal.  Ms. Moolenaar could not produce one shred of

18   paper signed by a prosecutor, even signed by Northrop,

19   indicating that no prosecution would follow if she came down

20   and had her client submit to questioning.

21        Your Honor, we submit that all the cases we've cited

22   in our motion papers and most notably Miranda talks about it.

23   There's a passage in Miranda, if I may, which reads:

24        "The presence of counsel in all cases before us today

25        would be the adequate protection device necessary to make

1          the process of police interrogation conform to the

2          dictates of the privilege against compelled

3          self-incrimination.   Counsel's presence would insure that

4          statements made in the Government-established atmosphere

5          are not the product of compulsion."   Miranda vs. Arizona,

6          384 U.S. 436, 466.

7          Your Honor, when we're talking about a one-on-one, a

8     defendant with a police officer, or the defendant against the

9     Government, we've got a long hard row to hoe, especially in a

10    situation like this, to show that a person made a voluntary

11    and free statement, but in a situation where you have an

12    attorney present -- this isn't a rookie, this isn't someone

13    right out of law school.   This is an experienced criminal

14    lawyer.

15          She had the options, weighed the options, and made a

16    tactical decision to take her client down to speak with the

17    postal inspectors, and that's exactly what happened.   It was

18    give and take.   She had to give something to get something.

19    She got free discovery.   She got to look at all those

20    magazines, even before the prosecution, before the grand jury.

21          THE COURT:   Well, she had an opportunity to look at

22    them.

23          MR. DIXON:   She claims she didn't look at them.   But

24    that was even before the grand jury had a chance to look at

25    them, even before the Government prosecutor had a chance to

1    review the evidence that we had.

2          And, Your Honor, I urge the Court to find factually

3    that Mr. Nader came to the postal inspection office

4    voluntarily; that he came with counsel; that he had

5    representation from an experienced attorney; and legally, that

6    the statements, the incriminating statements he gave -- and he

7    did give incriminating statements at both stages, pre-Miranda

8    and after Miranda -- were made freely and voluntarily, with

9    the advice of counsel.  And that's in the alternative, because

10   our first position is, Your Honor, that Miranda didn't apply

11   to the situation, because it was non-custodial and because the

12   man came in with a lawyer.

13         Your Honor, we would ask the Court to so find and

14   deny the portion of the defense motion that goes to the

15   suppression of statements, and stand ready to respond to any

16   questions that the Court may have.

17         MR. HOFFMAN:  Thank you, Your Honor.

18         A couple of preliminary matters that I should voice,

19   although I am sure the Court is aware of them, having written

20   the opinion in this case that brings us here today.  First --

21   and, Mr. Dixon, I'm sure he understands this, but didn't start

22   from this premise -- the Court has already held the warrant in

23   this case was invalid, unconstitutional.  The Court has also

24   held that a subsequent search was illegal.  The Court has

25   further held that everything seized by the Government, all

1    fourteen bags of material that belonged to Mr. Nader, was

2    seized illegally and has been suppressed.

3         The only thing that remains in this case from that

4    search is the package that was intercepted at the border,

5    delivered to the defendant's home when he was not home, taken

6    from his home before he came home; a package the defendant

7    never saw, never had in his possession.  Everything else in

8    this case has been suppressed.

9         Your Honor, in this hearing, as a result of that

10   prior ruling, the burden is on the United States to show that

11   the statements in this case did not result from an

12   exploitation of the illegally seized evidence.  That's the

13   operative phrase.  They have the burden of showing that these

14   statements were not the result of exploiting the illegally

15   seized evidence.  They must show that the statements were the

16   result and obtained by means sufficiently distinguishable to

17   purge that primary taint.  The Supreme Court recently so held

18   in Taylor vs. Alabama, 457 United States 687.  It's a 1982

19   Supreme Court opinion.

20        Your Honor, the Government has premised most of its

21   testimony and a large part of its argument on Miranda vs.

22   Arizona, and the giving of Miranda warnings and the signed

23   waiver of rights by the defendant.  Your Honor, that argument

24   in this case is a complete red herring.  The Supreme Court in

25   Taylor expressly so held, and let me read Your Honor a brief

paragraph from Taylor:

> "The State points to several intervening events that
> it argues are sufficient to break the connection between
> the illegal arrest and petitioner's confession."

That was an arrest case, this being a search case,
and I'll get to the distinction in a moment.

> "It observes" -- the State does in Taylor -- "that
> petitioner was given Miranda warnings three times.  As our
> foregoing discussion of Brown and Dunaway demonstrates,
> however, the State's reliance on the giving of Miranda
> warnings is misplaced."

The giving of the Miranda warning is misplaced, Your
Honor, because this isn't a Fifth Amendment case.  We're not
here discussing the custodial environment under which Mr.
Nader may or may not have been.

This is a taint hearing.  The purpose of this hearing
is to determine whether they exploited this illegally seized
evidence.  This is a Fourth Amendment question, not a Fifth
Amendment.  The presence of counsel for the defendant, the
giving of the Miranda warnings, the fact that he was not under
arrest is irrelevant.  The question here is:  Did they exploit
this illegally seized evidence to obtain statements from the
defendant?

The Court in Taylor held that when you're doing a
taint hearing, the giving of Miranda warnings doesn't even

1     matter in the Fifth Amendment context, in a confession.   That

2     is especially true in the context of a Fourth Amendment

3     question, in illegally seized evidence.

4           Your Honor, we cited some cases in our initial

5     memorandum.   There are two others which were directly on point

6     in this case.   I'm going to have trouble pronouncing the first

7     one, but it's United States vs. Rubalcava-Montoya, 597 F.2d

8     140.   It's from the Ninth Circuit, and I'm quoting from page

9     143, where the Court said:

10          "The Government has not rebutted the logical

11      inference on these facts that the incriminating 'evidence'

12      discovered in the course of the illegal search was used to

13      persuade these witnesses to testify.  ...  The probability

14      that official Government action, based principally on

15      evidence provided by the search, induced Ventura's

16      testimony suggests a close, direct link between the

17      illegal search and the testimony used against the

18      appellants."

