1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

        vs.        :    Criminal Action No. 85-33

GEORGE NADER,        :

       Defendant.        :

- - - - - - - - - - - - - - x

**FILED**

AUG 0 6 1986

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Courtroom No. 17
Washington, D.C.

Tuesday, July 29, 1986

The above-entitled matter came on for Trial in open

court before The Honorable JOHN GARRETT PENN, United States

District Judge, commencing at 11:10 o'clock a.m.


APPEARANCES:

    For the Plaintiff:

        RONALD DIXON, ESQUIRE


    For the Defendant:

        DAVID POVICH, ESQUIRE
        RICHARD S. HOFFMAN, ESQUIRE


HARRY DEUTSCH
Official Court Reporter
4800-G, U.S. COURTHOUSE
Washington, D.C.  20001
  (202) 898-0780



1            E X C E R P T   O F   P R O C E E D I N G S

2            (The following excerpt contains matters preliminary

3      to the prospective jurors entering the courtroom.)

4            MR. DIXON:  Good morning, again, Your Honor.

5            THE COURT:  Good morning.

6            MR. POVICH:  Good morning, Your Honor.

7            THE DEPUTY CLERK:  Criminal case 85-33, United States

8      of America vs. George Nader.  Mr. Dixon for the government;

9      Mr. Povich and Mr. Hoffman for the defendant.

10           MR. DIXON:  Your Honor, if I may, some preliminary

11     representations before we get to, I guess, the motions that

12     were submitted to the Court.

13           Your Honor, at this time, I am going to tender some

14     Jencks material to the defense.  This Jencks material may be

15     in duplication of other material that the defense has received

16     during the pendency of this case.

17           The material is comprised of a chain of custody form,

18     notes of Agent Bloodworth, a memorandum from Agent Bloodworth,

19     and a newsletter or type of description of International

20     Insight, and some background on Mr. Nader, and I will tender

21     those to the defense at this time as part of our Jencks

22     response.

23           Your Honor, Mr. Povich inquired earlier if there was

24     any Brady information available, and, in the government's

25     view, there is no Brady, but if we become aware of any --

1        THE COURT:  I always become nervous when the

2   prosecutor tells me that, in the government's view, there is

3   none.

4        MR. DIXON:  Let me just rephrase that, Your Honor.

5   Everything that we have has been turned over to the defense,

6   and I have not come across anything that suggests that Mr.

7   Nader is not guilty of this particular crime or suggests that,

8   if he is convicted at the time of sentencing, there is

9   something that should weigh in mitigation of the sentence.

10  There is information to that effect, but the defense has had

11  that.

12        What I mean is the information about the items that

13  were seized and then suppressed.  Agent Northrop testified on

14  the witness stand that they contacted the children -- of

15  course, this is not going to come out during the course of the

16  trial -- but they contacted the parents of the children who

17  were depicted in the photographs, and nothing had happened,

18  and that was one of their concerns.  Information like that,

19  Your Honor, has been turned over and has been explored to a

20  great degree.  Aside from that, there is nothing that we have,

21  I think, that the defense doesn't have, and I would stand on

22  that representation.

23        THE COURT:  Mr. Povich.

24        MR. POVICH:  Good morning, Your Honor.  With respect

25  to the Jencks material, this George Nader, it looks like a

1    resume sort of?

2         MR. DIXON:  Yes.

3         MR. POVICH:  Is this something that you obtained,

4    drew up or --

5         MR. DIXON:  That is something that was amongst the

6    materials that was turned over to me by the agents.  I don't

7    intend to use it, because, as far as background, we got enough

8    background from Mr. Nader during the course of the interview.

9    I don't intend to use it, but it was something I had wanted to

10   give to the defense.  I don't know if they had it or not.

11        MR. POVICH:  This was taken from his room or it was

12   taken --

13        MR. DIXON:  I can only presume that it was taken from

14   his room.

15        MR. POVICH:  But you don't intend to use it?

16        MR. DIXON:  No, but I wanted them to have it.

17   Indulgence please, Your Honor.

18        MR. POVICH:  Your Honor, indulge me for a moment.

19        THE COURT:  Yes.

20        (Discussion off the record.)

21        MR. DIXON:  The grand jury of Agent Northrop has also

22   been turned over, Your Honor.

23        MR. POVICH:  Most of this material, Your Honor, we

24   have already seen.  Some of it we have not seen.  I assume

25   that, at the appropriate time, I'll have a chance to look at

1    it.

2              THE COURT:  Certainly.

3              MR. POVICH:  Do you have anything else as a

4    preliminary matter that you want to address?

5              MR. DIXON:  Your Honor, I do not, and we can go into

6    the motions now.  Since they were filed by the defense, I

7    would defer to them.

8              THE COURT:  Let me just indicate a preliminary matter

9    I have.

10             MR. POVICH:  Sure.

11             THE COURT:  Within the last few days -- and I

12   understand that perhaps some of the documents or the motions

13   or papers were misfiled -- but it came to my attention

14   yesterday that some issues were raised that had not been

15   raised before.  One of the issues, as I understand it, that is

16   raised in the proposed jury instruction, is whether or not

17   1461 even applies to Mr. Nader.

18             MR. POVICH:  Yes.

19             THE COURT:  Another issue, I think, that may be

20   raised is whether 1462 applies, although the strongest

21   statement appears to be made with respect to 1461.

22             We have had an opportunity, very brief, but we did

23   have an opportunity to look at a few cases.  We read the

24   Pennsylvania case -- I think it's Pennsylvania.

25             MR. POVICH:  Sidelko, Your Honor.

1          THE COURT:  Yes.  And we've looked at one other case.

2          But my concern is that, first, I think that that

3    would have been a matter that was better brought up some time

4    ago, because it's quite possible that, if you're correct on

5    that, that charge could have been dismissed, and I guess my

6    question is, the instruction, as I've looked at it, would seem

7    to suggest that Mr. Nader cannot possibly be convicted of a

8    vital of 1461, if you're correct on your instructions.

9          MR. POVICH:  Yes, sir.

10          THE COURT:  If that is the case, why are we going

11    forward on 1461, if that is correct law, and it seems to me it

12    should be dismissed?

13          It also seems to me that the government might have an

14    interest here, because I would think the government would want

15    to resolve those matters before jeopardy attaches in the case.

16          MR. POVICH:  Yes, Your Honor.

17          THE COURT:  And of course the other problem is in

18    selecting a jury, although I suppose that perhaps we could

19    just briefly describe the charge without reading it, because I

20    think the two charges are somewhat related, but in impaneling

21    the jury and asking the jury questions, my concern is asking

22    questions which might relate to 1461.  Now, I would suspect

23    that it may be possible to do that without really getting

24    involved with the jury.

25          MR. POVICH:  Let me --

1          THE COURT:  Yes.

2          MR. POVICH:  -- just tell you my thinking, Mr.

3     Hoffman's thinking on this matter, and I apologize.

4     Apparently, Your Honor, what happened with respect to the

5     filing is that it got late, and the messenger gave it to an

6     officer who very kindly said that he would arrange to have it

7     filed, and then went to the wrong court.  That's what

8     happened.  I apologize for that.  It's really inexcusable.

9          This is a problem that I've been struggling with for

10    some time.  Normally, it would be a situation in which defense

11    counsel sort of sits back and waits to the conclusion of the

12    government's case, and then moves for a motion for a judgment

13    of acquittal.

14          I didn't want to do that, really, in this case.  I

15    wanted to alert -- when Your Honor asked for the instructions,

16    it really brought it home, and I wanted to alert Your Honor to

17    this matter of law that I thought we were all facing.  And

18    therefore I asked Mr. Hoffman if he would fully brief our

19    position on this thing.

20          Your Honor is absolutely correct.  I think, knowing

21    what everybody knows about this case -- and we know quite a

22    bit about it up to this point -- that I think that the Court

23    should consider whether we should go forward at this point

24    with 1461 particularly, although I think there's also a good

25    argument with respect to 1462, but 1461, before we've selected

1    the jury, and that the government may very well realize that

2    we are in that posture.  Either 1461 does or does not apply.

3    I don't think they've ever taken a position in this case that

4    there's anything other than ordering these materials and,

5    under those circumstances, I think it might be appropriate

6    that Your Honor consider it.

7         With respect to time, many judges are anxious to

8    impanel a jury and go forward.  I don't think that that would

9    expedite this case any, Your Honor.  I think that perhaps may

10   cause some problems along the line, and I think it might best

11   be expedited if Your Honor could have some time to reflect on

12   this matter, given the government's response to what our

13   position is, and any support that it feels that it has.

14        In addition to the Sidelko case, Your Honor, we

15   thought there were two D.C. Circuit cases we thought were

16   particularly helpful, and in that setting, I think Your

17   Honor's point is well taken.

18        MR. HOFFMAN:  If I could, Judge, add something to the

19   Court, Your Honor's expression of concern about why the matter

20   was not raised earlier.

21        Mr. Povich and I considered it in great detail, but

22   Your Honor will see that the indictment itself simply charges

23   that the defendant mailed the material.  The government could

24   have argued the statutory language was sufficient to state an

25   offense under the indictment.  We would have had to wait for

1    the government to put on its evidence.

2           It is now clear their theory is he ordered the

3    material.   The Sidelko case was pointed out to the

4    government's attorney in this case before Mr. Dixon was even

5    involved.   We had pointed it out to Mr. Behr and said you

6    shouldn't charge this.   He said we want to.   We didn't know

7    what they were going to do.   They've known about the case.

