1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

        vs.                       :   Criminal Action No. 85-33

GEORGE NADER,                     :

        Defendant.               :

- - - - - - - - - - - - - - x

**FILED**

**AUG 06 1986**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Courtroom No. 17
Washington, D.C.

Wednesday, July 30, 1986

     Trial resumed in the above-entitled matter in open

court before The Honorable JOHN GARRETT PENN, United States

District Judge, commencing at 11:25 o'clock a.m.


   APPEARANCES:

      For the Plaintiff:

         RONALD DIXON, ESQUIRE


      For the Defendant:

         DAVID POVICH, ESQUIRE
         RICHARD S. HOFFMAN, ESQUIRE


HARRY DEUTSCH
Official Court Reporter
4800-G, U.S. COURTHOUSE
Washington, D.C.  20001
   (202) 898-0780



1                    P R O C E E D I N G S

2           THE COURT:  Gentlemen, I have sent the jury back to

3    the jury lounge -- they're still with us, don't be

4    concerned -- but I've sent them back, because there were some

5    matters that were raised, and I am willing to address some of

6    those matters at this point, in the event it may have any

7    effect on what takes place after.

8           First, with respect to the matter of the motion to

9    change the indictment, it is my understanding that that motion

10   has been withdrawn.

11          MR. HOFFMAN:  Your Honor, in light of the voir dire

12   yesterday, we will not press that, so we withdraw it.

13          THE COURT:  I can advise you, Mr. Hoffman, that you

14   must have anticipated my ruling, because I was prepared to

15   deny the motion.  It seemed to me that the matter was -- you

16   know, I think the grand jury could have arrived at that

17   wording, because I think this is the type of thing that's

18   commonly referred to as child pornography, not to be confused

19   with the statute that was passed in 1984.

20          The second issue, of course, that was raised was

21   whether the government would stipulate and the effect of --

22   the Government had indicated it would not stipulate, and the

23   question was raised whether or not the members of the jury

24   could see the books, or whether the Court should adopt the

25   proposal made by defense with respect to that.

1        If this matter were to reach the jury, the Court

2   would rule that the government would have a right to present

3   those matters to the jury, and the reason why, frankly, I

4   think that, really, there would be no prejudice to Mr. Nader

5   if this material were presented to a jury, simply because I

6   have seen the material, as counsel know, and there's one

7   booklet there whose title I still find difficult to state -- I

8   guess I'm old-fashioned -- but it is one involving young girls

9   and young boys, and I would suspect that, for example, looking

10  at that particular booklet, that sometimes what you do not see

11  is more awesome than what you actually see, and I would think

12  almost, based upon our voir dire questions, that the jury

13  might very well have a suspicion that it is worse than perhaps

14  it is.

15        I use that as an example, because I thought that book

16  was pathetic.  It looked like the children were on a drug or

17  something; to me, it looked like they were really just there

18  and being positioned and not participants in anything.  It's

19  disgusting, but it was pathetic, and frankly, I think that it

20  would be less prejudicial for a jury to see that than not to

21  see it, because I think they would have a feeling of what else

22  might be there.

23        The third matter that counsel raised -- and now I am

24  trying to think of what the third matter was.

25        MR. HOFFMAN:  May I, Your Honor?

1          THE COURT:  Yes.

2          MR. HOFFMAN:  I believe it has to do with the scope

3    of Agent Northrop's testimony.

4          THE COURT:  Yes.  Thank you, Mr. Hoffman.

5          MR. HOFFMAN:  You are welcome.

6          THE COURT:  It must be advancing age, I guess.

7          I have had a chance to read through both the

8    investigative memorandum, as redacted by the government, and

9    the one as redacted by the defendant, and I have read the

10   original of it, and first, I guess, I would ask counsel

11   whether -- well, I'll put it this way.  Having looked at it

12   and having looked at that memorandum, it seems to the Court

13   that the material set forth on page 2, included by the

14   government, naturally follows the questions concerning the

15   controlled package.

16         Now, I did not go back and read the transcript of the

17   agent's testimony, but unless there was something that you

18   could point me to in that transcript, why then it just seems

19   to me that it naturally follows.  I note, for example, it

20   states on page 2 -- and, for the record, this is investigative

21   memorandum, memorandum of interview, date of interview April

22   16, 1984.  It identifies the people who were present at the

23   time of the interview, and after what the defendant would

24   include -- well, it reads as follows:

25         "He readily acknowledged that he did place the order,

1    and that the package was properly addressed to him at his

2    proper personal residence," and so forth.  "He was asked

3    if he recognized the return address bearing the name of

4    Ralph Zonatz in Holland.  He stated that he did, and that

5    it was a company name that he had mail ordered child

6    pornography from."  And then, of course, the defense would

7 stop there.

8         Then it goes on to read:  "He stated that his first

9    experience with child pornography was in Holland, while on

10    a plane trip enroute to Israel.  He had stopped there in

11    Holland for one evening and at a hotel he brought" -- I

12    guess it's "bought" -- "a magazine depicting young boys

13    engaged in sexual activity.  He stated that he jotted down

14    the name and address of a company know as COQ Company in

15    Cope Haven (sic) and kept that name and address with him

16    so that he might correspond with them and make future

17    purchases of similar material depicting young boys in

18    sexual activity."

19         And it goes on to say:  "He stated that the magazine

20 he had purchased he left in Holland intentionally," because he

21 thought it would not be well received -- I am paraphrasing

22 now -- in Israel, and he was concerned about what could happen

23 in Egypt.  Apparently, he was concerned that it might affect

24 his dealings in Israel, and he was afraid that in Egypt,

25 quote, "they would execute him for possession of it," end of

1    quote.

2         But it does appear to me, unless counsel can point to

3    something else, it appears to me that this was all a part of

4    the question relating to the controlled package, and he was

5    giving an explanation as to how he came to order the package

6    and know where to order it, because it goes on to say, and I

7    am on page 3, I think:

8         "Through his purchases with the COQ Company, he

9         became familiar with the Ralph Zonatz Company, who sells

10        similar magazines depicting young boys engaged in sexual

11        activity, and thus made this particular purchase from

12        them.  The controlled delivery package was in a sealed

13        condition and, without looking at the contents, he stated

14        he expected it to contain various magazines depicting

15        young boys in various sexual activities," and so forth.

16        So, unless there is something else that counsel can

17   point me to, if this case went to trial, the Court would allow

18   that matter to be -- allow that to be a part of his statement.

19        MR. HOFFMAN:  Your Honor, I would like to take a

20   moment to explain to you our position.  We have a very basic

21   problem, to start with, and I think it's been a little bit

22   overlooked.  It may not make a difference in the Court's

23   ruling and decision, but the testimony would be on our side of

24   the case that Mr. Nader never made -- never made -- those

25   statements.  We will have a witness to testify that those

1    statements are made up by the government agent.

2        So we're in a little bit of a Catch-22 situation, in

3    terms of I know that's what it says in terms of the order

4    things were said, as reflected in the various memorandum and

5    the notes.  It's obviously very difficult for us, because our

6    only information is that no such statements were ever made

7    about the Ralph Zonatz Company in ordering this material.

8        I only point that out because it has been said so

9    many times in the course of proceedings thusfar that these

10   statements were made.  I wanted to make sure the Court

11   understood that there's going to be, I think, equally

12   substantial and credible evidence on the other side that no

13   such statements were made.

14       But in terms of the agent's own memory about this, I

15   call the Court's attention to page 150 of the transcript of

16   his testimony, where it says, the question is:

17       "And what did you talk about?"  And this is after the

18   warning and reading of rights, I guess.

19       "We talked about all the rest of the evidence, and we

20       talked about all the previous evidence in a very brief

21       kind of way.  I mean, we had already established in the

22       conversational flow that he recognized the controlled

23       delivery, that he ordered the materials," period.  "He

24       recognized the return address.  He told us of how he came

25       to know this company.  He acknowledged doing previous

1    business with them."

2         Now, there's no reference in this testimony to the

3    name Ralph Zonatz at any point, but I assume when it talks

4    about the return address, that's what they're referring to.

5         Your Honor, this interview memo is, as Your Honor

6    ruled at the suppression hearing, is a dictated, cleaned-up

7    version of the notes of the agent.

8         The notes of one of the agents who was there, Agent

9    Bloodworth, has a chronology in it, and it says that Mr. Nader

10   ordered the package in question, and it has that statement

11   after the discussion about the trip to Israel and Holland.  I

12   don't know how it can naturally flow in the course of

13   conversation -- in fact, if you look at the agent's notes, it

14   has a general statement, and I'm quoting now from Agent

15   Bloodworth's handwritten notes --  I believe it is Agent

16   Bloodworth.

17        THE COURT:  Is that Defendant's 7?

18        MR. HOFFMAN:  I don't think Agent Bloodworth's notes

19   were admitted as an exhibit, Your Honor, because he did not

20   testify.  It says he "ordered materials in the past.  I.D.'d

21       the company mailed from; stopped in Israel, paren, 1981,

22       Holland; the magazines are everywhere while in Holland;

23       picked up a brochure, made subsequent orders from COQ in

24       Copenhagen; came across Ralph Zonatz Company there with a

25       catalog of COQ and Ralph Zonatz out of Holland."

1        Then it says after that:  "Did order the materials in

2    this package."

3        It has some other statements.  I can give you a copy

4    of this, Your Honor, if you don't have it.

5        It seems to me from that -- and this is what we

6    contended all along at the suppression hearing, and it's

7    difficult because it's a credibility question, I realize --

8    that they showed Mr. Nader this hamper, which they

9    acknowledged was full of all of these other magazines, and it

10   was out there open, and they talked about general matters, and

11   he acknowledged ordering the material that they had taken from

12   his room, and made some general statements about how he became

13   acquainted with it, and then they turned to the package in

14   question in this case.  That's our position.  I think it's

15   supported by their handwritten notes, although I recognize

16   it's turned around in their dictated memorandum.