19          The Ninth Circuit elaborated on that same thought,

20    Your Honor, United States vs. Taheri, 648 F.2d 598.   At page

21    601, where they discussed the seizure of opium from the

22    defendant in an illegal search of his car and subsequent

23    statements, it says:

24          "Shortly after the appellant was illegally arrested,

25      confronted with the illegally seized evidence, and advised

1    of his Miranda rights, he executed a written consent to

2    search both his car and hotel room where the opium was

3    discovered.

4         "The government seeks to justify admission of the

5    opium evidence because of the appellant's consent.  ...

6    The evidence found as a result of that consent must

7    nonetheless be suppressed if the unconstitutional conduct

8    was not sufficiently attenuated from the subsequent

9    seizure to avoid exclusion of the evidence."

10        The Court held in that case there was no sufficient

11   attenuation.

12        "The government, which bears the burden of showing

13   admissibility in these circumstances, points to no

14   intervening events which would show Taheri's consent was

15   'sufficiently an act of free will to purge the primary

16   taint of the unlawful invasion.'"

17        Your Honor, what those cases suggest, as in this

18   case, that what we focus on is whether the Government

19   exploited the evidence that it obtained in that illegal search

20   of Mr. Nader's room to get statements.

21        THE COURT:  Well, in those two cases, were the

22   defendants represented by counsel?

23        MR. HOFFMAN:  Were the defendants represented by

24   counsel at the time the statements were obtained?  I do not

25   believe, on the facts of those cases, Your Honor, that the

1  defendants' counsel were present with them.  I do not know

2  whether they were represented by counsel at the time.  That is

3  not apparent on the face of the pleadings.

4         Your Honor, I think that the use of the Government's

5  reliance on the fact that the defendant was in a non-custodial

6  situation and was Mirandized is best rebutted by a couple of

7  statements that Professor LaFave included in his treatise that

8  we cited in our original memorandum on pages 28 through 30,

9  and we have the cites in those memorandums at those pages,

10 Your Honor.  It's pointed out by Professor LaFave that:

11        "Statements based on the presence of illegally seized

12     evidence are more suspect than statements made after an

13     illegal arrest, because confronting the suspect with

14     illegally seized evidence tends to induce a confession by

15     demonstrating the futility of remaining silent."

16        The Supreme Court of California in a case very

17 similar to ours said that:

18        "If Miranda warnings were held to insulate from the

19     exclusionary rules confessions induced by unlawfully

20     obtained evidence, the police would be encouraged to make

21     illegal searches in the hope of obtaining confessions

22     after Miranda warnings, even though the actual evidence

23     seized might later be found inadmissible.  To so hold

24     would result in the Miranda warnings, which are intended

25     to protect the defendant's right to counsel and to remain

1    silent and to prevent exploitative police practice,

2    becoming the instrument of a bootstrap operation to

3    insulate unlawful police activities from the effect of the

4    exclusionary rule."

5         That's what we have in this case, Your Honor.

6         THE COURT:  When would such evidence ever be

7    admissible, or such statements?

8         MR. HOFFMAN:  The statements would be admissible,

9    Your Honor, if, for instance, there was an illegal seizure in

10   a case, but there was also legal seizures of legal evidence

11   that were very persuasive, and based on the legal evidence

12   that the defendant is confronted with, he decides that it is

13   in his interest to make some statement.  That's not in the

14   case here.

15        THE COURT:  Suppose it's 90 percent illegal and 10

16   percent legal seizures?  That's close to what we have here.

17        MR. HOFFMAN:  If it is 90 percent legal and 10

18   percent illegal --

19        THE COURT:  You've reversed it.

20        MR. HOFFMAN:  I'm sorry.  If it's 90 percent illegal

21   and 10 percent legal --

22        THE COURT:  Yes.

23        MR. HOFFMAN:  -- and both types of evidence sit on

24   precisely the same level, I think a much stronger argument can

25   be made that the statements are admissible, but as we'll

1    demonstrate here, and as I think Your Honor will see, the

2    evidence in this situation is not on the same footing.

3            See, what happened here, Your Honor, is we have a

4    seizure of a massive amount of evidence that is potentially

5    illegal from the defendant's room.  It was unwrapped, it was

6    in his possession, had his name on it.  It was together with

7    all his other material that clearly indicated his ownership.

8    That's one type of evidence.

9            Then we have another thing.  We have an envelope.  It

10   was delivered.  That's why we brought Mr. Gauntt here to

11   testify, Your Honor, even though I think the Government cannot

12   dispute this.  That envelope was delivered when Mr. Nader was

13   out of town.  The Government tried to deliver it three times.

14   The third time they left it, knowing he was out of town.

15           They then went and got the search warrant.  They came

16   back, took the envelope back.  He was still out of town.

17           They didn't leave the inventory.  That fact is clear.

18   But even if they did, I ask Your Honor to look at the

19   inventory -- it's been admitted -- the package is not listed

20   on the inventory.  The package is not listed on the inventory.

21   The only things listed on the inventory are the things that

22   were taken from the defendant's room.

23           The defendant didn't even know the package existed

24   when he came down for that meeting.  He knew his room had been

25   ransacked.  He knew they had gotten -- I don't know how many

1    magazines are in the material that we've looked at, Your

2    Honor, but it's fair to say dozens.  He knew that they took

3    his photo albums, he knew that they took all his other

4    personal documents, and he knew that he needed those back.  He

5    knew they had his passport, and he couldn't travel without it.

6    He knew all of that.  He knew nothing about this package.

7            THE COURT:  He knew about the package once he got

8    there.

9            MR. HOFFMAN:  Once he got there, that's correct, and

10    I think that that's important.  The sequence of events that

11    happens at the meeting with Mr. Nader does become very

12    important, because of what Your Honor said, because of the

13    separation between illegally seized and legally seized

14    evidence, but in this case, that package is an entirely

15    different situation from all of this other evidence.

16            Your Honor, I think there are two facts that are at

17    issue in this hearing that are disputed that are important.

18    The principal one, principal fact that is important, is the

19    sequence of review of this material at the meeting, and I

20    think Your Honor has recognized that in discussing the

21    admissibility of certain of these documents.