8           We decided we had no choice, really, but to wait

9    until they put their evidence in, and then move it be

10   dismissed.   We are prepared to do that, and have prepared a

11   memorandum in addition to the jury instructions for Your Honor

12   and for the government, because there is no 1461 charge

13   properly here on what we now understand the government's

14   evidence to be, but I don't think we really had a choice other

15   than wait until the jury instruction to bring it to Your

16   Honor's attention.

17          MR. POVICH:   That matter has been fully briefed, Your

18   Honor.   We'd like to provide the Court a written memorandum

19   and counsel for the government with a memorandum to reflect

20   upon, other than just -- it's been raised in a memorandum in

21   support of a motion for judgment of acquittal at the

22   conclusion of the government's case, but we know --

23   essentially, I think we know what the evidence is going to be,

24   and I think it might be appropriate for us to let the Court

25   have it at this time, even though --

1          THE COURT:  Well, as I understand your argument --

2     and correct me if I'm wrong -- it is that since Mr. Nader, for

3     the purpose of the motion, was the recipient of this

4     information, that he cannot be prosecuted under 1461.

5          MR. HOFFMAN:  Your Honor, 1461 -- I'll be brief --

6     only applies to people who deposit and send through the mails,

7     not those who order and receive.  That's what the statutory

8     language said up to 1958.  In 1958 they amended it.  The

9     current phrase says "use the mails."

10         But the legislative history and the case law is just

11    exactingly clear that the purpose of that amendment was to

12    make it a continuing offense for venue purposes and not to

13    expand the class of offenders.  There were two District cases

14    in this Circuit, Reed Enterprises vs. Corcoran, and the second

15    is a three-judge constitutional court, which was affirmed by

16    the Supreme Court of the United States, which says that that's

17    the purpose of the amendment and the only purpose, and it was

18    not to expand a class of offenders.

19         THE COURT:  I've looked at the legislative history, I

20    guess the 1958 legislative history, and it refers to the Ross

21    case --

22         MR. HOFFMAN:  Right.

23         THE COURT:  -- and it does seem to suggest that.

24         What about 1462?  I notice, in looking at the 1958

25    legislative history, which is -- all of it is short; I guess

1    that's not as short as the other two -- but it does suggest

2    that Congress was amending both 1461 and 1462 --

3            MR. HOFFMAN:  Your Honor --

4            THE COURT:  -- and 1462 had language similar to 1461.

5            MR. HOFFMAN:  Your Honor anticipates our motion.

6            THE COURT:  What do you contend?  Where do we stand

7    on 1462?

8            MR. HOFFMAN:  We contend, assuming the evidence is as

9    we believe the government will present it, that that charge as

10   well should be dismissed, and the defendant should be

11   acquitted.  We don't believe either charge applies in this

12   case.

13           We had the same problem with respect to 1462 as we

14   did with 1461.  They charged him in the statutory language,

15   and we were unable to pierce that at the point of a motion to

16   dismiss, but assuming the evidence is as we now believe the

17   government will present it, the defendant can't be convicted

18   under 1462.

19           There's another reason he can't be convicted, which

20   is fully briefed in this motion, and I think it is also

21   conclusively established --

22           THE COURT:  This is the motion I haven't seen yet?

23           MR. HOFFMAN:  Right.  We anticipated filing it as a

24   motion for judgment of acquittal at the close of the

25   government's case.  That is, that the legislative history,

1    although it's older -- I had to go back to 1905 to find it --

2    is fairly clear, in my view, and I think the Court will see,

3    that 1462 does not apply to the mails.

4         It was a supplemental statute that was designed to

5    address other means of transportation, and there is a colloquy

6    by the sponsor of the bill, who says -- and I have it quoted

7    in the papers which I will give to Your Honor and the

8    government -- it says this is to address other forms of

9    transportation, common carrier and bringing material into the

10   United States.  The mails are already covered by 1461.  It was

11   a later amendment.

12        That statute was passed in 1905.  Since 1905 there

13   has never, never been a case of someone prosecuted under 1462

14   for using the mails.  That is a common carrier statute and if

15   somebody carries it on them when they walk through customs

16   into this country.  It applies to interstate, foreign commerce

17   by use of express companies, common carriers and personal

18   delivery.

19        It's not a mailing statute, and for various reasons

20   that I can hold off on, if the Court doesn't want to get into

21   them now, it would make no sense to apply it to the mails,

22   because it would contravene what Your Honor has said you saw

23   in the legislative history was the purpose and scope of 1461.

24   They regulated the mails, they said these are the people we

25   want to prosecute, and if you applied 1462, you would wipe

1    that out, when from the history of the amendment, it's clear

2    they were trying to be consistent with it.

3         So I think what the government has done by charging

4    under 1462 may be to try and avoid the limitations of 1461 --

5    it only applies to depositors and senders -- so they charged

6    Mr. Nader under 1462.  You have to dig a little deeper, but I

7    don't think they can get out of that hole, given what their

8    evidence, we believe, is going to be in this case.

9         THE COURT:  Mr. Dixon, can you get out of the hole?

10        MR. DIXON:  Well, Your Honor, I'm going to try.

11   First of all, Your Honor, I would agree with the Court's

12   observation about the timing of this, but as I recall the law,

13   a defendant can raise a question about an indictment at any

14   time during the stage of the proceedings.

15        Going more to the point, Your Honor, as I read the

16   cases on the intent of 1461, it applies to Mr. Nader.  The

17   Court will see that we charged Mr. Nader as an aider and

18   abettor as well under 1461 and 1462; that, indeed, what Mr.

19   Nader did was, he assisted -- now, he wasn't the person who

20   actually mailed it, no, but the mailing occurred as a result

21   of his direct insistence.  In fact, he said that during the

22   course of an interview, that he looked around, found a person

23   who was willing to -- found some magazines whose publishers

24   were willing to send them, and he mailed for them himself.

25        Your Honor, what we have to prove --

1          THE COURT:  It's your allegation that he sent -- he

2   made this request through the mails?

3          MR. DIXON:  Yes, Your Honor.  Well, our allegation

4   would be that -- yes, indeed.

5          THE COURT:  Because --

6          MR. DIXON:  Circumstantially.  We can't show it

7   directly.  Circumstantially, we can show that it was through

8   the mails.

9          THE COURT:  Even if it could be a valid charge -- we

10  may as well put our cards on the table -- even if it could be

11  a valid charge, you still have the problem, of course, of

12  demonstrating his knowledge and so forth.

13         MR. DIXON:  Well, Your Honor, again, we can do that.

14  During the course of the interview with Mr. Nader, Mr. Nader

15  was shown the controlled delivery, and was asked -- and it's

16  contained in the memorandum -- was asked if he knew what it

17  contained; he said yes.  Was asked if he knew how it was

18  coming; he said yes.  And, for all intents and purposes, he

19  admitted that he had sent for it, and he admitted that he was

20  expecting something similar to what was in the controlled

21  delivery.

22         What I would -- and this came out during the motion

23  to suppress statements, Your Honor.

24         Your Honor, our evidence would show that Mr. Nader,

25  after being shown the controlled delivery, readily

1   acknowledged that he did place the order, that the package was

2   properly addressed to him at his proper personal residence,

3   and that the International Insight, also listed on the

4   address, was his firm.  He was asked if he recognized the

5   return address.  He said that he did, he stated that he did,

6   and it was a company that he had mail-ordered child

7   pornography from.

8          If the Court will indulge me one moment.

9          His statement goes on to explain how he had

10  encountered other pieces of child pornography in Europe and

11  was reluctant to bring those back with him, and this is why he

12  used this method to bring the controlled delivery to the

13  United States.

14         Indulgence one moment, please, Your Honor.

15         Okay.  The controlled delivery, now being in a sealed

16  condition, without looking at the contents, he stated that he

17  expected it to contain various magazines depicting young boys

18  in various sexual activities.

19         Your Honor, in the government's view, that's what we

20  expect the evidence to prove, and this is one of the reasons

21  we had the motion.  Mr. Nader knew what was inside that

22  package, and Mr. Nader is into it up to his neck, and -- well,

23  that's what we expect the evidence to show.

24         THE COURT:  Have you found any other cases on the

25  issue, Mr. Dixon?

1    MR. DIXON:  No, Your Honor, I have not.

2    THE COURT:  You've read --

3    MR. DIXON:  Yes, Your Honor, after -- yes.

4    THE COURT:  You have read the case cited by the

5  defendant?

6    MR. DIXON:  Yes.

7    THE COURT:  And the Middle District of Pennsylvania?

8    MR. DIXON:  The Fed. Supp. case, Your Honor, yes.

9    THE COURT:  Right.

10    MR. DIXON:  The trial court case, Your Honor.

11    THE COURT:  What's that?

12    MR. DIXON:  The trial court case.

13    THE COURT:  I'll overlook that, Mr. Dixon.

14    MR. DIXON:  Not in that sense, Your Honor, not in

15  that sense, but it's instructive.  We think that -- again,

16  going back to the elements of what we have to prove in order

17  to show the defendant guilty of the crime charged in the

18  indictment, and this is -- we must show that he knowingly used

19  the mails for the mailing or delivery of the material alleged

20  in the indictment; and that he knew at the time of the mailing

21  the general contents, character and nature of the material

22  that was mailed; and, thirdly, that the material was obscene.

23    THE COURT:  Do you feel that you have all of the

24  material on the issue that you can present?

25    MR. DIXON:  Yes, Your Honor.

1          THE COURT:  Cases and authorities?

2          MR. DIXON:  Yes.

3          MR. HOFFMAN:  Your Honor, if I may, Mr. Dixon just

4     confirmed for us why the charges ought to be dismissed,

5     because Sidelko is exactly this case, if that is, indeed,

6     going to be his evidence, as we thought it was.

7          We read to the Court a short passage from Sidelko:

8          "I conclude that the statutory language, 'knowingly

9          caused to be delivered by mail according to the directions

10         thereon', was not intended to apply to a person who orders

11         and receives such matter for personal use and

12         consumption."

13         If Congress had intended such coverage, it could have

14    been spelled out very easily in appropriate language.  That

15    such was not the Congressional intention is demonstrated by

16    the fact that the statute does make special reference to those

17    who take non-mailable matter from the mail, but only where it

18    is taken for the purpose of circulating or otherwise disposing

19    of it.