17        THE COURT:  I would also note that, in Defendant's

18   Exhibit 57 -- I am sorry, Defendant's Exhibit 7 -- whose notes

19   are those?

20        MR. HOFFMAN:  If it's handwritten notes, I would

21   assume it is Agent Northrop's.

22        THE COURT:  All right.  Because there, of course, he

23   does refer to some background information, and then he refers

24   to being the editor of the Middle East Insight, his address,

25   an address in Ohio, his employment, the fact that he's had no

1    military service, and then it said "Yes, he ordered the

2         pornographic magazines of boys.  Plane stopped in Holland,

3         had evening in hotel, bought a magazine, kept address COQ

4         Company in Copenhagen, Denmark.  COQ sent a catalog to him

5         upon request.  That's how he became familiar with Ralph

6         Zonatz."

7              MR. HOFFMAN:  That's correct, Your Honor.  In fact, I

8    think that's precisely our point.  We argued at the

9    suppression hearing that we did not believe it was credible

10   that Agent Northrop, an experienced postal service agent,

11   would have heard a statement by the defendant admitting

12   ordering the controlled delivery package and not have made a

13   note in the appropriate language.

14              Instead it says "Yes, he ordered the pornographic

15   magazines of boys."  I think that the most logical inference

16   is that refers to all the  other admittedly pornographic

17   magazines of boys that were taken from his room, not the

18   controlled delivery package.

19              And that corresponds with the order in Agent

20   Bloodworth's notes which distinguishes between the supposed

21   statement about the package and that of other material.

22              That's our difficulty, Your Honor, and that's why we

23   brought that subject up.

24              THE COURT:  Well -- you want to say something, Mr.

25   Dixon?

1          MR. DIXON:  Yes, Your Honor.  The defense may have a

2    difficulty with the state of the evidence as it is, and quite

3    naturally, they will, but, Your Honor, what the defense is

4    talking about at this point and, as the Court has said several

5    times, if this case goes to trial, it's not a matter of

6    admissibility, it's a matter of credibility, one that should

7    be argued to the jury, and that is their position.

8          There, I think, Mr. Hoffman is off the point.  What

9    we're talking about now is admissibility, not credibility, not

10   issues that can be argued to a jury one way or the other, and,

11   by implication, the Court has found some credibility, has

12   found Agent Northrop's memorandum credible and has found his

13   notes credible, because the Court has ruled that Miranda was

14   adhered to.

15         All of this was thrashed out a long time ago.  The

16   same arguments were made at that time that are being made

17   today.  If they want to make those arguments to a jury, and if

18   there's evidence to support it, why then they're welcome to,

19   but at this juncture, we would submit, Your Honor, that the

20   statements that Mr. Nader made, he made after being

21   Mirandized, he made it in response to questions, he made it

22   with his attorney present, and he was talking about the

23   controlled delivery and giving background, and assuming that

24   the defense is going to be I didn't make these statements, we

25   would submit, Your Honor, in response to that, that Mr.

1    Nader's statements about the background go to show yes, he

2    would have a reason to lie, shows his consciousness of guilt,

3    Your Honor, why he would have a reason to go around and around

4    and try to prevent people from knowing about this.  He had an

5    interest to protect.

6          THE COURT:  Were there any other preliminary matters?

7          MR. HOFFMAN:  Your Honor, let me make one thing

8    clear.  I'll try and be quick.  I didn't mean to suggest that

9    Mr. Nader contends he made no statements.  I am only talking

10    about the statements about the controlled delivery package.

11    Ms. Moolenaar admitted and acknowledged he made statements

12    about other materials.  So just to clarify that.

13          The other point is, I am sure Mr. Dixon knows we

14    can't argue it to the jury, because he has said that he will

15    not bring up the fact that there were other magazines in the

16    case, and obviously, we can't bring it up, so we're in a

17    Catch-22.  We can't cross-examine the agent on isn't it true

18    he said this with regard to other materials.

19          THE COURT:  I would rule, if this case went to trial,

20    as I've indicated.

21          Now, of course, I believe that takes care of all the

22    preliminary matters, and now we face the issue of the matters

23    raised in the indictment itself.  Of course, one question

24    raised with respect to 1462 is the common carrier issue.

25          MR. DIXON:  Your Honor, if I may.  If I may, just

1    briefly, Your Honor?

2        THE COURT:  Yes.

3        MR. DIXON:  The common carrier issue, Your Honor, we

4    submit, is one that is a non-issue, and that's what we were

5    trying to import to the Court yesterday, maybe in a clumsy

6    fashion.  Mr. Nader is not charged with bringing into the

7    United States obscene material by a common carrier.  The

8    indictment does not charge him with that.

9        The indictment charges him with bringing obscene

10   material into the United States, and the statute reads -- it

11   doesn't read and/or.  The statute reads either he does part A

12   or he does part B, or he can do them in conjunction.

13       The statute reads, Your Honor -- I'll just get it --

14   1462:  "Whoever brings into the United States" -- that's the

15   first sentence -- "or any place subject to the jurisdiction

16       thereof or knowingly uses any express company or other

17       common carrier."

18       A person can violate that statute by walking across

19   the border and -- I want to correct myself.  I made a

20   misstatement yesterday in arguing to the Court.  A person can

21   violate 1462 by walking across the border between the United

22   States and Mexico or the United States and Canada with obscene

23   material on his or her person.  That can happen.

24       You can drive -- he can drive across the border

25   between the U.S. and Mexico, U.S. and Canda, with obscene

1    material in his car, and if he's stopped at a border check

2    point, and they ask to search his car, and they find obscene

3    material, he can be arrested and charged.

4              THE COURT:  But of course he didn't do that.

5              MR. DIXON:  No, sir, he did not do that.

6              THE COURT:  Right.

7              MR. DIXON:  And where we go from there is, Mr. Nader

8    didn't do it, but he caused it to be done.  He didn't do it

9    directly, and that's why we charged him, in the alternative,

10   with aiding and abetting.  He assisted whomever, Ralph Zonatz,

11   in bringing that material into the United States, and under

12   that theory, Your Honor, under the theory of aiding and

13   abetting, Mr. Nader is just as guilty as the principal.  Even

14   though he didn't drop it in the box himself, even though he

15   didn't go -- he didn't travel across himself and did it, he

16   caused it to be delivered, and that takes us back to 1461 and

17   arguments that were made yesterday, Your Honor, as it relates

18   to the Reed case and Sidelko case.

19             Your Honor, those cases all go to jurisdiction.

20   Those cases all good to venue.  Those cases allow the United

21   States to bring a pornography prosecution any place where the

22   pornography passes through, and we disagree violently with

23   that Pennsylvania trial court judge who said in his

24   interpretation of the legislative history that what you're

25   doing is broadening the number of offenders.

1    Of course, the defense is going to say that, but the

2    Supreme Court has said time and time again, in Reidel, in

3    Orito, and in Twelve 200-Foot Reels of 8-Millimeter Film

4    that is not the issue.  Even though they said we're not making

5    the constitutional argument, but what they're saying, Your

6    Honor, is that he had a right to possess it in his home.  Yes,

7    indeed, but he does not have a right to receive it, to cause

8    it to be transported, and there we good back again to the

9    aiding and abetting theory.

10    THE COURT:  In the Orito case -- correct me if I'm

11    wrong, Mr. Dixon -- but they were not talking about the person

12    receiving the material, were they?  They were talking about

13    the person who shipped it.

14    MR. DIXON:  Well, Your Honor, they were talking about

15    the person who shipped the material under 1462, who ordered

16    it, but again, that case dealt with a coast to coast

17    situation.  That didn't deal with an international situation.

18    And we would submit that Orito, that Orito stands for the

19    proposition that you can't send for it, you can't receive it.

20    That takes us back to --

21    THE COURT:  It doesn't say that, Mr. Dixon.

22    MR. DIXON:  Well, Your Honor, that takes us back

23    to --

24    THE COURT:  If you can point me to where it does say

25    that.

1          MR. DIXON:  Your Honor, that takes us back to United

2    States vs. Twelve 200-Foot Reels of Super 8-Millimeter Film,

3    which was decided the same date as Orito.  Your Honor, on page

4    141 --

5          THE COURT:  141 of?

6          MR. DIXON:  Of Orito.

7          THE COURT:  Yes.  Just one moment.  Yes.

8          MR. DIXON:  "The District court erred in striking

9    down 18 U.S.C. 1462 and dismissing appellee's indictment on

10   these 'privacy' grounds.  The essence of appellee's

11   contentions is that Stanley has firmly established the

12   right to possess obscene material in the privacy of the

13   home and that this creates a correlative right to receive

14   it, transport it, or distribute it." -- Receive,

15   transport or distribute. -- "We reject that reasoning."

16 And they go on.

17         THE COURT:  Keep reading, Mr. Dixon.

18         MR. DIXON:  "This case was decided by the District

19   Court before our decisions in United States v.

20   Thirty-Seven Photographs and United States v. Reidel.

21   Those holdings negate the idea that some zone of

22   constitutionally, protected privacy follows such material

23   when it is moved outside the home area protected by

24   Stanley."

25         THE COURT:  Now, I gather that the argument made in

1   Orito was that, since this material was constitutionally

2   protected in the home, that, under the circumstances here, it

3   was protected, and the person who was being charged, acted --

4   and correct me if I'm wrong -- was the person who transmitted

5   the material, wasn't it?

6          MR. DIXON:  Yes, Your Honor.

7          THE COURT:  It wasn't the person who was transporting

8   the material in effect saying, "Well, look, this man can have

9   it in his home, and we're just transporting it to him."