22            If the Government presented Mr. Nader -- I shouldn't

23    say if.  The Government presented Mr. Nader, when he walked in

24    that room, with a mass of illegally seized evidence.  It was

25    sitting there in this -- I don't know if it was described.  I

1    think it was described as a hamper, three feet by three feet

2    by two feet, in fourteen bags; dozens of magazines that Your

3    Honor has held in a footnote in the opinion, you cannot

4    quarrel with the determination that at least some of those are

5    obscene, and others are of a similar character to that which

6    was in this sealed package.

7         Upon confrontation by Mr. Nader, we submit, with all

8    of that material, any statements he made at that point are the

9    fruit of the poisonous tree.  Those statements are induced by

10   the presentation of that evidence.  That's the purpose.  That

11   was the Government's objective.

12        Under cross-examination by Mr. Povich, although

13   reluctantly, Agent Northrop acknowledged that the reason all

14   of that material was sitting there was so that he can show it

15   to the defendant:  "Come on, George, look at what we've got

16   here."  The presence of counsel doesn't matter to that, Your

17   Honor.  It's the smoking gun.  "We have got the handgun that

18   was used to kill this person.  Your fingerprints are all over

19   it.  You want to talk to us?"

20        If that handgun has been illegally taken, any

21   statements made after that, whether there's a lawyer there or

22   not, are the fruits of the poisonous tree.  It's a deliberate

23   exploitation of illegally seized evidence.  They have used all

24   of this other evidence to make Mr. Nader talk.

25        Does the Court believe for a moment, if the only

1    evidence in this case, and the only legal evidence in this

2    case is that package, that Mr. Nader would have come down and

3    made the statements the Government contends he made about that

4    package?  No.  What the Government did is, they took out the

5    magazines.

6          Now that Your Honor has the notes, this is critical.

7    Look at the notes.  Look at the sequence of this meeting.  The

8    agents testified -- and I'll get to the agent's credibility

9    and a couple of things that we would ask Your Honor to

10   consider -- the agents testified, and I would submit the

11   agents so testified because they are knowledgeable about the

12   law and know the importance of these facts, that the first

13   thing they went over at that meeting was this package.  They

14   did that because they know what Mr. Dixon is going to argue,

15   that statements made as a result of being confronted with

16   solely that package are admissible, because the package, the

17   Court held, was legally seized.

18         In fact, if you look at --  don't take, for the

19   moment, Ms. Moolenaar's notes.  Take Agent Northrop's notes.

20   Look at his handwritten notes:  his handwritten notes, the

21   contemporaneous notes.  Not a word about reviewing this

22   package in the first part of these notes.  Not a word.

23         It says yes --

24         THE COURT:  Is that 7?

25         MR. HOFFMAN:  This is 7, correct.

1          THE COURT:  Seven, all right.

2          MR. HOFFMAN:  It says yes, he ordered pornographic

3    magazines of boys, and then it goes into some description.

4    And then it says Bag No. 1.  That's where it says "refused to

5    initial.  Admitted ordering magazines."

6          Then it says Bag No. 2, 3, 4, 5.  Six is skipped,

7    Your Honor.  I'll tell you, I think it's clear why 6 is

8    skipped.  We'll get to that in a minute.

9          But do you believe that this experienced agent --

10   this is what the Government is asking you to accept as a

11   fact -- that this experienced agent would have gotten an

12   admission from the defendant that he ordered the very package

13   and knew what was in the very package that is the subject of

14   the controlled delivery, and is going to be the focus of their

15   criminal investigation, and when the defendant so states at

16   the beginning of the meeting, he wouldn't write it down?  He

17   didn't write it down?  Apparently he says it was said, and he

18   wrote down he admitted ordering No. 1, he wrote down that he

19   generally admitted ordering some magazines about boys, but he

20   didn't write down that he admitted ordering this package?

21         Now, for purposes of this hearing, Your Honor, for

22   purposes of this hearing, the ultimate credibility

23   determination about whether Mr. Nader admitted ordering this

24   package is not at issue.  I repeat that again.  This is a

25   motion to suppress whatever statements he made about this

1    package.  Whether Ms. Moolenaar is right in saying he made no

2    admissions about ordering this package or Agent Northrop is

3    right, the Court need not decide that.

4         What the Court need decide is whether whatever

5    statements they got out of this package were the result of

6    exploiting this illegally seized evidence, and on that these

7    notes are almost conclusive, because these notes suggest they

8    went through that material bag by bag first, and before they

9    got to that, before they got to that, Your Honor knows what

10   they did.  They went through Bag No. 6, because Bag No. 6 is

11   the bag that had the pictures of the boys in it.

12        Agent Northrop testified that his primary concern in

13   this case is making sure that there were no children involved.

14   So what he did when they got there is, the first thing he

15   pulled out and talked to the defendant about is:  "Who are

16   these boys?  Give us their names and addresses.  We want to

17   know who these people are."  And then maybe he starts talking

18   to him about molestation.

19        Of course, The defendant knows he's involved in no

20   molestations, and the Government has conceded that for

21   purposes of this case, and he says, "You want those names?  I

22   didn't do anything there.  I'll cooperate with you on that.

23   Here's their names and addresses."  And they get him talking.

24   They exploited the illegally seized evidence.

25        The Court has specifically held that the purpose of

1    the Government in seizing that kind of material was illegal,

2    although perhaps not something to be condemned, given all of

3    our feelings about their desires to make sure that there are

4    no sexual offenses involved.  It was illegal.  Their petitions

5    had no basis in probable cause, were not presented to the

6    magistrate, were not used as a justification for this warrant.

7    But that was the first thing that they did at this meeting.

8    That's why Bag No. 6 is not listed.  It goes 1, 2, 3, 4, 7.

9         Now, look at Ms. Moolenaar's notes, Your Honor.  Look

10   at Ms. Moolenaar's handwritten notes of this meeting taken

11   contemporaneously, before she knew there was going to be any

12   issue about this in this case.  They go through the background

13   material, prior employment, all consistent with what the agent

14   also testified.

15        They came to Washington, D.C, his immigration plans,

16   all consistent.  First thing reviewed from the miscellaneous

17   box is Bag No. 6.  Contemporaneous notes.  Pictures of cousins

18   in Norway, close family friends.  Gives the family name.

19   Tells who the boys are.

20        Then go over fifty pictures of boys, to identify who

21   they were.  Not obscene pictures, just pictures.