20         Sidelko is exactly this case.  They had to prove that

21    somebody ordered -- in that case I think they had the order

22    forms, so the evidence was even better than here -- what was

23    stipulated to be obscene movies through the mail, and the

24    judge acquitted, because what Mr. Dixon has failed to address

25    when he read the elements of the offense is that the phrase

1    "uses the mails" under this statute -- and not only this case,

2    Your Honor; it's not just the Middle District of Pennsylvania,

3    it's this Circuit and it's the three-judge constitutional

4    court in this Circuit -- "uses the mails" means only deposits

5    in the mails.

6            The aiding and abetting statute doesn't do any good

7    for Mr. Dixon for the following reason.  The statute itself

8    uses the language "whoever causes" -- I just have read -- "it

9    to be delivered by mail according to the directions thereon,"

10   which is what aiding and abetting would be, cause to be

11   mailed, and the Court said that phrase doesn't work here,

12   because this only applys to people who are on the depositing

13   end, the sending end.

14           Congress was trying to punish people who distribute

15   obscene material, not people who receive obscene material, and

16   Mr. Nader, there's no evidence that he distributed, and

17   they've conceded that he wasn't distributing.  This was for

18   personal use and consumption.

19           Sidelko is directly on point, and the two D.C. cases

20   are almost directly on point.  The only difference is they

21   were constitutional courts interpreting the statute, rather

22   than applying it to a criminal case, on a declaratory judgment

23   decision, but the issue was identical:  what does "using the

24   mails" mean.

25           THE COURT:  How is the United States going to

1    prosecute someone in Denmark or Sweden or France or

2    wherever --

3            MR. HOFFMAN:  One answer to that, Your Honor, and I

4    assume this is one reason --

5            THE COURT:  -- because that's how the statute reads?

6    I'm speaking of 1462 now.

7            MR. HOFFMAN:  That's right.

8            Now, obviously, the United States can indict them.

9    If they send it here, they've done business here.  Whether

10   they could extradite from those countries under treaties with

11   the United States, I'm not familiar with.  But the answer to

12   that I think is, if they can't, it's because Congressional

13   intention was to go after a particular part of this business.

14           Now, Your Honor, the law has been changed since Mr.

15   Nader was indicted.  There is a new statute, passed in 1984 --

16           THE COURT:  Yes.

17           MR. HOFFMAN:  -- that does penalize people who

18   receive child pornography, but it can't -- it would be ex post

19   facto, obviously, applied to Mr. Nader.  We have pointed that

20   out to the government as well in negotiations, also before Mr.

21   Dixon was in the case, and told them we thought this was a

22   singularly inappropriate case to bring, since they now have a

23   statute that will allow them to do it and he can't be charged

24   under it, but they didn't choose to listen to us.

25           So the answer is, I think Congress probably

1    recognized that fact with respect to child pornography and

2    enacted a new law.  They didn't amend this one, because there

3    are other provisions of the law -- it's called the Child

4    Protection Act of 1984 -- and it does say that anyone who

5    receives this material is guilty of an offense, but that, it

6    seems to me, supports our position.  They would not have

7    needed to change that law if that law would have covered that

8    conduct, and they did in 1984, after the defendant was --

9    received the package, and after the facts that make up this

10   case occurred.

11           THE COURT:  Why wouldn't Mr. Nader be using the

12   express company to bring this material into the country when

13   he orders it?

14           MR. HOFFMAN:  I'm afraid I don't understand Your

15   Honor's question.

16           THE COURT:  Well, 1462 says "whoever brings into the

17   United States or any place subject to the jurisdiction or

18   knowingly uses any express company or other common carrier."

19           MR. HOFFMAN:  Right.

20           THE COURT:  Why wouldn't he be using them?

21           MR. HOFFMAN:  I think the answer to that is what Your

22   Honor said from the bench a few moments ago.  That statute was

23   identical to the mailing statute.  It said whoever knowingly

24   deposited with a common carrier in interstate or foreign

25   commerce -- the person on the other end, the shipper, the

sender -- and they changed it for exactly the same reason, to reverse the Ross-imposed limitations on venue.

Under Ross, as Your Honor may know, they said that you could only prosecute the sender in the place where he sent.  So what was happening was pornographers were going to, say, Los Angeles or New York, shipping stuff to the mid-west, and the communities in the mid-west couldn't prosecute them. They had to go to New York or Los Angeles.

Congress said that was not our intent.  We want those people to be prosecuted any place the express company or the mails are used, so we're going to change the statute to use, and then you can prosecute them on a continuing line.  Mr. Nader simply doesn't fall into the category of people who were intended to be covered.

I mean, Congress -- there may be a constitutional question in light of Stanley vs. Georgia, whether you can make it an offense to simply receive the material in your home without distribution.  Maybe Congress was thinking of that problem, because, as you know, Stanley says you have a First Amendment right to have even obscene material in the privacy of your own home.  I doubt that that -- I don't know whether that would cover receipt of obscene material.

There are various Supreme Court cases that suggest it would not, I admit that, but Congress was thinking about a particular class of offenders.  It may have been that Congress

1   could have prohibited mere receipt of this material, but they

2   didn't, and I think that these cases that we've cited and the

3   legislative history is clear it wasn't their intent.  It's a

4   statutory offense.

5       Mr. Nader would not be depositing, unless he was

6   someone who distributed obscene material.  You're right, he

7   just wouldn't be using express companies and the mails, as

8   those phrases are defined in these statutes.

9       THE COURT:  What about the phrase from 1462 which

10  reads:  "Whoever knowingly takes from such express company or

11  other common carrier any matter or things the carriage of

12  which is made unlawful"?

13      MR. HOFFMAN:  Well, that, it seems to me -- that's

14  very interesting, Your Honor.  There's no express company or

15  common carrier in this case.  I mean, this is the mails.  The

16  mails are 1461.  Express companies or common carriers are

17  1462.  And the statutes are exceedingly, just crystal clear,

18  that 1462 was passed to prohibit other means of

19  transportation, not the United States mails.  There are no

20  cases under 1462 involving mailing.  You can look at the

21  annotations of the statute.  There just aren't any cases.

22      1461 is the mailing statute.  In 1461, with the

23  mails, there is an additional prohibition or an additional

24  requirement.  It only prohibits taking from the mails with an

25  intent to distribute.  That's not in 1462.  I don't know why.

1   I don't know why, but I do know that he didn't use the express

2   company or common carrier, and there's no evidence that he

3   did.

4   Now, it may be a quirk in the law, Your Honor, but

5   these are statutory offenses, and Your Honor well knows the

6   maxim in legal construction requirements about interpreting

7   these according to the language in the statutes, particularly

8   when they're criminal statutes, very strictly.  It may have

9   been that Congress thought there was something worse about

10  taking things from express companies or common carriers than

11  there was from the mails.  I don't know why there's a

12  difference in that statute, but to repeat myself, I guess, I

13  do know that that statute, insofar as it talks about using

14  express companies and common carriers and taking from them,

15  doesn't apply to Mr. Nader.

16  Now, one other thing, Your Honor, that's undisputed.

17  Even if it did, he couldn't be prosecuted for it, because the

18  government was talking to us about being willing to stipulate

19  he never took the stuff from the mails or common carrier.  Mr.

20  Nader was out of town when the package was delivered.  The

21  government picked it up before he got back into the town.  He

22  never had possession of it.

23  So, even if that applied, he couldn't be prosecuted

24  for it.  But it doesn't.  I shouldn't go off on that.  Express

25  companies and common carriers are distinctly different from

1    the mails.  It's in the statute, in the legislative history,

2    and it is in the cases, the meaning of express company and

3    common carrier.  I think there is, in fact, an annotation

4    number in the U.S.C. under express company and common carrier

5    that talks about airlines, planes, people like Federal

6    Express, non-U.S. mail sources, but it does not apply to use

7    of the United States mails.

8            THE COURT:  Before you sit down, what about the

9    government's -- and I realize that your argument can be it

10   just doesn't apply -- but what about the government's argument

11   on aiding and abetting?

12           MR. HOFFMAN:  There's nothing to say.  One, the

13   aiding and abetting doesn't help them on the mailing statute,

14   because the aiding and abetting is already in the statute.

15   The statute says "whoever causes to be," and that's what

16   aiding and abetting is, causes to be.  And the Sidelko opinion

17   says that does not apply here.  It takes care of aiding and

18   abetting.

19           Aiding and abetting under 1462 might give you more

20   difficulty, except I just say again it does not apply here,

21   because it's not the United States mails.  I don't know what

22   the argument would be if this had been placed in Federal

23   Express or some express company and they charged them the same

24   way.

25           I know an argument I could make that I think is very

1    good, and that is there is a doctrine of aiding and

2    abetting -- because we looked at this as well before

3    determining it doesn't apply -- that when Congress has passed

4    a statute that necessarily applies to two people, a sale and a

5    purchase, a mailer and a receiver, and only applies a penalty

6    for one of them, you can't convict the person on the other end

7    for aiding and abetting, because Congress has expressed an

8    intention not to punish them.

9         It's a case called United States vs. Farrar, which is

10   a Supreme Court decision that says that, and that statute

11   involved an illegal sale of either narcotics or liquor.  They

12   prosecuted the purchaser as an aider and abettor, and the

13   Supreme Court said you cannot do that.  When Congress passed

14   the statute in using an offense that necessarily involves two

15   people and only punishes one of them, you can't whipsaw the

16   other one in as an aider and abettor.  It would be contrary to

17   Congressional intent.

18        THE COURT:  Have you cited that in your paper?

19        MR. HOFFMAN:  I have not, Your Honor, because I

20   didn't know whether the government was going to argue aiding

21   and abetting.

22        THE COURT:  Do you have the citation for us?

23        MR. HOFFMAN:  I do.  I can give you several citations

24   to that.  United States vs. Farrar, Your Honor, is 281 U.S.