10         MR. DIXON:  Your Honor, I think what the Supreme

11  Court was trying to reach in Orito, and based upon Twelve

12  200-Foot Reels, what they were trying to reach is, you can

13  have it, but the government can severely limit how you get it,

14  and whether it's being transported -- whether Mr. Zonatz is

15  sending Mr. Nader the film really is not the prime point.  The

16  prime point is, Your Honor, that you can't get it by way of

17  mail, by way of the mail or by way of coming in through the

18  border.

19         That is the kernel, Your Honor, we see in those

20  cases, and going back to United States vs. Twelve 200-Foot

21  Reels, at page 125, it reads the issue is "whether the United

22     States may constitutionally prohibit importation of

23     obscene material which the importer claims is for private,

24     personal use and possession only."

25         If I am importing it myself -- all right, following

1   the Court's logic, if I'm going to import this myself, I'm not

2   going to give it to anyone, I'm going to import it myself, I'm

3   going to have it for my own personal use, I can't do that,

4   following the Court's reasoning.  I cannot do that.

5        Well, if I cannot import it myself, how can John Doe

6   mail away to Holland or mail away to someone else and have it

7   brought to him?  That's the same principle, Your Honor.  You

8   have a right -- it has to get to John Doe.  It has to get to

9   your house first.  Whether you import it, whether you bring it

10  across yourself, or whether you sit in your home and order it,

11  it has to pass from point A to point B and to the person's

12  home.

13       If it can materialize in the person's home, that's

14  fine, but -- if Mr. Nader, Your Honor, had gone to -- say the

15  material had been transported, and Mr. Nader had gone to the

16  person's house -- he didn't transport it -- had gone to the

17  transporter's house, picked up the pornography and walked back

18  to his home, Mr. Nader would have a problem in transporting

19  that pornography from the person who transported it into the

20  United States to his home.  He just can't do it.  You can't

21  receive it, you can't deliver it.  You cannot.  Once he gets

22  it to his home, he's okay.

23       Your Honor, we -- under the cases that we found --

24       THE COURT:  Can we just go back to the case we were

25  addressing now?

1        MR. DIXON:  Yes, sir.

2        THE COURT:  Really, in that case, the Supreme Court

3   case you're dealing with, Orito, you are dealing with a person

4   who is the shipper, aren't you?

5        MR. DIXON:  Yes, Your Honor.

6        THE COURT:  And I assume -- it appears to me,

7   anyways -- that the issue is whether the shipper could be

8   prosecuted under such circumstances where he's transporting

9   those items to a person in his home or to his home --

10       MR. DIXON:  Yes, Your Honor.

11       THE COURT:  -- where that person, if he had it in his

12  home, would have a constitutional right to have it there.

13       MR. DIXON:  Yes, Your Honor.

14       THE COURT:  And I gather that the argument was that,

15  well, this is material that the person who ordered it could

16  have a right to have in his home, and therefore how can we be

17  held for that?  Isn't that it really comes down to?

18       MR. DIXON:  That's what they were arguing Your Honor,

19  yes, I agree with you.

20       THE COURT:  You weren't dealing with the person who

21  received it in that case.

22       MR. DIXON:  I agree with that, Your Honor.  But in my

23  mind's eye, that sort of loops around the other question.

24  Here we have someone who ordered it from his home.  He made

25  the order.  He is not in -- in Orito, we don't have a

1    receiver, we don't have anyone that Mr. Orito claimed that he

2    was going to give it to.

3           Here we have someone who actually ordered it out of

4    his own mouth.  It's an issue of fact whether he ordered it or

5    not, but we -- our evidence is going to show that Mr. Nader

6    ordered this material himself, based upon his conversations,

7    with his lawyer present, with Agent Northrop.  He ordered it

8    from overseas, from the Ralph Zonatz Company.  He caused it by

9    filling out that order blank and sending the money.  Ralph

10   Zonatz wouldn't -- Your Honor, Ralph Zonatz wouldn't have sent

11   Mr. Nader anything, had Mr. Nader not filled out the order

12   blank and sent in the money.

13           THE COURT:  Or unless someone ordered it for him.

14           MR. DIXON:  That's not an issue in the case, because

15   our evidence claims he ordered it.

16           THE COURT:  It is an issue in the case, actually,

17   because whatever he's done, he has to do it knowingly.

18           MR. DIXON:  He does, Your Honor.

19           THE COURT:  That's something you have to prove.

20           MR. DIXON:  Our evidence on the knowingly is the

21   interview he had when they showed him the controlled delivery

22   and he said I know what's in it, and the surrounding

23   circumstances of the clandestine routes he used to order this

24   stuff.  If he wants to get on the witness stand, he can say I

25   didn't say all of that, Ms. Moolenaar can come in and testify

1   no, he didn't say that, but the fact remains, Your Honor, that

2   is a fact that the jury, we submit, should have a chance to

3   deal with, and if I may, Your Honor -- just one moment,

4   please.

5           Your Honor, and again, if I may, sir, borrowing a

6   little logic from my adversary, because of the substantial

7   ramifications of this issue, that being -- at the time this

8   case was decided, that being the Supreme Court saying even as

9   a -- you just can't possess it, period.  The Supreme Court is

10  silent on that, Your Honor.

11          They say our rulings today should not be read, should

12  not be read -- in all of the cases that I found -- our rulings

13  should not be read to say that a person cannot only possess

14  pornography in his home, but he can go to the store and buy it

15  and bring it back and he can order it.  They do not say that.

16  And that is significant.  That is a significant omission, and

17  we would submit to the Court --

18          THE COURT:  In which case?

19          MR. DIXON:  In all of the cases.  In Orito, in Twelve

20  200-Foot Reels of Film, and in the other case.  They do not

21  say that, Your Honor.

22          THE COURT:  I guess it depends on what was asked.

23          MR. DIXON:  Pardon?

24          THE COURT:  It depends on the question that was

25  asked.

1        MR. DIXON:  It depends on what was asked, but it also

2   depends on the ramifications of what we have.  They made a

3   blanket statement that you can't import it, you can't receive

4   it.  How does someone who brings it -- well, Your Honor, I

5   would submit that the Court is constrained by the cases, the

6   Supreme Court cases and, most notably, the Hurt case --

7        THE COURT:  The which case?

8        MR. DIXON:  -- the Hurt case that the Court's law

9   clerk found, to deny the motions, and if the evidence comes

10  out the way that the government suspects the evidence will

11  come out, to deny the motion for judgment of acquittal,

12  because there is no -- there is no clear -- I would say it's

13  clearer on the side that Mr. Nader cannot cause this to be

14  transported than it is to say -- relying on the Sidelko case,

15  relying on that case that was criticized in the Hurt case, and

16  by implication, by implication, we would submit was overruled

17  in subsequent cases coming down from the Supreme Court on this

18  very issue.

19       THE COURT:  Well, you keep saying on this very issue.

20  I wish there was a case on this very issue, but I haven't

21  found one on it, and I invite you to point my -- you know,

22  point me to a case that's on this issue.

23       MR. DIXON:  I think, Your Honor, what the Court is

24  doing is relying on the factual scenario, in that all the

25  people caught with pornography were transporters, were people

1    who were bringing it in, were people who actually had it, and

2    there was some thought that they were going to give it to

3    other people, but I don't think the Court should stop, should

4    limit itself there.   I mean that --

5           THE COURT:   That was the issue decided by the Court,

6    isn't it?

7           MR. DIXON:   That was the issue decided, Your Honor.

8           THE COURT:   I'm not saying that the Court may not

9    decide it the way you argue at some time in the future, but

10   that's the issue before the Court.

11          MR. DIXON:   Your Honor, all I will say, Your Honor,

12   is that the way we read the cases, it allows for prosecution

13   similar to the one that we have today under 1461 and 1462,

14   because Mr. Nader was actively involved in the transportation.

15          We would submit, even if -- I'll go so far as to say,

16   even if we hadn't charged the aiding and abetting, if the

17   facts showed aiding and abetting during the course of the

18   trial, we could reasonably ask the Court to instruct the jury

19   on aiding and abetting, but we did charge aiding and abetting

20   in this case, and again, Your Honor, going back to aiding and

21   abetting, if Mr. Zonatz transported it and Mr. Nader aided and

22   assisted in the transportation, Mr. Nader is treated the same

23   as a principal.

24          THE COURT:   Well, Mr. Hoffman cited a case which he

25   contends doesn't agree with that argument, do you recall that,

1    yesterday?

2         MR. DIXON:  No, I don't recall the case Mr. Hoffman

3    was referring to.

4         MR. HOFFMAN:  Are you talking about United States vs.

5    Farrar, Your Honor?

6         THE COURT:  Yes, United States vs. Farrar, reported

7    at 281 U.S. 624, 50 Supreme Court 425.

8         MR. DIXON:  Well, Your Honor, as -- trusting my

9    memory on that particular case that Mr. Hoffman cited --

10        THE COURT:  This concerned, I believe, whether or not

11   the purchaser of an item could be charged as an aider or

12   abettor.

13        MR. DIXON:  Whether or not the purchaser of an item

14   could be charged as an aider or abettor?  Your Honor, I don't

15   recall the particular facts in this case.

16        THE COURT:  It says "By indictment returned in the

17      federal District Court for Massachusetts, the defendant

18      was charged with unlawfully and knowingly having purchased

19      intoxicating liquor fit for use for beverage purposes, in

20      violation of the National Prohibition Act," and as I

21   understand the case, he was charged as an aider and abettor.

22        MR. DIXON:  Only --

23        THE COURT:  Well, I think they were trying to bring

24   him in, as I understand the case.  They can prosecute the

25   person who sold it, but they're also trying to bring this man

1    in.