22        The next thing they get to is the defendant's

23   passport, which isn't surprising, because one of the reasons

24   the defendant wanted to go down there, in all probability, and

25   the agents testified to this, is they knew he traveled a lot,

16

1      and they had his passport.  He couldn't leave, he couldn't do

2      any of his business, he couldn't go out of the country, unless

3      they would give him back his passport.  So then they talked

4      about his passport.

5            Then the next thing that happened is they went over

6      Bag No. 1.  Your Honor, in determining credibility, I ask you

7      to look at the following, because this is extremely important.

8      Ms. Moolenaar did not hesitate to write down on these notes

9      where an admission is made.  You see under Bag No. 2 -- and

10     this is a damning admission on her part -- it says under Bag

11     No. 2, "Admitted ordering magazines."

12           The defendant did admit placing some orders.  He did.

13     Agent Northrop says that he admitted it.  Ms. Moolenaar says

14     that he admitted it.  He admitted ordering those magazines

15     that the Government already had conclusive evidence he'd

16     ordered.  They were in his home, they were unwrapped, they

17     were in his dresser, they were under his bed.  They were

18     wherever the Government took them from when they illegally

19     searched.

20           You flip through all those bags, confronting the

21     defendant with fourteen bags of illegally seized evidence, and

22     then you get to the controlled delivery, and that's what

23     happened, Your Honor.  They made a concerted effort to wear

24     him down with all this material that they knew was in his

25     room, that he had no possible explanation for.   They had him

1    dead to rights.  The cat was out of the bag, as one of these

2    decisions says on illegal searches.  The cat was out of the

3    bag, and then they got him to make statements about this

4    illegal package.

5              THE COURT:  What was in Bag No. 9?

6              MR. HOFFMAN:  What was in Bag No. 9?  Bag No. 6 you

7    mean?

8              THE COURT:  Nine.

9              MR. HOFFMAN:  The only thing written on these notes

10   is that there was high school material.  It says "High school

11   ID."  As Your Honor will recall, I believe there was a high

12   school book that was taken, some material from Carmel, Ohio,

13   where the defendant went to high school.  I suspect that

14   that's what's in those bags.

15             Your Honor, I think we'll have trouble if we go back

16   to the evidence in its present form and try and compare it

17   with this.  I don't believe the condition of the evidence is

18   the same.  I don't believe the same material is in the same

19   bags.  We have to go based on what's in the contemporaneous

20   notes, because the bags are no longer the same.  It's been

21   looked at and placed in different bags.  No one did anything

22   intentionally, I'm not suggesting that.  I'm just suggesting

23   that this is all we have.  They're not the same.  We can't go

24   back and examine it based on its current condition.

25             Your Honor, I think what we have here is a classic

1    case of exploitation of illegally seized evidence.  The

2    Government has failed to demonstrate any sufficient

3    explanation for the defendant making any statements about the

4    only evidence that remains in this case, which is this

5    package, other than the exploitation of the evidence which was

6    illegally seized.

7         Whatever statements were made about the controlled

8    delivery, whatever statements there were -- and I repeat

9    because I think it's important, and it was a major focus of

10   this hearing; even though it was for purposes of this motion

11   not a critical determination, it was a major focus of this

12   hearing -- what statements the defendant did, in fact, make

13   about that controlled delivery -- and we all got sidetracked

14   into discussing that, into a debate between Ms. Moolenaar and

15   the agent about did he acknowledge that he knew such and such

16   or did he not.

17        That issue is not the critical issue here, because

18   whatever statements the defendant has made came after an

19   exploitation of the illegally seized evidence, and under the

20   standard of Taylor vs. Alabama, going all the way back to Wong

21   Sun, the original case on the fruit of the poisonous tree and

22   the taint doctrine, this is a case in which whatever

23   statements were obtained have to be suppressed.

24        Your Honor, I want to address one other thing,

25   because Mr. Dixon talked credibility, and as I've said, on the

1    sequence of events, credibility is in issue here.  I ask you

2    to consider the following things in considering Agent

3    Northrop's credibility.  The first one is his testimony

4    regarding the inventory for conducting the search.

5          He said he was certain, absolutely certain, that that

6    inventory was left in the home.  Your Honor, we've established

7    conclusively, I believe, that that inventory was not left in

8    the home.  Mr. Gauntt has absolutely no reason to lie.  He has

9    no interest in this proceeding.  He signed it, because the

10   Government said we need you to sign this.  He's a 70-some year

11   old man who testified he trusted the government.  They told

12   him "I need you to sign this," and he signed it.

13         Did they leave a copy with him?  Absolutely not.  He

14   would remember, for God's sake.  I said, "Assume that this

15   man's house has not been searched very often."  When four

16   agents came into his house and searched it, if they left

17   something, he would remember it, and he doesn't remember it,

18   because it didn't happen.  He testified he did not receive a

19   copy.

20         THE COURT:  He signed it.

21         MR. HOFFMAN:  Sure he signed it.  They gave it to him

22   and told him to sign.

23         But that's not the only evidence, Your Honor.  Ms.

24   Moolenaar is not lying about it.  She picked up the pink copy

25   at the Clerk's Office.  When she went downstairs to get a copy

17

1    of the inventory and the warrant, the pink copy, which is the

2    recipient's copy, the copy that they would have left, had they

3    left a copy, was attached to that material.  That's where she

4    got the inventory.

5         Besides that, Your Honor, if she had the inventory,

6    what the heck would she need to go down there to go over what

7    had been obtained in the search?  It's listed in the

8    inventory.  The Government contends that her motivation was to

9    get free discovery.  If you had that inventory, you don't need

10   the discovery.  It says in there, "20 obscene magazines of

11   boys, passport."  Whatever they took is listed.

12        On my copy, the Xerox that's admitted, you can't read

13   it very well, but the pink copy is better.  You don't need

14   this kind of free discovery that's supposedly the reason they

15   came down there.  It's listed in the inventory.  She didn't

16   have the inventory.  The agent's testimony on that point is

17   simply not credible.

18        The second thing, Your Honor, is he testified that he

19   is absolutely certain this package was opened and the contents

20   were displayed.  Absolutely certain.