25   624.  The general proposition is stated in LaFave and Scott,

1    criminal law section 65 at page 521 to 22, 1977 edition, and

2    it is codified in the Model Penal Code at section 2.06(b).

3              But, Your Honor, I would ask the Court not -- advise

4    the Court that, in our view, you need not reach that question,

5    because I think it is one taken care of by the statute itself,

6    so far as 1461 is concerned, and so far as 1462 is concerned,

7    it can't apply, because you can't aid and abet something that

8    didn't happen, and there was no use of a common carrier or

9    express company.

10              THE COURT:  Mr. Dixon.

11              MR. DIXON:  Your Honor, if I may.

12              Your Honor, what Mr. Hoffman argues the law provides

13   and doesn't provide, the government has a very difficult time

14   with.  We don't have any problem with a person having, if that

15   person prints it himself, generates it himself, having

16   material such as this in his own possession in his own home.

17              Where the problem comes in, as the Court has viewed,

18   is when you get the material from point A to point B.  There

19   is a blanket prohibition against the importation of obscene

20   material.  That's what 1461 is all about.  Mr. Nader had to

21   get that, had to get that obscene material in some way.  If he

22   didn't, they wouldn't be arguing now that he was in possession

23   of it.

24              They argue to the Court it doesn't apply, and then

25   they argue to the Court it really doesn't apply because he

1   never got it.  On the one hand, they want the Court to accept

2   the proposition that he received it and it was for personal

3   use, therefore it's okay; but, on the other hand, they want to

4   argue to the Court, well, he never received it.  They can't

5   have it both ways.

6       Your Honor, we view the indictment, as it presently

7   stands, as in conformity with the statute and the cases that

8   interpret the statute.

9       In addition, Your Honor, going on the aiding and

10  abetting theory, we do not accept Mr. Hoffman's reading, of

11  course.  The aiding and abetting theory, as the Court

12  realizes, if you have a bank robber, and you've got A

13  outside -- it only takes one person to rob the bank -- and

14  you've got A outside in the car with the engine gunned and

15  ready, and B is inside robbing the bank, and he runs out and

16  they take off, the person outside gets charged with the bank

17  robbery as well as an accessory after the fact and whatever.

18      That's what we have here.  Mr. Nader didn't mail the

19  material himself, and in some instances receipt isn't even

20  necessary for the government to prove the case.  Mr. Nader

21  didn't mail the material himself, he caused it to be mailed by

22  someone else in another country.

23      We have no problem if Mr. -- if this stuff just

24  materially appeared in Mr. Nader's room.  He can look at

25  anything he wants inside of his room behind closed doors with

the shades drawn, but this material, the only way it got to

him -- if he had gone over and gotten it and gotten through

Customs without being spotted, then he'd be okay.  But it came

through the mails, and that is the violation that we think the

law is seeking to embrace, as well as on the aiding and

abetting theory, Your Honor, we think we're on solid ground.

Another interesting point.  If all had been as Mr.

Hoffman now says it is, why 1461 and 1462 may have been

repealed with something more specific.

But, Your Honor, I would submit to the Court that,

first of all, we don't know what the evidence is going to

show.  I assume that the evidence is going to show exactly

what it did in the motion, and as far as the claim that

they're making about the common carrier, assuming that is

true, it would be reasonable, would it not, within the realm

of possibility, for a defendant to know that a common carrier

could have been used to transport the mail from A to B to get

to him, any type of common carrier?  Now, we can't tell what

was in Mr. Nader's mind, but that is part of the realm of

possibility, that is reasonable to assume and draw that

inference.

THE COURT:  Why did Congress use the term "express

company and common carrier" in 1462, and in 1461 use "the

mails"?

MR. DIXON:  Your Honor, my response is that they were

1    trying to cover the whole ballpark.  They were trying to cover

2    conduct that involved the mails and trying to cover conduct

3    that involved using a common carrier.

4            THE COURT:  Then would you tie 1462 together with

5    1461?

6            MR. DIXON:  Well, Your Honor, I would say that they

7    are related, but they go to defining different criminal

8    conduct.

9            THE COURT:  1462 refers to express companies and

10   common carriers and not the mails.

11           MR. DIXON:  Your Honor, I would -- again, I would say

12   that the spirit of both are to reach the conduct of Mr. Nader.

13   Obviously, 1462 talks about common carrier, 1461 talks about

14   the mail.  I mean, those are specifically mentioned in the

15   particular statutes.  But all I'm saying is that they serve in

16   conjunction, but they are not in conflict with each other as

17   far as what the conduct they're trying to regulate, and the

18   conduct that they're trying to regulate is obscenity being

19   brought to the United States.

20           THE COURT:  But 1462 refers to express companies and

21   common carriers.

22           MR. DIXON:  Yes, Your Honor.

23           THE COURT:  Is that applicable here?

24           MR. DIXON:  Your Honor, I would say, under the

25   theory, under the circumstances that the government presented,

1    circumstantially, it could be.  Circumstantially, it can be.

2          If we're talking about -- we're not talking about

3    mail going from Arizona to New York City.  We're talking about

4    mail matter coming from Europe into the United States, and I'm

5    saying that it could be.

6          We, again, we don't have direct evidence to show that

7    at some point along the line that the mail that came in this

8    parcel was carried either on a contractual basis or some other

9    basis by a common carrier and deposited in New Jersey, but

10   what I'm saying is, circumstantially, that is within the realm

11   of possibility in this case, and that's what we have.

12          THE COURT:  Well, what do we instruct the jury?

13          MR. DIXON:  Your Honor, we would ask the Court to

14   instruct the jury -- let me just get my jury instructions.  As

15   to 1461 or 1462?

16          THE COURT:  Well, as to 1462.

17          MR. DIXON:  Well, we would ask the Court to instruct

18   the jury along the lines that --

19          THE COURT:  The jury may come back and say, "What do

20   you mean by express company or common carrier?  Is that the

21   same as the mails?"

22          MR. DIXON:  Well, Your Honor, if they ask the

23   question like that, I would recommend that the Court tell them

24   yes, and I think common sense would take hold -- I think a

25   jury would know, a jury would know the difference between the

1    mails and when we're talking about a common carrier like

2    Federal Express or something like that.  I don't think that

3    would be a hangup for the jury.

4         I think the main elements of this are:  a, were they

5    brought into the United States by mail; b, was Mr. Nader

6    responsible for it; and c, were they obscene.  And, in the

7    alternative, did Mr. Nader in any way actively cause all of

8    these to be brought in.  With 1462, that's in the alternative.

9    We're pleading in the alternative with that one.

10        THE COURT:  In the 1984 statute, the legislative

11   history of the 1984 statute, is there any discussion of these

12   two statutes, 1461 and 1462?

13        MR. DIXON:  You mean as far as the legislative

14   history goes, Your Honor?

15        THE COURT:  Yes.

16        MR. DIXON:  On that, Your Honor, I am not familiar

17   with that.  I'm not familiar with the legislative history on

18   that one.

19        THE COURT:  Would you agree that, if these acts

20   allegedly done by Mr. Nader had been done, say, one year

21   later, that this would be a case brought under the new 1984

22   statute?

23        MR. DIXON:  The child pornography statute?

24        THE COURT:  Yes.

25        MR. DIXON:  Your Honor, I think we would have the

1    option of doing that, and I think that child pornography and

2    exploitation, that law or that particular statute, is geared

3    to a particular group of victims, while 1461 and 1462, while

4    not dealing with a group of victims per se, is dealing with a

5    broad range of criminal activity, and Mr. Nader's conduct, we

6    would submit, falls within that broad range of criminal

7    activity.

8        For instance, it's against the law to have a shotgun,

9    but it's also against the law for a convicted felon to have a

10   shotgun or someone convicted of a pistol offense, and I mean,

11   there are two statutes that serve the same purpose, but there,

12   again, they're going deeper, to a particular group, and here,

13   with the child pornography statutes, those were geared

14   particularly, particularly for people dealing in child

15   pornography.

16       Child pornography didn't happen as of 1984.  People

17   have been getting the types of magazines that Mr. Nader

18   received for a long, long period of time.  He said that

19   himself, he was getting them.  He knew how to get them for a

20   long period of time, prior to the date that he got them, and,

21   Your Honor --

22       THE COURT:  We were told during the suppression

23   hearing, or it was suggested, I guess, during the suppression

24   hearing, that rarely did they ever prosecute this type of

25   offense.

1          MR. DIXON:  Well, Your Honor -- was that my

2    suppression hearing?

3          THE COURT:  I thought it was.

4          MR. DIXON:  Your Honor, let me just say this, Your

5    Honor.

6          THE COURT:  That may have been a statement made by

7    the witness, but I recall someone saying that.

8          MR. DIXON:  Your Honor, that may be the posture that

9    has been taken in the past, but all I can tell the Court is,

10   in prosecuting this case, the government has looked at the

11   history of this case, looked at the negotiations that we don't

12   deny between the defense and the United States Attorney's

13   office, and a decision was made long before this prosecutor

14   came into the case that we would have to adhere to a certain

15   posture, and that posture has resulted in us being here today.

16          Your Honor, I would -- it appears that the Court has

17   a very genuine and deep concern about the status of this case

18   at this moment.  I would ask the Court to allow the government

19   to look over the case that Mr. Hoffman has recently cited, and

20   ask that we return to this matter in about 45 minutes or so.

21          THE COURT:  Well, I do have a concern, and the

22   concern goes both towards Mr. Nader and the government.  It

23   seems to me that any ruling with respect to whether this type

24   of charge can be brought should be, if possible, pretrial for

25   any number of reasons.  Also, of course, on the other hand, if

1    this is a charge that just cannot stand, because Mr. Nader is

2    just not the person included in the statute, then I suppose

3    there's no need to go through with a trial and take the time

4    of a jury.