2              MR. DIXON:  As an aider or abettor?

3              THE COURT:  As an aider or abettor.

4              MR. DIXON:  And in our case, Mr. Nader is charged

5    with doing the act as well as assisting in doing the act, and

6    they're not legally inconsistent theories.  In that case, it

7    sounds like this man was brought in basically on the aiding

8    and abetting theory.

9              THE COURT:  It seems to me the cases are pretty

10   close.  You're saying Mr. Nader ordered something through the

11   mail or by common carrier, whichever, and as a result he

12   received something, and I guess in that case, this man ordered

13   something and he received something.

14             MR. DIXON:  Well, Your Honor, what I would say to

15   that case, I think the statute we have, specifically the mail

16   statute, addresses this particular problem, and I think Mr.

17   Nader's act of actually sending for the pornography once he

18   knew about it, and assisting Mr. Zonatz -- and the same

19   argument could apply there, assisting this man to sell

20   liquor -- but what Mr. Nader did was knowingly and willfully

21   send off for this pornography and cause it -- now, what we're

22   talking about there, we're not talking about someone causing

23   something to come across state lines.  There we're just

24   talking about the sale of illegal alcohol, and you need a

25   willing buyer and you need a willing customer.

1        But here we're talking about taking another step,

2    causing something to come from one place to another, and we're

3    not talking about someone who is in an after-hours joint or

4    selling illegal liquor, and the reason he's able to stay in

5    business, because people come and support him.  We're talking

6    about something totally different.  There has to be another,

7    another step on Mr. Nader's part, another knowing, conscious,

8    willful step.  Mr. Nader knowingly, consciously and willfully

9    filled out the application form using S. Nader or J. Nader,

10   showing that he knew that it was wrong to do what he was

11   doing.  The statements that he gave show that he knew he was

12   wrong to order the material, because he wanted to hide it for

13   moral reasons as well as legal reasons, and he took the next

14   step of actually sending it away.

15        Your Honor, in closing, I would say that, as I have

16   said earlier, that the case should go to the jury based upon

17   the law as we see it, and I don't think that the -- I think

18   that the only case that really supports the defense position

19   has been criticized and has been, by implication, overruled by

20   the factual scenario put before the Supreme Court in the Orito

21   case and the other cases, that being the District Court case

22   out of Pennsylvania, saying that the reason there was a 1958

23   amendment to 1461 was to allow the United States to get at

24   each place where pornography passes through, and everyone was

25   up in arms about that, because they said well, what you're

1    doing is allowing the government to forum shop, and those were

2    the issues, Your Honor, and the judge -- the district court

3    judge, we would submit, didn't have the personal possession

4    issue before him.  He went on to find -- he went on to find --

5    that the legislative history of that was such that it allowed

6    the United States to prosecute anywhere along the continuum,

7    and again --

8            THE COURT:  Let me just say, Mr. Dixon, there's no

9    question in my mind that you have vigorously argued throughout

10   this case the position of your office and the position of the

11   United States with respect to these charges.

12           Let me further say that we're not speaking about what

13   Mr. Nader should have done or shouldn't have done.  And we're

14   not speaking of the evils of child pornography at this point.

15   I think we all know how evil that is, and the fact that if

16   there are not buyers, perhaps children wouldn't be engaged in

17   this type of activity.

18           As I say, if you look at the one booklet that I

19   mentioned before, it almost looks as though those children

20   were doped and they were just being posed, and it's

21   disgusting, and I suppose there should be some way to put an

22   end to it, and I gather that's why the 1984 statute was

23   passed.  As I say, if you don't have buyers in this country,

24   then maybe that'll dry up some of the market.

25           It's one thing with adult pornography, but something

1    else with child pornography, and this is child pornography,

2    there's no question about that.  But of course that's not the

3    issue before us right now.

4            MR. DIXON:  No, Your Honor.

5            THE COURT:  The issue is the statute and how the

6    charge is made.

7            MR. DIXON:  No, it's the statute and how Mr. Nader is

8    charged.

9            THE COURT:  Mr. Hoffman.

10           One other thing before I hear from Mr. Hoffman.  The

11   reason I am, again, addressing these issues at this point and

12   not waiting until a jury is impanelled and sworn and we hear

13   the evidence is, if this Court should make a ruling against

14   the government and that ruling is in error, I want to preserve

15   for the government the right to take an appeal, and of course

16   I would even urge them to do so, so it would be in the

17   government's hands, not the Court's.

18           Yes, Mr. Hoffman.

19           MR. HOFFMAN:  I think you've done the government an

20   enormous favor here, Your Honor.  I think that we would have

21   preferred, given the government's position in this case, to

22   have them put on their proof and have it dismissed, so that

23   Mr. Nader wasn't under this cloud any longer, but I defer to

24   your desire to address the question now.

25           Your Honor, my task, the first thing, is there have

1    been some straw men built up by Mr. Dixon here in the last

2    couple of days.  They have nothing to do with this case, and I

3    have got to get those things aside so we can focus on what the

4    issue is.

5              I am just perplexed as can be by the government's

6    continued reference to Orito and Twelve 200-Foot Reels of

7    Film.  The Court has already read the opinions, as I detected

8    by the Court's questioning of Mr. Dixon, on an issue I want to

9    put aside right away.

10             These are constitutional cases.  Stanley vs. Georgia

11   was a ruling in the late sixties saying somebody had a

12   constitutional right to possess materials.  People then tried

13   to expand that constitutional right, and, as Your Honor said

14   correctly, in Orito the person was saying if he has a

15   constitutional right to possess it, I ought to have a

16   constitutional right to send it to him.  The Supreme Court

17   rejected that.  There's no constitutional right.  They said

18   there's no constitutional right to receive it.  I'm not

19   arguing that.

20             The Court said, well, that issue is not addressed

21   here.  It doesn't even matter where the issue is addressed.

22   We are not making a constitutional argument.

23             There is not a word in Orito about statutory

24   construction.  The person who is being prosecuted in Orito was

25   a sender.  He didn't have an argument about the statute not

1 applying to him.  He was guilty if the statute was

2 constitutional, so he challenged the constitutionality of the

3 statute.  The Court rejected his argument.

4   There is no element of statutory construction in this

5 opinion at all.  There is also no element of statutory

6 construction in Twelve 200-Foot Reels of Film, which isn't

7 even a criminal case.  That is a case under 19 U.S.C. section

8 1305, the civil forfeiture provision, where the government has

9 a right to forfeit obscenity.

10   The person said in that case, if I have a right to

11 possess it under Stanley, I have a constitutional right to

12 have it imported to me, and this statute is unconstitutional.

13 Again, no question of statutory construction and no statute

14 that has remotely anything to do with this case, because it's

15 a civil statute.  Again, the Court said no constitutional

16 right.

17   Your Honor, we don't make a constitutional argument.

18 I know I've said that several times yesterday and today, but I

19 have to keep repeating.  It's kind of unusual to say this, but

20 the strongest case to explain that difference to the Court is

21 the Hurt case, which the Court found yesterday, much to our

22 surprise, because they divide the issue correctly in that

23 case.  They don't even mention Orito in the section that deals

24 with the interpretation of 1461, and I believe wrongly deals

25 with Sidelko.  They don't even mention the case.

1          The person made a second challenge that the statute

2     was unconstitutional, and they rejected that.  I'm surprised

3     they took as long as they did.  It should have been a

4     one-sentence rejection:  The argument was considered and

5     rejected in Orito on a constitutional basis.

6          We are here because Mr. Nader is charged with a

7     crime.  Crimes in this country are statutory offenses.  If

8     there is no crime that makes it an offense to receive and

9     order material, then it doesn't matter whether it's

10    constitutional or not for him to have that right.  It doesn't

11    matter whether he has a constitutional right.  There are lots

12    of things we don't have constitutional rights about that

13    aren't crimes.  So we've got to put that issue aside.

14         This case is just completely irrelevant to Your

15    Honor's consideration.  It doesn't say anything about whether

16    the statute intended to cover people who receive.  All it says

17    is whether the statute is constitutional.  That case aside,

18    let me deal with what the issues are in this case.

19         We have an issue of statutory construction.  What

20    does 1461 and what does 1462 intend to penalize?  I was -- I

21    heard the government's statement about Sidelko, and again I

22    was just floored by it, when he said that Sidelko didn't deal

23    with someone who possessed, and somehow the Court was

24    extrapolating.

25         Sidelko is exactly this case.  I trust Your Honor

1   knows that.  It's somebody who they said made a mail order for

2   pornography which was mailed to him.  He received it.  They

3   charged him with, not possessing it, but with ordering it.

4   They said ordering it is a crime under exactly the same

5   rationale as we have here, and they focused on the language

6   which says "caused to be delivered through the mails," just as

7   Mr. Dixon is focusing on the language, and the Court quite

8   correctly, quite correctly, said that is not an offense, that

9   is not what Congress was doing when it passed the statute.

10       Your Honor, the issue is what was Congress doing.

11   There's one phrase in 1461 that is really the entire issue.  I

12   don't purport to say, Your Honor, that this is a simple case

13   in terms of an easy case.  It is, however, a simple case in

14   terms of what the issues are.  There's only, really, one issue

15   under 1461.  It's the meaning of the phrase "uses the mails."

16   That's the only issue.

17       All this other stuff, they're straw men.  When we get

18   to that issue, there's a body of case law out there.  There's

19   really only, as far as I know, four cases that are relevant to

20   your consideration, Your Honor:  Sidelko, Reed Enterprises vs.

21   Corcoran, Reed Enterprises vs. Clark, and this brand new

22   opinion out of the Ninth Circuit.