21        Your Honor, I said that I believe the agent in this

22   case knows the law.  He demonstrated that much when he talked

23   about Miranda.  He was very knowledgeable about Miranda and

24   the fact that he didn't have to give Miranda warnings because

25   this was a non-custodial setting.  Very careful about that.

1        He knew the law on that.

2                He also knows that the only way he can get statements

3        in this case is if it was the result of showing the defendant

4        the magazines that were left.   The magazines that are left.

5        He says, "I took out the magazines, and those are the ones I

6        showed him."

7                Look at his notes.   Not a word in his own notes about

8        unsealing this package and showing the magazines.   Nothing.

9        The one exhibit that the Court has left out, we still have the

10       testimony on, because the agent has testified about it.   He

11       read his memorandum, even the later-created memorandum that

12       more serves his interest.   He read it.   Not a word.

13               He says in that memorandum, he testified under oath,

14       that he remembers the envelope remained in a sealed condition.

15       The envelope was in a sealed condition.   Nothing about opening

16       it up and displaying its contents.   Because he didn't open it

17       up and display its contents.   That's the second point I ask

18       the Court to consider on the agent's credibility.

19               The third, Your Honor, is the testimony on the

20       sequence of this interview itself.   He testified he was

21       absolutely certain that the package was the first thing that

22       was displayed, but as I've already pointed out to Your Honor,

23       in looking at his notes, where he writes very carefully, "Bag

24       No. 1 inspected and admitted, Bag No. 2," nothing in the

25       beginning about this package.   That is simply not credible.

1    To believe that the agent would go over the very package

2    that's the controlled delivery, is the focus of this case, and

3    not write it down is not credible.

4         So, on the ultimate issue in this case, which depends

5    in part, in part, on the sequence of inspection, I ask the

6    Court to credit Ms. Moolenaar's testimony, that what happened

7    here is they went over the illegally seized evidence to induce

8    the defendant to make statements.  That's precisely what they

9    did, and that's precisely the reason the Court should suppress

10   those statements.  Thank you, Your Honor.

11        THE COURT:  Of course, at the time when they went to

12   the agent's office to view this material, it's obvious that

13   counsel would have known that there was a package or something

14   to that, triggering the search warrant, isn't it?

15        MR. HOFFMAN:  She may not have known that, Your

16   Honor.  I don't think it's obvious at all.  A defendant with

17   this quantity of material in his room, there could have been

18   many other methods by which they obtained the search warrant.

19   There could have been somebody who testified that there's a

20   paedophile at this address.  They could have presented that

21   evidence.  She did not have --

22        THE COURT:  I think she testified that, throughout

23   this meeting, she saw this envelope, even though she said it

24   was never opened, but she saw this envelope sitting on the

25   table.

1          MR. HOFFMAN:  At the time of meeting, there was no

2     question that there was knowledge that there was an envelope

3     in this case.  There was also knowledge that there was all

4     this other paedophilia in the case, all of these other

5     magazines that they could have prosecuted at that time the

6     defendant for obtaining.

7          THE COURT:  Well, of course, presumably, you say they

8     could have prosecuted, but I suppose counsel could also have

9     thought there was a chance for a motion to suppress, if they

10    were seeking to prosecute him.

11         MR. HOFFMAN:  At that time, Your Honor, counsel did

12    not even have the affidavit -- I think there's undisputed

13    testimony counsel did not have the affidavit or the search

14    warrant which resulted in the entrance of the defendant's home

15    and his room.  She knew that there had been a search, and she

16    knew that a lot of material had been obtained, but she didn't

17    know what it was, and she didn't know how they got in there.

18         But, Your Honor, I think what we have to --

19         THE COURT:  Of course, she could have asked for it.

20         MR. HOFFMAN:  She could have asked, Your Honor.

21    There's no question she could have asked.  But I think what we

22    have to focus on is not what the defendant's counsel's conduct

23    was.  I don't think that's really the issue here.

24         We acknowledge that this is not a custodial setting.

25    We're not saying that the defendant was pressured through

1    questioning at which he should have had a lawyer to make

2    statements.  What happens, though, is the lawyer is distinctly

3    irrelevant to this determination.

4              "We've got you.  Here's all of the evidence.  Do you

5    want to talk to us about it?"  Particularly, Your Honor,

6    particularly when they bring up the subject of child

7    molestation.  "Here are these pictures of these boys.  Tell us

8    who they are.  Tell us where we can talk to them."  And the

9    defendant, being confronted with what he at that time did not

10   know was illegally seized evidence, says, "I'll give you those

11   names and addresses.  I didn't do anything wrong.  You can go

12   check it out," and he does so.

13             THE COURT:  Of course, you almost act as though the

14   defendant was there without his counsel.  He did have an

15   attorney there.

16             MR. HOFFMAN:  That's correct, Your Honor.  We

17   obviously don't dispute he had an attorney there.  But I don't

18   think, Your Honor, when the issue is confronting someone with

19   illegally seized evidence that induces a statement, the

20   presence of counsel is a determinative factor, unlike the

21   Fifth Amendment.

22             THE COURT:  But it is a factor.

23             MR. HOFFMAN:  It may be a factor.  It may be a

24   factor.  It's not irrelevant.  They're entitled to bring it it

25   up.  I think it's admissible in this hearing.  But it's not a

1    determinative factor on the decision about whether the

2    Government has exploited the illegally seized evidence, which

3    is the critical question.  The presence of counsel doesn't

4    make the presentation of illegally seized evidence,

5    particularly this massive quantity of illegally seized

6    evidence, any more legal, or it doesn't make the defendant's

7    statements any less a product of being confronted with that

8    material than if there was no lawyer.

9         If he had come in, into a non-custodial setting, and

10   been confronted with this illegally seized evidence and made

11   statements, I don't think that would be materially different

12   than the situation in this case.  There might be the question

13   that Mr. Dixon said we could have raised, had he been alone,

14   about overbearing his will, Fifth Amendment type violations,

15   but those questions aren't before the Court.  Those questions

16   have not been raised.  As to those questions, I think it

17   clearly would make a difference.  As to this question, this

18   taint here, I think it doesn't make a difference.