5          Now, my concern is, of course, we do have a jury

6    waiting in the wings --

7          MR. DIXON:  Yes.

8          THE COURT:  -- eagerly waiting, I'm sure, to come

9    down and possibly be impanelled as jurors in this case, but I

10   do think the matter has to be or should be resolved prior to

11   actually impanelling the jury.

12         MR. DIXON:  Yes, indeed.  I agree with the Court.

13         THE COURT:  Mr. Hoffman.

14         MR. HOFFMAN:  Well, Your Honor, I'm concerned about

15   one thing.  None of this is new to the government.  I mean, we

16   gave them Sidelko a long time ago, and Reed Enterprises, the

17   two cases, and they decided to go through with this.  Mr.

18   Dixon has said there were evidently some discussions in the

19   office and they decided not to negotiate with us about

20   anything other than a felony, and decided to go through with

21   this.  They knew about this case.

22         Now, we came here today, and we didn't sandbag the

23   government, Your Honor.  We gave them the jury instructions,

24   which cited Sidelko, and told them our theory on both counts

25   on July 11th -- July 11th, that's some time ago now -- and

1    they got them, and they didn't call us after that, either.

2           Now, here we are ready to go.  They don't have a

3    case.  Mr. Dixon was trying to save his case.  They do not

4    have a case.  If they put on the evidence, Your Honor would

5    have to direct a verdict for the defendant, and I think we're

6    entitled to that.  I would accept it before trial, if you

7    don't want to take the time of the jury, of course, but, you

8    know, I don't want to delay -- the defendant has been under

9    this indictment that long time, and I don't think he's within

10   the class of offenders.  He's entitled to go on with his life.

11   I want to get this thing over with.

12          Now, if we don't want to impanel the jury to do that,

13   obviously, we'll be happy to wait and be happy to give Mr.

14   Dixon a few minutes to look at the cases.

15          MR. POVICH:  Excuse me, Your Honor, for one moment.

16          MR. HOFFMAN:  Mr. Povich wants me to tell you

17   something and I'm forgetting, so if you'll indulge us.

18          (Discussion off the record.)

19          MR. POVICH:  Your Honor, I'd like -- if Your Honor is

20   going to reflect on it for some period of time, you should

21   have the benefit of some legislative history to which Mr.

22   Hoffman can cite you on 1462.

23          MR. HOFFMAN:  Mr. Dixon was flopping back and forth.

24   I thought I heard him concede that 1461 or 1462 are aimed at

25   different conduct and they are:  one is the mails, the other

1    is express companies and common carriers.  I know the

2    government has an obligation in the defendant's case to try

3    and support its argument, but there is no argument that can

4    responsibly be made that express company and common carrier

5    applies to the United States mails.  I researched that.  I

6    looked at all the cases.  It does not.

7         Now, this statute was passed originally in 1897.

8    Your Honor, whatever number of years we've had since then,

9    there has not been one prosecution under that phrase "using

10   the United States mails."  It does not apply to the United

11   States mails.  There is all kinds of prosecutions about

12   airlines and trains and common carriers, but not the United

13   States mails.

14        When the statute was amended in 1905 -- I have -- I

15   can hand up to the Court, because I brought an extra copy, the

16   debate.  The debates in those days were not very long, they

17   were short, but a Senate sponsor was asked by Mr. Lodge -- I

18   don't know if that's a relative of the famous Senator Lodge or

19   not --

20        THE COURT:  Probably.

21        MR. HOFFMAN:  What?

22        THE COURT:  Probably.

23        MR. HOFFMAN:  "Can the Senator tell me what the

24   purpose of the bill is?"

25        And the Senate sponsor:  "It is to apply the same

1        restrictions on the carriage of obscene matter by express

2        company, et cetera, that are now applied under the postal

3        laws to the carriage of that matter by mail carriers.

4             "Mr. Lodge:  I have no objection to the bill.

5             "Let the bill be read again."

6             Another Senator says:  "It applies to express

7    companies particularly."

8             Now, it's clear that they had their statute about the

9    mails, and what happened is people were using non-mail methods

10   of transporting, so they enacted another statute about the

11   non-mails, express companies and common carriers.

12            There just isn't a responsible argument that express

13   companies and common carriers covers the United States mails.

14   If the government wants to take a few minutes to consider

15   whether it wants to press that position, I guess we have no

16   objection to that, but we want to get this matter resolved.

17            THE COURT:  All right, counsel have anything else at

18   this point?

19            MR. DIXON:  No, Your Honor.

20            THE COURT:  Counsel, I am going -- and you have a

21   memorandum to give me; is that right?

22            MR. HOFFMAN:  I did not hand it up, Your Honor?

23            THE COURT:  I don't think you have.

24            MR. HOFFMAN:  I have several copies, so I'll make

25   sure I do.  Obviously, Your Honor, this is entitled memorandum

1    in support of a motion for a judgment of acquittal,

2    anticipating that it would have been filed at the close of the

3    government's case, but I can lodge the original with the clerk

4    at this point.

5             MR. POVICH:  We'll provide a copy to the government.

6             MR. HOFFMAN:  I will give Mr. Dixon a copy.

7             THE COURT:  Then, counsel, we'll stand in recess

8    until 1:30.

9             (At 12:00 o'clock noon, a luncheon recess was taken.)

10                        AFTERNOON SESSION

11                          (2:08 p.m.)

11

12             THE COURT:  Sorry to be late coming back, counsel,

13    but like you, I suppose, I'm trying to digest as much as I can

14    in a short period of time.

15             I did ask my clerk to furnish you with a copy of the

16    case she found in the Ninth Circuit, and I take it you have

17    that.  So who wishes to go first?

18             MR. DIXON:  I'll jump in, Your Honor.

19             Your Honor, prior to getting the case from your law

20    clerk under somewhat pressing circumstances, I was able to

21    find a case that I think is dispositive of the Supreme Court

22    case.  It, indeed, is mentioned in the case that your clerk

23    offered us, U.S. versus Hurt, decided July 25, 1986, and

24    that's U.S. vs. Orito, and Orito stands for the proposition --

25    and that's 413 U.S. 139 -- that was a 1462 prosecution --

1          THE COURT:  1462?

2          MR. DIXON:  Yes, sir.

3          MR. DIXON:  I have it here, Your Honor, a copy that I

4    must return to the law library downstairs.  That case dealt

5    almost exclusively, as I see it and read it, with the privacy

6    issue, Orito coming on the heels of Stanley.

7          Stanley was limited in U.S. vs. Twelve 200-Foot Reels

8    of Film, and it appears from reading that -- and my education

9    has been broadened somewhat -- it doesn't look like a person,

10   depending upon the jurisdiction where he is and depending upon

11   what the level of obscenity is and what they're going to

12   prosecute, you don't have a right to import it, you don't have

13   a right to have it delivered, you don't have a right to do

14   anything except have it materialize in your home and possess

15   it there.  Orito says you can't even bring it into the

16   country.  As far as 1461 goes, it covers that as well; it

17   speaks to mailing.  You don't have -- there's no First

18   Amendment right of privacy to receive this information.  You

19   can possess it in your home.

20         THE COURT:  It uses the word "receive"?

21         MR. DIXON:  Yes, sir.  I'll read you the passages

22   that I've found that speak directly to this point.  Page 141:

23         "The essence of appellee's contention is that Stanley

24      has firmly established a right to possess obscene material

25      in the privacy of the home and that this creates a

1    correlative right to receive it, transport it, or

2    distribute it.  We have rejected that reasoning."

3        It goes on to say, at page 143:

4    "We cannot say that the Constitution forbids

5    comprehensive federal regulation of interstate

6    transportation of obscene material merely because such

7    transportation may be by private carriage, or because the

8    material is intended for the private use of the

9    transporter."

10       Your Honor, moving away from what the law is, if we

11   go back to the indictment, most particularly count 2, which is

12   1462, we don't charge Mr. Nader with bringing the obscene

13   material in by common carrier.  We charge him in the first

14   part of the statute, which talks about bringing it into the

15   United States, period.

16       But aside from that, after further discussion with my

17   witnesses, I have found as follows:  that Mr. Taylor works in

18   the Customs Service, in a particular district, in a particular

19   building that deals with mail that comes from Europe by one

20   means, and that's by ship.  There are only two ways to get

21   mail from Europe to the United States, and that's by air --

22   all air traffic mail goes into Kennedy Airport, New York; all

23   the shipping comes into upstate New Jersey, and we expect,

24   circumstantially, again, to show that, a, Mr. Nader said he

25   ordered it from Europe; b, the package itself reflects Ralph

Zonatz in Holland as the sender; c, Mr. Taylor, who

intercepted and interdicted the mail works in an area that

only receives mail from Europe and the only way it gets to him

is by steamship, by common carrier.

But we didn't even charge that.  We didn't charge him

with common carrier in the indictment.  We charged him with

just bringing it into the country.  But even if we were to go

that length, we can show circumstantially that a common

carrier was used.

But the bottom line, Your Honor, and one that I think

zealous and honest prosecution and defense may have missed, is

the privacy issue, which we think wilts under Orito and the

case that I was -- that I did not find, this Circuit case that

the Court's law clerk found.  But Orito is mentioned in the

Circuit case as standing for that proposition, and I have it

here, and I can tender it to the Court for its review.

I would represent at this time, Your Honor, and

argue, that the issues that were raised earlier are now

resolved, and we would submit resolved in a fair favor --

although they've been resolved in the government's favor,

resolved in a fair favor -- and I think the only appropriate

thing is go to trial, but I'll defer to counsel.

MR. HOFFMAN:  Your Honor, let me clear up a couple of

things.

THE COURT:  Just a moment.

1          MR. HOFFMAN:  I'm sorry.

2          Your Honor, with respect to Mr. Dixon, let me deal

3     with non-arguments first and then get to the ones that count.