23       Sidelko said there's this phrase "uses the mail."

24   What does it mean?  I think it made a very telling argument.

25   It said, well, let's look at what it means.  The statute has

1     said since 1873 -- this is the original Comstock Act, Anthony

2     Comstock; it was passed in 1873 -- since that time it has

3     said:  whoever knowingly deposits in the mail is guilty of an

4     offense.  Whoever knowingly deposits.

5          All the prosecutions through history, sixty years,

6     always against people who deposit in the mail.  Never against

7     people who receive.  Not because of some constitutional

8     argument, but because that's what the statute said, that's

9     what it covered.

10          They have changed it in 1958.  The Court said "uses

11     the mails," that phrase is not self-evident to me what that

12     means.  Normally, I don't think, in common-sense parlance, you

13     think of somebody who received something in the mail as the

14     user of the mails, it's the sender.

15          But the Court said I'm going to figure out what they

16     meant, I'm going to look at the legislative history.  Your

17     Honor, I have the Senate report on that bill, and Your Honor

18     mentioned that you had looked at the Senate report on that

19     bill.  It is absolutely clear that there was only one intent

20     of Congress when they amended the statute:  to reverse the

21     decision of the United States vs. Ross.  It wasn't to prevent

22     the government from forum shopping, which Mr. Dixon said.  It

23     was to allow the Government to forum shop.

24          There's this case out there that ruled wrongly in the

25     Tenth Circuit, this Ross case, that deposit in the mails meant

1    you could only prosecute somebody where they placed it in the

2    mails, so all the pronographers went to Los Angeles or New

3    York -- that's the only place they could be prosecuted -- and

4    they couldn't get any convictions, even though they were

5    mailing to Iowa or Nebraska.  Congress said we didn't mean

6    that.  We meant you can prosecute them anywhere in the chain

7    where they sent it, so we'll use the phrase "using the mail."

8           There's a three-page discussion of this issue, three

9    full pages by the D.C. Circuit, and they said the only thing

10   Congress intended when they passed that statute was to expand

11   the venue provision of the act, no intent to expand the class

12   of offenders.

13          It's not a criminal offense, so no indictment was

14   dismissed.  It's a declaratory judgment act about the meaning

15   of the statute, and they interpreted the statute.  Exactly

16   what we're calling on Your Honor to do is what that case did.

17   That's what they had to do under the declaratory judgment act,

18   and they interpreted it to mean just what I said it meant,

19   that it only applies to depositors, but they could be

20   prosecuted in various other ways.

21          There is no contrary authority since 1967, I think is

22   the last case until this decision the Court found yesterday,

23   and let me turn to that now.  It's the Hurt decision out of

24   the Ninth Circuit, and if you'll indulge me a moment, I'd like

25   to find my copy of it.

1          THE COURT:  There is one other case that touched upon

2     the subject, and the name of it slips me, but I will furnish

3     it to counsel.

4          MS. OAKES:  Rubin.

5          THE COURT:  Are you familiar with the Rubin case?

6          MR. HOFFMAN:  No, I'm not, Your Honor.  Does Your

7     Honor know the date of it?

8          THE COURT:  1970.

9          MR. HOFFMAN:  No, I'm not familiar.  I may be, but if

10    I am, it didn't make an impression on me.

11         THE COURT:  312 Fed. Supp., but I forget the page

12    number, Central District of California.

13         MR. HOFFMAN:  I am familiar with it.

14         THE COURT:  It was the case in which, as I recall,

15    the Court focused upon who actually controlled the delivery.

16         MR. HOFFMAN:  Right.

17         THE COURT:  And pointed out that this person

18    apparently had ordered a shipment.  I guess it was late.  He

19    kept checking on it.  They told the shipping company to

20    disregard the instructions of the sender and so forth.  Was

21    that the case you're familiar with?

22         MR. HOFFMAN:  Yes, I'm familiar with that case.

23         THE COURT:  Are you familiar with that case?

24         MR. DIXON:  Yes, Your Honor, I remember.

25         MR. HOFFMAN:  Your Honor, let me turn to this most

1    recent Ninth Circuit case, because I assume it's the one that

2    troubled you yesterday, and I make no bones about the fact it

3    is on point.  It discusses the right issue.  I think it

4    resolves it wrongly and contrary to the law of this Circuit.

5    Let me deal for a moment, if I can, Your Honor, on why I think

6    this decision is wrong.

7         The first thing it says is we need not determine what

8    "uses the mails" means, because it is patently clear what

9    "uses the mail" means.  It means uses the mail.  So any

10   looking at the legislative history is wrong.  That's what it

11   says.  It criticizes Sidelko for trying to find out what

12   Congress meant.

13        That, to me, Your Honor, is -- I don't know if

14   nonsense is too strong -- but it is just a statement by them

15   that they don't want to deal with the issue.  It is not

16   patently clear what "uses the mail" means.  If it was clear,

17   this Circuit wouldn't have spent three pages figuring it out

18   in the D.C. Circuit case and the three-judge constitutional

19   court would not have said -- Your Honor, look at that opinion.

20   The three-judge constitutional court said the issue is

21   sufficiently serious that you are entitled to invoke the

22   special provision that forces us to have a three-judge

23   constitutional court to decide what the statute meant when

24   they amended it in 1958.

25        It is the law of this Circuit, Your Honor.  It has

1   just demolished the notion that the Ninth Circuit said last

2   week that it's so clear we don't need to look at the

3   legislative history.  We've already decided here, the law of

4   this District, that we do need to look at the legislative

5   history.  They don't cite either of the Reed Enterprises

6   cases.  I don't know why, they just don't.  It might not have

7   been convenient.  Maybe they didn't find them.  It's hard not

8   to find them -- in the annotation, they're one of the only

9   cases that deal with this particular issue, with the meaning

10   of that legislation -- but for some reason they don't cite the

11   D.C. Circuit cases.

12           Having done that, they then don't address the second

13   principal issue that  Sidelko dealt with, which is equally

14   serious.  They talk about maxims of legislative construction,

15   and I mentioned yesterday there is one equally important to

16   the one they're supposedly invoking here, which is you don't

17   interpret a statute to make one part, especially a criminal

18   statute, to make one part superfluous.

19           Look at what this statute says, 1461.  It has a

20   provision that used to say whoever deposits in the mail, and

21   then it lists the material, is punishable by, and then says

22   whoever takes from the mail if they have an intent to

23   distribute it to somebody else.  That's not a quote, but it's

24   pretty close.

25           Now, if this case is right, they have read that

1    section out of the statute, 'cause you don't need to have the

2    intent to distribute, 'cause merely by receiving you've

3    committed an offense under this case, 'cause they say you used

4    the mails; the phrase "used the mails" is so clear, we don't

5    need to interpret it.  They don't even mention that section of

6    the statute.

7         Sidelko's most powerful argument -- it's a short,

8    succinct opinion -- is that one, is that we can't interpret it

9    the way the government wants us to, because what happens to

10   the rest of the statute?  What do we think Congress was doing

11   when they said somebody who takes from the mails is only

12   guilty if they intend to give it to somebody else?  They must

13   have meant something when they did that.  They didn't write it

14   for no reason, and we believe what they meant is if you

15   deposit it that's an offense, complete in and of itself, but

16   on the other end, if you're on George Nader's end, you're only

17   guilty under this statute if you distribute it to somebody

18   else.

19        Now, Your Honor, one more time.  We are not saying

20   and we're not arguing, the issue is not before the Court,

21   whether they could have done it the other way.  The question

22   is what did they do.  And what they did is correctly

23   interpreted in Sidelko and those two D.C. cases.

24        Now, Your Honor said there's no case on point.  I

25   guess the only thing that would be -- well, Sidelko, I think

1    you would recognize, is precisely on point, as is this case on

2    point, and I argued --

3         THE COURT:  I think we were referring to the Supreme

4    Court cases.

5         MR. HOFFMAN:  Well, the Supreme Court has never

6    interpreted this statute on this question, that is true, and

7    Orito certainly doesn't even purport to do that.  It doesn't

8    even begin to discuss that issue.

9         But, absent Supreme Court precedents, the next best

10   thing for this Court is D.C. Circuit precedent, and the next

11   best thing after that would be a three-judge constitutional

12   court which, my understanding from law school is, has the

13   effect of Circuit precedent.  It's more than just a District

14   Court opinion.

15        I guess if the government wants the D.C. Circuit to

16   tell Judge Fahy, Judge Skelly Wright and Judge Leventhal that

17   they were wrong in 1957 when they decided that the only intent

18   of Congress in passing this amendment was to expand the venue

19   provisions, not the class of offenders, they can take it up,

20   but I don't think that's this Court's obligation right now to

21   say, because of a Ninth Circuit opinion, I think these judges

22   were wrong in interpreting this statute.  That's a pretty

23   impressive panel, Your Honor, and I think they've stated the

24   law.

25        The only thing I could get that would be any better,

1    if this was a case that dismissed an indictment.  It doesn't,

2    because it's declaratory judgment, not a criminal case, but

3    Sidelko did dismiss an indictment on exactly these facts.

4         There's no distinction between the cases, and it

5    doesn't pay to argue there is, just like it doesn't pay for me

6    to pretend I can distinguish Hurt.  I can't.  I have to take

7    it on its face, as Mr. Dixon has to take these cases on their

8    face, and deal with them, not try and avoid them.  The way I

9    deal with Hurt is by telling Your Honor, in all honesty, I

10   think it's wrong, I think it's contrary to our precedent.

11   That's all on 1461, Your Honor.

12        THE COURT:  What about 1462?  Would you address Mr.

13   Dixon's argument on the language in the first paragraph.

14        MR. HOFFMAN:  Yes, Your Honor.  We did in our

15   memorandum, and Mr. Dixon, who got our memorandum, made no

16   reference to it.  The reason that doesn't apply is because,

17   again, the legislative history is clear that this statute

18   doesn't apply to the mails.  The other one does.