19        I think the cases that discuss how the warnings of

20   the defendant, the cautioning of the defendant, the giving him

21   of his Miranda warnings in that one case we read -- in the

22   Supreme Court case, they said it three times, repeatedly

23   telling him, "You have the right to remain silent.  Don't make

24   statements.  Anything you say can be used against you, can and

25   will be used against you."  No question of the defendant not

1    understanding his rights in those cases.

2          When you read those cases, all of the cases we cited

3    today and the ones in the initial memorandum, none of the

4    cases suggest that the defendant somehow didn't understand his

5    right to a lawyer, or didn't know he could ask for a lawyer.

6    The point that those cases make is once you confront him with

7    the evidence of the crime, the cat is out of the bag.  Silence

8    is futile.  They demonstrate the futility of the silence.  The

9    lawyer's being present doesn't make silence any less futile.

10   Thank you, Your Honor.

11          THE COURT:  Mr. Dixon.

12          MR. DIXON:  Your Honor, just a few brief points.

13          Your Honor, I would agree with Mr. Povich and Mr.

14   Hoffman wholeheartedly, had not two things happened, and Mr.

15   Hoffman very politely stayed away from both.  They base their

16   argument on a Fourth Amendment violation.

17          Your Honor, the Court will recall, in reading Wong

18   Sun, the seminal case on taint, the second part of the

19   decision went to Wong Sun.  A man who was arrested on one

20   date, was released on another date.  Some time passed, and

21   that's the crucial, one of the crucial factors in this case

22   that Mr. Hoffman stayed away from, to get away from the taint

23   argument.

24          The search was on April 12th.  Mr. Nader wasn't there

25   on April 12th.  The interview was on April 16th, four days

later.

All the cases that Mr. Hoffman cites stand for those propositions that he said they stood for:  immediately after arrest a person is confronted, or shortly after arrest a person is confronted.  But we don't have that here.

That's why Mr. Hoffman didn't talk about it, because the taint -- assuming, arguendo -- and we don't agree there was a taint -- but assuming, arguendo, there was, it was attenuated by the time that Mr. Nader had the presence of mind to get the card that had been left by Northrop, the presence of mind to find an attorney, a criminal attorney, a special assistant United States attorney.  Now, he didn't know that at the time he got Ms. Moolenaar, but he had the presence of mind to find an attorney -- that's two days gone -- to discuss the case with the attorney, and we -- and we, of course, with this rendition, are disputing what Ms. Moolenaar said -- to find the attorney, to discuss the case with her, for her to get on the phone and set up an interview, some four days later, and within that four-day time period, she could have come down here and got a copy of the search warrant, come down here and got a copy of the inventory, even though we dispute an inventory wasn't left.  She could have done a whole number of things.  That's the first thing Mr. Hoffman didn't want to talk about.

The second factor that he did talk about, and tried

1    to minimize, and rightfully so, and that is, after the taint

2    has been attenuated by four days, a meeting is held, a meeting

3    not like Wong Sun, where he goes in with his lawyer, a

4    criminal lawyer, someone that he has consulted.  Wong Sun

5    walked in there by himself, and gave an inculpatory statement.

6    The Supreme Court said it was wrong, the seizure of the

7    evidence was bad.

8           But we have an attenuation of the taint over four

9    days.  This man has had a chance to think about it.  He's been

10   in the community.  He's not been locked up in jail.  The same

11   thing with Mr. Nader.  He's an intelligent individual, who's

12   confronted with a volatile situation, because he's trying to

13   save his image, as a person who deals with the Middle East

14   exclusively.

15          He went to an attorney, he talked to her, and then

16   they made a decision to talk to the postal inspectors.  They

17   didn't make a decision to contact the United States attorney

18   involved.  They didn't want to get to that level.  They made

19   it informal themselves.  They have created it, if you will,

20   Your Honor.  If they wanted to speak to an assistant United

21   States attorney, that was available to them.  They could have

22   gone in and spoken to Mr. Behr or anyone who's responsible for

23   the case.

24          Assuming a lot about Ms. Moolenaar, we can assume she

25   knew that.  She could have walked into the office, and the

1   negotiations could have started there, instead of trying to

2   come in the back door and get as much as you can -- you got to

3   give up a little bit, but get as much as you can -- know more

4   about the case than the prosecutor when the prosecutor get it.

5       And, Your Honor, if there was any taint, that taint

6   was attenuated to virtually nothing four days later when Mr.

7   Nader walked in with his lawyer, and you will recall that she

8   was asking him questions about probable cause and everything

9   else, but she conveniently forgot to ask for a copy of the

10  affidavit.  Your Honor, that stretches credulity.

11      Your Honor, we would submit, again, and in final,

12  that the Court has ruled on certain documents that were taken

13  out of Mr. Nader's room.  We're not quarreling with that right

14  now.  Bound by that, Your Honor, anything that flows

15  therefrom, statements -- he could have said he participated in

16  the Kennedy assassination; anything that flowed therefrom is

17  bad.  If it happened immediately -- if he was confronted with

18  it immediately after the bad search.  But that didn't happen,

19  and he had the buffer of an attorney.

20      And, Your Honor, as much as they try, they're trying

21  to get the Court away from the fact.  They're saying Ms.

22  Moolenaar's presence was de minimis.  Why was she there?  The

23  same question was put to her:  "Why did you go?  You didn't

24  need to go there.  Why did you go?  If they just wanted to get

25  some background, why did you go down there?"

1          The reason she went down there is to try to derail

2     this prosecution and try to get control of the situation and

3     try to negotiate from that point, negotiate from a point of

4     strength, because knowledge is strength.

5          And I would take exception to Mr. Hoffman's remarks

6     about just having an inventory was enough.  Ms. Moolenaar knew

7     more than just getting an inventory.  She knew that she would

8     have to interview those officers, she would have to talk to

9     them, she would possibly try to get them to make admissions,

10    find out what they had, see what it looked like, see what the

11    value of it would have been in front of a jury possibly, see

12    if they found anything else they didn't mention, see exactly

13    what they had to convict her client.

14         That's what she did.  Your Honor, we would submit to

15    the Court again, instead -- that the statements should not be

16    suppressed, because as far as the Fourth Amendment -- I

17    thought they were going to come in another direction, but

18    they're sticking with this Fourth Amendment argument, and we

19    submit that died, that died on April 16th, four days after the

20    search.  That died on April 16th, when Mr. Nader came in with

21    his lawyer.