4     Orito has nothing, zero, to do with this case.  We didn't make

5     a constitutional argument.  That case decides whether you have

6     a constitutional right to receive, under Stanley vs. Georgia,

7     material in your home.  It doesn't interpret the language of

8     1461, which is our motion.  We don't make any constitutional

9     argument in our motion.  We didn't make a privacy argument

10    here.  Orito deals with whether or not the First Amendment

11    protects your right to receive material.

12          I said in our opening argument that we aren't

13    disputing whether that right exists or not, and, in fact, I

14    believe I said I thought it had been rejected already.  That's

15    the case that rejected it.

16          But that's not our argument.  It has nothing to do

17    with this case.  You'll see in that case, there is no

18    statutory construction about 1461, about whether it only

19    applies to deposit in the mail or whether it includes someone

20    who orders through the mail.  It's not relevant.

21          The case that is relevant, unfortunately for us, Your

22    Honor, is the one that was apparently decided on Friday.  Your

23    law clerk found it.  I represented to the Court that I had

24    Shepardized Sidelko and there's no contrary authority, and I

25    had, but I think I had done it on Thursday, so this didn't

1    exist yet.

2              As to this case, which is, I must concede, on point,

3    because it goes -- Your Honor, if I may just make one more

4    point about Orito.  The structure of this opinion is section A

5    is the applicability of section 1461 to persons who order

6    material.  That's the relevant section for our discussion now.

7    Section B is about whether there's a constitutional privacy

8    right.  We didn't even make that argument.

9              It doesn't even suggest that Orito has anything to do

10   with the statutory construction issue, and that's the only

11   issue we have before the Court right now, the statutory

12   construction issue.  As to that statutory construction issue,

13   Your Honor, two things about this decision:  one, it's wrong,

14   and two, it's contrary to the law of this Circuit.

15             THE COURT:  The law of this Circuit?

16             MR. HOFFMAN:  Corcoran and Clark are good law in this

17   Circuit.  This case, for some reason, doesn't cite them.

18   Corcoran and Clark say that the amendment in 1958 solely

19   related to a change of venue and didn't expand that class of

20   offenders.

21             Now, those were declaratory judgment actions for

22   interpreting the constitutionality of the statutes, but the

23   Court discussed at great length in one of them, a three-page

24   discussion, about what the intent of the amendment was, and it

25   disagrees with this court.  It says we read the legislative

1   history, and we think there's a limitation on the phrase

2   "using the mail." It only has to do with people who deposit

3   in the mail.  This doesn't cite D.C. Circuit precedent.  It

4   wasn't necessary that it does, but it's not good law in this

5   Circuit.  Now, I guess the government could take it up and say

6   that they should change the law and adopt this, but I don't

7   think that's this Court's responsibility.

8        Something else about the persuasiveness of this

9   decision.  The rationale on this decision is that the language

10   is plain on its face.  It says "uses the mail."  Therefore,

11   Sidelko is wrong to determine what that phrase means.

12        One, that doesn't -- I don't understand that.  I

13   don't think it necessarily is clear what "uses the mail"

14   means.  It certainly could mean the person who mails, and not

15   the person who merely receives and requests through the mail.

16        But, more important than that, this court says that

17   interpreting the phrase "uses the mail" to exclude people who

18   order violates a standard of statutory construction:  you do

19   not look to the legislative history if the language is clear.

20        This opinion violates an equally applicable standard

21   of statutory construction, which is that you don't interpret a

22   statute to make another provision of the same statute

23   superfluous.  The most persuasive reasoning in Sidelko is, if

24   you construed the phrase "uses the mail" to apply to somebody

25   who just got it after requesting it, you would render

1    superfluous the statute which says under mailing you're only

2    guilty of a criminal offense if you take from the mails with

3    the intent to circulate.  Under this reasoning, that drops out

4    of the statute.  Everybody who receives is going to be guilty,

5    according to this opinion, and that last part of the statute

6    would become meaningless.

7           Now, they don't discuss that at all.  Sidelko does,

8    and while I -- you know, I'm surprised, and I wish I had known

9    about this in advance, but I don't think it changes anything,

10   because we have here -- and we cited it in our memorandum, and

11   I'm sure Your Honor has had a chance to look at it -- two D.C.

12   cases, one by the D.C. Circuit, Corcoran, and one by a

13   three-judge court, both of which, I think, went over that

14   particular question, and they both say the statute, when it

15   was amended in 1958, was done solely for the purpose of

16   expanding the venue provisions of that law.

17          Section A of this opinion is relevant:  it's the

18   right question, it's the question we're addressing.  Section B

19   is not.  We knew about Orito, Your Honor, I didn't have the

20   name in my head, but for that very reason, we raised no

21   constitutional argument.  So don't be sidetracked, I think --

22   and when you handed me this, I'm sure you and your law clerk

23   were not sidetracked, because it obviously is extremely

24   relevant.  We didn't make the constitutional issue.  It was

25   foreclosed years ago, and it's not presented in their case.

1   On the issue of statutory construction, the case law in this

2   Circuit is already established.

3         Now, Mr. Dixon made another point about common

4   carriers, he thinks they can show evidence.  He slipped it in,

5   though the fact is it's not charged in the indictment.  If

6   they wanted to reindict, if that's possible -- I don't know

7   whether they can or not -- but it isn't in this indictment.

8         I would also tell you, Your Honor, that if we get to

9   that point, the government has represented in affidavits and

10   through government counsel in briefs that the only method of

11   transportation in this case is the mails, is use of the mails.

12         Now, I'm very disturbed to hear him now say that they

13   know there's something else, a common carrier involved,

14   because we looked, and there's an affidavit by Mr. Bloodworth

15   and the brief by Mr. Dixon's predecessor saying this is a

16   mails case, it was use of the mails that's being prosecuted.

17   There was no mention in those affidavits or in those

18   representations to the Court in briefs about some other method

19   of transportation.

20         MR. POVICH:  One other thing.

21         (Discussion off the record.)

22         MR. POVICH:  One other thing, Your Honor.  The fact

23   that a ship was used to transport the mails does not mean that

24   it's not in the mails.  As Your Honor knows, trains bring the

25   mails to Washington, a train is a common carrier, but it is

1    deposited in the mail, and I think Your Honor will see, when

2    we get down to it, that there are stamps on this, stamped,

3    deposited in the mail in the Netherlands.

4          THE COURT:  May I see the package?

5          MR. POVICH:  Yes.  It's not a question of federal

6    freight forwarder, some private company got it to New Jersey,

7    and all of a sudden it got into the mails.  It was put into

8    the mails by whoever it was in the Netherlands.  It started in

9    the mails, it ended in the mails.  A ship may be used to

10    transport the mails, but it was still a mailed package.

11          MR. HOFFMAN:  I think that, following up on Mr.

12    Povich, obviously, the mails use something to transport it.

13    They either use trains, boats, planes or trucks.  The mail

14    goes some way.  Obviously, that does not make every mailing

15    use of a common carrier.  Mails are transported, but one

16    statute applies to the mails, another applies to private

17    common carriers, and this is a mails case.  You know, I don't

18    want to -- I won't repeat myself again, except to say I think,

19    while that case discusses the right issue, it's simply not the

20    law in this Circuit.

21          THE COURT:  All right.  Counsel have anything else?

22          MR. DIXON:  Your Honor, I would just close by saying

23    that, of course, Mr. Nader is going to reject Orito, because

24    Orito is plain and right to the point.  They stood right here

25    and told you that the reason Mr. Nader's conduct doesn't fall

14

1    within the statute is because it was for personal use, and

2    there's no -- you can statutorily construct that.  You can

3    look at it under a microscope.  It means one thing, personal

4    use.  Therefore, according to their argument, Sidelko applies,

5    because that Court said that the amendment to the statute was

6    such that it didn't want -- we don't want to broaden the

7    number of defendants that we have, we're just talking about

8    jurisdiction, we're just talking about venue.

9        Your Honor, as I said when I started with Sidelko,

10   that case -- well, that case just doesn't stand the light of

11   day when you're looking at Orito or the other cases or the

12   case that the Court's law clerk found, and we would ask the

13   Court to deny what we would in a friendly way fashion a motion

14   to dismiss the indictment at this point, and I think, once the

15   evidence comes in, our position will be the same as it is now,

16   and we would be supported by the law, and if we get to the

17   point of a motion for judgment of acquittal, the same

18   arguments will hold true.  But at this juncture, Your Honor,

19   we would represent that the defense, based upon the case the

20   Court found and based upon Orito, don't have a leg to stand

21   on, and we would ask the Court to go forward on the case.

22       THE COURT:  Well, I wish I could see it all as

23   positive as counsel for both sides do.  It's absolutely clear

24   to them, and it's not clear to me.  I've read the Ninth

25   Circuit case, and I've had an opportunity to go back and read

1   the District Court case, but I am a little concerned about its

2   language, in that it seems -- its comments on statutory

3   construction do concern me somewhat.

4          Counsel, I have to look at more of these cases, but

5   we do have a jury awaiting, and I would suggest to counsel

6   that perhaps we can go ahead and seek to impanel a jury, not

7   swear the jury, and have them come back tomorrow, and if we're

8   lucky, perhaps we can get that finished today, and then have

9   them come back tomorrow, and that'll give the Court some

10  additional chance and perhaps counsel as well to look for any

11  other authorities, but I would like to have the case move

12  along.

13         MR. HOFFMAN:  Your Honor, I appreciate that.  We have

14  one problem.  We had not anticipated this long discussion and

15  delay on that particular subject, and we have several

16  preliminary matters that we had thought would be what took up

17  the Court's time prior to impanelling the jury.

18         There are, in addition to some other matters that

19  we're going to take up, three motions that have been filed.

20  One motion to exclude evidence of various statements that the

21  government contends Mr. Nader made.  Now, I have never

22  received an opposition to that motion, and it may be that the

23  government is not going to try now and admit statements that

24  he supposedly made about admitting other publications.