19        THE COURT:  Well, Mr. Dixon argues that it reads

20   "whoever brings into the United States" --

21        MR. HOFFMAN:  It does read that.

22        THE COURT:  -- "or any place subject to the

23   jurisdiction or knowingly uses an express company or common

24   carrier."  So his argument, I gather, is not that it was

25   brought in by a common carrier or express company; that it was

1   brought in, period.

2          MR. HOFFMAN:  That's correct.  I know that's his

3   argument.  He's refined that from yesterday, and I think

4   that's true.  Common carrier has nothing to do with that case,

5   and I appreciate that clarification by him.

6          But what our memorandum points out, I think goes

7   clearly down the legislative history, is this was a statute

8   that was designed to fill in a gap left by the mailing

9   statute.  See, Hurt is very instructive, Your Honor.  Hurt is

10  a case in which the mail was sent from Sweden into the United

11  States.  They prosecuted the man under 1461.  That's the right

12  statute to prosecute under, if you can, because it's use of

13  the mails.  1462 has nothing to do with use of the mails.

14  It's use of other means of bringing things into the United

15  States.

16         Mr. Dixon is right.  If somebody walked across the

17  border from Mexico to the United States or from Canada to the

18  United States with obscenity, you prosecute him under 1462,

19  because he brought it into the United States personally.  If

20  you use an express company or common carrier to bring

21  something into the United States, you prosecute him under

22  1462.  If you use the mails to bring it into the United

23  States, you prosecute him under 1461.

24         And when they passed 1461, they said we have a

25  certain set of people we're after, and Mr. Nader is not one of

1    them.  You can't make him one of them by trying to use a

2    different statute.

3          There isn't a single case in the annotations of

4    1462 -- and Hurt is the latest one -- that uses it for mails.

5    It does not have anything to do with the mails.  It fills

6    in -- and we pointed out the legislative history in our

7    memorandum -- it fills in a gap.

8          Prior to 1905, the only regulation of transporting of

9    obscenity was through use of the mails.  Congress said that's

10   a mistake.  We have to close the other areas.  We're going to

11   close it for bringing it into the United States -- if somebody

12   carries it across, that's the first phrase -- and we're going

13   to close it for using an express company or common carrier;

14   that's the second phrase.

15         They didn't enact a statute to duplicate one that

16   already existed.  A person who sends into the United States by

17   mail is the sender.  The depositor can be prosecuted under

18   1461.  If it's a U.S. company that does the sending through an

19   overseas outlet, if it's an overseas person we can get

20   jurisdiction over, you can prosecute them.

21         As I said yesterday, I don't know what the

22   extradition treaties are, but if there's a company called

23   Ralph Zonatz or COQ, who we've got evidence ships things in

24   here, they can indict them, and if they have an  extradition

25   treaty, they can prosecute them.  I believe in some of the

1    Scandinavian countries, it's now an offense.  If they want to

2    undertake that prosecution, they can.

3         I don't think they can do what they're doing with Mr.

4    Nader -- the mailing statute doesn't cover his conduct -- use

5    something that that has nothing to do with the mails and

6    whipsaw him into that statute.

7         Mr. Dixon tries to avoid Farrar on the aiding and

8    abetting theory.  He did so by pointing to the correct phrase.

9    Aiding and abetting in 1461 is superfluous, because 1461 in

10   the text of the statute says whoever causes to be mailed.  It

11   says that already.

12        That's what came to the court in Sidelko, and Sidelko

13   said that was not intended to apply to somebody who ordered,

14   for the same reasons I've already gone over, and I don't want

15   to take too much time.  That would mean that the person who

16   takes from the mails with intent to distribute, that would

17   read that language out of the statute.

18        What Congress meant when it said "causes to be

19   mailed" was we don't want a depositor who runs a business of

20   shipping pornography to hand everything to a shipping clerk,

21   the shipping clerk puts it in a mailbox, and he argues I

22   didn't physically mail it, I'm not guilty.  So they said

23   "whoever causes to be mailed."

24        Anybody on the sending side can be prosecuted under

25   this statute.  Anybody on the sending side.  It's not just

1    "causes to be mailed," it's "causes to be mailed according to

2    directions thereon."  I don't know how much you can read into

3    the phrase, but you can certainly logically infer from that

4    what they're talking about is somebody on the sender's side.

5    The people they're after say label it this way and somebody

6    else mails it; those are the people who can be prosecuted on

7    the statute.  Outside of that, Farrar governs.

8         Because there's a principle behind Farrar.  We have

9    cited the general proposition.  The Model Penal Code and

10   LaFave and Scott state the general proposition.  The general

11   proposition is when there is a crime that necessarily involves

12   two people like mailing -- it's always two people, one who

13   sends and one who receives; just like sale, always two people:

14   you can't have a sale without a purchaser and a seller --

15   they said when Congress has passed a criminal statute in such

16   a case and only penalized one side, it's illegal to sell

17   liquor, said nothing about the purchaser, we won't allow a

18   general aiding and abetting theory to bring that person in,

19   because it's too likely the Congressional intent was just to

20   punish the one side of the transaction.

21        There are a number of other cases involving that same

22   kind of thing.  That's the principle.  If you went to the

23   aiding and abetting statute, I think it's unnecessary here,

24   because we have a primary statute that has the language in

25   there to be interpreted itself.  So I don't think aiding and

1    abetting adds anything to the 1461 charge.

2         Your Honor, in conclusion, the one thing I wanted to

3    make sure happens here is that we decide the case for the

4    right reasons.  I wanted to make sure we don't get off on this

5    constitutional argument which Mr. Dixon, with respect, is

6    throwing up as a huge smoke screen.

7         We have to decide what the statute prohibits, what

8    Congress intended to prohibit by a piece of legislation.  Not

9    what they could have done, what they might have done, what

10   they constitutionally are allowed to do.  Just what they did.

11        And what they did, I think case law -- these cases

12   we've talked about -- are much more persuasive, that argue

13   that what they did was they made it a crime to distribute this

14   material we don't like.

15        I don't know why they didn't make it a crime to

16   receive it, but that's not Your Honor's task here and that's

17   not my job.  I think somebody decided they made a mistake in

18   1984, at least with respect to child pornography, and you know

19   the statute now makes it an offense to receive it.  Mr. Dixon

20   said yesterday that that statute does lots of things, that it

21   really doesn't amend this statute, and it's not inconsistent,

22   but they address this exact question, and they show that if

23   they want to make it a crime to receive, they can do it, which

24   is what Sidelko says.

25        If Congress wanted to do it, they could have done it

1   real easily, and here's what they wrote in this statute, 18

2   U.S.C. section 2251.  The Child Protection Act of 1982

3   specifically provides criminal penalties for any person who,

4   quote, "knowingly receives material," unquote, depicting

5   minors engaged in sexually explicit conduct.

6        If Mr. Nader was indicted a year from now, we would

7   have a serious problem.  We would not be up here arguing this

8   motion.  We wouldn't be able to argue this motion, because

9   Congress said whoever knowingly receives it, but they said it

10  after this man was indicted.  They said it after the acts in

11  this case took place, and obviously it would be an ex post

12  facto problem to apply that law to him, and for that reason I

13  assume the government is not even attempting to do that.

14       That amendment is very illustrative, Your Honor.

15  It's not dispositive, but it's illustrative.  It shows what

16  Congress can do when they want to, when they know how to do,

17  and I think it's for that reason that Sidelko and the two Reed

18  cases in this Circuit are right.  They didn't do what Mr.

19  Dixon wants them to have done in this case.

20       The government right now, Your Honor, is on a crusade

21  against pornography.  Your Honor knows that from the Attorney

22  General's Commission report and your own cases dealing with

23  that.  I was shocked to see this case out of the Ninth

24  Circuit, because in twenty-some years since Sidelko, there

25  hasn't been another one I'm familiar with, except that case

1    which is different, it doesn't go after somebody who ordered

2    the material.  But they've decided to prosecute these cases

3    now, and they've made a policy judgment.  What they're trying

4    to do is stretch a statute beyond its proper limits.

5            Their remedy now, Your Honor, is to go and have them

6    amend 1461 if they want to, and that is something they can do,

7    and then they can address the policy concerns that Your Honor

8    has expressed, that everybody shares here, but you can't do it

9    by prosecuting somebody under a statute that didn't apply when

10   it was passed.  Thank you.

11           THE COURT:  Mr. Dixon, anything else you wish to

12   argue?

13           MR. DIXON:  No, Your Honor, I think our position is

14   clear, that, obviously, the statute, in our view, applies to

15   Mr. Nader's conduct, 1461 and 1462.

16           THE COURT:  All right.

17           With respect to 1462, so I know exactly what the

18   government is saying, and what they intend to offer, it isn't

19   that this came to the United States by way of a common carrier

20   or by express?

21           MR. DIXON:  No, sir.  The indictment doesn't charge

22   that.

23           THE COURT:  Because those are not the facts.

24           MR. DIXON:  No, sir.  Let me just say this.  We are

25   not charging him with that, but we can show factually that

1    that is the only reasonable circumstances by which they came

2    to the border of the United States.  Once they arrived in the

3    United States, then the mails were used.

4           But putting that aside for a moment, we charge, so

5    Mr. Nader can defend against and Mr. Nader through discovery

6    and other means, either through common sense or talking to us

7    otherwise knows -- I mean common sense tells you, you just

8    can't -- there are only two ways to get mail from Holland or

9    Denmark or any other foreign country to the United States, and

10   that's by air and by sea.