22         Taint was attenuated, it was gone, and Mr. Nader

23    wasn't there because of the bad search.  Mr. Nader was there

24    to try to get around what the postal inspectors had found,

25    and, Your Honor, we would ask the Court not to go off in the

1    direction with the defense on this Fourth Amendment taint

2    argument, because it is dead.  It died on April 16th.

3         Now, if this had happened on April 12th or April

4    13th, we would submit there would probably be a problem, even

5    though Mr. Nader came down with his attorney, because it's

6    just too close in time; there wasn't a cooling off period.

7    And he had that.

8         Your Honor, we think that the fair disposition at

9    this point of this case, at this pretrial level, is for the

10   Court to deny the motion to suppress, and we would ask the

11   Court to so act.

12        MR. HOFFMAN:  Your Honor, may I just address -- just

13   the proximity question.  That's a new one.  That's the only

14   thing I'm going to address.

15        THE COURT:  All right.

16        MR. HOFFMAN:  It seems to me we may have some -- I

17   don't think we have a confusion on the facts, but I heard

18   something that I was surprised that I heard.  Mr. Dixon seems

19   to concede, if there was a close proximity in time between the

20   illegality and the statements, that under Wong Sun and its

21   progeny, there has to be suppression.  He not seems to

22   concede, he does concede it.

23        His argument would be valid if the defendant was at

24   his house when they did this illegal seizure; they said we

25   want to talk to you about this stuff, and four days later he

1    comes down to talk about it.

2            The defendant wasn't there.  The first time he was

3    confronted with this illegally seized evidence is at this

4    meeting.  There is no attenuation.  He hasn't seen any of this

5    stuff.  He's not around, he's out of town.  He comes back in

6    town, there's been a search of his house.  He's never talked

7    to anybody about it.  He doesn't know what was taken, and the

8    first time he comes in, and they show him, "This is what we

9    got on you, fellow," that's when these statements are made.

10           There's no attenuation here.  These statements are

11   the product -- immediately on being confronted for the first

12   time with this illegally seized evidence, they got these

13   statements.  Your Honor, I concede Mr. Dixon has conceded the

14   case.  This is an immediate statement based upon the

15   confrontation with the illegally seized evidence that the

16   defendant was subjected to.  Thank you, Your Honor.

17           THE COURT:  All right.  Thank you, counsel.

18           Before I excuse counsel, and I will consider the

19   cases you've cited, are there any other cases you wish to

20   cite, Mr. Dixon?

21           MR. DIXON:  No, sir, Your Honor.

22           MR. HOFFMAN:  No, sir, Your Honor.

23           THE COURT:  Before I excuse counsel, I don't believe

24   we've set a trial date in this case, have we?

25           MR. DIXON:  No, sir.

1    THE COURT:  Because I assume that the Government

2    intends to go forward, no matter how the Court rules on the

3    statements, or is that correct?

4    MR. DIXON:  Your Honor, in the, I'd like to say,

5    unlikely event that the Court suppresses the statements, I

6    would have to ask the Court for some time to discuss with my

7    supervisors whether or not we want to take an interlocutory

8    appeal, because, admittedly, in candor, the case -- we think

9    we can make a case without the statements, but the statements

10   provide a clear nexus between Mr. Nader and the package.

11   THE COURT:  All right.  Suppose the Court does not

12   suppress the statements, does the Government intend to take

13   its appeal at that point in any event?

14   MR. DIXON:  If the Court does not suppress the

15   statements?

16   THE COURT:  Yes, I'm just trying to get a feeling for

17   scheduling.

18   MR. DIXON:  Your Honor, if the Court does not

19   suppress the statements --

20   THE COURT:  Of course, that leaves you with most of

21   the evidence suppressed.

22   MR. DIXON:  Yes, sir.  We would -- and I can say, I

23   think, without being overruled, we would go forward on the

24   controlled delivery, and not attempt to -- and I don't think

25   our office would attempt to appeal this Court's ruling on the

1    suppression of the items that were taken out of the room.

2              THE COURT:  All right.  How long do you think the

3    trial of this case will take, Mr. Dixon, if the case goes to

4    trial?

5              MR. DIXON:  Your Honor, I think the Court has

6    probably heard our case in the motion.  I would say about a

7    day, if that; a day, maybe a day and a half, and that would be

8    it, just the controlled delivery.

9              MR. POVICH:  About the same.

10             THE COURT:  About two to three days; is that what

11   you're saying?

12             MR. POVICH:  Yes, sir, I would think three days at

13   the most.

14             MR. DIXON:  With the understanding, Your Honor, we

15   would have to get the customs agent who initially intercepted

16   the mail and get him or her here, but I don't think that would

17   present a significant problem if we get to a trial posture.

18             And, Your Honor, let me just say this, and this would

19   have to remain oblique.  If in the event that the Court

20   decides not to suppress the statement, and we're actually

21   going to trial, I have given this case a fresh look, and I

22   would have to do some very serious talking to people in our

23   office, and I hope the Court can appreciate my comments, and

24   I'll have to leave it at that.

25             THE COURT:  But you said if the Court does not

1    suppress the statements?

2         MR. DIXON:  If the court does not suppress the

3    statement.

4         THE COURT:  Well, I think we should set at least or

5    get a feeling for a trial date, at least a tentative trial

6    date, while I have you all here.

7         MR. DIXON:  Very well.

8         MR. DIXON:  Your Honor, my speedy trial clock has

9    exploded on this case -- I don't know where we are -- and I

10   would have to rely on the Court's clerk to tell us exactly

11   where we stand.

12        MR. HOFFMAN:  I think I can give the Court some help

13   on that.  If the Court doesn't already know, we have no speedy

14   trial pressure, because the motion was filed in a time period

15   that was excludable.

16        THE COURT:  The motions have either been pending --

17        MR. HOFFMAN:  Right.

18        MR. DIXON:  I'm just talking about the time that

19   elapsed up to the filing of the motion.  We have to count from

20   that time.  Whatever time expired, I think we have to start

21   counting.  If eight days expired, as the Court will recall, up

22   to the time of filing the motions, we have eight days in

23   already, and I just didn't recall when we started, because Mr.