25         THE COURT:  I thought that that's been resolved.

1          MR. DIXON:  So did I, Your Honor.  We're not going to

2     seek to -- just let me make sure it's clear.  We're not going

3     to seek to admit in our case in chief anything at all about

4     the evidence that was seized and suppressed by this Court.  No

5     statements, nothing at all.  But, as the defense and the Court

6     realize, if Mr. Nader were to take the stand, then, of course,

7     that would come in to impeach him.

8          MR. HOFFMAN:  We know that.

9          MR. DIXON:  But only statements that related to the

10    controlled delivery.

11         MR. HOFFMAN:  I hadn't been notified of that.  That

12    one, then, is taken care of.

13         There's also a motion to strike a phrase from the

14    indictment as prejudicial or surplusage under rule 7(d).  The

15    government inserted the phrase "commonly referred to as child

16    pornography" in the indictment.  We've cited authorities on

17    that.  The government responded.

18         I don't want to take up much time on that, Your

19    Honor, simply say that I think that's in there just to try to

20    inflame the jury.  This is not a child pornography case in the

21    sense of the statute, the child pornography statute having

22    been passed.

23         The charging language is in the indictment.  It says

24    the material is obscene.  This doesn't add anything other than

25    to characterize the evidence in such a way that is quite

1    damaging, and the cases we cited say that those kinds of

2    characterizations, which don't add any evidentiary

3    information, are subject to being stricken at the Court's

4    discretion.

5         THE COURT:  Well, it is not a child pornography

6    statute case --

7         MR. HOFFMAN:  Right.

8         THE COURT:  -- but it is a child pornography case,

9    isn't it?  That's what we have here allegedly.

10        MR. HOFFMAN:  Correct, but what I'm saying, Your

11   Honor, is that the language that is in the indictment, where

12   it is referred to as obscene material, is the charging

13   language, and the rest of the description, especially the

14   phrase "commonly known" -- I mean, commonly known by whom?  I

15   don't know how a grand jury could come out and say this stuff

16   is commonly known as.

17        I think that is the kind of language that is -- if

18   you look at United States vs. Hubbard, one of your brethren,

19   Judge Richey, wrote an opinion about how you should strike

20   those phrases in an indictment that add kind of unnecessary

21   government attempts to color the evidence, to add kind of

22   flavor to the case that aren't necessary to the charge.  It's

23   obviously not something that is major, but we feel that if the

24   jury has read the indictment, the indictment is sufficient

25   without that phrase, which is the last phrase and can be

1   eliminated very simply.

2           Your Honor, the final motion that we have pending is

3   a motion in limine, and this is quite an important motion

4   about the use of the material itself that is in the envelope.

5   I believe that is a motion that Your Honor got in the time it

6   was filed.  I don't think that is one of the ones that was

7   misfiled.  The government has also responded to that.

8           THE COURT:  Yes.

9           MR. HOFFMAN:  As Your Honor knows, we offered to

10  stipulate this material is obscene.  The government has

11  refused that stipulation.  They want to display in whatever

12  form they want these six magazines and films and the other

13  material in the envelope to the jury.

14          Your Honor, I believe that that kind of display to

15  the jury in this case would be improper.  We recognize at the

16  outset that you cannot force necessarily the government to

17  accept a stipulation by offering it.  On the other hand, it is

18  equally true that the government can't simply reject a

19  stipulation and admit whatever evidence it wants on a subject.

20  Everything is subject to the Court's discretion under rule

21  403.  If the evidence is unduly prejudicial, the Court can

22  exclude it.

23          There are cases that we cite, particularly the Second

24  Circuit cases which have dealt with this one, which say that

25  when the defendant has not contested his intent, the

1  government can't say, "Well, we don't want to accept that

2  stipulation.  We're going to admit evidence that he's been

3  convicted five times of heroin distribution in a heroin case

4  to show that he knew what heroin was," and the guy says, "I

5  know what heroin is, I'm admitting I know."  "We don't want to

6  accept the stipulation."

7       The courts say that's reversible error in those

8  cases, because the inference is so likely, the possibility is

9  so extreme that the jury, because the man has had heroin on

10  previous occasions, is going to convict him that he had it on

11  this occasion.

12       In this case, we deal with a very similar

13  circumstance, slightly different prejudice.  Your Honor, we

14  concede that this material is obscene, because it is obscene.

15  It's offensive material.  There is a great danger that if this

16  material is displayed in whatever way Mr. Dixon wants to

17  display it by showing picture after picture, the jury will be

18  so offended by it that it will convict the defendant just

19  because his name is on the package.

20       We've just spent four hours discussing the

21  technicalities of this statute, whether it applies to ordering

22  or not, and that issue has not been done yet.  The government

23  has to show in this case, even Mr. Dixon admits, that what

24  they've got to try and prove is that the defendant ordered the

25  material.  That's going to be a battle.  We have witnesses who

1  say the defendant never admitted ordering the material, and we

2  don't think they're going to be able to show that he ordered

3  the material.  But if there's no restriction on the manner in

4  which the evidence can be put in, I don't think they're going

5  to pay any attention that the defendant ordered the material.

6  The risk they're going to convict him because he's associated

7  with the material is so great he's never going to get a fair

8  trial.

9       Let me make sure the Court is aware.  We are not

10 asking the Court to prohibit them using this material at all.

11 We filed a limited motion.  We want the magazines to be taped

12 shut.  The covers of these magazines are bad enough.  You know

13 the titles, Your Honor.  I don't have to recite them in open

14 court, although maybe I should for the record.  One of them is

15 called "Fucking Children."  They show nude young people on the

16 covers.

17      There is no doubt, by use of that material the

18 government can inform the jury what the case is about.

19 They're not going to be prejudiced.  Mr. Dixon wants to show

20 it in whatever way he can for the maximum prejudicial effect.

21 He doesn't want the jury to focus on this ordering question,

22 which is rather obscure and is going to be tough for a jury,

23 anyway.  He wants them to look at this material and say, "The

24 hell with this," and the Court can prevent that and let him

25 have a fair trial by this very simple exercise of the Court's

discretion, just say "Give them the magazines, tape them shut, they know what the case is about," and I think the Court should exercise its discretion under rule 403 to insist that the evidence be admitted in this case in that way.

That's the only other motion we have pending, Your Honor. If Mr. Dixon wants to respond on that, I'll sit down.

THE COURT: All right, Mr. Dixon.

MR. DIXON: Your Honor, on the language in the indictment, I'll submit on our pleadings.

On the in limine motion, Your Honor, all that I can say is that what Mr. Povich and Mr. Hoffman are suggesting is that, in a heroin case, using his illustration, that the government shouldn't be allowed to bring in, if the defendant was caught with a pound of heroin, the government shouldn't be allowed to bring in a pound of heroin, because of all the negative publicity about heroin. The jury may see that pound of heroin, and just as a matter of fact convict him because they see a pound of heroin.

Your Honor, we don't buy that argument. We don't buy the argument that the gravamen of the offense cannot be presented by the United States to prove its case. We don't buy the argument, and in the cases that the defendant cites, a majority of those cases, I agree with him, that they stand for those propositions, but those are other crimes evidence cases. Other crimes evidence, not what we have here.

1              We're not talking about other crimes evidence.  We're

2      talking about a bloody knife.  We're talking about a

3      photograph of the deceased.  We're talking about --

4              THE COURT:  A photograph of the deceased?

5              MR. DIXON:  Well, during the autopsy or something

6      like that.  We're talking about the actual stuff.

7              THE COURT:  I rarely let those in.

8              MR. DIXON:  Well, Your Honor, if it were a question,

9      Your Honor --

10             THE COURT:  If there's a relevant issue --

11             MR. DIXON:  If there's a question about where he was

12     shot or something like that.

13             THE COURT:  Of course.

14             MR. DIXON:  Indeed, and there's a question here as to

15     what is obscene.

16             Now, we would take issue with what counsel said.  We

17     didn't reject his offer to stipulate.  Sure, we'll stipulate

18     to obscenity, but we also want to have the right for the jury

19     to be able to see the evidence, and for the government to be

20     able to use the evidence.

21             Now, there's not too much -- and I think Mr. Hoffman

22     and Mr. Povich make much ado about nothing.  I don't believe,

23     after having had many jury trials, that just because a jury

24     sees some children, that they're going to automatically

25     convict -- sees some children having sex or partially clothed,

1    they're going to automatically convict Mr. Nader.  We should

2    give the jury the due that it should receive at least.

3         Why do we have a jury?  They can compartmentalize.

4    They can make decisions.  That's why we have a jury system.

5    Let's not choose for the jury what it should or should not

6    receive, consistent with giving Mr. Nader a fair trial.

7         Mr. Nader, Your Honor, after very long -- the history

8    of this case is very long -- we have evidence to show Mr.

9    Nader admitted ordering the material, admitted knowing what's

10   inside the material.  Their position is, or I guess Ms.

11   Moolenaar is going to claim for him -- because those were the

12   only two people who were present -- that that just didn't

13   happen.

14        Your Honor, we submit, in order to rebut that, we

15   should be allowed to present the full evidence that we have in

16   a manner that's consistent with Mr. Nader's right to receive a

17   fair trial, and we don't think a jury looking through the

18   evidence that we have is going to unduly prejudice Mr. Nader

19   when we're not talking about other crimes.  We're not talking

20   about people's heads being blown off or anything like that.

21   We're talking about what he ordered from Holland, and we would

22   ask the Court to allow us -- to deny their motion in limine.

23        THE COURT:  Mr. Dixon, in presenting your evidence in

24   this area, is it your intention to show to the jury the

25   contents of the envelope or only certain materials?

1    MR. DIXON:  Your Honor, I would not -- I do not

2    intend to bring in a -- in one of the cases, Grassi --

3        THE COURT:  Yes.

4        MR. DIXON:  That case, as I recall, it was a

5    situation where they had numerous pieces of film.  If we had

6    numerous pieces of film, I'm not going to show every piece of

7    film we have.  I'm not going to ask the jury to review the

8    8-millimeter film we have.  We think that's unnecessary.  All

9    that we expect to do is have the evidence identified, properly

10   admitted into evidence, and if the jury wants to look at it,

11   they can.  I am not going to stand in front of the jury, Your

12   Honor, with the magazines and paste them on their foreheads,

13   but if they want to look at them, they can.