11          THE COURT:  By what?

12          MR. DIXON:  By air and by sea.  The airmail goes into

13   Kennedy, the shipping comes into New Jersey.

14          But putting that aside for a moment, the indictment

15   charges Mr. Nader with bringing it in.  We do not charge him

16   with using a common carrier to bring it in.  There's a factual

17   basis for it, but we did not charge him with that.  We charged

18   him, in my view, with the broadest -- the shotgun approach to

19   1462, because that first phrase in 1462 covers everything.  It

20   covers mail, it covers walking across, it covers everything.

21          THE COURT:  They didn't need the language referring

22   to common carriers and express companies?

23          MR. DIXON:  Not in my view, no, sir.  Now, if Mr.

24   Nader later on, in trying to defend himself, says "Wait a

25   minute, government, wait a minute.  This is too broad.  Be

1    more specific.  What's your bill of particulars?  How are you

2    claiming I allegedly violated the statute?"  "Well, you did so

3    by A, B and C."

4          But Mr. Nader never took that tack, because 1461

5    talks about the mails.  Just because we charged 1461 does not

6    necessarily mean we can't charge 1462 if there's a mailing,

7    but -- but, but, but -- if we're talking about, say,

8    stretching the imagination, someone on a private boat bringing

9    the material from England, say, to the United States, the

10   mails don't apply, 1461 does not apply.  1462, if the first

11   part -- I'm sorry, 1462, common carrier, doesn't apply, but

12   the first phrase of 1462 does, just by merely bringing it into

13   the United States.

14         THE COURT:  Mr. Nader did not do that.

15         MR. DIXON:  No, sir.  No, sir, he did not do that, he

16   did not use -- he did not physically bring it in himself, all

17   right, and that's --

18         THE COURT:  He didn't bring it in by common carrier.

19         MR. DIXON:  No, sir.  No, sir.  It came in by common

20   carrier.

21         THE COURT:  It came in by mail.

22         MR. DIXON:  In order to for it to be transported from

23   New Jersey to Washington, D.C., the mails come into play, but

24   we don't have the mails in play going from Holland to the

25   United States.  We're talking about a common carrier.

1          THE COURT:  You don't have U.S. mails, you have

2   mails.

3          MR. DIXON:  We have carriers that carry it, that

4   contract with the United States Postal Service to carry mail.

5   That's what we have.

6          THE COURT:  But that's the mail.

7          MR. DIXON:  Well, if we're talking about --

8          THE COURT:  There are cases under the private express

9   statutes, as you know, that deal with this issue.

10          MR. DIXON:  We're talking about domestic mail and

11   international mail.  I would agree they, indeed, are the mail,

12   because the restrictions are different, as far as searching,

13   and that's been gone over, as far as searching those pieces of

14   mail.  Mail that comes from other countries can be searched

15   almost with impunity, while, of course, there's another issue

16   for domestic mail.

17          But to answer the Court's question, we rely, as the

18   indictment charges, on the language in the first phrase of

19   1462.

20          THE COURT:  So what you're really doing is reading

21   1462 to include mails.

22          MR. DIXON:  Yes, sir.

23          THE COURT:  And that's how it came --

24          MR. DIXON:  Yes, sir, to include mails, but not

25   exclude mails.  1462 includes, but does not exclude, the mail.

1          THE COURT:  And, therefore, when you rely on the

2   phrase "whoever brings into the United States," that's what

3   you're referring to?

4          MR. DIXON:  Yes, sir.

5          THE COURT:  Because -- and I just want to make sure

6   our record is clear.

7          MR. DIXON:  Yes, indeed.  Yes, indeed.

8          THE COURT:  We're not saying that Mr. Nader brought

9   it in personally.

10          MR. DIXON:  No, we're not saying --

11          THE COURT:  He didn't bring it by common carrier or

12   express.

13          MR. DIXON:  We are not saying that Mr. Nader -- the

14   facts do not support the theory that Mr. Nader brought it in

15   personally.  The facts support the theory that Mr. Nader

16   started a chain of causation that ultimately brought --

17          THE COURT:  And this stuff was mailed --

18          MR. DIXON:  Yes.

19          THE COURT:  -- from Zonatz in Holland.

20          MR. DIXON:  In Holland to Mr. Nader here in the

21   United States.

22          THE COURT:  Anything else from you, Mr. Hoffman?

23          MR. HOFFMAN:  I --

24          THE COURT:  I think you've exhausted it.

25          MR. HOFFMAN:  As long as the last statement by Mr.

1   Dixon is the concession the Court was trying to ring out of

2   him, rather than everything in between, then I have nothing

3   else to say.

4          THE COURT:  All right.

5          Gentlemen, I am going to recess, because something

6   else, which may have some impact, has been brought to my

7   attention, and I want to have -- I haven't had a chance to

8   look at that, and I do want to look at that before I rule.

9   But I -- well, before I say anything, I better look at what

10  else has been found.

11         So we'll stand in recess, and I think we'll just take

12  our luncheon recess.  We'll stand in recess until 1:45.  The

13  jurors may be excused for that period of time.

14         MR. POVICH:  Your Honor, could I ask if what Your

15  Honor has under consideration is an opinion or a case?

16         THE COURT:  No, I think it's the legislative history

17  of the 1984 act.

18         MR. HOFFMAN:  Oh, okay.

19         THE COURT:  And there may be something in it that I

20  would want to read.

21         Counsel, if you'll let us know where you can be

22  reached, if we see something that we think is particularly

23  significant, I will let you know.

24         MR. POVICH:  I'm sorry, I didn't hear exactly when

25  you asked us to return here?

1          THE COURT:  1:45.

2          MR. HOFFMAN:  I suspect we'll be here.

3          MR. POVICH:  We'll be here, Your Honor.

4          MR. HOFFMAN:  We'll just be here waiting for Your

5   Honor.

6          MR. DIXON:  As will the government, Your Honor.

7          (At 12:35 p.m., a luncheon recess was taken.)

8                    AFTERNOON SESSION

9                      (1:55 p.m.)

10          THE COURT:  Counsel, the final matter under

11   consideration by the Court was the question of whether Mr.

12   Nader is a person who can be charged under 18 U.S.C. 1461 and

13   18 U.S.C. 1462.

14          I would note, first, that this is a matter, of

15   course, that came to the attention of the Court quite

16   recently, and we haven't had an awful lot of time to consider

17   all of the ramifications of the statute, but we have made

18   every effort to review those cases that are applicable here,

19   we've made every attempt to review the legislative history

20   that was available to us, and, of course, the facts in this

21   case.

22          Yesterday, although this Court had some concerns

23   about the matter raised in papers filed by the defendant,

24   concerns over whether or not this case could go forward, I

25   thought it best, since we had a jury panel available, that we

1   begin to select the jury and begin that process.  As you know,

2   we heard arguments yesterday on these issues, and we went

3   forward to begin the selection process.  That gave us the

4   evening to consider some matters.  Then, of course, this

5   morning we heard further arguments.

6         First, I would start with the proposition that this

7   is a case which is not brought under the child pornography

8   statute of 1984.  As I understand, the reason it was not

9   brought under those statutes is because the events which

10   occurred in this case occurred prior to the effective date of

11   that legislation.

12         If the case had been brought under those statutes, it

13   would appear that there would be no issue and the case could

14   go forward.  I say if it was brought under those statutes,

15   because I'm not ruling on that issue, of course --  I'm not

16   saying that there may not be issues that would be raised under

17   those statutes as well -- but because we really don't have to

18   consider those matters here.

19         Now, the first statute that Mr. Nader is charged

20   against is 1461.  We've had sufficient discussion about 1461,

21   and I do not intend at this point to set down in detail my

22   ruling, because it will be my intention to, within a week,

23   issue a formal written ruling, so that that would be made

24   available to counsel for whatever purpose they wish to make of

25   it.

1          The Court would also note, before announcing its

2     ruling, that, of course, we are all concerned about materials

3     of the nature seized in this case.  This Court has had an

4     opportunity to review the material that was seized in the

5     controlled package, and I can well understand how the grand

6     jury would have no difficulty in classifying that material as

7     pornography or child pornography.  Counsel themselves have

8     conceded that at least some of the material is obscene.  Not

9     all of the material, as I see it, is obscene, but it all does,

10    apparently, relate to a particular area involving young

11    children, in most cases, young boys, but in a few cases, young

12    girls.

13          And of course we can well understand the desire of

14    the government to prosecute any cases involving child

15    pornography in any way they can, because it is not just the

16    person, I suppose, who transmits that material in the mail, it

17    is the person who may receive it or use it, because those

18    persons create a market for this type of material.

19          The great concern is we're not dealing here with

20    adults, we're dealing with children, and there may be cases

21    where children do not voluntarily enter into these

22    arrangements for this type of posing, and even if they do,

23    quote, "voluntarily," end of quote, enter into these

24    arrangements, they are children who probably do not realize

25    the consequences of what they're doing, and certainly, they

1    should be protected.

2         So I must start off first by saying that I can fully

3    understand the government's attempts to prosecute cases where

4    child pornography is involved.  But, of course, it's not the

5    intention that we have to look at in this situation.  It comes

6    down to whether or not the prosecution can properly go forward

7    under the statutes involved.

8         Now, with respect to 18 U.S.C. section 1461, of

9    course, two cases have been brought to our attention.  There

10   were other cases that discuss that statute, but the two

11   primary cases, as I see it, are the case of United States vs.

12   Hurt, H-U-R-T, which was decided by the Ninth Circuit Court of

13   Appeals on July 25, 1986, Friday, this past Friday, and in

14   that case, the Court of Appeals addressed the very issue that

15   is before us in this Court, and held that the person who

16   receives the matter, the obscene matter, can be prosecuted.

17        The other case is United States vs. Sidelko, which is

18   reported at 248 Fed. Supp. 813, a 1965 opinion, which our

19   research indicates was not appealed, and in that case, the

20   United States District Court judge, Judge Nealon, whom I have

21   appeared before in the past, ruled that 1461, section 1461,

22   would not apply to a situation like that we have before us.