24   Behr had the case before I.

25        MR. POVICH:  There's not -- Your Honor, I can

interject with Mr. Nader here, that the Speedy Trial Act is

not a right at this moment we wish to invoke, and I believe we

have already waived it because of the extensive nature of the

motions and the pendency of the motions, and we would continue

to do so to allow -- obviously, the Court needs time to rule

on the motions, but also with respect to the actual trial of

this case, that is not a factor.   The defendant has been on

bond, and that is not a factor that we wish to raise at any

time in this case, based not only on what I'm telling you now,

but my earlier conversations with Mr. Behr when he was in the

case, and the recommendations which I made to him at that

time.

          THE COURT:   Well, counsel, going back then to a trial

date, one of the problems that we've had, I have, counsel, to

be quite candid, is that some cases that have already been set

by me, that appear on my calendar, which, of course, is all in

code down there, either are no longer my cases or will be

transferred to a new judge who is taking the bench in the next

two or three weeks.

          MR. DIXON:   Will this Court keep this case?

          THE COURT:   Oh, yes.   There's no question that we

have this case.   Criminal cases are not being transferred.

          Well, let me ask you all first, when is -- what is

the first available date that you have on your calendars?   I

can tell you that, as far as February is concerned, I'm not

1    available, because I start a trial tomorrow which, absent some

2    miracle, will go to trial, I'm sure.  So I think we're at

3    least into March.

4             MR. DIXON:  Your Honor, I would suggest a day during

5    the week of March 10 or March 17.

6             MR. POVICH:  My time is better beginning of April.

7             THE COURT:  What's that?

8             MR. POVICH:  My time, Your Honor, is much better in

9    the beginning of April.  My recollection is that I really have

10   a hard time picking right now in March, but I think I'm fairly

11   clear in April.

12            MR. DIXON:  Could I suggest the week of April 14,

13   Your Honor?  The first week and the second week in April are

14   bad for me, and if the Court and the defense are considering

15   the week of April 14, I would ask that we consider the 16th,

16   the 17th or the 18th.

17            MR. POVICH:  Your Honor, I'm -- this always happens

18   to me.  There's a bar convention that I'd like to attend that

19   would start right after that, and I've done this before, and

20   ended up sending my wife down alone, and if we could avoid the

21   middle of April.  First part of April is good for me.  Maybe

22   the end of March is preferable.

23            THE COURT:  Let me give you some dates.

24            MR. POVICH:  Yes, sir.

25            THE COURT:  And then if for some reason you cannot --

1    if you're not available for those dates, why you can tell me.

2    The first date that I would have that appears to be available

3    is March 18.

4         MR. DIXON:  That's agreeable, Your Honor.

5         THE COURT:  Then March 25, I have a jury trial,

6    criminal case, so that cannot be changed, unless there's a

7    disposition in that case.

8         THE COURT:  April 1st --

9         MR. POVICH:  That's good for me.

10        MR. DIXON:  Your Honor, I have a trial set on April

11   1st in front of Judge Pratt, but it's a case that I hope to

12   remove from his calendar and mine, but I would prefer, knowing

13   the conflict exists now -- nothing is absolute, except the

14   case has been set -- I'd prefer not to set another case on

15   that day, because of the obvious conflict.

16        THE COURT:  Gentlemen, there's a possibility of April

17   8.  I do have a matter set, but it's a civil matter, and I

18   know they've been having some discovery problems.

19        MR. POVICH:  That's agreeable, Your Honor.

20        MR. DIXON:  That's bad for the Government, Your

21   Honor.

22        THE COURT:  That's bad for you?

23        MR. DIXON:  Yes, sir, as well as the 10th.

24        MR. DIXON:  What about the last week in April, Your

25   Honor?  If the Court please and Mr. Povich, how's that?

1           THE COURT:  We discussed the 14th.  That's a bad day

2      for counsel for the defendant.

3           MR. DIXON:  No, the 28th, Your Honor; 28th, the 29th

4      or the 30th.

5           MR. POVICH:  I don't want to be away for a week and

6      come back and start a trial.  I don't think that's fair to the

7      client, Your Honor.

8           MR. DIXON:  Your Honor, why don't we do this.  Let's

9      set the 1st down for the Nader case, and I will -- I don't

10     think that case will be on Judge Pratt's calendar as of April

11     1st.

12          THE COURT:  The 1st?

13          MR. DIXON:  Yes, sir.  And I'll --

14          MR. POVICH:  That's agreeable, Your Honor.

15          THE COURT:  That's agreeable?

16          MR. POVICH:  Yes, sir.

17          THE COURT:  All right.  Then we'll set it down for

18     the 1st, but Mr. Dixon, please keep us advised.

19          MR. DIXON:  Yes, sir.

20          THE COURT:  Because Judge Pratt's case will have

21     priority, if it goes.

22          THE COURT:  All right.

23          Then, Mr. Nader, I will continue you on the same

24     bond, with the same conditions.  I'm setting your trial now

25     for April 1, but I do ask that, pursuant to the conditions of

1    your release, you maintain contact with your counsel, in the

2    event it is necessary to change that date.  The date could be

3    an earlier date possibly, depending upon your counsel's

4    calendar and the Court's calendar, or it can be a later date,

5    but at this point, we'll set it for April 1.

6            But you are responsible to keep in touch with your

7    counsel, and if for any reason you cannot reach your counsel

8    on the basis of at least once a week to check these dates,

9    then you should call the Court to determine if there's been

10   any change in that date, because if you fail to appear on the

11   date set, of course I will issue a bench warrant for your

12   arrest, and additional charges can be preferred against you.

13   Do you understand that?

14           THE DEFENDANT:  Yes.

15           (At 3:37 p.m., the hearing in the matter was

16   concluded.)

17                              -oOo-

18

19                    CERTIFICATE OF REPORTER

20           I hereby certify that the foregoing is the official
     transcript of proceedings in the hereinbefore-captioned
21   matter, and that it is complete and accurate to the best of my
     knowledge and ability.

22

23

24           _Harry Deutsch_
             HARRY DEUTSCH
25           Official Court Reporter