14       THE COURT:  So you're going to show them the contents

15   of the package?

16       MR. DIXON:  Yes, sir.

17       THE COURT:  Everything?

18       MR. DIXON:  Yes, sir.

19       MR. HOFFMAN:  Your Honor, just one thing.  Mr. Dixon

20   made a statement about photographs that I found very

21   revealing.  As Your Honor said, those normally are not

22   admitted unless they're relevant to some disputed issue in the

23   case.

24       THE COURT:  I said I did not.

25       MR. HOFFMAN:  I believe other judges have the same

1    practice, Your Honor.  What I don't understand is there's no

2    issue in the case to which it's relevant.  We've offered a

3    stipulation.  We submitted jury instructions, Your Honor, that

4    asked Your Honor to tell the jury that the material is obscene

5    as a matter of law.  Those are our jury instructions.  Mr.

6    Povich is going to, in his opening statement, concede the

7    material is obscene.  Obscenity is not an issue.  There is no

8    legal issue that's relevant in this case to which the contents

9    of the magazine applies.  It only has a prejudicial effect.

10        What is it necessary to show?  We've given the

11   government the element of the case that the material is

12   obscene, and I think that Mohel -- M-O-H-E-L, I don't know how

13   you pronounce it -- talks about what a defendant has to do to

14   make sure he's not sandbagging the prosecution about whether

15   there's really a stipulation.  We carefully have followed

16   everything in there.  We have given a written stipulation.  We

17   submitted jury instructions that say the issue is taken away

18   from the jury; the Court instructs them as a matter of law

19   that the material is obscene.  We can't do any more, and I

20   don't understand, when he says or concedes that they're

21   entitled to show material relevant to issues in the case, well

22   I don't know what the issue in the case is that it's relevant

23   to.

24        THE COURT:  All right.

25        Counsel, with respect to the matter of the wording --

1    well, with respect to the first motion, that's been resolved.

2          With respect to the second and third motion, that is,

3    the wording of the indictment and this last issue about the

4    evidence that would be submitted to the jury, I'd like to give

5    that further consideration and advise counsel tomorrow.

6          Now, are we ready to call for our jury panel?

7    Counsel will, of course, be prohibited from reading from the

8    indictment, so that that will not be presented to the jury,

9    and counsel will be prohibited during voir dire from trying to

10   in any way, of course, display the material.  Obviously, it

11   hasn't been received in evidence.

12         Now, I realize that we do have an issue with respect

13   to 1462 and 1461, but it does seem to the Court that the Court

14   can perhaps just make a brief statement to the jury to the

15   effect that the defendant is charged with importing obscene

16   materials into the United States in violation of the law, and

17   we can go forward with that without actually reading the

18   indictment to them.  I'm not sure they really need the

19   indictment read to them at this point.

20         Mr. Dixon.

21         MR. DIXON:  If I may, Your Honor.  Your Honor, I

22   understand the Court's reluctance to, as far as the indictment

23   goes, in reading the indictment to the jury, but if that

24   carries over to the area of opening statement --

25         THE COURT:  No, no, no.  We're not discussing opening

1    statement.

2             MR. DIXON:  Very well.

3             THE COURT:  We're just speaking in terms of voir

4    dire.

5             MR. DIXON:  Very well.  I have no objection to that,

6    Your Honor.

7             THE COURT:  The question is, in referring to the

8    charges against Mr. Nader, whether that would fairly assess,

9    would be a fair assessment for the jury, so that counsel can

10   ask them questions without addressing any issues that are

11   before the Court for ruling.  Of course, again, I stress to

12   counsel that, with respect to these matters, these matters

13   really only came to the Court's attention yesterday --

14            MR. DIXON:  Yes, Your Honor.

15            THE COURT:  -- although I realize they may have been

16   submitted earlier.

17            All right, any problem?

18            MR. DIXON:  Your Honor, the only reluctance that I

19   have is that, in reading over the proposed voir dire questions

20   submitted by the defense, I kept mine fairly general and

21   short, but the defense gets very detailed, and I think the

22   Court's purpose may be defeated by the number and type of

23   questions asked by the defense and its efforts to pick twelve

24   fair and impartial jurors.

25            For instance, the entire 27 questions are in some way

1   related to sexual conduct, either with children or of some

2   homosexual nature, and all of the questions go to the heart of

3   what the defense is trying not to do, and what the Court --

4   the Court in its balancing is trying not to prejudice Mr.

5   Nader, but all of these questions go right to -- I mean, when

6   the jury hears this -- they can ask ask them if they like --

7   my questions, Your Honor, that I submitted to the Court, I

8   think were general enough and not specific enough so as to say

9   too much about the case.  I mean, both counsel want to plead

10  their cases to the prospective jury at time of voir dire.  I

11  mean, that's the artful way to do it, but at their peril, if

12  they want to go into this, I think there may a problem.

13          THE COURT:  Mr. Hoffman.

14          MR. HOFFMAN:  Your Honor, I think there is a slight

15  problem.  When we proposed these, we obviously didn't know

16  what the Court's ruling would be on whether the material was

17  going to be displayed.  We have asked questions in here to try

18  and ascertain whether jurors could look at the material in the

19  magazines and still decide the case in a fair manner, I think

20  is the type of standard question.

21          Each of these questions refers to activities that are

22  in those magazines.  If the magazines were in a sealed

23  condition, I would be the first one to eliminate some of these

24  questions.  We're in a kind of a predicament, and I look to

25  the Court for whatever guidance we can get on that.

1    I think it would be very difficult for the defense to

2    proceed in a case without being able to quiz the jury, for

3    instance, on whether they could view material displaying

4    homosexuality, which some of those magazines engage in.  If a

5    juror said, "No, I'm so offended by that, I think it's against

6    God's law, and I just couldn't sit on the case," then that

7    would be a juror who we, I don't think, should sit.  On the

8    other hand, if the material is not displayed, it may be that

9    we don't need to ask that question.

10    THE COURT:  I have some problem with the way the

11    questions are posed, and I think, without any criticism

12    intended, that, for example, with respect to 12 through 17, or

13    12 through 16, that the way those questions are posed, I just

14    wonder whether you're going to get an answer from the jury.

15    You know, when we ask the three-part question about

16    crime -- and I'm not sure we really have to get into that in

17    much detail here -- but we always try to be careful so that we

18    can couch it so that a juror can respond without responding to

19    a specific question, for example, yes, I may have committed a

20    crime.  So we always ask it in three parts:  whether he's been

21    a witness to a crime, whether he may have committed a crime,

22    or whether he has been the victim of a crime, and then, of

23    course, his fellow jurors really do not know what he's

24    responding to.

25    So I think that some of the questions should be

1  changed, and I should advise counsel that it is the Court's

2  practice to allow counsel to ask questions after I've

3  completed my questions, and a lot of these questions I will be

4  going through and putting to the jury, at least some of them,

5  and some of them I will not, because I think in some of the

6  questions, it may very well suggest to the jury that I have a

7  feeling one way or the other, and while counsel can ask the

8  question, I would be afraid to ask the question.

9       But with respect to, for example, 12 through 16, it

10 seems to me that the question should be framed along the line

11 that if any evidence is presented by either side in the case

12 which would depict, and then describe the matters that you

13 have in 13 through 16, and then ask the jurors whether this

14 would in any way affect their ability to render a fair and

15 impartial verdict, and then, of course, they really don't have

16 to indicate whether they agree or like it, or don't like it or

17 oppose it.  It could be that when they approach the bench,

18 we're going to get those answers.

19      Second, I don't know what sort of reaction we're

20 going to get from the jurors, but it is -- we may have a

21 number of jurors approaching the bench.  If that is the case,

22 then I am considering taking the individual voir dire in the

23 juryroom, because I think it'll be a little more comfortable,

24 rather than trying to keep our voices down up here, and it's

25 my experience, especially in a case that is sensitive, that

1    once jurors are out of the courtroom, they may be a little

2    more candid about what their concerns are than in the

3    courtroom.

4         MR. HOFFMAN:  Your Honor, just so Your Honor

5    understands our position, when we wrote these questions, you

6    may see in the beginning, we did not anticipate these being

7    asked in open court of the jurors.

8         THE COURT:  I understand that.

9         MR. HOFFMAN:  These were written only on the

10   understanding, because we discussed it previously, Your Honor,

11   that there would be questions outside the presence of the

12   other jurors.  So that was what we anticipated, not that these

13   would be given when they're in a panel.

14        MR. POVICH:  These were questions I wanted Mr. Dixon

15   to ask the jurors.

16        THE COURT:  What's that?

17        MR. POVICH:  These were questions I wanted Mr. Dixon

18   to ask the jurors.

19        (Laughter.)

20        THE COURT:  Anything else, counsel?

21        MR. DIXON:  Not from the government, Your Honor.

22   We're ready for the panel.

23        Your Honor, before the jurors come in, there's one

24   small point I'd like to raise.  One of the stamps has come off

25   of our evidence, and what I'm going to do is try to get it

back on there as best I can, but I do want the record to
reflect that when counsel saw it, there were two stamps on
there.

MR. HOFFMAN:  There were two stamps on there.

THE COURT:  The record may reflect that the Court saw
two stamps on the package, and I have no problem with that.

MR. DIXON:  Thank you, Your Honor.

(Whereupon, the Excerpt of Proceedings was
concluded.)


-oOo-


CERTIFICATE OF REPORTER


I hereby certify that the foregoing is the official
transcript of proceedings in the hereinbefore-captioned
matter, and that it is complete and accurate to the best of my
knowledge and ability.

_____
HARRY DEUTSCH
Official Court Reporter