23        Judge Nealon, N-E-A-L-O-N, in considering that

24   matter, went back and looked at the legislative history of the

25   statute, and based upon that, he concluded, and I quote, at

1    page 815, quote:   "There is nothing in the amendment or its

2        legislative history" -- he was referring there, of course,

3        to the 1958 amendment -- "to indicate that Congress

4        intended to expand the class of offenders to those

5        recipients who order and receive nonmailable materials

6        through the mails for purely private consumption," end of

7    quote.

8            The Court of Appeals for the Ninth Circuit considered

9    that opinion and disagreed with it, because the Court found

10   that it was unnecessary for the District Court in the Middle

11   District of Pennsylvania to look at the legislative history.

12   The Court found that the statute, as written, was plain on its

13   face.

14           Now, as I said before to counsel, I am only trying to

15   give you a brief indication of the reasons for the actions I'm

16   taking today.  I will write an opinion, and I do not intend to

17   set forth my reasons in detail here, but after reviewing the

18   decision in Hurt and the decision in Sidelko, I find that, in

19   my opinion, the decision by the United States District Court

20   for the Middle District of Pennsylvania is well reasoned and

21   should be followed by this Court.  That being the case with

22   respect to that, the Court would find that 18 U.S.C. section

23   1461 would not be a statute under which Mr. Nader can be

24   charged.

25           Now, of course, that doesn't end the issue, because

1    the government also argues that Mr. Nader can be also charged

2    as an aider and an abettor, but I, having read the case of

3    United States vs. Farrar, I must also conclude that Mr. Nader

4    is in the position of a purchaser here, and therefore, if

5    Congress had intended to include the receiver of this type of

6    material under the statute, that they would have done so.

7    They have not done so.

8            I would also note that the Sidelko case was decided

9    in 1965.  Congress has certainly had an opportunity since 1965

10   to consider that legislation or that case, rather, and to

11   enact legislation to correct any void that they found in the

12   statute.  They have not done so, and I can only conclude that

13   they have not done so because they did not intend to.

14           So the Court concludes, very briefly, gentlemen, that

15   with respect to the charges filed under 18 U.S.C. 1461, 18

16   U.S.C. section 2, aiding and abetting, that charge against Mr.

17   Nader must be dismissed.

18           That still leaves the other charge made against Mr.

19   Nader under 18 U.S.C. 1462.  The government has conceded, and

20   I think the record is clear, that in this particular case the

21   material was not transported into this country by way of a

22   common carrier, and it was not walked across the border or

23   driven across the border in some way by Mr. Nader.  It was

24   sent through the mails.  It was sent through the mails of the

25   originating country, Holland, and it was sent through the

59

1    United States mails, where this material was intercepted.

2            Since that time, since the time of the passage of the

3    statute, I would note that Congress has given consideration to

4    other statutes to close gaps which may exist because 1461 and

5    1462 do not cover every situation.  One such statute for

6    example was 1465, and that was used to close what Congress

7    felt was a gap in the statute, which would not allow the

8    prosecution of certain persons dealing with obscene materials,

9    and, indeed, I think that the 1984 act found in 18 U.S.C. 2251

10   to 2255 is just an attempt to close that gap, especially where

11   it relates to pornographic materials relating to children.

12           Now, again, looking at 1462, as the Court has, and

13   looking at the authorities cited by the parties, the Court

14   will also announce its intention to rule that Mr. Nader cannot

15   be prosecuted under 1462 and that that charge must also be

16   dismissed.

17           Again, I can appreciate the desire and the intent of

18   the government in attempting to prosecute these cases, a case

19   like this.  There's no question in this Court's mind, as I

20   think I indicated in a memorandum order, a memorandum opinion

21   filed with respect to the motion to suppress, as counsel have

22   conceded, that the material is obscene, but we are bound by

23   what the statute tells us, we are bound by what the statute

24   states, and Mr. Nader can only be prosecuted under those

25   statutes.

1          Now, the Court could have allowed this matter to go

2    to trial, impanel a jury, and present this case to a jury, and

3    then, of course, the first question would be the matter of

4    instructions.  I certainly could not in good conscience, in

5    good faith, allow the government to go forward without at

6    least putting the government on notice of the Court's

7    concerns, and if the case had gone forward, I had been asked

8    to give certain instructions, and indeed, if I had adopted

9    what the Court has found today, I suppose at the conclusion of

10   the government's case, the Court would be in a position of,

11   perhaps, directing a verdict or possibly letting the case go

12   forward and then directing a verdict.

13          I don't think that would be fair to the government,

14   and I don't think that would be fair to the people concerned

15   with these matters.  At least by ruling on these matters

16   pretrial and before the jury has been selected and before

17   jeopardy has attached, it at least gives the government an

18   opportunity to appeal the Court's ruling, if the government

19   feels it can do so, and if the government feels it wishes to

20   do so.

21          So, gentlemen, I will enter an order within a few

22   days.  I'm not entering the order today.  I'm announcing my

23   intention to enter an order, because I think the government

24   should have an opportunity to read what I write before they

25   decide whether to appeal.  But I will enter an order within a

few days, together with a memorandum opinion setting forth the

reasons why the Court is dismissing the charges against Mr.

Nader.

Do counsel have any questions?

MR. DIXON:  Your Honor, I'm just trying to make sure

for any subsequent purposes that the record reflects all that

it should.

The Court, of course, is making no finding -- well,

the Court has made a finding on obscenity.

THE COURT:  Well, I don't think there's any issue on

that.  Even the defendant has conceded that the material is

obscene, and I think I also made that finding in the

memorandum opinion.

MR. DIXON:  Now, one sticky point, Your Honor.  If

the government is to appeal, as far as that factual record --

I think the factual record in this case, the Court has gleaned

from prior hearings and submissions of parties -- but the

record of the facts as to how this relates to 1461, the

mailings in 1462, have been received by the Court through

representations of both counsel.  I don't think that that

would create a problem as far as the factual basis, but the

Court can make the factual findings and reach conclusions of

law based upon what it has before it.

THE COURT:  Again, I stress that I do intend to put

it in writing.

1          MR. DIXON:  Yes.

2          THE COURT:  And, obviously, I'm just touching --

3          MR. DIXON:  Yes.  Aside from that, Your Honor, we

4   think that the record at this point is in a state that, if

5   there is an appeal, that both parties would be in a good

6   position to advocate their respective positions.

7          THE COURT:  Well, if the government -- you know, I

8   would -- I'm neutral in the matter, of course, but it is a

9   matter of concern, I'm sure, to the government.

10         MR. DIXON:  Yes, Your Honor, it is.

11         THE COURT:  And I would say to the government that I

12   certainly invite you to file an appeal, because maybe the

13   matter should be clarified by the Court of Appeals.

14         One of the things the Court did take into

15   consideration with respect to 1461 is the fact that our Court

16   of Appeals has in a way addressed that issue, and I think that

17   the conclusion that our Court of Appeals reached and our

18   three-judge court reached is different than the conclusion

19   reached by the Ninth Circuit, and that's another factor that I

20   found persuasive, as well as certain matters in the

21   legislative history that I will make an attempt to set out

22   when I file something in writing.

23         MR. DIXON:  Well, Your Honor, I don't think that

24   anyone can quarrel with the procedural result, as to how this

25   case reached the point where it is today procedurally, but of

1    course, the government has its view of the law and that's

2    quite different than the Court's.

3            THE COURT:  And I encourage it to appeal.

4            MR. DIXON:  Yes, Your Honor.  I understand, Your

5    Honor.

6            THE COURT:  All right, is there anything else?

7            MR. HOFFMAN:  Your Honor, one brief matter.  I wanted

8    to alert the Court to something that we intend to submit.  We

9    would request, since there has been no trial and, obviously,

10   Mr. Nader has not been found guilty, the Court issue a

11   published opinion in the name of a John Doe defendant and the

12   Court of Appeals take this case in the name of a John Doe

13   defendant.  In support of that, we will submit something,

14   address it to the Court's discretion to do that, but prior to

15   something being published, I want to alert the Court that we

16   intend to make such a submission.

17           THE COURT:  Of course you should keep in mind that

18   there's already something published.

19           MR. HOFFMAN:  I know that, Your Honor, but the

20   something that is published is not going to be going to the

21   Court of Appeals.

22           THE COURT:  Is not going to be what?

23           MR. HOFFMAN:  Going to the Court of Appeals on an

24   appellate issue, at least not in this posture, and if we had

25   been aware of the Court's desire to publish that opinion, we

1  would have said the same thing, but it slipped us by and it

2  became too late, but in this situation -- I just wanted to

3  alert the Court that we will do it.

4         THE COURT:  You haven't done it yet.  You may do it.

5         MR. HOFFMAN:  Yes.  We intend to look at it, and I

6  just didn't want anything to come out and be sent to West

7  Publishing Company before we had our opportunity.

8         THE COURT:  I'm sure that we'll hear from Mr. Dixon

9  on that issue.

10         Counsel have anything else?

11         MR. DIXON:  No, sir, Your Honor, not from the United

12  States.

13         MR. POVICH:  No, Your Honor.  Thank you.

14         MR. HOFFMAN:  Thank you, Your Honor.

15         (At 2:25 p.m., the hearing on the matter was

16  concluded.)

17

18                        -oOo-

19

20              CERTIFICATE OF REPORTER

21         I hereby certify that the foregoing is the official
   transcript of proceedings in the hereinbefore-captioned
22  matter, and that it is complete and accurate to the best of my
   knowledge and ability.

23

24         _____
           HARRY DEUTSCH
25         Official Court Reporter